IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
             Plaintiff             )
                                   )
        -VS-                       ) No. 97-MJ-00217-JCB
                                   ) Pages 2-1 - 2-113
CATHERINE GREIG,                   )
                                   )
             Defendant             )


DETENTION HEARING - DAY TWO


BEFORE THE HONORABLE JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE


A P P E A R A N C E S :

    JACK W. PIROZZOLO, ESQ. and JAMES D. HERBERT, ESQ.,
Assistant United States Attorneys, Office of the United States
Attorney, 1 Courthouse Way, Boston, Massachusetts, 02210,
for the Plaintiff.

    KEVIN J. REDDINGTON, ESQ. and PATRICK H. REDDINGTON, ESQ.,
Law Offices of Kevin J. Reddington, 1342 Belmont Street,
Suite 203, Brockton, Massachusetts, 02301, for the Defendant.

ALSO PRESENT:  Brian T. Kelly, Esq.,
               Assistant United States Attorney.


                    United States District Court
                    1 Courthouse Way, Courtroom 17
                    Boston, Massachusetts
                    July 13, 2011, 10:40 a.m.


            LEE A. MARZILLI
         OFFICIAL COURT REPORTER
       United States District Court
      1 Courthouse Way, Room 7200
          Boston, MA  02210
            (617)345-6787

1                          I N D E X

2    WITNESS                 DIRECT   CROSS   REDIRECT   RECROSS

3    MICHAEL CARAZZA

4         By Mr. Herbert:      2-4
          By Mr. Reddington:            2-24
5         By Mr. Herbert:                        2-62

6    KEVIN J. WEEKS

7         By Mr. Reddington:   2-66
          By Mr. Pirozzolo:             2-75
8

9

10
     EXHIBITS                 RECEIVED IN EVIDENCE
11
     27                       2-9
12   28 (Sealed)              2-11
     29                       2-12
13   30                       2-15
     31                       2-17
14   32                       2-18
     33                       2-19
15   34                       2-20
     35                       2-20
16   37                       2-21

17

     VICTIM STATEMENTS        PAGE
18
     By Timothy Connors:      2-86
19
     By Stephen Davis:        2-88
20
     By Christopher McIntyre: 2-89
21
     By Thomas Donahue:       2-89
22

23   CLOSING ARGUMENTS

24   By Mr. Herbert:          2-91

25   By Mr. Pirozzolo:        2-103

0292fb1f-331f-4107-a31f-5233d752e689

1               P R O C E E D I N G S

2          THE CLERK:  Today's date is July 13, 2011.  We're on

3     the record in the matter of United States v. Catherine Greig,

4     Criminal Action No. 97-217.  Counsel please identify themselves

5     for the record.

6          MR. PIROZZOLO:  Good afternoon, your Honor.  Jack

7     Pirozzolo and Jamie Herbert for the United States.

8          MR. REDDINGTON:  Good afternoon, your Honor.  Kevin

9     Reddington.  With me is Patrick Reddington, and I represent the

10    defendant, who is before the Court.

11         THE COURT:  Good morning, everyone.  We were in the

12    middle of the government's case when we broke.  Special

13    Agent Carazza is here and ready to take the stand?

14         MR. HERBERT:  He is, your Honor.

15         MR. PIROZZOLO:  Your Honor, there's one scheduling

16    matter I would like to address before he comes in.  I

17    understand Kevin Weeks has been scheduled here to testify, and

18    we request just a five-minute break after the conclusion of

19    Mr. Carazza's testimony, in between Mr. Carazza's testimony,

20    and, if he were to testify, Kevin Weeks's testimony.

21         THE COURT:  Yes, we will deal with that at the

22    conclusion of Special Agent Carazza's testimony.

23         MR. PIROZZOLO:  Thank you.

24         MR. HERBERT:  Thank you, your Honor.  Michael Carazza.

25

1              MICHAEL CARAZZA

2    having been first duly sworn, was examined and testified as

3    follows:

4              THE CLERK:  State your name and spell your last name

5    for the record.

6              THE WITNESS:  Michael Carazza, C-a-r-a-z-z-a.

7         MR. HERBERT:  May I proceed, your Honor?

8         THE COURT:  Yes.

9    CONTINUED DIRECT EXAMINATION BY MR. HERBERT:

10   Q.   Good morning, Mr. Carazza.

11   A.   Good morning.

12   Q.   When we broke last time, the last time you were here, you

13   were asked some questions about the apartment where Mr. Bulger

14   and Defendant Catherine Greig were living in Santa Monica.  Do

15   you recall that?

16   A.   Yes, I do.

17   Q.   Now, I take it you've not personally seen that apartment;

18   is that correct?

19   A.   I have not.

20   Q.   Have you had the layout and the size of the apartment

21   described to you by agents who have seen it?

22   A.   Yes.

23   Q.   Could you tell us what you learned about the size and the

24   layout.

25   A.   Sure.  It was a two-bedroom apartment, two bathrooms, with

Page 5

1    a living room and a fireplace in between the living room and

2    the dining room.

3    Q.    And roughly how big a -- it was a two-bedroom and two-

4    bathroom apartment.  Was it small, medium, large?

5    A.    On the smaller size.  The bedrooms were maybe ten-by-ten,

6    ten-by-twelve.

7    Q.    Now, you also testified about some cash, a large amount of

8    cash that was found during the search of that apartment after

9    the arrest?

10   A.    Yes.

11   Q.    Can you tell us where in that apartment specifically the

12   large amount of cash was found.

13   A.    Sure.  It's been explained to me that the majority of the

14   cash was found in the common area, in a hole in the wall in a

15   hallway that connects the kitchen to the living room.

16   Q.    So the hole in the wall, was anything covering up the hole

17   in the wall?

18   A.    A mirror or a picture.

19   Q.    So it was in a hole in the wall behind the mirror or

20   picture in a hallway that led from living room to kitchen?

21   A.    Yes.

22   Q.    Now, you began your testimony -- I just want to go back

23   and clear up what might have been garbled as to dates at the

24   beginning.  You recall testifying about what you learned about

25   when Mr. Bulger first fled the Boston area?

1   A.   I do.

2   Q.   And do you recall what you learned about what date that

3   was?

4   A.   Approximately December 23 of 1994.

5   Q.   And I also asked you about a trip to New Orleans that

6   Mr. Bulger and Ms. Stanley took.  Do you recall the dates that

7   they were in New Orleans?

8   A.   I believe they checked in on December 26 of 1994 and

9   checked out on January 2 of 1995.

10  Q.   All right.  And you testified about Mr. Bulger accessing a

11  safe deposit box in Clearwater, Florida, on January 3, and that

12  was 1995?

13  A.   Yes.

14  Q.   All right, I just wanted to clear up one thing with

15  respect to Exhibit 13, if you could turn to that.  I think I

16  asked you if Exhibit 13 was a collection of identification

17  documents using Identities A and B.  And is it actually more

18  correct to say it's Identities A and B, but they're not the

19  only identities listed on this exhibit?

20       (Witness examining document.)

21  Q.   In other words, if you look at the bottom of the first

22  page of Exhibit A, are those two AARP cards in the actual name

23  that Mr. Bulger was living in in California?

24  A.   Yes.

25  Q.   Okay, Charles Gasko, G-a-s-k-o?

1  A.   Yes.

2  Q.   The other identities above that are in a different name,

3  correct?

4  A.   They are.  I believe they're all Identity A.

5  Q.   Now, sir, have you received any information from anyone in

6  the FBI who's done a check of the California Registry of Motor

7  Vehicles to determine whether or not Catherine Greig had a

8  valid driver's license in California?

9  A.   I have.

10  Q.   And what was the result of that check?

11  A.   They were unable to locate a valid driver's license in

12  either Catherine Greig's true name or in any of the alias

13  identities which we uncovered in the apartment.

14  Q.   All right, now, one other point just to go back to the

15  last time you were here.  You recall I was asking you some

16  questions about a trip in which Kevin Weeks drove to Chicago to

17  meet Mr. Bulger?  Do you recall that?

18  A.   Yes.

19  Q.   And do you recall testifying that Mr. Bulger asked

20  Mr. Weeks to take his photograph for the purposes of making

21  fake IDs?

22  A.   I do.

23  Q.   And that Mr. Weeks had purchased a bedsheet to use as a

24  backdrop?

25  A.   I believe they bought a bedsheet at a department store,

Page 8

1   possibly Bloomingdale's.

2   Q.   All right.  And do you recall testifying that the

3   defendant, Ms. Greig, was present when that photograph was

4   taken?

5   A.   I do.

6   Q.   In the course of your investigation, it is true that you

7   wrote a number of reports of interviews with Mr. Weeks?

8   A.   I may have wrote one.  There were additional interviews of

9   Kevin Weeks done after I left the task force.

10  Q.   Okay.  And is it the practice that if you had sat in on

11  that interview, if someone else actually wrote it, your name

12  would still be on it?

13  A.   It would be at the bottom.

14  Q.   Have you had a chance to go back and review your 302s to

15  determine whether that specific piece of information, that

16  Ms. Greig was present while that photograph was taken, whether

17  that is specifically reflected in any of those 302s?

18  A.   I have.

19  Q.   And what was the result of that?

20  A.   I did not find it in any of the 302s.

21  Q.   All right.  So what was the basis for your testifying that

22  she was -- that Mr. Weeks indicated she was present?

23  A.   To the best of my recollection, Kevin Weeks indicated that

24  when he and his girlfriend traveled to Chicago and met James

25  Bulger and Catherine Greig, there was at no time during the day

Page 9

1   in July of '96 when they met that the four of them separated.

2   Q.   All right, sir, would you turn to Tab 27 in your binder.

3   Do you see a collection of three pages in that tab?

4   A.   I do.

5   Q.   Are these documents that were seized in the search of the

6   apartment in Santa Monica after the arrest of Mr. Bulger and

7   Ms. Greig?

8   A.   They are.

9        MR. HERBERT:  We would offer these, your Honor, as

10  Exhibit 27 in evidence.

11       MR. REDDINGTON:  No objection.

12       THE COURT:  All right, Exhibit 27 is admitted into

13  evidence for purposes of this proceeding.

14       (Exhibit 27 received in evidence.)

15  Q.   Mr. Carazza, can you identify what Exhibit 27 consists of.

16  A.   Sure.  There's two receipts, one dated what appears to be

17  April 29 of 2011, and the other May 29 of 2011; and they

18  indicate received from, on the May, 2011, C. Gasko, and on the

19  April, 2011, Carol and Charles Gasko.  Both amounts on the

20  receipts are $1,165, and indicated on the receipt is a check

21  mark "For rent."

22  Q.   Okay.  And the top one, does that indicate that it's for

23  from June 1, 2011, to June 30, 2011?

24  A.   It does.

25  Q.   And the bottom one from May 1 to May 31 of 2011?

Page 10

1    A.    It does.

2    Q.    And then the second page of that, is that a notice of

3    changes in terms of tenancy for 2010 to 2011?

4    A.    It is.

5    Q.    For Charles and Carol Gasko, tenants in possession?

6    A.    Yes.

7    Q.    Of the apartment where they were found to be living at

8    Apartment 303; is that correct?

9    A.    That is correct.

10   Q.    At 1012 Third Street in Santa Monica?

11   A.    That's correct.

12   Q.    Now, sir, did you learn that agents actually interviewed a

13   property manager from that apartment building out in Santa

14   Monica recently?

15   A.    They did.

16   Q.    And did you learn what the property manager told the

17   agents with respect, first of all, to how long Mr. Bulger and

18   Ms. Greig had been living in that apartment house?

19   A.    According to her recollection, at least the late 1990s,

20   maybe 1998, 1999.

21   Q.    And did she indicate that she believed that they had been

22   renters there the whole time?

23   A.    Yes.

24   Q.    Did she indicate which of the two of them paid the rent?

25   A.    She indicated that almost on every occasion, the rent was

Page 11

1   paid by Catherine Greig.

2   Q.   And did she say in what form she paid the rent?

3   A.   Cash.

4   Q.   And did this witness or any other witnesses from Santa

5   Monica indicate whether the defendant and Mr. Bulger were away

6   for periods of time during the tenancy at that apartment

7   building?

8   A.   She did.

9   Q.   The apartment manager said they rented there, but they

10  would be gone for periods of time?

11  A.   There were periods of time where she did not notice them.

12  Q.   All right, would you turn to Tab 28, please.

13  A.   Okay.

14  Q.   All right, is that also a series of documents that were

15  seized in the search?

16  A.   It is.

17        MR. HERBERT:  Your Honor, we would offer this as

18  Exhibit 28, and it's under seal.

19        MR. REDDINGTON:  No objection.

20        THE COURT:  All right, Exhibit 28 is admitted into

21  evidence for purposes of these proceedings under seal.

22        MR. HERBERT:  Thank you, your Honor.

23        (Exhibit 28 received in evidence.)

24  Q.   All right, sir, can you identify just in general what

25  those documents consist of.

1          (Witness examining documents.)

2     A.    Electricity bills and possibly a cable bill, and

3     MoneyGrams, which appear to be the method of payment for each

4     of those bills.

5     Q.    And do the bills indicate that they were in the name of a

6     Carol with a last name that is similar to but not identical to

7     the name on the apartment?

8     A.    They do.

9     Q.    Would you turn to Tab 29, please.  Is that also a series

10    of documents seized in the search?

11    A.    It is.

12          MR. HERBERT:  Your Honor, we would offer this as

13    Exhibit 29 in evidence.

14          MR. REDDINGTON:  No objection.

15          THE COURT:  Exhibit 29 is admitted into evidence

16    specifically for the purpose of these proceedings.

17          (Exhibit 29 received in evidence.)

18    Q.    All right, and the first page of that, does that reflect a

19    bill from the Los Angeles Times addressed to Carol Gasko,

20    G-a-s-k-o, at the apartment building where they were located?

21    A.    It does.

22    Q.    Does the second page indicate a customer's receipt for

23    payment payable to the LA Times?

24    A.    It does.

25    Q.    This is through, this particular one, through February 18

Page 13

1   of 2012?

2   A.   The bill from the Los Angeles Times indicates pays through

3   2/18 of 2012, and the receipt states "LA Times Sunday through

4   2/18/2012."

5   Q.   And the third page is a document with respect to the

6   possible cancellation of the Sunday LA Times unless there is a

7   notification to the contrary?

8   A.   This appears to be an ad for the LA Times, then with some

9   handwritten notations on it, one of which is "must cancel" and

10  then a phone number, 1-800-88-Times.

11  Q.   And does it indicate under that "or subscription will

12  continue at regular rate"?

13  A.   Yes.

14  Q.   Would you turn to Tab 30, please.  Well, actually, before

15  I do that, did agents doing interviews out in Santa Monica of

16  other residents from the apartment building or employees from

17  the apartment building learn that there were times when

18  Ms. Greig would obtain the LA Times not from having it

19  delivered to the door but by going to the corner and picking it

20  up from the box?

21  A.   Yes.

22  Q.   And that she would do that on a regular basis?

23  A.   She was observed on more than one occasion to do it.

24  Q.   All right.  And did you talk to agents who are familiar

25  with the search of the apartment that night with respect to

1  anything they found in the walls other than weapons and money?

2  A.   The second search, which was done last week, in one of the

3  holes in the wall, an agent found an LA Times article dated

4  December of 1998, and that is in evidence in Los Angeles right

5  now.

6  Q.   Was this actually pieces or crumbled-up pieces of paper,

7  to your understanding, that were used to sort of stuff into the

8  wall?

9  A.   Yes.

10  Q.   All right, would you look at Tab 30, please.

11  A.   Okay.

12  Q.   And is this essentially a compilation of articles from

13  LexisNexis that were run in the Los Angeles Times about

14  Mr. Bulger and Ms. Greig?

15  A.   They are.

16  Q.   Dating from May 24 of 1998 through June of this year, is

17  that correct, June 28 of 2011?

18       (Witness examining documents.)

19  A.   Yes.

20  Q.   Would you turn to Tab 31, please.

21       MR. HERBERT:  I'm sorry.  I offer that as well, your

22  Honor, as Exhibit 29.

23       MR. REDDINGTON:  I would ask --

24       MR. HERBERT:  If I didn't offer -- that's Exhibit 30,

25  and if I didn't offer 29, I'd offer that as well.

Page 15

1    MR. REDDINGTON:  I would ask that there be a

2    foundation as to the source of these downloads of the numerous

3    articles.

4    THE COURT:  All right, Mr. Herbert, do you --

5    MR. HERBERT:  Yes, your Honor.

6    Q.  Special Agent Carazza, are you aware of whether or not

7    those newspaper articles were downloaded and retrieved by an

8    employee of the U.S. Attorney's office?

9    A.  They were.

10    MR. REDDINGTON:  I have no objection, with that

11    understanding.

12    THE COURT:  All right, Exhibit 30 is admitted into

13    evidence for purposes of these proceedings, and if Exhibit 29

14    is not admitted already, it is at this time.

15    MR. HERBERT:  Thank you, your Honor.

16    (Exhibit 30 received in evidence.)

17    Q.  All right, sir, would you turn to Tab 31.

18    A.  Yes.

19    Q.  Was that document also seized in the search, or is that a

20    copy of a document seized in the search?

21    A.  It is.

22    Q.  And does that purport to be an appointment card for an

23    appointment or a series of appointments at an establishment

24    known as The Haircutters?

25    A.  It does.

1   Q.   And it indicates the name of the stylist there?

2   A.   Wendy.

3   Q.   Okay.  And is there the name Carol Gasko, G-a-s-k-o, next

4   to it?

5   A.   There is.

6   Q.   Did you learn that agents interviewed the hairstylist from

7   The Haircutters named Wendy last week?

8   A.   Yes, Wendy Farnetti.

9   Q.   And did she indicate that she did in fact cut the hair or

10  do the hair for Ms. Greig?

11  A.   Styled, colored, cut, different variations depending on

12  the appointments.

13  Q.   Did she indicate whether or not Ms. Greig came to those

14  appointments alone or with someone else?

15  A.   Alone.

16  Q.   And did she indicate whether she typically had something

17  with her when she came to the appointments?

18  A.   On occasion, a Whole Foods shopping bag or cart.  That's

19  one thing I recall.

20  Q.   And in the interview with this hairstylist, Wendy, did she

21  indicate that at any time that she was working with Ms. Greig,

22  they had a conversation about boyfriends?

23  A.   They did.

24  Q.   Could you tell us what Wendy said about that conversation.

25  A.   Sure.  She indicated to agents that over time they had had

1   conversations about relationships; and Wendy Farnetti, the

2   stylist indicated to Catherine Greig that she had trouble

3   finding good boyfriends, and described herself as not a junk

4   magnet but something indicating she happened to attract or draw

5   the wrong guys.

6   Q.   And did she indicate whether Ms. Greig had a response to

7   that?

8   A.   She did.   Catherine Greig told her that she liked bad

9   boys, and then indicated that she knew her husband was a bad

10  boy when they married, but he's mellowed out now.

11  Q.   All right, sir, did you also learn --

12          THE COURT:   Mr. Herbert, did you want to admit

13  Exhibit 31?

14          MR. HERBERT:   Yes, your Honor.   Thank you.   We would

15  offer Exhibit 31.

16          MR. REDDINGTON:   No objection.

17          THE COURT:   All right, Exhibit 31 is admitted for

18  purposes of this proceeding.

19          (Exhibit 31 received in evidence.)

20  Q.   All right, sir, did you learn that agents who conducted

21  the search of the apartment building found certain books

22  relating to the creation of false identification?

23  A.   Yes.

24  Q.   Would you turn to Tab 32, please.

25  A.   Okay.

Page 18

1    Q.   Was this also seized during the search?

2    A.   It was.

3         MR. HERBERT:  We offer this, your Honor, as Exhibit 32

4    in evidence.

5         MR. REDDINGTON:  No objection.

6         THE COURT:  All right, Exhibit 32 is admitted into

7    evidence for purposes of this proceeding.

8         (Exhibit 32 received in evidence.)

9    Q.   And is this essentially three pages from one of those

10   books?

11   A.   It is.

12   Q.   And what's the title of it?

13   A.   "Secrets of a Back Alley ID Man," then underneath that,

14   "Fake ID Construction Techniques of the Underground."

15   Q.   All right, sir, in the course of the investigation, the

16   fugitive investigation, the harboring investigation that you

17   testified about last time, are you aware that certain

18   individuals were convicted of obstructing those investigations?

19   A.   Yes.

20   Q.   Could you turn to Tab 33, please.

21   A.   Okay.

22   Q.   And does Tab 33 consist of a copy of an indictment and

23   behind that a judgment of conviction, the indictment against

24   United States of America v. Margaret McCusker and Kathleen

25   McDonough?

1   A.   It does.

2   Q.   And the judgment would be for Ms. McCusker; is that

3   correct?

4   A.   Yes.

5   Q.   Does this reflect that Ms. McCusker and Ms. McDonough were

6   indicted for perjury before a grand jury and obstruction of

7   justice?

8   A.   Yes.

9   Q.   And that Ms. McCusker was convicted of two counts of

10  perjury and one count of obstruction of justice?

11  A.   Yes, it does.

12          MR. HERBERT:  I would offer this as Exhibit 33, your

13  Honor.

14          MR. REDDINGTON:  No objection.

15          THE COURT:  Exhibit 33 is admitted for purposes of

16  this proceeding.

17          (Exhibit 33 received in evidence.)

18  Q.   Would you look at Tab 34, sir.

19  A.   Okay.

20  Q.   And is this a copy of a judgment in a criminal case

21  against Kathleen McDonough for that same case, indicating that

22  she was convicted of one count of perjury and one count of

23  obstruction of justice?

24  A.   It is.

25          MR. HERBERT:  We offer Exhibit 34, your Honor.

Page 20

1          MR. REDDINGTON:  No objection.

2          THE COURT:  Exhibit 34 is admitted for purposes of

3     this proceeding.

4          (Exhibit 34 received in evidence.)

5     Q.   Would you turn to Tab 35, sir.  And is that a copy of an

6     indictment against John P. Bulger?

7     A.   It is.

8     Q.   And again for perjury and obstruction of justice?

9     A.   Yes.

10    Q.   And is that John P. Bulger the brother of James Bulger?

11    A.   It is.

12         MR. HERBERT:  I would offer Exhibit 35 in evidence,

13    your Honor.

14         MR. REDDINGTON:  No objection.

15         THE COURT:  Exhibit 35 is admitted for purposes of

16    this proceeding.

17         (Exhibit 35 received in evidence.)

18    Q.   And Tab 36, is that a copy of the judgment in a criminal

19    case, that same case against John P. Bulger, indicating that he

20    was convicted of two counts of perjury and two counts of

21    obstruction of justice?

22    A.   Yes.

23         MR. HERBERT:  I would offer this as Exhibit 36, your

24    Honor.

25         MR. REDDINGTON:  No objection.

Page 21

1        THE COURT:  All right, Exhibit 36 is admitted for

2   purposes of this proceeding.

3        (Exhibit 36 received in evidence.)

4   Q.   And, sir, do all those judgments and indictments, they

5   relate to the investigation you testified about?

6   A.   Yes, they do.

7   Q.   Now, are you also aware of others who were indicted for

8   obstructing this investigation; specifically, an individual

9   named Richard Schneiderhan and a couple of his relatives?

10  A.   I am aware of that.

11  Q.   And do you recall where Mr. Schneiderhan worked at the

12  time of the obstructive conduct in that case?

13  A.   At Verizon, which I think prior to that it was maybe Bell

14  New England, whatever the local phone company was.

15  Q.   All right.  And were Mr. Schneiderhan and the other

16  defendants charged and convicted for tipping off pen registers,

17  advising one of Mr. Bulger's brothers about those?

18  A.   Through someone else they advised, they got the message to

19  the Bulgers.

20  Q.   And what's a pen register?

21  A.   It's a device, electronic device installed on a telephone

22  that -- it generates the numbers pulsed from the phone and can

23  also capture incoming numbers, not a hundred percent, but some

24  local area calls, and then sometimes long-distance calls.

25  Q.   And, in your experience, what value would it be to someone

Page 22

1    to be tipped off that there is a pen register on the phone?

2         MR. REDDINGTON:  At this point, your Honor, I'm

3    suggesting that if this has something to do with Ms. Greig, I

4    have no objection; but if this is just background for somewhat

5    salacious detail, I would object to it.

6         THE COURT:  Mr. Herbert, are you --

7         MR. HERBERT:  I'll ask another question, your Honor.

8    Q.   Sir, do you use pen registers at various times throughout

9    this sixteen-year investigation?

10   A.   We did.

11   Q.   Once or more than once?

12   A.   Several times, a lot more than once.

13   Q.   All right, it's fair to say there were numerous pen

14   registers in this case?

15   A.   Yes.

16   Q.   And they were on individuals that you thought might be in

17   communication with Mr. Bulger or Ms. Greig?

18   A.   In communication with either James Bulger or Catherine

19   Greig or in communication with conduits for communication of

20   James Bulger and Catherine Greig.

21   Q.   And the pen registers that were the subject of that

22   Schneiderhan indictment, were they pen registers from this

23   investigation?

24   A.   Yes, they were.

25   Q.   All right, sir, I want to go back to almost where we began

Page 23

1    just for this last line of questioning.  Directing your

2    attention to the night of January 5 of 1995 or the early

3    morning hours of January 6 of 1995, are you aware of any law

4    enforcement officers who actually went to the defendant's home

5    to speak to her that night?

6    A.    I am.

7    Q.    And this is the night after Stephen Flemmi had been

8    arrested; is that correct?

9    A.    It is.

10   Q.    And after the charges against Mr. Flemmi and Mr. Bulger

11   and some others had been made public; is that correct?

12   A.    It is.

13   Q.    Who did you learn went to Ms. Greig's house?

14   A.    Now-retired Massachusetts State Police Colonel Thomas

15   Foley and a fellow State Police officer that he worked with at

16   the time.

17   Q.    All right.  And it's fair to say that Mr. Foley was not

18   the colonel at that time?

19   A.    He was not.  I believe sergeant at the time.

20   Q.    He became a colonel of the State Police later?

21   A.    Yes.

22   Q.    All right.  And have you had a chance to speak to

23   Mr. Foley about what happened when he and Mr. Graney went to

24   the defendant's house?

25   A.    I did.

Page 24

1   Q.   What did Mr. Foley tell you?

2   A.   He indicated that after an unsuccessful attempt to locate

3   James Bulger at Theresa Stanley's residence, after a search

4   warrant was obtained, that he and Patrick Graney from the State

5   Police went to Catherine Greig's house in Squantum.  She met

6   them in the driveway.  Tom Foley indicated to her that they

7   were looking for James Bulger, that they wanted to look in the

8   house.  He described it as not a very pleasant conversation

9   with her.  She said she had nothing to say to him and that he

10  ain't getting in the house.

11  Q.   Did she use any expletives?

12  A.   There were some, yes.

13          MR. HERBERT:  Can I just have a second, your Honor?

14          (Discussion off the record between government counsel.)

15          MR. HERBERT:  I've got no further questions, your

16  Honor.

17          THE COURT:  All right.  Mr. Reddington?

18          MR. REDDINGTON:  Thank you, your Honor.

19  CROSS-EXAMINATION BY MR. REDDINGTON:

20  Q.   Agent, you would agree that the first set of indictments,

21  if you will, against Mr. Bulger that, let's say, were the

22  Judge Mark Wolf indictments allege racketeering; is that

23  correct?

24  A.   Upon review of them, they do, yes.

25  Q.   Right.  And they were returned back in '95, correct?

1   A.   The original indictment?

2   Q.   Right.

3   A.   Yes.

4   Q.   And there were a number of people that he was indicted

5   along with that were co-defendants; is that true?

6   A.   There were.

7   Q.   And it was a rather sweeping indictment in the sense of

8   the number of pages, but Mr. Bulger, quite frankly, was pretty

9   much restricted to only a couple of the alleged predicate acts

10  on this racketeering charge, correct?

11  A.   I don't have the whole indictment down.

12  Q.   Well, in any event, you would agree with me, sir, that in

13  1995 when the indictment was returned against James Bulger and

14  other people, it alleged racketeering, extorting money from

15  loan sharks or bookies and things of that nature, right?

16  A.   It did.

17  Q.   Now, at that time, were you part of the FBI organization?

18  A.   I was.

19  Q.   Were you involved in any of the South Boston or Bulger

20  investigations?

21  A.   I actually believe I was scheduled to be on an arrest

22  team, came back early from Christmas vacation, and that my

23  location was canceled at short notice, but I was not part of

24  the organized crime squad.

25  Q.   But in the course of your involvement as an agent, you

Page 26

1   would agree with me that you were pretty familiar with, let's

2   say, Mr. Bulger's general reputation among the streets of --

3   people in the streets of South Boston?

4   A.   At which time?

5   Q.   Well, 1995.

6   A.   Honestly, I wasn't all that familiar with it until after

7   the charges came out.

8   Q.   All right.  And when you say "the charges," we're focusing

9   on 1995 charges, correct?  Right?

10  A.   Is that what you'd like me to answer to?

11  Q.   Yes.

12  A.   Yes.

13  Q.   Because there's a big difference between the racketeering

14  charges in 1995 and the other charges that allege murder and

15  many, many other acts of violence.  It was about four years

16  later, right?

17  A.   I'm not sure of the exact date, but I know James Bulger

18  was charged in both indictments.

19  Q.   All right.  And let's say those would be the Judge Richard

20  Stearns indictment, right?

21  A.   I believe so.

22  Q.   All right.  So 1995 Mr. Bulger -- and, by the way, would

23  you agree that from your investigation and your understanding,

24  on the streets, if you will, in the city of South Boston, that

25  Mr. Bulger was a person that was almost of a mythical

0292fb1f-331f-4107-a31f-5233d752e689

1   proportion, in great respect on the street, correct?

2   A.   I don't know that I agree to that.

3   Q.   Well, I'm not asking that you would say that the FBI would

4   agree with that, but I'm saying, on the streets in the city of

5   Boston, South Boston --

6   A.   You asked me if I would agree, and I said I don't think I

7   agree.

8   Q.   Well, I certainly wouldn't expect you to agree.  So my

9   suggestion, sir, is that he had a reputation of being a

10   Robin-Hood-type person, didn't he?

11   A.   I wouldn't characterize it as that.

12   Q.   Well, there's allegation or understood that he was keeping

13   the drugs out of the city of Boston, off the streets of South

14   Boston, correct?

15   A.   I don't know if that's true or not.

16   Q.   Well, I'm asking about your investigation, since you've

17   testified here on the reports and people that you've talked to.

18   You certainly have heard of the reputation of a Robin-Hood-like

19   person keeping drugs out of the city of Boston, South Boston,

20   helping the old ladies, providing turkeys on Thanksgiving,

21   things of that nature?  You've heard of that, haven't you?

22   A.   I've heard a lot worse actually.

23   Q.   I understand you've heard a lot worse, sir, but my

24   question is simple:  Have you heard what I just asked you as

25   being the reputation for Mr. Bulger in 1995?

Page 28

1   A.   In 1995 I would not have any knowledge of that.   I was on

2   a squad that did not handle organized crime or drugs.

3   Q.   All right.   When did you become involved with the

4   so-called "Bulger team"?

5   A.   August of 1997.

6   Q.   Now, when you got involved in that capacity, sir, you were

7   involved with the investigations, and, of course, you're

8   personally familiar with the people that you were looking for,

9   Mr. Bulger and Catherine Greig.   True?

10  A.   Yes.

11  Q.   You know the background, you know the personalities, if

12  you will, of these individuals, right?

13  A.   The idiosyncrasies and such, yes.

14  Q.   All right.   And would you agree, sir, that Catherine Greig

15  was a person that grew up in the city, that she went to school

16  all the way up to Northeastern University?

17  A.   Yes.   She went to dental hygienist school.

18  Q.   Dental hygienist school, and in fact she ended up actually

19  teaching in that capacity for a particular school?

20  A.   She did.

21  Q.   Forsyth Academy?

22  A.   Yes.

23  Q.   And you knew that she had family in the city here.   She

24  had her sister, and she had her mother, and she had some other

25  relatives, correct?

0292fb1f-331f-4107-a31f-5233d752e689

1   A.   Yes.

2   Q.   Now.  Your investigation would involve interviews of a

3   number of people pertinent to Catherine Greig's character or

4   personality; is that fair to say?

5   A.   The interviews were more geared towards the location and

6   apprehension of Catherine Greig and James Bulger.

7   Q.   Well, I mean, you recently interviewed the state trooper,

8   and you allege that it was less than a pleasant experience when

9   in January he asked Ms. Greig if she knew or had seen

10  Mr. Bulger; is that correct?

11  A.   Yes.

12  Q.   Okay.  And that was from Mr. Cullen's article in the

13  Boston Globe must have tipped you off as to that allegation; is

14  that fair?

15  A.   I talked to Tom Foley yesterday.

16  Q.   All right, yesterday.  And Mr. Cullen's article appeared

17  the day before, right?

18  A.   It did.

19  Q.   Okay.  And you read it?

20  A.   I did.

21  Q.   Okay.  Did you read the Herald too?

22  A.   Maybe sporadically.  The sports section, yes.

23  Q.   Now, would you agree, sir, that you have intelligence as

24  to, let's say, the nature of the personality or disposition of

25  Ms. Greig?

Page 30

1    A.    Sure.

2    Q.    Okay.  And people were interviewed out in Santa Monica

3    that were neighbors for many, many years that knew Ms. Greig

4    and Mr. Bulger; is that correct?

5    A.    Yes.

6    Q.    Would you agree, sir, that every person that was

7    interviewed expressed nothing but great respect, if not love,

8    for Catherine Greig?

9    A.    In Santa Monica?

10   Q.    Yes.

11   A.    It's fair to say she was well liked.

12   Q.    And there were a number of people that made statements to

13   the effect that her interest and focus was on, for example,

14   dogs and cats and taking the strays in, and taking them to vets

15   or having their problems taken care of; is that fair?

16   A.    Yes.  She had an interest in animals, and I believe she

17   had befriended some people who had pets, cats, dogs.

18   Q.    And in the course of the investigation, sir, let's say

19   when the charges were taken out against Ms. Greig, they would

20   have been taken out in 1997, I believe?  I'm looking at the

21   complaint.

22   A.    April of '97.

23   Q.    April 25, 1997, right?

24   A.    Yes.

25   Q.    And that was based upon an affidavit of a gentleman by the

1   name of Charles J. Gianturco, right?

2   A.   It is.

3   Q.   Now, Charles Gianturco was a -- I guess he's retired

4   now -- he was an FBI agent, correct?

5   A.   He was.

6   Q.   Now, Charles Gianturco indicated that on January 5, 1995,

7   a criminal complaint was filed in this court charging

8   Mr. Bulger with the initial charge of extortion, correct?

9   A.   I'm not for certain.  If you'd like, I can read it.

10  Q.   Well, trust me, I'm reading from the complaint.  I'm just

11  trying to get the timeline here.  On January 10 of 1995, a

12  federal grand jury then returned the large indictment against

13  Mr. Flemmi, Mr. Bulger, Mr. Salemme, any number of people under

14  the RICO indictment?

15  A.   The indictment was on or about January 10 of 1995 in which

16  James Bulger was charged.

17  Q.   Okay, yes.  And that was the indictment that alleged

18  extortion and violations of the RICO statute, correct?

19  A.   I believe so.  I don't have the indictment memorized, but

20  it sounds about right.

21  Q.   Now, when was it that Theresa Stanley left the state with

22  Mr. Bulger, according to your investigation?

23  A.   I believe it was on or about December 23 of 1994.

24  Q.   When was it that Theresa Stanley, according to your

25  investigation, came back to the state of Massachusetts, being

Page 32

1    brought back to Hingham?

2    A.    For the drop-off?

3    Q.    Yes.

4    A.    As best as we can construct it, sometime in February of

5    1995.

6    Q.    All right.  So Theresa Stanley was with Mr. Bulger, who by

7    your investigation had been tipped off, so to speak, about the

8    indictment, right?

9    A.    Retired FBI Agent John Connolly was convicted of tipping

10   off James Bulger.

11   Q.    Right.  So January 5, '95, the complaint is issued.

12   Mr. Bulger was not around, right?

13   A.    He was not.

14   Q.    January 10 of '95 he's indicted, and he was, as we say,

15   "tipped off" and was not around, right?

16   A.    He was not around.

17   Q.    Your investigation would reveal that he was with

18   Ms. Stanley and taking various trips and going to different

19   places during that time frame, right?

20   A.    To include accessing a safe deposit box.

21   Q.    Now, would that be the Fort Lauderdale box?

22   A.    No.

23   Q.    Okay.

24   A.    Clearwater, Florida.

25   Q.    I'm sorry?

Page 33

1   A.   Clearwater, Florida.

2   Q.   Clearwater.  Now, is that the safe deposit box that was

3   opened up in the name of Ms. Stanley and Mr. Bulger?

4   A.   It's one of them.

5   Q.   And did your investigation indicate that Ms. Stanley and

6   Mr. Bulger opened up other safe deposit boxes during that time

7   frame before she was brought back to Massachusetts?

8   A.   The boxes that we are aware of were established prior to

9   1995.

10  Q.   And whose name were they in?

11  A.   James Bulger and Theresa Stanley.

12  Q.   Now, every time Theresa Stanley was involved with a safe

13  deposit box, is it fair to say that your investigation would

14  reveal that at no time did she ever open the box, for example?

15  Records never indicated that she accessed the box?

16  A.   She never indicated that she accessed the box.

17  Q.   So in fact what occurred here is that she would cosign, if

18  you will, on the box with Mr. Bulger, and had nothing

19  whatsoever to do with the safe deposit box after that?  Is that

20  your understanding?

21  A.   She was on the box.  What her role in opening it and later

22  was, I'm not certain.

23  Q.   Well, you know that in a bank, when you have a safe

24  deposit box, if you want to access the box, you have to have

25  your key, the bank person has their key, and you have to sign

Page 34

1    indicating that you accessed the box, right?

2    A.   Yes.

3    Q.   Okay.  And there were no records indicating that

4    Ms. Stanley accessed any of those boxes?

5    A.   No.

6    Q.   And at some point the Clearwater box, if you will, was

7    indeed accessed, and it had to be drilled open, right?

8    A.   Yes.

9    Q.   And there's no money, there's nothing in it?

10   A.   It was empty, I believe.

11   Q.   Now, during that period of time while Mr. Bulger was with

12   Ms. Stanley and you were able to reconstruct the trips and the

13   travel, do you know that they stayed in hotels?

14   A.   I know of at least one hotel.

15   Q.   And do you know that they paid cash?

16   A.   I'm not positive.  I'd have to see the guest receipt for

17   the New Orleans hotel.

18   Q.   Did they have a car?

19   A.   To the best of my recollection, he drove his Mercury Grand

20   Marquis when they left Massachusetts.

21   Q.   Your investigation, it's fair to say that Mr. Bulger

22   always drove, didn't allow anybody else to drive his vehicle,

23   did he?

24   A.   I don't know.

25   Q.   All right, but your investigation would show that while he

Page 35

1   was with Stanley, he was driving, and they were staying in

2   hotels, or a hotel, at least, and paying cash?

3   A.   I don't know the method of payment for the New Orleans

4   hotel.  It may have been cash; it may have been a credit card

5   also.

6   Q.   Did you determine that purchases were made while they were

7   on this vacation, shall we say?

8   A.   Are we talking December of '94 when they leave or prior to

9   that?

10  Q.   I know that there were a number of trips prior to that,

11  but my focus is on December, '94, January 5 of '95 with the

12  complaint, January 10, '95, the indictment, being with Stanley,

13  traveling around, things of that nature, during that time

14  period, until February when she is dropped off in Hingham.

15  A.   According to Theresa Stanley, they had driven to certain

16  locations, at which I believe one was Arizona and California,

17  and that they had picked up some memorabilia and such.

18  Q.   Now, did Theresa Stanley indicate that she had a

19  longstanding relationship with Mr. Bulger?

20  A.   She did.

21  Q.   And how many years?

22  A.   Over twenty.

23  Q.   Over twenty years.  And in the course of your

24  investigation of other agents or perhaps yourself, did she

25  indicate that she was aware that Catherine Greig had a

Page 36

1  relationship with Mr. Bulger?

2  A.   She did.

3  Q.   And when was she aware of that, or was she aware of that

4  the whole time?

5  A.   To the best of my recollection, Catherine Greig told her

6  in the fall of 1994 about her relationship she had with James

7  Bulger.

8  Q.   And that absolutely devastated Ms. Stanley, didn't it?

9  A.   It probably did.

10  Q.   She was pretty upset about it, right?

11  A.   I -- I don't know her state of mind at the time, but I

12  would say she probably was upset.

13  Q.   And being as upset as she was in the fall of 1994, it was

14  a few short months or a couple of months later that she took

15  off with him in December of '94, right?

16  A.   She did travel with him in December of '94.

17  Q.   In February of '94 when she's returned --

18  A.   '95.

19  Q.   I'm sorry, thank you.  '95 when she is returned, she's

20  dropped off at her sister's house in Hingham, right?

21  A.   Yes.

22  Q.   And it's at that point that you make the observation, or

23  the surveillance, I suppose, would show that Ms. Greig met with

24  Mr. Bulger, or was there any surveillance on that at all?

25  A.   I didn't -- law enforcement, as far as I know, did not

Page 37

1   know about the return trip to Massachusetts in February of '95.

2   I'm sure if they did, we wouldn't be sitting here today.

3   Q.   So when was it that Mr. Weeks was observed getting in his

4   vehicle and driving away at a high rate of speed and trying to

5   avoid being followed and things of that nature?

6   A.   That would be the night of January 4, 1995, I believe.

7   Q.   All right.  So January 4 of 1995, it's your understanding

8   and investigation would show -- and this, by the way, is

9   obviously after Stanley leaves Massachusetts with Mr. Bulger

10  and well before February when she comes back, correct?

11  A.   It's in between the two, yes.

12  Q.   All right.  And that would be the time that you made the

13  observation of Catherine Greig being with Mr. Weeks and

14  something about Monument Beach, right?

15  A.   Again, I did not make the observation on January 4, nor am

16  I aware of anyone making an observation in law enforcement in

17  February when James Bulger picked up Catherine Greig.

18  Q.   Now, in the complaint, which the affidavit I know that you

19  have reviewed, it's fair to say that "It was around April of

20  1996 that Stanley cooperated with and provided information to

21  federal law enforcement."  I'm reading from the complaint.

22  A.   Are you asking a question or just reading?

23  Q.   You would agree that it was from April of '96 through

24  October of '96 that Stanley was cooperating with and providing

25  information to federal law enforcement?

Page 38

1    A.    And periods thereafter.

2    Q.    And during that period of cooperation, Mr. Gianturco

3    indicates that "She advised that at the time the arrest

4    warrants with Bulger had issued," January 5 and of course

5    January 10, "she was at a location outside of Massachusetts,"

6    is what the affidavit --

7    A.    I believe that's what's contained in the affidavit.

8    Q.    Did she indicate where they were outside of Massachusetts?

9    A.    I would have to read the indictment, but I believe maybe

10   New York is one of the locations in there.  The complaint, not

11   the indictment.  I'm sorry, I misspoke.

12   Q.    If you're referring to the complaint -- and I have no

13   problem, by the way, if you read one of the things -- but the

14   affidavit does not make any reference whatsoever to where it

15   was.  It just says that she, Stanley, admits that on January 5

16   and 10, '95, she was with Bulger at a location outside of

17   Massachusetts.  That's all it says.  In your investigation, are

18   you aware of where outside of Massachusetts?

19   A.    I'm aware of some of the locations, sir.

20   Q.    And one of those would have been Selden, New York, right?

21   A.    A car was purchased by James Bulger in January of 1995 in

22   Selden, New York.

23   Q.    And the Matos family, they live in that area, correct?

24   A.    They do.

25   Q.    Now, did your investigation or your brother or sister

0292fb1f-331f-4107-a31f-5233d752e689

Page 39

1    agents' investigation reveal that indeed Mr. Bulger and

2    Ms. Stanley did go to the Selden, New York, property?

3    A.   Yes.

4    Q.   And did meet in fact with the Matos family, correct?

5    A.   I know they met with at least Primitivo Matos.  I'm not

6    sure if they met the whole family.

7    Q.   And the Matos family are related in some fashion to

8    Mr. Kevin Weeks, correct?

9    A.   They are.

10   Q.   Paragraph 15 on the affidavit indicates that on

11   January 5, 1995, shortly after the arrest warrant was issued,

12   Greig was observed by law enforcement officers -- and this is

13   the meeting, if you will, with Mr. Weeks on January 5 of

14   1995 -- indicating --

15   A.   The night of the 4th, I believe.

16   Q.   Okay.  It indicates on the complaint, January 5 of 1995,

17   that Mr. Weeks left the L Street Tavern at a high rate of

18   speed, and, of course, surveillance was also being effectuated

19   involving Ms. Greig.  You're aware of that, right, in the

20   affidavit?

21   A.   I am.

22   Q.   And then of course it indicates around 11:00 p.m. Weeks

23   and Greig were observed meeting with one another on the streets

24   of South Boston.  You're aware of that, sir, correct?

25   A.   Yes.

Page 40

1   Q.   Now, the Thomas Baxter identification or identity, sir,

2   Mr. Weeks took care of that, didn't he?

3   A.   Took care of it how?

4   Q.   By obtaining it for him, getting it for him, making it for

5   him, giving it to him?

6   A.   I don't think so.  It was set up in 1976 or '78, probably

7   long before Kevin Weeks was a close associate of Mr. Bulger.

8   Q.   Exactly.  So Mr. Bulger for a number of years, if not ten

9   years prior to the charge, or twenty years prior to the

10  complaint and the indictment, had already been involved with

11  false identifications and setting up safe stash places and

12  things of that nature, right?

13  A.   He at least prepared for the Thomas Baxter name.  What

14  other names, I'm not aware of.

15  Q.   Now, in the course of the investigation, sir, you've

16  generated a number of what we've called or refer to as 302s,

17  correct?

18  A.   I have.

19  Q.   Along with a number of other agents or detectives that are

20  involved with this investigation, correct?

21  A.   I have.

22  Q.   And you also spoke to the agents that were involved in the

23  ultimate arrest and search of the premises out in California

24  that they were living in, right?

25  A.   I did not speak to the agents that arrested him.  I spoke

1    to Boston agents that conducted the follow-up search.

2    Q.   Well, is it fair to say that you are pretty much the lead

3    investigator on this case, at least as far as Boston is

4    concerned?

5    A.   Absolutely not.

6    Q.   You certainly are aware of various things such as the

7    search.  You testified without difficulty.  You know about

8    that, right?

9    A.   Yes.

10   Q.   And you're aware of the fact that there was a tip that was

11   received from an individual to the FBI, correct?

12   A.   Yes.

13   Q.   And that tip indeed came from a neighbor of --

14           MR. HERBERT:  I object, your Honor.  Let me object at

15   this point to any questions that are designed to identify the

16   tipster in this case, and I'd rely on the Supreme Court case of

17   Roviaro v. United States for that.  And I have a copy of that

18   for the Court if the Court would like, but essentially the case

19   stands for the proposition that law enforcement has a very

20   legitimate privilege in order to protect the identity of

21   confidential informants, and the Court would need to find that

22   that legitimate privilege is -- law enforcement interest in

23   maintaining that confidentiality is substantially outweighed by

24   the defendant's need for the identity of confidential

25   informant.  I would suggest that there's no relevance to

Page 42

1    questions that would be designed to identify the tipster in

2    this case.

3        MR. REDDINGTON:  We know who this person is.  I'm not

4    looking for identity of the informant.  I'm just trying to

5    elicit from the agent that indeed it was a person from

6    California, who as a result of the campaign, if you will, and

7    advertising made a phone call.

8        MR. HERBERT:  Again, your Honor, obviously the tip led

9    to their arrest and --

10       MR. REDDINGTON:  I'll move on.

11       THE COURT:  Mr. Reddington --

12       MR. REDDINGTON:  I'll move on.

13   Q.   You would agree, sir, that the travels, if you will, of

14   Mr. Bulger and Ms. Greig involving New York at the Selden

15   property were investigated into during the investigation,

16   right?

17   A.   Yes.

18   Q.   And Mr. Bulger purchased the car, not Catherine Greig,

19   right?

20   A.   I believe the car was purchased when James Bulger was

21   still with Theresa Stanley.

22   Q.   Right, and that would be --

23   A.   January 17 of 1995.

24   Q.   Okay.  And you would agree, sir, that, again, when

25   Ms. Greig was with Mr. Bulger, that they did indeed go to the

Page 43

1    New York property, the Selden property, right?

2    A.    They did.

3    Q.    And the Matos family were interviewed; is that right?

4    A.    They were.

5    Q.    And in fact is it Primitivo?  Is that his name?

6    A.    He also goes by Chico.

7    Q.    Chico.

8    A.    He's the husband.

9    Q.    At some point it was determined that in fact, as you

10   testified, Mr. Bulger left the vehicle in a garage, that in

11   fact he basically gave it to Mr. Primitivo Matos, Chico, right?

12   A.    It appears that he did.

13   Q.    Okay.  Now, in the course of your investigation, they also

14   went to -- when I say "they," I mean Catherine Greig and

15   Mr. Bulger -- went to -- I think you described it as "the very

16   end of Louisiana" in your direct testimony?

17   A.    It's very remote.

18   Q.    Very remote.

19   A.    Yes.

20   Q.    And this was an area of Louisiana I guess is what, a

21   campground?

22   A.    No.  I'd describe it more as an oil rigging and sport

23   fishing community.

24   Q.    And it was extremely remote.  It was literally on the very

25   end of Louisiana right on the Gulf, correct?

Page 44

1   A.   It was on the very end.

2   Q.   And they would go there on a number of occasions and stay

3   and befriended a number of people; is that correct?

4   A.   They did.

5   Q.   And some of the people that they befriended, for example,

6   one would have been people by the name of Gautreaux,

7   G-a-u-t-r-e-a-u-x; is that correct?

8   A.   Yes.

9   Q.   And they would be with the Gautreaux family, socialize

10  with the Gautreaux family for literally weeks, if not months at

11  a time, correct?

12  A.   Yes.

13  Q.   And in fact the Gautreaux family became very friendly with

14  Catherine Greig, for example.  They referred to her as auntie;

15  is that correct?

16  A.   The children may have.

17  Q.   Okay.  You made an indication, sir, that while at the

18  Gautreaux house, that they would socialize, that they would eat

19  and things of that nature, right?

20  A.   Yes.

21  Q.   Mr. Bulger liked the Cajun cooking, didn't he?

22  A.   Yes, he did.

23  Q.   In the interviews on the 302s on the Gautreaux family, by

24  the way, you agree, sir, that Mr. Gautreaux indicated that

25  Mr. Bulger insisted on never having his picture taken?  True?

Page 45

1   A.   I do recall reading that.  I don't know if it's my

2   interview, but I do recall reading that in the file.

3   Q.   And he indicated that he did not like to have his photo

4   taken, and he refused and would not allow Greig to have her

5   picture taken, right?

6   A.   It sounds familiar, yes.

7   Q.   Okay.  She wanted to have her picture taken with one of

8   the little kids.  Bulger refused to let them take her picture,

9   right?

10  A.   I don't know if that's how it played out.

11  Q.   Would you agree, sir, that the 302 indicates that Greig

12  was extremely attached to the dogs, a litter of puppies, and

13  would take the puppies on one occasion to the vet to have them

14  taken care of, and indeed Mr. Bulger paid the vet bill for the

15  Gautreauxs?  Do you recall that in the 302?

16         MR. HERBERT:  Your Honor, I would just ask that if the

17  witness is going to be asked what the 302 says, that he be

18  allowed to look at it.

19         MR. REDDINGTON:  Sure.

20         THE COURT:  That seems a sensible suggestion.

21         MR. REDDINGTON:  No problem.  I just have to tell you,

22  your Honor, when I received the disk from the government, what

23  I did is, because it was on a disk, I had to kind of cut and

24  paste and download it so I could print it out through my

25  office, so it's not a complete 302.

Page 46

1        THE COURT:  Well, I appreciate that clarification, and

2    I am sure that --

3        MR. REDDINGTON:  But I'll show him exactly what.

4    Q.   Does that look familiar to you?

5    A.   This is an incomplete document, so I feel uncomfortable

6    answering that.

7    Q.   If it helps your comfort level, let me tell you, that

8    comes from a 302 that's on a disk that I'm sure we could

9    probably pull up but --

10   A.   Again, I'd prefer to see the original document.

11   Q.   Well, it's on a disk, so let me ask you.  May I?  In the

12   course of your investigation, you've read the 302s, have you

13   not?

14   A.   I have.

15   Q.   And in the review of the 302s, you recall that the

16   Gautreauxs were interviewed, including Glenn Gautreaux, Ashley

17   Gautreaux, and, of course, the father and mother Gautreaux?

18   A.   Glenn, Jr., is that what you're indicating as Glenn?

19   Q.   Yes.  Do you recall in the course of the interview

20   Mr. Gautreaux indicating that Catherine Greig was very kind to

21   his children as well as his dog and the puppies?

22   A.   Absolutely.

23   Q.   Okay.  Do you recall a person by the name of Puebla,

24   P-u-e-b-l-a?

25   A.   Agnes?

Page 47

1   Q.   Okay.  And who is that?

2   A.   I recall her to be someone from Grand Isle, a relative of

3   the Gautreauxs possibly.  It's been probably fourteen years

4   since that.

5   Q.   Do you recall, sir, that Puebla indicated that indeed Tom

6   was harsh in demeanor to Helen?

7   A.   Again, if you have the 302, I'll review it and answer.

8   Q.   Well, here's the 302 that I think has names on it, so

9   hopefully that will be okay.

10  A.   Again, I'm uncomfortable with the version of this because

11  it could be cut and pasted.  I'd prefer to see --

12  Q.   I don't have the ability to do that --

13  A.   -- Sergeant Robert Patenaude's original 302.

14  Q.   Well, I don't have it, sir, so do you agree that the 302

15  document that you're holding in your hand is a copy of what

16  appears to be a 302?

17  A.   Not a very good one.  Sorry.  I'm not trying to be

18  difficult but --

19  Q.   You're aware, sir, that I received literally 24 hours

20  before the hearing, because counsel for the government, perhaps

21  under their obligations or just out of their good nature,

22  provided me with discovery on a disk that then has to be

23  downloaded and reviewed and read, thousands of pages.

24  A.   Uh-huh.  I believe the first production was Friday of last

25  week, so --

0292fb1f-331f-4107-a31f-5233d752e689

Page 48

1   Q.   Okay.  So that gave me the weekend to review it and

2   download it and be ready to go, right?

3   A.   That would be an issue you may want to address with the

4   U.S. Attorney's office.

5   Q.   Okay.  And my question, sir, is pretty simple:  What does

6   it appear to be that you're holding?

7   A.   Part of a 302.

8   Q.   Okay, does it have a name on it, sir?  You can read the

9   typing, can't you?

10  A.   Again, I'm uncomfortable with this 302.

11  Q.   Well, don't be uncomfortable --

12       THE COURT:  Mr. Herbert, are you able to help with

13  this because this is wasting time?

14       MR. HERBERT:  It is, your Honor, I agree.  Of course

15  we don't have that 302, as I think Mr. Reddington indicated.

16       THE COURT:  I'm sure Mr. Reddington is not trying to

17  pull a fast one on anyone.  We're just trying to get to the

18  substance of this, so --

19       MR. HERBERT:  Yes, we have no objection, your Honor.

20  I think it is what it is.  Obviously it's an excerpt.  I have

21  no objection if the witness is asked to acknowledge what's on

22  the piece of paper that Mr. Reddington has given him.

23       THE WITNESS:  Or testifying to my recollection of the

24  interview with Agnes Puebla.

25       MR. HERBERT:  Yes, your Honor.

Page 49

1   Q.   Would you agree, sir, that it indicates that Puebla

2   described Tom as being harsh in demeanor?

3   A.   Can I?  I'm sorry.

4   Q.   Sure.

5        (Witness examining document.)

6   A.   Yes.

7   Q.   Okay.  A person by the name of Ashley Gautreaux was

8   interviewed as well, was she not?

9   A.   I'm sure she was.

10  Q.   And do you recall Ashley Gautreaux indicating -- and let

11  me approach you with the 302 -- that she did not like Tom --

12  and Tom of course would be Mr. Bulger -- because he was very

13  controlling, I think was the word that she used?

14       (Witness examining document.)

15  A.   It does indicate that, yes.

16  Q.   Okay, thank you.  And on the same 302 -- and, by the way,

17  SA Michael Carazza, would that be you?

18  A.   That is me.

19  Q.   Okay.  It's been a few years since you did that interview,

20  though, right?

21  A.   I'd say about fourteen.

22  Q.   All right.  Do you remember Ashley indicating that it

23  would be Tom that would take the wad of $100 bills from a pouch

24  that he wore, and on one occasion I guess purchase something at

25  Walmart?

0292fb1f-331f-4107-a31f-5233d752e689

1   A.   Can I see that?

2   Q.   Sure.

3        (Witness examining document.)

4   A.   Yes.

5   Q.   And she indicates also that he got pretty irritated with

6   the Walmart people and created a bit of a scene, yelled at the

7   clerks, and left the store, right?

8   A.   It says that.  I don't recall her telling me that fourteen

9   years ago, but --

10  Q.   Sure, okay.  Do you remember interviewing a person by the

11  name of -- I guess it would be the Rudolphs?

12  A.   Black?  Is their nickname Black on the report?

13  Q.   Yes.

14  A.   Yes.

15  Q.   Okay, I'm looking at a 302, Michael Carazza.  That would

16  be you.  Do you recall them stating that "Tom was very

17  controlling with Helen, ordering her around like a servant.

18  Tom would clap his hands as a signal to Helen that he needed

19  her to get him something, and Helen would always respond

20  quickly"?  Do you recall that statement?

21  A.   I recall words to that effect from that interview.  I

22  don't recall the exact statement.

23  Q.   Do you recall him indicating in the interview that Tom

24  always carried a knife on his belt?

25  A.   I don't recall that, but if it's in the document, I'll

Page 51

1   take a look at it.  It wouldn't be inconsistent with

2   information that we obtained.

3   Q.   And indeed Mr. Gautreaux also indicated that Mr. Bulger

4   always carried a knife in his rear pocket for protection.  Do

5   you remember Mr. Gautreaux stating that?

6   A.   Again, words to that effect.  I cannot recall if he said

7   it was for protection, you know, fourteen years later.

8   Q.   And how about, do you recall him indicating that Ms. Greig

9   was very subservient to Bulger, that Bulger was strict and

10  definitely in charge?  Do you recall him indicating that to

11  you?

12  A.   I don't recall that.

13  Q.   I'll approach you with a portion that does not have your

14  signature on it because that's the portion that I downloaded

15  from what was --

16        (Witness examining document.)

17  A.   Well --

18  Q.   Yeah, I understand, but I think your attorneys have

19  indicated that they trust me enough that I'm not going to play

20  games here.

21  A.   Okay.

22  Q.   So would you agree that at least for purposes of your

23  answer, that Mr. Gautreaux indicated that Catherine Greig was

24  very subservient to Mr. Bulger and he was in control?

25  A.   It does indicate words to that effect.

0292fb1f-331f-4107-a31f-5233d752e689

Page 52

1   Q.   Okay, thank you.

2   Q.   Now, at some point they go to the apartment that you've

3   described, and for literally what, fourteen, fifteen years

4   were, as they say, hiding in plain sight, I guess, right?

5   A.   "They" James Bulger and Catherine Greig?

6   Q.   Yes.

7   A.   According to the landlord, at least 1998 or 1999.

8   Q.   Okay.

9   A.   The manager, I'm sorry, the manager of the apartment

10  building.

11  Q.   The manager.  The managing person described them as being

12  quiet tenants?

13  A.   Pleasant.

14  Q.   People, as we said, you've already testified, in the

15  neighborhood had very nice things to say about Catherine as far

16  as being a neighbor, correct?

17  A.   Sure.

18  Q.   Now, when you finally made the arrest and Mr. Bulger was

19  placed under arrest, a ruse, as you use the term, was used to

20  kind of lure him out of the apartment, correct?

21  A.   Yes, ruse.

22  Q.   And before I get there, do you recall indicating that your

23  investigation showed that there was some plastic surgery done

24  apparently by Ms. Greig, sir?

25  A.   We have information that she had received plastic surgery

Page 53

1   in the past.

2   Q.   In the past?

3   A.   Uh-huh.

4   Q.   Like about five years before 1995?

5   A.   Sure.  Maybe even longer than that.

6   Q.   Right.  She never had any plastic surgery while she was in

7   California, did she?

8   A.   Not that we know of.

9   Q.   Okay, so you certainly didn't mean to let the Court think

10   that she had plastic surgery to alter her appearance or, you

11   know, to try to allude law enforcement, do you, sir?

12   A.   Absolutely not.  It's possible, but we have not any

13   information as to that.

14   Q.   All right.  One of the exhibits that was introduced, sir,

15   you might recall was the Best Western McArthur Hotel.  You

16   referenced the fact that Mr. and Mrs. Thomas Baxter checked in

17   and paid cash from September 30 through October 7, it looks

18   like.  Do you recall that exhibit?

19   A.   Yes.

20        THE COURT:  Mr. Reddington, could you just give me an

21   exhibit number.

22        MR. REDDINGTON:  I think it was Exhibit 9, your Honor.

23        THE WITNESS:  Exhibit 9, your Honor.

24   Q.   The only question I had, sir, I just wanted to flesh that

25   out, that receipt is signed by Thomas Baxter, correct?

Page 54

1   A.   It indicates Thomas Baxter.

2   Q.   Okay, thanks.  Now, in the course of the search of the

3   premises, after the ruse was used and he was then placed in

4   custody, law enforcement went into the apartment, and that's

5   when Catherine Greig was placed under arrest; is that right?

6   A.   As far as I can tell, that's what happened.

7   Q.   Would you agree that she at all times was courteous and

8   cooperative and certainly caused no difficulty?

9   A.   Absolutely.

10  Q.   And in the course of the investigation, sir, would you

11  agree that a search was conducted of the premises?

12  A.   On the evening of the arrest or the one subsequent to

13  that?

14  Q.   Well, there were two searches that were conducted, right?

15  A.   Yes.

16  Q.   The first search was after the arrest of Mr. Bulger and he

17  was placed in custody, right?

18  A.   Actually, it was after both James Bulger and Catherine

19  Greig were arrested and in custody.

20  Q.   All right.  And your investigation, sir, would reveal that

21  at the time Mr. Bulger was in custody, he talked to the police

22  apparently in a voluntary, somewhat garrulous fashion, correct?

23  A.   I'm sorry, I didn't --

24  Q.   He just kept talking to the police.  He had no problem

25  talking to the police.

1   A.   At which time?

2   Q.   When he was arrested.

3   A.   In concurrence with his arrest or afterwards?

4   Q.   Yes, the day he was arrested, he's in custody, he's in the

5   cuffs, right?  He's in a garage?

6   A.   I hope so.

7   Q.   He's in a garage, right?

8   A.   I believe the arrest at first was in the garage, and then

9   they later brought him up to the apartment.

10  Q.   Okay.  So while he's in the garage and while he's

11  handcuffed, he makes a statement to the police that he would

12  take them upstairs to show them where the guns and money was;

13  he didn't want them to trash his apartment.  Fair?

14  A.   I don't know if it was for the trashing of the apartment,

15  but he did indicate cooperation in helping them find where guns

16  and money were located.

17  Q.   All right.  And at the time he made that statement, he

18  indicated to the police officer that Catherine knew nothing

19  about the guns and nothing about the money, right?

20        MR. HERBERT:  I'm going to object to getting into

21  Mr. Bulger's actually self-serving comments about Ms. Greig's

22  knowledge.

23        THE COURT:  Overruled.

24  Q.   Yes?

25  A.   I do recall him saying that she knew nothing about the

Page 56

1    guns and never touched them.  As to the money, I don't recall

2    him indicating that she had no knowledge of that.

3    Q.   All right.  A consent search was effectuated; is that

4    right?

5    A.   It was.

6    Q.   And that would be his consent to go in and search the

7    apartment?

8    A.   Their consent.

9    Q.   Pardon?

10   A.   Their consent.

11   Q.   Okay.  Did the police talk to Catherine Greig about that?

12   Did they ask her to consent to that search?

13   A.   Agents and officers who arrested James Bulger and

14   Catherine Greig received both of their consent for the search.

15   Q.   Okay.  And did Catherine Greig go up to help them search

16   the apartment?

17   A.   She was present.  Did she help the search?  I don't know.

18   Q.   Was she brought up into the apartment while the search was

19   going on?

20   A.   She was brought back up after she spoke to James Bulger, I

21   believe.  Again, I wasn't there, Mr. Reddington, but as far as

22   I know, they obtained consent from both James Bulger and

23   Catherine Greig, and that James Bulger assisted them in finding

24   the weapons.

25   Q.   All right.  Catherine Greig didn't assist them in finding

0292fb1f-331f-4107-a31f-5233d752e689

Page 57

1   anything, did she?

2   A.   I don't know.  I wasn't there.

3   Q.   All right.  Mr. Bulger, to your knowledge, is the one that

4   indicated that he would show them where the, let's say, the

5   hide was in the apartment, correct?

6   A.   I don't know if he used that word.

7   Q.   Okay, he used some kind of word to say that he was going

8   to show you where the guns are, and lo and behold, behind the

9   mirror there's a hole in the wall, and inside the hole were

10  guns?

11  A.   There were guns.

12  Q.   Many guns?

13  A.   Many guns.  Many holes too.

14  Q.   Pardon?

15  A.   Many holes.

16  Q.   Many holes.  And they were all covered up, right?

17  A.   Yes.

18  Q.   All right.  And indeed one of the holes also held a large

19  amount of cash, and it was all wrapped in plastic and all

20  stacked neatly, correct?

21  A.   Yes.

22  Q.   You indicated that in his bedroom, one of the exhibits

23  that were presented by the government to her Honor indicates a

24  stack of money that probably looks like it might be about a

25  half an inch high next to what looks to be either a

Page 58

1   .9 millimeter or a .40, correct?

2   A.   It looked like a revolver, but looking at a bookshelf with

3   money?

4   Q.   Yes.

5   A.   A small stack of money and a gun?

6   Q.   Right.

7   A.   Yes.

8   Q.   Now, that would be in his bedroom, correct?  He indicated

9   that's his bedroom?

10  A.   He did, and that's where it was found.

11  Q.   All right.  Now, a search I imagine was effectuated of

12  Catherine's bedroom as well?

13  A.   At the arrest, I don't know if it was.  Uhm, I would think

14  they would have been thorough to search the whole apartment for

15  weapons, contraband and such.

16  Q.   Right.  No contraband, no weapons, to your knowledge, were

17  found in Catherine's bedroom, true?

18  A.   There were not.

19  Q.   There was some more money that was found in one of the

20  pictures that was taken.  I believe it was of a drawer?  Do you

21  remember that?  It almost looks like a little cash register

22  drawer.  It has, you know, stacks of bills, a couple of

23  hundreds, a couple of twenties, a couple of tens, fives, and

24  ones all neatly lined up?  Do you remember that?

25  A.   If you have the picture --

Page 59

1   Q.   Sure, I do.

2          MR. REDDINGTON:  That's not part of your package, your

3   Honor.  That's pictures that were submitted to me by the

4   government on the disk that I downloaded.

5          THE COURT:  And would you like to introduce that into

6   evidence?

7          MR. REDDINGTON:  Yes, I would.

8          THE WITNESS:  This is not part of the packet?

9          MR. REDDINGTON:  No, it's not part of the government's

10  property, no.

11         MR. HERBERT:  Could I see what counsel is referring

12  to.

13         (Document passed to Mr. Herbert.)

14         MR. REDDINGTON:  I don't think there's an objection by

15  the government, your Honor.

16         MR. HERBERT:  No objection.

17         THE COURT:  All right, what number are we up?  So

18  Exhibit 37.  I guess it's defendant's exhibit.  And,

19  Mr. Reddington, when you have a chance, if you could get a copy

20  for the Court.

21         MR. REDDINGTON:  Of course, your Honor, yes.

22  Q.   Now, I'm going to hand you what is now Exhibit 37.  Do you

23  remember seeing that drawer with the little piles of money,

24  tens, twenties, fives, whatever, a couple of hundreds lined up

25  in that drawer?

Page 60

1   A.   Yes.   There's some Gasex and a Bed Bath & Beyond receipt

2   also.   I don't know the location of --

3   Q.   Gasex, is that what you said?

4   A.   Yes, I do see that, but I have no idea where it was

5   obtained.

6   Q.   My question is focused --

7   A.   On the money?

8   Q.   Yes.   Did you ever see that drawer, sir, when you were

9   there working this investigation and doing a search or your

10  brother agents?  Did anyone indicate that that was photographed

11  in the apartment?

12  A.   Again, I was not at the search, either of the searches, so

13  I'm not sure where that picture was taken.

14          MR. REDDINGTON:  Okay, I'm going to offer that.  Thank

15  you.

16          THE COURT:  All right, Exhibit 37 is admitted for

17  purposes of this proceeding.

18          (Exhibit 37 received in evidence.)

19          MR. REDDINGTON:  Excuse me, your Honor, one minute.  I

20  apologize.

21          THE COURT:  Take your time.

22          MR. REDDINGTON:  Thank you.

23  Q.   Do you recall, sir, testifying about an occasion that a

24  gentleman by the name of Peter Lee apparently met with

25  Mr. Bulger, I think it may have been New York or Chicago?

0292fb1f-331f-4107-a31f-5233d752e689

Page 61

1   A.   New York.

2   Q.   And the purpose was that he was to deliver an envelope

3   that was handed to him from Kevin Weeks; is that right?

4   A.   That's correct.

5   Q.   And Mr. Weeks to your investigation had indeed been

6   meeting with Mr. Bulger in New York, in Chicago, and for some

7   reason was unable to make this particular meeting, so he asked

8   Mr. Lee to do it, right?

9   A.   I know he met with him in Chicago in July of '96.  I don't

10  know if he had met with him in New York prior to sending Peter

11  Lee there.

12  Q.   Do you recall in the testimony that you had given to us on

13  Monday that Mr. Lee met and indeed handed an envelope to

14  Mr. Bulger, right?

15  A.   He did.

16  Q.   And this envelope was not inventoried, it was not opened,

17  it was not discussed in Catherine's presence, although your

18  testimony was that she was there at the time of this meeting,

19  right?

20  A.   She was there, and the envelope was never opened.  I

21  believe I testified to that effect.

22  Q.   Yes, you did.  And then they went to dinner, I guess.

23  A.   Or lunch.  I'm not sure what time of day it was.  It was

24  an Irish bar/restaurant.

25  Q.   Okay.  And do you recall that Mr. Lee indicated that

Page 62

1  indeed Mr. Bulger was very irate to the point of almost

2  becoming apoplectic, and he thought he was going to kill him,

3  literally?

4  A.   There were times during the trip that I believe Mr. Lee

5  was concerned.

6         MR. REDDINGTON:  Your Honor, I think that would

7  conclude my questions for this gentleman right now for purposes

8  of the hearing.

9         THE COURT:  All right, any redirect, Mr. Herbert?

10        MR. HERBERT:  Just very briefly, your Honor, if I may.

11 REDIRECT EXAMINATION BY MR. HERBERT:

12 Q.   Agent Carazza, Mr. Reddington asked you about how long

13 Ms. Stanley was with Mr. Bulger as an item.  Do you recall

14 that?

15 A.   Yes.

16 Q.   And you said about twenty years, to your knowledge.  Can

17 you tell us to the best of your knowledge about how long the

18 defendant was with Mr. Bulger?

19 A.   Well, now it's probably thirty-six years if you count the

20 '95 time to the present.

21 Q.   And Mr. Reddington asked you a little bit about the

22 defendant's family and her background.  You testified as to

23 what she did for a living.  To the best of your knowledge, when

24 was the last time she drew a paycheck?

25 A.   Approximately mid-1980s.

Page 63

1  Q.   And, to the best of your knowledge, how many close

2  relatives does she have living at the moment?

3  A.   Blood relatives?

4  Q.   Yes, from her immediate family.

5  A.   Maybe one?

6  Q.   Would that be her sister, Margaret McCusker?

7  A.   Her sister, yeah.  I'm going to be missing someone.

8  Sorry.

9  Q.   Did your investigation develop any information about what

10  Ms. McCusker did for a living?

11  A.   She's a nurse, I believe, at some type of clinic, maybe a

12  drug rehab clinic.

13  Q.   I think Mr. Reddington was asking you about the night that

14  Kevin Weeks bolted from the L Street Tavern and met up with

15  Ms. Greig.  Did you testify previously on direct that that was

16  in fact January 5 of 1995?

17  A.   I may have.  The complaint was signed on the 4th, so --

18  Q.   All right.  Would it be the same day that Flemmi was

19  arrested?

20  A.   Yes.  Thank you.  And I'm sorry if I confused the two

21  dates.

22  Q.   And just to clarify, Mr. Reddington made reference to the

23  FBI's investigation and other agencies' investigation.  Is it

24  fair to say that in addition to the FBI task force, there were

25  other agencies that were also looking for Bulger and Greig,

Page 64

1    including the State Police and the DEA?

2    A.   Absolutely.

3    Q.   Mr. Reddington asked you about how some of the witnesses

4    in Grand Isle characterized Mr. Bulger's relationship with

5    Ms. Greig.  Do you recall that?

6    A.   I do.

7    Q.   And you testified on direct that there were times when she

8    was seen walking alone in the morning or times when she went to

9    visit people alone.  It's fair to say that the witnesses in

10   Grand Isle did not suggest that she was somehow captive of

11   Mr. Bulger, did they?

12   A.   They never indicated that.

13   Q.   And Mr. Reddington asked you about one or two witnesses

14   who complained about some aspects of Mr. Bulger's personality.

15   Is it fair to say there are others that appeared to get along

16   with him and the two of them fairly well?

17   A.   Absolutely.

18            MR. HERBERT:  No further questions.

19            THE COURT:  All right, Mr. Reddington?

20            MR. REDDINGTON:  No, your Honor, thank you.

21            THE COURT:  All right, Special Agent Carazza, you may

22   step down.

23            (Witness excused.)

24            THE COURT:  Does the government have any further

25   witnesses?

1          MR. HERBERT:  No, your Honor, no further witnesses.

2          THE COURT:  All right, Mr. Reddington, do you have any

3     witnesses?

4          MR. REDDINGTON:  Yes.  I would like to call Mr. Kevin

5     Weeks.

6          THE COURT:  All right.

7          MR. REDDINGTON:  And I know we need a few minutes

8     to --

9          THE COURT:  And, actually, may I see the parties at

10    sidebar.

11         MR. REDDINGTON:  Sure.

12    SIDE-BAR CONFERENCE:

13         THE COURT:  Do you know how long?

14         MR. REDDINGTON:  About ten or fifteen minutes.  I

15    already spoke to Brian Kelly and counsel.  I'm not looking to

16    invade any parameters.  I just want to focus on his

17    observations of the relationship of Catherine and Mr. Bulger,

18    and that's it.

19         THE COURT:  All right.  And did you subpoena

20    Mr. Weeks?

21         MR. REDDINGTON:  Yes.

22         THE COURT:  All right.  And are there any other issues

23    I should know about before he testifies?

24         MR. HERBERT:  Just a procedural one.  If it's

25    acceptable to the Court, we would ask if Mr. Kelly could sit at

1    counsel table.

2          MR. REDDINGTON:  No problem.

3          THE COURT:  Yes, that's fine.

4          All right, so you need about five minutes to bring him

5    down?  I'd like to try and finish today.

6          MR. REDDINGTON:  Yes, absolutely, no question.

7          THE COURT:  All right, very good, very good.  So we'll

8    take a five-minute recess.

9          (End of sidebar conference.)

10          THE COURT:  So we're going to take a five-minute

11    recess and resume shortly.

12          THE CLERK:  All rise.  Court is in recess.

13          (A recess was taken, 11:58 a.m.)

14          (Resumed, 12:11 p.m.)

15          MR. REDDINGTON:  May I proceed, your Honor?

16          THE COURT:  Yes.  Have you sworn him in?

17          THE CLERK:  No, not yet.

18                    KEVIN J. WEEKS

19    having been first duly sworn, was examined and testified as

20    follows:

21          THE CLERK:  State your name and spell your last name

22    for the record.

23          THE WITNESS:  Kevin J. Weeks, W-e-e-k-s.

24    DIRECT EXAMINATION BY MR. REDDINGTON:

25    Q.   Good afternoon, sir.

1    A.    Good afternoon.

2    Q.    Mr. Weeks, do you know James Bulger?

3    A.    Yes.

4    Q.    And can you tell us how long a period of time you've known

5    Mr. Bulger?

6    A.    Since 1974, about eighteen.

7    Q.    And is it fair to say that you were perhaps his closest

8    confidante?

9    A.    Possibly, yes.

10   Q.    Do you know Catherine Greig?

11   A.    Yes.

12   Q.    And how long have you known Catherine Greig?

13   A.    Probably through the years less than I've known James

14   Bulger.

15   Q.    So certainly a couple of decades anyway?

16   A.    Yes.

17   Q.    Now, do you recall, sir, when a complaint was taken out

18   against Mr. Bulger and subsequently an indictment was returned

19   against Mr. Bulger?

20   A.    Yes.

21   Q.    And that would be, I believe, in January of 1995?

22   A.    January 5, yes.

23   Q.    Did you have a conversation with Mr. Bulger regarding the

24   returning of that indictment?

25   A.    Yes.

Page 68

1    Q.   And do you recall what you indicated to him?

2    A.   At which period of time?  When he took off, it was the

3    23rd of December.  The first time I talked to him was when

4    Steve Flemmi was arrested, which was on January 5.  I don't

5    think the indictment was handed down till January 10.

6    Q.   That's correct.

7    A.   So I talked to Jim Bulger the night that they arrested

8    Steve Flemmi.

9    Q.   And you indicated that, to your knowledge, he, so to

10   speak, took off around December 23; is that right?

11   A.   Correct.

12   Q.   And did he take off in the presence or the company of

13   somebody else?

14   A.   Yes.

15   Q.   And who was that?

16   A.   Theresa Stanley.

17   Q.   And do you know where they went?

18   A.   I don't know exactly where they went.  I learned later on

19   that they went to New York.

20   Q.   At some point, sir, did Mr. Bulger return to the state

21   sometime at the end of January or the beginning of February,

22   2005?

23   A.   In February, yes.

24   Q.   And do you recall, sir, at some point meeting with

25   Catherine Greig?

Page 69

1  A.   Yes.

2  Q.   And where did you meet with Catherine Greig?

3  A.   Up near Thomas Park at the bottom of the Golden Gate

4  stairs.

5  Q.   And was she with anyone, or was she alone?

6  A.   She came walking down alone.

7  Q.   And when she came walking down the stairs alone, you

8  greeted her, I would imagine, and then did you then go

9  somewhere?

10  A.   Yes.

11  Q.   Where did you go?

12  A.   We drove around for about an hour or so.  I wanted to make

13  sure I didn't have any tails on me, and eventually we ended up

14  at Malibu Beach.

15  Q.   And at Malibu Beach, did you see someone?

16  A.   Yes.

17  Q.   And who did you see?

18  A.   James Bulger.

19  Q.   And did you have a conversation with him?

20  A.   Yes.

21  Q.   Now, where was Theresa Stanley at that point?

22  A.   Theresa Stanley, from what he told me, had been dropped

23  off at her daughter's house in Hingham.

24  Q.   Now, Mr. Bulger had a longstanding relationship with

25  Theresa Stanley; is that correct?

Page 70

1   A.   Correct.

2   Q.   But at the same time apparently he had a longstanding,

3   somewhat secretive, if you will, relationship with Catherine

4   Greig?

5   A.   Not as long but, yeah, he did.

6   Q.   Okay.  And when Catherine met up with you, was she

7   carrying anything?

8   A.   She had a small bag with her, you know, a handbag or

9   whatever.

10  Q.   And that's it?

11  A.   That's it.

12  Q.   She had no luggage, no suitcase, no nothing?

13  A.   No.

14  Q.   And did she then get into the vehicle with Mr. Bulger?

15  A.   When I dropped her off?

16  Q.   Yes.

17  A.   We all did.

18  Q.   And where did you all then go?

19  A.   We drove around South Boston.

20  Q.   For how long?

21  A.   For a while.

22  Q.   And then what happened?

23  A.   Then we came back to Malibu Beach.  Jim Bulger and I went

24  for a walk.  We left Cathy by the car, and we were talking --

25  Q.   Excuse me.  I apologize.  When you say Jim Bulger and you

1    went for a walk, I imagine that was to discuss business?

2    A.    Yes.

3    Q.    Did you ever see Mr. Bulger include Catherine in

4    conversations regarding business?

5    A.    Not in my presence, no.

6    Q.    Was Catherine, to your knowledge, involved in any of the

7    business?

8    A.    No.

9    Q.    Did you ever, to your knowledge, on the streets or over

10   the years, the many decades that you've known Catherine Greig

11   ever known her to be violent?

12   A.    No, no.

13   Q.    To ever be involved in any criminal activity involving the

14   business?

15   A.    Not to my knowledge.

16   Q.    So after you two took a walk to talk, Catherine was left

17   by the car?

18   A.    Yes.

19   Q.    All right.  And after a fashion, you then came back, I

20   imagine?

21   A.    Correct.

22   Q.    And then what happened?

23   A.    Jim Bulger and myself, we shook hands.  We established

24   how, you know, we would be in communication with each other,

25   and I walked back to my car and drove away.

Page 72

1   Q.   And did you see Catherine get in the vehicle with Bulger

2   and leave?

3   A.   Yes.

4   Q.   When was the next time that you had occasion to speak to

5   or meet Mr. Bulger?

6   A.   Well, I was speaking to him quite frequently in the

7   beginning, at least once a week.  You know, he would call me on

8   a prearranged number I had, and we would talk about what was

9   going on.

10  Q.   Did you have occasion to meet up with him in person?

11  A.   Yes.

12  Q.   And would some of those occasions be either Chicago or

13  New York?

14  A.   Mostly in New York, once in Chicago.

15  Q.   Did you have some kind of code or whatever as to where

16  you'd meet, like meet by the double lions or the lions or

17  something?

18  A.   Yeah, that was the library, the lions.

19  Q.   And the lions would be out in front of the library?

20  A.   Correct, in New York.

21  Q.   And when you would meet with Mr. Bulger, was Catherine

22  Greig there with him?

23  A.   Sometimes, yes.

24  Q.   Did you ever have occasion to speak business, so to speak,

25  with Mr. Bulger on those occasions?

Page 73

1   A.   No.  Usually what -- well, yeah, we used to talk, but we'd

2   usually leave Cathy in the park or something sitting on a

3   bench, and we'd go for a walk.

4   Q.   Okay.  So, in other words, yet again, Catherine certainly

5   had nothing to do with any discussions regarding business, that

6   she would either feed the pigeons or sit on a bench or

7   something while you guys would talk?

8   A.   Correct.

9   Q.   Did you have occasion to prepare any type of or assist in

10  the preparation of any type of false identification?

11  A.   For Jim Bulger?

12  Q.   Yes.

13  A.   Yes.

14  Q.   Okay.  Was there an occasion that a purchase was made of a

15  sheet, and it was hung on a wall or something to make it

16  look --

17  A.   Yeah.  That was in Chicago.

18  Q.   That was in Chicago.  And was that in an apartment that

19  that took place?

20  A.   It was actually, it was a hotel room.

21  Q.   A hotel room.  Was that Mr. Bulger's hotel room?

22  A.   Yes.

23  Q.   And was Catherine there?

24  A.   Yes.

25  Q.   Did she participate in the taking of photographs or have

0292fb1f-331f-4107-a31f-5233d752e689

Page 74

1    her photograph taken for purposes of identification?

2    A.   No.   She was -- she was talking to another person that was

3    there while I proceeded with Jim Bulger to take the photographs

4    and stuff.

5    Q.   I'm going to ask you, sir, back in 1995, when these

6    indictments were returned, being, I believe -- you're a

7    lifelong resident or at least certainly familiar with the

8    streets of South Boston, as they say?

9    A.   Yes.

10   Q.   In that capacity, sir, and knowing people in the streets

11   of the city, would you agree, sir, that Mr. Bulger had a

12   reputation of somewhat mythic proportions among the citizenry?

13   A.   A reputation as far as what?   He had several reputations.

14   Q.   Well, I mean, he was considered by many to be kind of like

15   a Robin Hood type, guy right?

16   A.   Yes.

17   Q.   And he was considered by many to have kept the streets

18   safe and keep drugs out of the city, right?

19   A.   Yes.

20   Q.   And he was considered by many to be very helpful to the

21   old people, in the sense of buying them turkeys and things, and

22   helping people get jobs and things of that nature?

23   A.   Yes.   He was generous with people.

24   Q.   And that was the Whitey Bulger, if you will, of 1995?

25   A.   Yes.

1   Q.   Well before four years later when indictments were

2   returned alleging various charges of murder and acts of

3   violence, correct?

4   A.   Correct.

5   Q.   And certainly that was well before any information from

6   Judge Mark Wolf's hearing revealed that Mr. Bulger was an

7   informant, and indeed had been for many, many, many years

8   cooperating with the FBI?

9   A.   Correct.

10          MR. REDDINGTON:  Thank you, sir.  I appreciate it.

11   That's all I have.

12          THE COURT:  Any cross-examination by the government?

13          MR. PIROZZOLO:  Yes, your Honor, just briefly.

14   CROSS-EXAMINATION BY MR. PIROZZOLO:

15   Q.   Following up first on the last few questions that

16   Mr. Reddington asked you, Mr. Weeks, he asked you about

17   Mr. Bulger's reputation among people in the community of South

18   Boston, that line of questioning you just went through, and you

19   mentioned that that was the reputation among some people,

20   correct?

21   A.   Correct.

22   Q.   You knew him as his friend as being something quite other

23   than that?

24   A.   Yeah, he had a reputation with the average people in South

25   Boston as being, you know, a good guy, a Robin Hood; and then

1   people that were criminals that were around our circle had a

2   different, you know, outlook towards him, what he was capable

3   of.

4   Q.   And that included, as you were his friend, as his friend,

5   you were aware of that other side of Mr. Bulger, correct?

6   A.   Correct.

7   Q.   And it's fair to say that Ms. Greig, at least to your

8   knowledge for the last few years before flight, was also a

9   friend of Mr. Bulger as well?

10  A.   Yes.

11  Q.   And would also be in a position to be aware of

12  Mr. Bulger's reputation as a criminal in South Boston?

13  A.   I don't know what she knew as far as his reputation.  I

14  mean, you know, she probably saw one side of him, and other

15  people saw another side of him.  I don't know.

16  Q.   And in fact you really don't know what Ms. Greig was aware

17  of at the time that she left with Mr. Bulger or anytime before

18  that, correct?

19  A.   No.  I only know my interactions.

20  Q.   Now, I want to focus on the night of January 5, 1995.  You

21  were asked some questions about that night a few moments ago

22  when you were at the L Street Tavern.  Do you remember that

23  line of questioning?

24  A.   Yes.

25  Q.   And you left -- you were at the bar at that time?

Page 77

1    A.    Yes.

2    Q.    And you left the bar shortly after something happened.

3    What happened?

4    A.    Michael Flemmi came in the bar and motioned for me.  I

5    went outside with him, and he told me that they had just

6    arrested Stevie Flemmi.  I went back in, grabbed my jacket; I

7    went out the side door.

8    Q.    And after you left the bar, did you leave on your own or

9    with somebody else?

10   A.    A friend of mine drove me from the bar.  I left my car

11   there.

12   Q.    And after you left in the car with a friend, did you

13   subsequently see Ms. Greig that evening?

14   A.    Later that evening, yes.

15   Q.    Where did you see her?

16   A.    Down by the rotary by the stores we used to own down in

17   South Boston.

18   Q.    And did you speak to her?

19   A.    Yes.

20   Q.    And what did you say to her, and what did she say to you?

21   A.    I told her they had arrested Stevie.  We noticed a lot of

22   law enforcement around us, driving around and stuff, and she

23   had mentioned that she had seen them too and stuff.  And I

24   mentioned to her, "I think they might be looking for Jimmy."

25   Q.    And what did she say to you?

Page 78

1   A.   She was -- you know, she acknowledged that she understood

2   what I was saying.  She was giddy in the sense of that nervous,

3   like, she was a nervous person about the whole thing.

4   Q.   Now, after that night in 1995, you did stay in touch with

5   Mr. Bulger, you just mentioned?

6   A.   Yes.

7   Q.   Okay.  And sometime after that night in 1995 in January,

8   you had occasion to meet Mr. Bulger back in Boston, correct?

9   A.   Yes.

10  Q.   And that was where Ms. Greig met up with Mr. Bulger and

11  you, which is what you just testified to a few moments ago?

12  A.   Correct.

13  Q.   When you met Ms. Greig, what, if anything, did you speak

14  about before you met Mr. Bulger that evening?

15  A.   Basically we just had small talk:  "How are you doing?"

16  you know, "How have you been?" stuff like that.  She was

17  nervous, you know.  I told her, you know -- I kept on driving

18  around and stuff, and I told her, you know, to relax, that I'm

19  just making sure no one's, you know, following me around, you

20  know.  So I was obviously going in misdirections until I

21  finally got to where I was going.  It was small talk.

22  Q.   And then you subsequently met Mr. Bulger with Ms. Greig,

23  correct?

24  A.   Correct.

25  Q.   And what did you observe Ms. Greig do upon seeing

0292fb1f-331f-4107-a31f-5233d752e689

1    Mr. Bulger?

2    A.    She smiled when she saw him, and he come -- he come

3    walking out of the dark and walked up, and then shook my hand

4    and gave her a hug.

5    Q.    And what, if anything, did you see about her demeanor?

6    Did she appear to be upset, afraid, happy to see him?

7    A.    She appeared nervous.  I mean, I can't -- for what, you

8    know, I don't know, but she appeared nervous.

9    Q.    Did they embrace?

10   A.    Yes, they did.

11   Q.    And then she had something with her.  What did she have

12   with her?

13   A.    She had a small, like, bag with her.  It wasn't that big.

14   Q.    And when she got into the car, did she appear to get into

15   that car willingly?

16   A.    Yes.

17   Q.    And then you drove around for some time after that with

18   Ms. Greig in the car, correct?

19   A.    And Jim Bulger, yes.

20   Q.    And Mr. Bulger.  Did Ms. Greig at any time express any

21   desire to get out of the car?

22   A.    She, uhm -- I don't remember her saying anything the whole

23   time.

24   Q.    Now, after Ms. Greig and Mr. Bulger left that evening, you

25   continued to stay in touch with Mr. Bulger through telephone

Page 80

1    contact; is that correct?

2    A.    Yes.

3    Q.    And it was in fact the case that you would arrange calls

4    for various people on behalf of Mr. Bulger, correct?

5    A.    Correct.

6    Q.    Basically how did that work?

7    A.    Uhm, well, when I would talk to him, I would give him the

8    number; and then we had a certain time and date, whatever, that

9    he would call me back, I'd be at that phone.  So incoming calls

10   would be a person's phone that I trusted, I knew, or it was a

11   pay phone, and he would call me back.  When he wanted to get

12   ahold of someone, I would go to the person; I would tell them,

13   "Get me a number where you can be," and then I would give the

14   number to Jim Bulger so he could call.

15   Q.    And so it would be through some kind of third party that

16   would receive the call often?

17   A.    Well, if he wanted to talk to somebody else.

18   Q.    But the call would be arranged someplace, some mutual

19   friend of you and Mr. Bulger?

20   A.    No, not mutual friend of mine.  It was probably whether

21   that person felt comfortable talking that he was going to talk

22   to.

23   Q.    And did you ever arrange any calls for people to speak

24   directly or indirectly with Ms. Greig?

25   A.    I arranged a phone call with Kathy McDonough, but that was

Page 81

1    at Jim Bulger's urging.

2    Q.   But you did arrange that?

3    A.   Yes.

4    Q.   Now, you spoke a few moments ago about Chicago?

5    A.   Yes.

6    Q.   And your trip to Chicago?  Now, prior to your trip to

7    Chicago, did you make arrangements to prepare a fake

8    identification for Mr. Bulger?

9    A.   Yes.

10   Q.   And what did you do?

11   A.   I took pictures of his brother with a fake mustache on.  I

12   had some IDs made and brought them out to Jim Bulger in

13   Chicago.

14   Q.   And when you met Mr. Bulger in Chicago, Ms. Greig was

15   there with him?

16   A.   Yes.

17   Q.   And who's the brother?

18   A.   Jack.

19   Q.   And when you went to Chicago, did Mr. Bulger express any

20   satisfaction or dissatisfaction with the photos?

21   A.   To me.  The mustache that Jackie had on was too big.

22   Q.   And that then prompted you to take additional photos of

23   Mr. Bulger in that hotel room, correct?

24   A.   Right.  We went to a store and we bought another camera.

25   We got a sheet and we hung it up, and I took more pictures of

0292fb1f-331f-4107-a31f-5233d752e689

Page 82

1    Jim Bulger so it would be his picture that was on the ID.

2    Q.   And whatever Ms. Greig's specific involvement in taking

3    those photos was, it is in fact the case that she was present

4    in that hotel room at the time you were taking those photos

5    with that sheet?

6    A.   Well, it's a hotel room, but there's like two rooms, a

7    bedroom and then a small room.  And she was basically the

8    person that I had brought out with me talking to them while I

9    took the pictures of Jim Bulger, and we took multiple pictures

10   because we were trying to center it and get it just right so it

11   would like the license.

12   Q.   And that took a little bit of time?

13   A.   Yes.

14   Q.   About how long?

15   A.   I don't remember.  It was more than an hour.

16   Q.   And would you describe Ms. Greig as an intelligent person?

17   A.   Yes.

18   Q.   Would you describe Ms. Greig as a strong-willed person?

19   A.   She's a strong person.  She's a caring, compassionate

20   person.

21   Q.   And when was the last time you saw Mr. Bulger and

22   Ms. Greig?

23   A.   Uhm, I believe it was '96 in November in New York.

24   Q.   And so from 1996 in November until June 22, 2011, you have

25   no knowledge of what Ms. Greig may have done to obscure her

Page 83

1    identity?

2    A.   Correct.

3    Q.   You have no knowledge of what Ms. Greig may have done to

4    assist Mr. Bulger in obscuring his identity from authorities?

5    A.   Correct.

6    Q.   You have no idea what Ms. Greig may have done in terms of

7    assisting Mr. Bulger in living in California where they were

8    for the last ten to fifteen years?

9    A.   Correct.

10   Q.   You have no knowledge of her signing out prescriptions in

11   assumed names, both for herself and for Mr. Bulger --

12          THE COURT:  Mr. Pirozzolo, this sounds more like

13   testimony from you, so --

14          MR. PIROZZOLO:  I have nothing further.

15          MR. REDDINGTON:  I have nothing further, thank you.

16          THE COURT:  All right the witness may step down.

17          (Witness excused.)

18          THE COURT:  Is there any further evidence,

19   Mr. Reddington?

20          MR. REDDINGTON:  No, your Honor.

21          THE COURT:  All right, is there any further evidence

22   from the government?

23          MR. HERBERT:  No, your Honor.

24          THE COURT:  All right, so let me take up -- Mr. Kelly,

25   you may be excused.

Page 84

1          MR. KELLY:  Thank you.

2          THE COURT:  All right, in terms of the victim

3    statements, I want to thank both counsel.  I did read the

4    briefs and the cases cited therein, and they were very helpful.

5    Does either side wish to add anything to what they've already

6    submitted?

7          MR. PIROZZOLO:  Unless there is specific questions,

8    your Honor, no.

9          MR. REDDINGTON:  Likewise, your Honor, I think it says

10   it all in the submission.

11         THE COURT:  All right, the federal statute, the Crime

12   Victim Rights Act, makes clear that crime victims have the

13   right to be reasonably heard at any public proceeding in the

14   District Court involving release.  In other words, victims have

15   the right to be heard at detention hearings.  I don't think

16   that is seriously in doubt.

17         The closer question in my mind is whether the family

18   members who would like to speak today meet the legal definition

19   of crime victim in the crime victim rights statute.  That is

20   not to say that those family members are not victims in the

21   common everyday use of the term "victim," but the question

22   before me is whether their circumstances satisfy the following

23   definition, that they are, quote, "persons directly and

24   proximately harmed as a result of the commission of a federal

25   offense."  The question is whether they are victims in this

1   case, not any other case.  After reading the cases, the issue

2   appears quite complex.

3        So what I propose to do today is to take the

4   statements of -- I understand four victims would like to speak,

5   and reserve decision on whether the individuals who speak today

6   meet the required legal definition that determines who gets to

7   speak.

8        Is there any comments from the government on that

9   proposal?

10       MR. PIROZZOLO:  No, your Honor.

11       THE COURT:  Any comments, Mr. Reddington?

12       MR. REDDINGTON:  No, your Honor.  Thank you.

13       THE COURT:  All right, I understand that the parties

14   have agreed on a procedure with respect to the victim

15   statements, and that is that the four family members who wish

16   to speak may give brief statements orally.  And I would ask

17   each of the speakers to keep in mind the following:  The issues

18   before me are not guilt, innocence, or punishment.  Indeed,

19   Ms. Greig is presumed innocent at this time.  The issue before

20   me is whether Ms. Greig should be released or detained pending

21   trial, and your remarks would be most helpful to me if you

22   discussed that issue.

23       Mr. Pirozzolo, do you have a proposed order of the

24   victims?

25       MR. PIROZZOLO:  Yes, your Honor.  Should I have them

Page 86

1    come up one at a time?

2          THE COURT:  Yes, and they can use the podium behind

3    you.

4          MR. PIROZZOLO:  Okay, the first person to speak would

5    be Timothy Connors.

6          MR. CONNOR:  Good afternoon, your Honor.  My name is

7    Timmy Connors.  I am the son of Eddie Connors --

8          THE COURT:  Excuse me, Mr. Connors.  We're just going

9    to move the microphone.  Thank you.

10          MR. CONNORS:  Good morning, your Honor.  Good

11    afternoon.  My name is Timmy Connors.  I'm the son of Eddie

12    Connors, who was murdered by Whitey Bulger on June 12, 1975.

13    I'm here on behalf of my family and myself to plead that

14    Ms. Greig not be granted bail.

15          On Monday Attorney Reddington had stated that these

16    were Whitey's crimes and not Ms. Greig's.  I disagree.  This is

17    about both of them.  Ms. Greig chose to leave the state and

18    build a new life with him.  She changed her identity and chose

19    to acclimate herself as necessary.  While myself and my family

20    have endured the torture of wondering if Whitey was alive or

21    dead enjoying his long-extended freedom, Ms. Greig was running

22    errands for Whitey and living life as normal.  She may have

23    even had access to his finances.

24          It's an injustice to the victims' families if

25    Ms. Greig was given the gift of bail.  She could have ended our

Page 87

1    pain if she chose to divert one of those calls to her sister or

2    a law enforcement agency.

3         If you wanted to go on the notion set forth by her

4    attorney that she is considered by family and neighbors as a

5    kind person, which they would be guilty of perjury, then Whitey

6    should be freed on bail also, as he was considered by some, as

7    Attorney Reddington mentioned, a Robin Hood, a decent guy.  So,

8    your Honor, it's obvious we can't believe what friends and

9    neighbors say about her because her neighbors were his

10   neighbors too.

11        Thank you.

12        THE COURT:  Thank you, Mr. Connors.

13        Mr. Pirozzolo, who would like to speak next?

14        MR. PIROZZOLO:  The next person to speak is Stephen

15   Davis.

16        THE COURT:  Mr. Davis?

17        MR. DAVIS:  I'm Steve Davis, brother of Debra Davis.

18   I can't put into words in three minutes, your Honor, the

19   suffering of my whole family for thirty years now.  I just want

20   to thank the Court for having the opportunity to be heard.

21        I believe Catherine would be a risk of flight.  One,

22   she has the knowledge and experience and means to survive on

23   the run, proven to us for the past sixteen years, assuming the

24   numerous false identities, and, as we've seen on tape and

25   everything, coming and going as she pleased to the stores and

Page 88

1    shopping and all that.

2         I think, in all fairness, she does not deserve the

3    freedom, having assisted America's most wanted criminal in the

4    past sixteen years.  And we all are victims.  Family members of

5    the victims deserve some kind of justice.  So I don't know, you

6    know, like, Mr. Reddington is saying Robin Hood.  I never heard

7    that.  I never heard this guy take care of anybody, the guy

8    they're all trying to protect.  And I didn't know Robin Hood

9    was a good guy.  I guess in his eyes maybe, but Robin Hood

10   robbed the rich to give to the poor.  I mean, that's not a good

11   man.  She in my eyes and my family, she's an evil woman, and

12   she doesn't deserve the freedom she's searching for because we

13   don't have that.  My sister can't stand here today and tell

14   anybody how she feels because it was stolen by the man that

15   this woman was in love with.  And that's all I have to say.

16        THE COURT:  Thank you, Mr. Davis.

17        MR. DAVIS:  Thank you.

18        MR. PIROZZOLO:  The next person to speak, your Honor,

19   is Chris McIntyre.

20        THE COURT:  Mr. McIntyre?

21        MR. McINTYRE:  Good afternoon, your Honor.  My name is

22   Christopher McIntyre.  My brother John was a victim of

23   Whitey's.  I'm here just to let the Court know that where this

24   woman is going to be bailed to is less than 100 yards from my

25   mother's front yard.  This would cause emotional grief for my

Page 89

1  mother.  She's 84 years old and she's having failing health

2  right now.  I think that in itself should deny this.  I mean,

3  some restraining orders are stronger than that.  And I'm just

4  asking that, you know, if there's another address, let her bail

5  to that, but Squantum, she can't bail to Squantum.  Come on.

6  That's all I have to say.

7          THE COURT:  All right, thank you, Mr. McIntyre.

8          MR. PIROZZOLO:  Your Honor, finally will be Thomas

9  Donahue.

10          THE COURT:  Mr. Donahue?

11          MR. DONAHUE:  I just want to start off, your Honor, by

12  thanking you for giving me the opportunity to speak here.  All

13  I need is just a few minutes of your time and a few minutes of

14  your mind.  I don't have the best vision in the world, but

15  please give me a few minutes.  Thank you for hearing me.

16          I speak to you for my brother, my mother, and my

17  family.  When I was younger, I memorized a poem.  My father was

18  then dead.  It was on parents' day.  The poem goes as follows:

19          "Father, father, where are you going?  Oh, don't walk

20  so fast.  Speak, father.  Speak to your little boy or else I

21  shall be lost forever."

22          And lost is what I was.  I couldn't read it that day

23  because I was so lost.  It was too painful.  My father Michael

24  Donahue was gone, killed in cold blood by Whitey Bulger in

25  Maine, 1982, but I'll always remember this.  It was for my

Page 90

1   father.  But my father's loving presence has still been lost to

2   all of us after all these years.

3           As I look at the defendant before you, I know that

4   Whitey Bulger was Catherine Greig's longtime companion.  She

5   walked the streets of Santa Monica, Grand Isle, the streets of

6   Ireland and other places in the world over the past sixteen

7   years.  If they had not been caught on June 22, Ms. Greig would

8   still be caring for my father's killer in a Santa Monica

9   hideout today.  My family has spent the past sixteen years, in

10  fact the past twenty-nine years, without our father, husband,

11  and grandfather.  During the same time, Ms. Greig was using

12  false identities and spending the blood money Bulger took from

13  his victims to do her hair, go out and buy fancy clothes, and

14  nice restaurants.  She also kept in touch with her family with

15  calling cards bought for her by Bulger, got prescriptions

16  filled here in the U.S. and in Mexico, and lived and slept with

17  Bulger in an apartment filled with guns and cash, tons of guns

18  and cash.  While she was tinting her hair and getting surgery

19  to change her looks, we laid awake at night sweating from the

20  nightmares and shedding tears of our lost father.  The sixteen

21  years with her lover on the run were the sixteen years that we

22  cried.  She knows of his evil ways, his killing, his torture,

23  his infliction on all of us.  Without her, he may have been

24  caught a long time ago.

25          No man is an island.  If you let her go, if you allow

Page 91

1   her then to go live with her sister who kept her on the run, it

2   is a complete smack in the face to every victim throughout

3   Whitey Bulger.  In fact, at the end of the day, it is almost

4   stunning that I am addressing you at the invitation of a

5   government that refuses to acknowledge us as victims, even

6   today, in the U.S. Court of Appeals as they argue against us.

7   For years no one listened to us except for our lawyers, Bob

8   George and Ed Hinchey, who provided a voice for us when no one

9   else would listen.  So did the late Judge Reginald Lindsay, the

10  Honorable Judge Lindsay, by the way, who tried so hard, even

11  when he was sick, to tell the truth about this tragedy.

12          I hope you are listening as well, your Honor.  Setting

13  Ms. Greig free under any circumstances would be unjust and

14  unbearable, not just for my family but to everyone and anyone

15  victimized by Whitey Bulger, her partner in crime, because she

16  knew everything he did, and she condoned everything he did as

17  well.  She knew of and condoned it.

18          Thank you very much, your Honor.  I appreciate it.

19          THE COURT:  Thank you, Mr. Donahue.

20          Does the government wish to present argument at this

21  time?

22          MR. HERBERT:  Yes, your Honor.

23  CLOSING ARGUMENT BY MR. HERBERT:

24          MR. HERBERT:  Your Honor, obviously the chief issue of

25  concern in this case is risk of flight.  To state the obvious,

Page 92

1   the mere fact that this defendant spent the last sixteen years,

2   which amounts to more than a third of her adult life, living as

3   a fugitive and is before the Court now, not because she turned

4   herself in but because she was apprehended, would be enough to

5   justify concluding that she presents a very substantial risk of

6   flight.  But this isn't simply a case of someone remaining a

7   fugitive for sixteen years in a low-profile case where there

8   was no concerted effort to find her.  As the evidence shows,

9   the defendant learned the tricks of the fugitive trade, if you

10  will, from a top-ten fugitive who was wanted for nineteen

11  murders, who had a substantial reward offered for his capture,

12  and multiple agencies, federal, state and local, looking for

13  him, and someone who was featured on America's Most Wanted more

14  times than anyone else.  So this is not your average flight,

15  even protracted average flight.

16         Clearly from the evidence the Court can conclude the

17  defendant has a demonstrated ability to remain as a fugitive.

18  This is someone who knows how to be a successful fugitive in

19  her own right.  She's not simply a traveling companion for

20  Mr. Bulger.  I think the evidence is clear on that.  She was a

21  willing, active participant in their joint effort to evade

22  arrest.

23         She knows everything you'd need to know to be a

24  fugitive.  She certainly knows how to acquire and make false

25  identification documents.  She knows how to change her

Page 93

1   appearance.  She's had multiple plastic surgeries and could

2   easily get more.  She knows how to get healthcare in a phony

3   name.  She knows how to stay in role, as it were, in her false

4   identity so as not to arouse suspicion.  She knows how to

5   communicate with friends and loved ones without giving up her

6   location, and she knows how to spend money without a trace.

7        Your Honor, she also has a motive to flee.  She's

8   looking at substantial prison time.  The low end of her

9   guidelines just for the harboring are 33 months in prison after

10  trial.  But this is obviously far from a heartland harboring

11  offense, and so I would suggest that an upward departure or

12  variance would be appropriate after conviction.

13       But she also has exposure for other potential offenses

14  beyond the one that she is charged with now, and she would well

15  know that.  She's got possible exposure for conspiracy, for

16  identity theft, for being an accessory after the fact, for

17  misprision of a felony, and possibly for illegal weapons

18  possession as well.  So from her standpoint, really, the only

19  alternative to a potentially lengthy sentence would be the

20  unpleasant prospect of cooperating against somebody to whom she

21  clearly remains very close by all indications.

22       Even if she goes to trial, she has to know that if she

23  sticks around, she could be compelled to testify against

24  Mr. Bulger, even if she didn't choose to do so willingly, and

25  that would give her motive to flee.  Given how accustomed she's

1  become to her life as a fugitive, you have to conclude that

2  resuming her flight would be an attractive option.

3       But that's just looking at her own motive to flee

4  without taking into account Mr. Bulger's interests, and

5  Mr. Bulger clearly has his own reasons why it would be in his

6  interest for her to flee.  He knows she could cause some

7  additional legal headaches, not that he needs any, but more to

8  the point, she could cause legal headaches for those close to

9  him who were helping them remain fugitives.

10      By all indications, she remains very much aligned with

11  Mr. Bulger, and judging from statements she's made to Pretrial

12  Services in California and statements that he made to Pretrial

13  Services in California, she may be beholding to him or his

14  brother for the expenses of her legal representation.  So you

15  have to ask yourself whether Bulger might be able to influence

16  her to flee, even if that's not something that she would be

17  inclined to do on her own.

18      She clearly has the means to flee.  She's told

19  Pretrial Services she has no money in her own name but that

20  Bulger controlled all the finances, all the money for the two

21  of them; but, as I say, the Pretrial Services report indicates

22  that Mr. Bulger said that his brother might be able to pay for

23  her legal representation.

24      I think what the Court has to look at here is that

25  given all of the planning that went into their life as

Page 95

1    fugitives, and all the planning he clearly did for his life as

2    a fugitive starting years before he was charged, common sense

3    would dictate that they had a contingency plan for just this

4    situation.  It would make sense that the plan would include him

5    securing topnotch counsel for her, and she certainly does have

6    one of the most prominent defense attorneys in the

7    Commonwealth.  And, if deemed in his interest, there's no

8    reason why that plan wouldn't include her taking off; getting,

9    for instance, a key to a safe deposit box that we don't know

10   about, accessing new identities and new money, and connecting

11   with people who can help her.

12          Your Honor, the cash in the apartment cannot possibly

13   be all Bulger had.  Somebody as careful as he was could not

14   possibly have risked becoming a penniless fugitive if that

15   apartment building caught fire and their apartment contents

16   were destroyed.

17          She hasn't told the Court about any other accounts or

18   safe deposit boxes that they had access to that they could have

19   drawn upon if that were to happen, and I think that's a factor

20   the Court should consider.  Even if she did, there would be no

21   reason to be believe or to be confident that she told you about

22   all of them, and there's no reason to suppose that we know

23   about all of the boxes and accounts that they had access to.

24   We know about some, but we know that this was an exceptionally

25   well-planned flight.

1          We know Bulger opened one or two safe deposit boxes

2     with Ms. Stanley, another girlfriend.  The fact that there's no

3     evidence that she, Ms. Stanley, accessed them I think would be

4     a further indication that she was on that box for this type of

5     situation; and it would make sense that he had the same plan

6     put in place over the last sixteen years with respect to

7     Ms. Greig.

8          Also, she presumably has access to additional

9     identities and connections established during the travels, so

10    there's no question she has a demonstrated ability and a strong

11    incentive to flee.  So the question becomes whether there are

12    any conditions or combinations of conditions that could

13    reasonably assure her appearance, and I would suggest that

14    there are not.  Financial conditions that Mr. Reddington has

15    floated -- and I would say they're far from final proposals to

16    the Court if they are the things he's raised in his brief --

17    but they lack the adequate documentation that you would need to

18    know what measure of security he's even contending to have, but

19    they're simply inadequate as proposed.

20         Her house is no security at all.  She walked away from

21    that completely in 1995, presumably for good.  Her sister's

22    house, we don't know how much equity is in that house.  We

23    don't have an appraisal or title documents from Mr. Reddington.

24    But even if it was all that Mr. Reddington said it was, without

25    knowing how much money Bulger has access to, we can't possibly

Page 97

1    evaluate whether that provides any meaningful assurance that

2    she would appear.  For all we know, Bulger could very easily

3    make her sister whole if she were to lose her house.

4         And I would suggest the Patriarca case which

5    Mr. Reddington cited stands for the proposition that if the

6    Court is going to rely on a financial condition, that it's

7    incumbent upon the Court to get a very detailed financial

8    statement from the defendant, I would suggest more detail than

9    the affidavit that goes along with court-appointed counsel; and

10   in this case, it would require an inquiry beyond simply her

11   statement, "I don't have any money in my own name at this

12   time," because that obviously leads to the substantial

13   loophole.

14        Third-party custodian -- I don't know that's even been

15   put on the table -- that wouldn't be appropriate.  Certainly if

16   he's suggesting that she live with her sister, her sister and

17   her closest friend have already been convicted of obstructing

18   this investigation.

19        And, finally, house arrest and electronic monitoring

20   are inadequate because the bottom line is, if somebody is this

21   much of a risk of flight, she can go if she wants to go.

22   Neither of those conditions are going to prevent her from

23   fleeing if she's determined to do so.

24        So to just briefly -- I know the Court has to consider

25   the factors under 18 United States Code, Section 3142(g).  Just

Page 98

1    briefly touching on some of them, one of the factors is the

2    nature and circumstances of the offense charged, including

3    whether it's a crime of violence or a terrorism offense and

4    some others listed.  I would suggest that this is a serious

5    offense.  Harboring is an accessory-type offense.  That's the

6    way it's treated in the law; that's the way it's treated in the

7    Guidelines.  It derives its seriousness from the underlying

8    offense that the person is an accessory to.  In this case, the

9    underlying offenses of Mr. Bulger could hardly be more serious.

10          As to her offense, when you're considering risk of

11   flight in a detention motion, clearly the nature and

12   circumstances of her charged offense would weigh heavily in

13   favor of detention.

14          The second factor, the weight of the evidence against

15   the person, I would suggest this is a very strong case.  The

16   Court has seen the evidence, and I don't need to belabor that,

17   but it consists of multiple witnesses, documents, and other

18   evidence from the search.  You've seen the bonds, surveillance

19   tape, phone records, et cetera.

20          If you consider the history and characteristics of the

21   person, including such things as family and community ties,

22   your Honor, this defendant has literally no ties to the

23   community that she wasn't willing to sever completely in 1995

24   when she took off with Mr. Bulger, and she's lived with him in

25   other locations that entire time.  So she has none that the

1   Court could point to that would counsel in favor of granting

2   her release.

3          She certainly had time after the charges.  You know,

4   Mr. Reddington is suggesting that the original charges were

5   somehow tame.  The Court has the indictment in front of her.

6   You can read what Bulger is alleged of.  Yes, there are no

7   murders alleged against Mr. Bulger in that case.  There was a

8   murder of a lawyer alleged against Mr. Bulger's partners,

9   Stephen Flemmi and Frank Salemme.  But the extortion case, as

10  the indictment alleges, the success of their extortion business

11  was dependent upon this enterprise's reputation for violence

12  and the fear of the individuals that they were exploiting.  So

13  it certainly would not be accurate to suggest that she didn't

14  know whom she was throwing her lot in with, and she certainly

15  had time to reflect on all the press that came out, some of

16  which the Court has in evidence, before she took off with him.

17         You just heard from some of the victims.

18  Mr. Reddington wants to suggest she's a person of good

19  character because people seem to like her and she did favors

20  for neighbors and was kind to animals.  That's all well and

21  good, but I think the victims very legitimately have a

22  different take on her character when she was an essential

23  participant in keeping Mr. Bulger from facing the very serious

24  charges against him.

25         You should also consider on that factor her record of

0292fb1f-331f-4107-a31f-5233d752e689

Page 100

1    appearance.  Obviously, she didn't have a court appearance that

2    she failed to appear for, but since 1997 she has had charges

3    against her, she has been wanted, and she has willingly failed

4    to surrender on this case for the last fourteen years.

5         So, last, I would just say that the last factor

6    includes -- and this is Subsection (4) under 3142(g) -- as the

7    Court knows, it includes the provision that in considering

8    conditions of release, "The judicial officer may upon her own

9    motion, or shall upon motion of the Government, conduct an

10   inquiry into the source of the property to be designated for

11   potential forfeiture or offered as collateral to secure a bond,

12   and shall decline to accept the designation, or the use as

13   collateral, of property that, because of its source, will not

14   reasonably assure the appearance of the person as required."

15        I would suggest if the Court, and I don't think the

16   Court should get to this point, but if the Court were to give

17   any consideration to any financial conditions such as the

18   posting of any security, we would ask the Court to make an

19   inquiry into the source of that property for all the reasons

20   that I think are obvious from the evidence.

21        So that's all, your Honor.

22        THE COURT:  Now, Mr. Herbert, you haven't spoken

23   directly to probable cause.  Did you want to address that

24   separately?

25        MR. HERBERT:  Yes.  Well, I think I can be very brief

Page 101

1   with that.  I don't think there's any dispute between the

2   parties --

3            THE COURT:  And just to be clear, we're here both for

4   a detention hearing and a probable cause hearing, which is to

5   determine whether the government has sufficient level of proof

6   to hold Ms. Greig at this point.

7            MR. HERBERT:  Yes, your Honor.  So there is no dispute

8   between the parties with respect to the elements for the

9   harboring offense.  They're that a warrant was issued for a

10  person's arrest, the defendant knew about it, the defendant did

11  something to harbor or conceal that person, and did so with the

12  intent to conceal that person's location in order to make it

13  more difficult for that person to be captured.  And I would say

14  the evidence is really overwhelming, it's far beyond probable

15  cause with respect to all of those elements of this.

16           I just point out Mr. Reddington filed something

17  yesterday, a case United States v. Bohna, which he thought was

18  helpful to her position, suggesting that stood for the

19  proposition that merely filling prescriptions or providing some

20  money to a fugitive is not enough to constitute harboring.  And

21  I would say, if you take a look at that case, that actually

22  supports the government's position.  In that case the

23  prescription that the defendant filled was in the fugitive's

24  true name, and it was packaged with, I believe it was an

25  airline card that was again in the fugitive's true name.

Page 102

1          Now, certainly if you take the Vons Pharmacy

2     transaction here, if Ms. Greig had walked into Vons Pharmacy

3     and said, "I'm Catherine Greig, and I'm here to fill a

4     prescription for James Bulger, and, by the way, this

5     prescription is in the wrong name, and I refuse to sign

6     anything but my true name," well, then maybe we'd have

7     something to talk about.  Obviously that's not what she did.

8     What she did was obviously designed to conceal Bulger's

9     identity and hers.  And so that's only one of the many acts

10    that we've presented that were clearly acts designed to conceal

11    their identity and their location.

12          So there was -- and we're short on time -- there was a

13    number of -- Mr. Reddington cited a case that itself collects a

14    number of the cases discussing what types of acts are

15    sufficient for harboring.  This is the case of the United

16    States v. Vizzachero.  I would actually commend that to the

17    Court's attention.  I know the Court will read it, but there

18    are a number of examples in that that I think are of the piece

19    with the type of evidence the Court has heard today and

20    yesterday.

21          THE COURT:  Okay.  And, Mr. Herbert, I had understood

22    most of your argument attention to go to the risk of flight

23    component.  The government also moved on obstruction of

24    justice.  Did you want to speak to that as well?

25          MR. HERBERT:  Yes, your Honor.  I would say that

1    clearly risk of flight is the number one concern.  If the Court

2    didn't believe that that was enough to justify flight, then

3    it's unlikely for you to consider that danger to the community

4    or obstruction would be.  Nevertheless, as you just heard from

5    the end of Mr. Carazza's testimony, this is a case that has

6    been rife with instances of obstruction of justice.  This is a

7    defendant who was committing crimes on behalf of Mr. Bulger

8    essentially every day for the last sixteen years.  I would say

9    there's a very substantial risk that if she were released, she

10   would continue that pattern and the pattern we've seen

11   throughout this fugitive investigation, and I would say that

12   that presents an unacceptable risk as well, and none of the

13   conditions can prevent her from doing that.  It is an

14   alternative basis, but clearly risk of flight is the main one.

15          THE COURT:  All right, Mr. Reddington?

16          MR. REDDINGTON:  Yes, thank you, Judge.

17   CLOSING ARGUMENT BY MR. REDDINGTON:

18          MR. REDDINGTON:  First of all, I want to thank the

19   Court.  I appreciate the opportunity that you've given us to

20   have a full hearing-out, if you will, of everybody's position

21   in this case.

22          Now, dealing with the statute, your Honor, 3142, I

23   understand that the Court has a number of considerations, such

24   as seriousness of the offense.  Counsel for the government

25   seems to have argued the Guidelines argument that it's

Page 104

1    33 months on the low end of the Guidelines, but it may very

2    well be considered to be on the higher end of the Guidelines.

3    The statute for which she's been charged before you is a

4    five-year max in the event of conviction.

5         Your Honor also is well aware -- and this goes with

6    the incentive to take flight because of a pending criminal

7    case -- your Honor also knows that under the Bureau of Prisons'

8    standards, the person gets 54 days a year right off the top.

9    So that's calculated into whatever sentence a person gets, plus

10   you have credit for whatever time that you served.  It is on

11   balance certainly not the type of incentive that she would, I

12   would suggest to you, take flight after all of these years, and

13   leaving her family, her sister and her friend, who are her

14   backbone, her bedrock, and they've got so much catching up to

15   do.  There is no way, your Honor, as I look at this woman, that

16   she has the wherewithal.

17        I mean, it's almost like she's painted out to be --

18   the government attempts to paint her out to be some type of a

19   nefarious person with a wicked, evil mind and the ability to

20   evade, and she knows how to hide, she knows how to create all

21   this stuff.  I don't think there's a person in this room that

22   thinks for one minute that Catherine Greig is sitting down and

23   creating and will create fake identifications, that Catherine

24   Greig takes guns and hides them in walls, Catherine Greig has

25   800,000 some odd dollars all wrapped in plastic inside walls

1   that are secreted with mirrors, and obviously not known or

2   something that somebody could see.

3        We all know who is the person, who is the mastermind,

4   who is the person that has "the business," as Mr. Weeks talked

5   about.  And I think what was very telling is the image of, when

6   business is talked, she is told basically, "Go sit there and

7   feed the pigeons."  Just as the Gautreauxs indicated, that he

8   is very demanding, that he is very controlling, that he would

9   clap his hands, that she would jump; she would come forward,

10  she would wait on him, she would take care of him, the other

11  people down there in Louisiana.

12       I don't think I have to belabor to this Court that

13  this woman did not fall in love with a man -- and let's not

14  forget, the murder indictments -- because I hear and I

15  certainly respect, and I think they were very classy, eloquent

16  statements from these people, and the horror and the suffering

17  that they've had at the hands of the legal system, I

18  understand.  However, she has nothing to do with any of those

19  murders or acts of violence.  Indeed, they did not even come

20  forth, if you will, for four years after she had left.  There

21  is not one scintilla of evidence, there's no indication -- and,

22  by the way, and I think it may have been certainly not an

23  intentional effort to deceive the Court or certainly mislead

24  the Court on the government's part, but all of these LexisNexis

25  articles -- and I'm looking at them -- they're all, you know,

Page 106

1   August 10, 2003, 2000, 2001.  There is not one indication of

2   all of this publicity that she's aware of.  And certainly I

3   think initially the inference may have been -- and, again, I

4   don't suggest that they intended to cause this inference --

5   that these were computer searches perhaps that were found

6   inside the apartment, which would be indicative of the fact

7   that perhaps there's some type of a following, keeping up with

8   the hysteria, if you will, of "Where's Whitey?" and the

9   discussion about -- there's not one bit of evidence that this

10  woman even knew about the murder allegations or the various

11  things that he's alleged to have done.  And any one of us in a

12  relationship, do you really sit there and talk about things

13  with your spouse or with your loved one or your significant

14  other?  I mean, can you imagine, your Honor, you know, "Gee,

15  are you really involved with all of those things?  No.  That's

16  people just saying bad stuff about me," while they're out in

17  California hiding in plain sight for all of those years,

18  walking down the street?

19          She goes, she picks up the prescriptions.  She goes,

20  she shops.  She has her hair done.  And they have Gasex, as the

21  agent felt funny trying to bring out.  Yeah, they do, they have

22  human needs.  As she was living in that apartment, she had her

23  own bedroom.  She didn't have a bedroom that she shared with

24  the White Man.  She had nothing to do with the gun or the money

25  that was -- quite frankly, it's not illegal in California for a

0292fb1f-331f-4107-a31f-5233d752e689

1  person to have a weapon for self-protection.  There's no

2  indication she had any knowledge of that gun or the little

3  stack of money that was there.  The thing I introduced into

4  evidence is like a little cash drawer.  That's the dole.

5  That's where the money is kept for rent or for groceries or

6  things of that nature.

7        Now, does anyone think that a woman who fell in love

8  with this man, has been with him -- and he is locked away.

9  Trying to see him is like trying to see Hannibel Lecter.

10  Trying to have contact with him is impossible.  Trying to get

11  contact with my client is -- and I appreciate the efforts that

12  the marshals have made to clear that way for us to do that, but

13  she's not going to be in touch with Mr. Bulger.  She certainly

14  isn't going to go out and start organizing his business and

15  having contact with people, as the government would apparently

16  have you believe.

17        And I think, your Honor, you yourself believe and know

18  that this woman has no ability to do anything other than be

19  with what's left of her family.  She's not a criminal.  She's

20  not a criminal in the sense of an organized person.  She's not

21  guilty of the crimes, so she's not guilty of all these acts of

22  violence.

23        So under the statute -- and I should respond, I

24  suppose, to the government's suggestion, and, again, no

25  disrespect to the government, but it does seem like a little

1    piling on.  It seems like maybe a little kind of being a bully

2    a little bit.  You know, we're going to kind of throw out

3    there, "Well, if you don't do the right thing, we can hit you

4    with a conspiracy or identity theft."  There's not one nickel,

5    not one that was obtained as a result of an identity.

6         There are no medical bills.  There's no medical

7    insurance that they obtained or that she obtained.  So to

8    reference that, well, she had healthcare, she paid for

9    everything.  No indication whatsoever that there is any

10   identity theft.

11        Misprision of a felony, now we're going back to the

12   dark ages, okay?  And also the exposure on that case is very

13   low.

14        Conspiracy, conspiracy for what?

15        Illegal weapons?  Bring it on.  There's no way this

16   woman knew anything about weapons hidden behind the wall, the

17   AKs and the .40s and the .9s.

18        So I don't think, your Honor, that the fact that the

19   government, and I have respect for the prosecutors, but I don't

20   think the fact that the government is basically saying to her,

21   "Look, we all know that if you were a cooperator, you'd be

22   sitting in Squantum right now," and, "You know, if you're going

23   to exercise your rights, if you're going to demand your speedy

24   trial and you're not going to cooperate, then you're going to

25   sit in jail," and that's the dirty little secret.  We all know

1  that that is the leverage that the government has on an

2  individual, and that's not right.

3      The issue under the bail statute is whether or not you

4  can fashion, or I can propose and that your Honor would find to

5  be acceptable, number one, is there a likelihood she's going to

6  take flight?  I suggest there is not.  The charges are not

7  something that the potential penalty would deprive her of her

8  willingness to appear before this Court and be with her family.

9      Number two, when you consider under the bail statute,

10  or under the statute, I should say, on the issues of detention,

11  the proffer that can be made, now, in that regard, we have been

12  working with Pretrial Services and intend to continue to work

13  with Pretrial Services.  Mr. O'Brien has been very helpful.

14  And I understand as well, as I think I mentioned to you in the

15  very beginning of the hearing, I have to have appraisals.  I've

16  done this before.  I get the forms.  I know how to do it, have

17  the appraisals, submit the property.

18      This property, for example, her property goes back

19  many, many years.  There's no deriving of real estate from

20  criminal funds.  She was a hardworking woman, obtained her

21  education, was a teacher, and she is respected by people.

22  There isn't a person in Santa Monica -- I know it was like

23  pulling teeth to get Mr. Carazza to agree, but there's not a

24  person in Santa Monica that does not have extreme love and

25  respect for this woman.  Yes, she likes dogs.  Yes, she likes

1   cats.  Yes, she likes people.  Yes, she likes to take care of

2   the Gautreauxs' kids down there, they call her "auntie."

3        This woman is not a violent person.  You heard it from

4   Mr. Weeks.  She is not involved in criminal enterprises.  Her

5   only crime is a crime of passion, falling in love with this

6   gentleman and living with him for these years.  She knows and

7   acknowledges the fact that she has an obligation.  If your

8   Honor, consistent with your duty and consistent with the law,

9   makes a determination that she is able to post significant real

10  estate, her sister is willing to post her real estate, that's a

11  fairly large amount of money to secure.  And I would, as I say,

12  propose to have the title search, the evaluations and all of

13  the rest.

14       Let's face it, in this day and age of ankle bracelets

15  and monitoring, you can't even fall out the door, you can't

16  even go on your porch without the bells and whistles going off.

17  And then look at her.  What is she going to do?  She's a master

18  of disguise?  Really, she's not a master of disguise.  I mean,

19  if the Court is of a determination that the serious nature of

20  the offense is such that it's not going to provide an incentive

21  for her to take flight, that she has a lot to work with.  You

22  know that, Judge.  We've got a good case.  I disagree with my

23  brother that they've got an overwhelming case by any means.  I

24  think she's got a great case.  Bring it in front of a jury and

25  we'll try the case.

Page 111

1        If your Honor determines that the security of the

2    ankle bracelet and the electronic monitoring are sufficient to

3    insure that we or Probation or Pretrial Services will know her

4    whereabouts, coupled with her promise, looking you in the eye

5    and promising that she is not going to certainly embarrass this

6    Court, she will appear at every court appearance, coupled with

7    her signing the documents to put up her house and that of her

8    sister, who obviously I think your Honor can infer they're at

9    least in the position where they're back together again.

10       So with all of that understanding -- and this has been

11   a hearing that, for example, there have been some things that

12   have been thrown out there.  I think we all felt, and I think

13   my brother may have argued to you, that she is known to change

14   her looks, she's known to have plastic surgery, she'll do it

15   again.  And when I crossed the agent, wait a minute, there's no

16   way that while she's on the run she's having plastic surgery;

17   and I think everybody in this room thought that that was what

18   was the reference.  That's well before any of this being with

19   Mr. Bulger.

20       So there's no indication we have a nefarious person

21   that knows how to hide, knows how to create identities, knows

22   how to be a criminal organizer.  She's just a simple woman who

23   wants to be with her sister, and promises this Court, subject

24   to the proffers that I will make, to show up in this court.

25       Now, it's my suggestion, your Honor, that we would

1   continue to agree to a detention subject to submitting the

2   documents and forms that I have to do for the real estate, and

3   subject to, obviously, Pretrial being able to do a fuller

4   in-depth investigation.

5          THE COURT:  Mr. Reddington, are you suggesting that I

6   enter a voluntary order of detention without prejudice?

7          MR. REDDINGTON:  Without prejudice, subject to the

8   fact that I will make the submissions; and then this Court will

9   be able to, once you get whatever recommendation comes from

10  Pretrial Services, then you could revisit the issue and make a

11  decision.

12         THE COURT:  All right.

13         Ms. Greig, if you could please stand.  What your

14  counsel has offered is that I should enter a voluntary order of

15  detention without prejudice.  After the hearing, you would be

16  entitled to a decision by me on the merits of the detention

17  question, and what I understand Mr. Reddington to be asking me

18  to do is to enter a voluntary order of detention without

19  prejudice.  So that would mean essentially it would put off my

20  decision on the detention.  Have you had an adequate time to

21  talk to Mr. Reddington?

22         THE DEFENDANT:  Yes, I have.

23         THE COURT:  And are you willing to have me enter a

24  voluntary order of detention?

25         THE DEFENDANT:  Yes.

Page 113

1    THE COURT:  All right, I find the defendant has made a

2    knowing and -- we've had the hearing, but essentially to agree

3    to have me enter a voluntary order of detention without

4    prejudice.

5        MR. REDDINGTON:  Yes, your Honor.

6        THE COURT:  And I will do that, and I understand --

7    Ms. Greig, you may be seated.  Mr. Reddington, I understand

8    that you would like the Court to make a probable cause finding.

9    Is that correct?

10       MR. REDDINGTON:  Yes, your Honor, but I would waive

11   any further argument.

12       THE COURT:  All right, very good.  I will take that

13   matter under advisement, and I will enter a voluntary order of

14   detention without prejudice.

15       Is there anything further from the government?

16       MR. PIROZZOLO:  No, your Honor.

17       MR. REDDINGTON:  No, your Honor.

18       THE COURT:  Mr. Reddington?

19       MR. REDDINGTON:  I'm sorry.  You asked the government.

20       THE COURT:  I was going to ask you that.  We stand in

21   recess.

22       (Adjourned, 1:13 p.m.)

23

24

25

Page 114

1                    C E R T I F I C A T E

2

3

     UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )

5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8    do hereby certify that the foregoing transcript, Pages 2-1

9    through 2-113 inclusive, was recorded by me stenographically at

10   the time and place aforesaid in No. 97-MJ-00217, United States

11   of America v. Catherine Greig, and thereafter by me reduced to

12   typewriting and is a true and accurate record of the

13   proceedings.

14       In witness whereof I have hereunto set my hand this 17th

15   day of July, 2011.

16

17

18

19

20

                   /s/ Lee A. Marzilli
21               _____

                   LEE A. MARZILLI, CRR
22                 OFFICIAL COURT REPORTER

23

24

25