UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,                )
                                         )
                Plaintiff,               )  Criminal Docket
vs.                                      )  No. 1:97-mj-00217-JCB-1
                                         )  July 11, 2011
CATHERINE GREIG,                         )  Detention Hearing
                                         )  @2:50 p.m.
                Defendant.               )  Day One
                                         )
                                         )

BEFORE:  THE HONORABLE JENNIFER C. BOAL
                UNITED STATES MAGISTRATE JUDGE

John Joseph Moakley United States Courthouse
1 Courthouse Way, Courtroom No. 17
Boston, MA  02210

Helana E. Kline, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 5209
Boston, MA  02210

```
APPEARANCES:


For the Plaintiff:

United States Attorney's Office
(By:  Jack W. Pirozzolo, Attorney at Law &
      Jamie D. Herbert, Attorney at Law)
1 Courthouse Way, Suite 9200
Boston, Massachusetts  02210
(617) 748-3189


For the Defendant:

Law Offices of Kevin J. Reddington
(By:  Kevin J. Reddington, Attorney at Law &
      Patrick H. Reddington)
1342 Belmont Street, Suite 203
Brockton, Massachusetts  02301
(508) 583-4280
```

```
                    I N D E X


Witnesses called on behalf of the Government:

Testimony of:

MICHAEL CARAZZA


                Direct  Cross  Redirect  Recross

By Mr. Herbert     4


              E X H I B I T S

 Government's

 In Evidence:

 Exhibits                                    Page
```

```
 A                                            15
 1                                            15
 2                                            16
 3                                            16
 4                                            17
 5                                            17
 6                                            17
 7                                            22
 8                                            22
 9                                            44
 10                                           47
 11                                           57
 12                                           66
 13    (Sealed)                               70
 14    (Sealed)                               70
 15    (Sealed)                               71
 16    (Sealed)                               72
 17    (Sealed)                               74
 18    (Sealed)                               75
 19    (Sealed)                               75
 20    (Sealed)                               76
 21    (Sealed)                               77
 22    (Sealed)                               77
 23    (Sealed)                               78
 24    (Sealed)                               79
 25    (Sealed)                               80
 26                                           82
```

```
1              P R O C E E D I N G S

2         THE CLERK:  The United States District Court for

3    the District of Massachusetts is now in session, the

4    Honorable Jennifer C. Boal presiding.  You may be seated.

5         Today's date is July 11, 2011.  We're on the record

6    in the matter of United States versus Catherine Greig,

7    Criminal Action No. 97-217.

8         Counsel, please identify themselves for the record.

9         MR. PIROZZOLO:  Good afternoon, your Honor.

10   Jack Pirozzolo and Jamie Herbert for the United States.

11        MR. REDDINGTON:  Good afternoon, your Honor.

12   Kevin Reddington representing Ms. Greig; and with the

13   Court's permission, Patrick Reddington, a third-year law

14   student working in my office, who's been working on this

15   case; and for the record, obviously, Ms. Greig is before

16   the Court.

17        THE COURT:  So we're here today for the limited

18   purpose of determining:  one, whether there is probable

19   cause as committed by the defendant, and, two, whether

20   Ms. Greig will be detained or released pending trial.

21        Is the government ready to proceed?

22        MR. HERBERT:  We are, your Honor.

23        THE COURT:  And how many witnesses does the

24   government intend to call?

25        MR. HERBERT:  One witness, your Honor, Special
```

1    Agent Michael Carazza.

2            THE COURT:  And does the government have a set of

3    exhibits for the Court?

4            MR. HERBERT:  Yes, your Honor.  It should be on the

5    bench.

6            THE COURT:  All right, and I understand did the

7    parties want to approach without the exhibits?

8            MR. PIROZZOLO:  Yes, your Honor.

9            (Whereupon, a brief sidebar discussion commenced.)

10            MR. PIROZZOLO:  So what we provided to the Court by

11   way of exhibits includes some exhibits that do not need to

12   be sealed but other exhibits that ought to be sealed because

13   they contain identifying information such as:  Social

14   Security Nos., dates of birth, for various individuals

15   that are included in the package of information.

16        It also includes some medical records and other

17   identifying information that would not be appropriate to the

18   Court's local rules to have disclosed.  We've provided them

19   in unredacted form for purposes of this hearing.

20            THE COURT:  And to Mr. Reddington as well?

21            MR. REDDINGTON:  Yes.

22            MR. PIROZZOLO:  Yes, your Honor, and the agent will

23   testify when we get to these exhibits identifying them as

24   Person A, Person B, Person C, that correspond in the binder

25   that are Tab A, Tab B, Tab C.

1     Tab A is a summary of the different identifications,

2    different aliases, that Ms. Greig and Mr. Bulger used.

3    In addition to that, there's a list with an x next to the

4    ones that ought to be sealed.

5        In terms of sealing, I guess we're just looking for

6    some guidance from the Court as to how you would like us to

7    handle it?

8            THE COURT:  Because they don't actually go into the

9    court record by the party who's entering the exhibits --

10            MR. PIROZZOLO:  Right.

11            THE COURT:  So I'm not sure that I need to seal

12   them, but, obviously, I'm not sure they should be turned

13   over to the public.

14            MR. PIROZZOLO:  Yes, your Honor.

15            THE COURT:  But I think that's up to you because

16   they're not court documents, right?

17            MR. HERBERT:  Actually, your Honor, we could hold

18   custody of them, but they are official court records once

19   they're admitted into evidence at the hearing ... so I guess

20   what we would propose is that when we offer those, we offer

21   them under seal.  They can be received under seal and

22   obviously maintained.

23            THE COURT:  And it may be that you may have to make

24   a redacted form of them.  Do you have any objection?

25            MR. REDDINGTON:  None whatsoever because we've

1    already talked about this.

2         THE COURT:  All right.  So we'll proceed on that

3    basis, admit them under seal.

4         MR. HERBERT:  In terms of scheduling, your Honor, I

5    understand from the marshals that we don't expect to finish

6    today.

7         THE COURT:  Well, we could have given you more time

8    today.

9         MR. HERBERT:  But we propose just going until 4:00

10   today.

11        THE COURT:  I'd like to keep going.  Marshals don't

12   control the courtroom so we're going to go until 4:30

13   unless there's a convenient time to stop before then, and

14   the victims are here?

15        MR. PIROZZOLO:  Yes, your Honor.  There are a number

16   of victims in the courtroom, and there are at least a couple

17   who indicated they do wish to be heard at the hearing.  I

18   think procedurally it makes sense for that to come at the

19   end.

20      I've spoken to them about a second day for purposes of

21   this hearing, and they informed me that they are, in fact,

22   available on Wednesday, and if we don't conclude on

23   Wednesday, they would be available to make a statement as

24   well.  Right now I understand there's two, but there may be

25   an additional one.

1          THE COURT:  And I don't want it to protract the

2     proceedings.

3          MR. PIROZZOLO:  Understood, your Honor.  I've

4     already spoken with them.

5          THE COURT:  They can also do it by written statement

6     if they would like to; but if they'd like to speak, as long

7     as it's contained so that --

8          MR. PIROZZOLO:  I'll make that clear.

9          THE COURT:  All right.

10          MR. REDDINGTON:  I just heard about this about half

11     an hour ago.  I would like to know, first of all, who they

12     are, and, basically, what they're going to say.

13          THE COURT:  And if I'm not going to hear from them

14     today, why don't you discuss it.  If there are any objections

15     or changes to the procedure we've talked about, either file

16     something if that's appropriate, or, otherwise, you can

17     indicate if you worked out a procedure.

18          MR. PIROZZOLO:  Of course.

19          MR. HERBERT:  Thank you, your Honor.

20          MR. PIROZZOLO:  Thank you.

21          (Whereupon, the sidebar discussion concluded.)

22          MR. HERBERT:  The United States calls Special Agent

23     Michael Carazza.

24          (Whereupon, a discussion commenced off the record.)

25          THE CLERK:  We're back on the record in the matter

1    of the United States versus Catherine Greig, Criminal

2    Action No. 97-217.

3         Counsel, please identify themselves for the record.

4              MR. PIROZZOLO:  Good afternoon, your Honor.

5    Jack Pirozzolo and Jamie Herbert for the government.

6              MR. REDDINGTON:  Good afternoon, your Honor.

7    Kevin Reddington; and with me is Patrick Reddington, a

8    third-year law student from my office who's been working on

9    this case, and, of course, as well as Ms. Greig.

10             THE COURT:  And, Mr. Herbert, if you could just

11   identify the witness that the government is going to call?

12             MR. HERBERT:  Yes, your Honor.  It's Michael Carazza.

13             THE CLERK:  Would you please stand and raise your

14   right hand.

15             (Michael Carazza duly sworn.)

16             THE CLERK:  Please state your name, spelling your

17   last name for the record.

18             THE WITNESS:  Michael Carazza, C-a-r-a-z-z-a.

19        DIRECT EXAMINATION BY MR. HERBERT:

20   Q.   Good afternoon, Mr. Carazza.

21   A.   Good afternoon.

22   Q.   Could you tell us how you're employed, sir?

23   A.   I'm a Special Agent with the FBI in Boston.

24   Q.   How long have you been a Special Agent with the FBI?

25   A.   Just over 21 years.

1     Q.   Where are you currently assigned?

2     A.   The Public Corruption Squad in Boston.

3     Q.   For how long approximately have you been on the Public

4     Corruption Squad?

5     A.   Approximately nine years.

6     Q.   Do you investigate public corruption cases?

7     A.   Yes, we do.

8     Q.   And did you do a stint as the actual chief of that

9     squad?

10    A.   I did.

11    Q.   What other crimes have you investigated as an FBI

12    agent?

13    A.   Financial crimes, violent crimes, fugitive

14    investigations, kidnappings, bank robberies.

15    Q.   Now, sir, did you work for a time on an investigation

16    into a fugitive:  James J. Bulger?

17    A.   I did.

18    Q.   And did you also work on the harboring a fugitive

19    investigation relating to the defendant in this case,

20    Catherine Greig, as well as others?

21    A.   I did.

22    Q.   Was that all part of a task force?

23    A.   Yes, it was.

24    Q.   Referred to as the Bulger Fugitive Task Force?

25    A.   The Bulger Task Force.

1    Q.   Okay.  How long did you work on the Bulger Task Force?

2    A.   Oh, I guess from 1997 until early 2002, and then I

3    assisted on and off sporadically since that time.

4    Q.   And prior to that had you worked on other fugitive

5    investigations?

6    A.   I had.  I had been assigned to the fugitive task force

7    for a few years prior to the Bulger case.

8    Q.   Could you give us a general description of your duties

9    and responsibilities when you were working on the Bulger

10   Task Force?

11   A.   Sure.  I was assigned as the case agent in August of

12   1997.  At the time I was a detective with the Boston Police

13   as well as a Sergeant from the Department of Corrections

14   Fugitive Unit.  They had been long members of the fugitive

15   task force, and we were assigned to the investigation.

16      As case agent, I was responsible for reviewing the

17   prior investigation, conducting the investigation going

18   forward, interviews, media, things like that.

19   Q.   When was the Bulger Task Force formed if you recall?

20   A.   August of 1997.

21   Q.   And before that time were other agents assigned to

22   investigate -- to conduct the fugitive and harboring

23   investigation?

24   A.   There were.

25   Q.   Now, when you got onto the Bulger Task Force, did you

1   have an opportunity to familiarize yourself with the

2   investigation that had taken place prior to that?

3   A.   I did.

4   Q.   And then more recently have you had an opportunity

5   to familiarize yourself with the investigation that took

6   place after you left the Bulger Task Force?

7   A.   I have.

8   Q.   And how were you able to familiarize yourself in

9   general about those matters?

10  A.   Review of the reports, review of the leads that had

11  been sent out.  We re-interviewed people who had been

12  interviewed, attempted to interview others who had not been

13  interviewed, conducted a harboring investigation going

14  forward after August of 1997, reviewing documents,

15  telephone analysis, things like that.

16  Q.   So is it fair to say, sir, that you're testifying

17  today based on a combination of your own personal knowledge,

18  as well as review of records; in some cases records --

19  reports written by other agents and investigators as well

20  as conversations with other agents and investigators?

21  A.   That's correct.

22  Q.   Now, sir, based on your personal experience and what

23  you learned from others, were you able to determine that

24  Mr. Bulger and Ms. Greig used various identities/aliases

25  while fugitives?

1    A.   We were able to ascertain that, yes.

2    Q.   And is it fair to say that some of those identities

3    were acquired from actual people?

4    A.   Yes, they were.

5    Q.   And is there an investigation ongoing relating to the

6    use of those identities?

7    A.   There is.

8    Q.   Sir, would you turn in the binder that's before you to

9    Tab A; do you see a document there?

10   A.   I do.

11   Q.   And can you identify what that document is?

12   A.   It's labeled:  Identification and Alias Table.

13   Q.   All right.  And just in general, without identifying

14   the names on there, what's depicted on that table?

15   A.   Various names that the investigators later determined

16   were James Bulger and Catherine Greig.

17        MR. REDDINGTON:  With all due respect, your Honor,

18   I apologize.  I understand the standard would be that a

19   certain amount of hearsay would be admissible at this

20   hearing, but I would ask that the Court not allow total

21   conclusory testimony such as that.

22        THE COURT:  You're absolutely correct in your

23   statement of the law, Mr. Reddington, but I don't believe

24   we apply that level of hearsay now so overruled.

25   Q.   All right.  Sir, so you're saying that this table

1    depicts various, to your understanding and knowledge,

2    various aliases/identities that have been used by Mr. Bulger

3    and Ms. Greig; is that correct?

4    A.   It does.

5    Q.   All right, and is it fair to say that not all of those

6    identities have been made public?

7    A.   That's correct.

8    Q.   Do you see a series of letter designations in the

9    left-hand column there?

10   A.   I do.

11   Q.   All right.  And are those letter designations for the

12   purposes of today's hearing that would apply, one for each

13   of the identities, that have not necessarily been made

14   public?

15   A.   Correct.

16        MR. HERBERT:  Your Honor, as we discussed briefly at

17   side bar the government would offer this as Exhibit A for

18   today's proceedings, essentially, as an aid to the Court

19   and for the record.  We'd offer that under seal for the

20   reasons just discussed with our witnesses, and we would

21   propose referring to these identities that are not yet

22   public by letter designation as we go through?

23        THE COURT:  Mr. Reddington, any objection?

24        MR. REDDINGTON:  No, your Honor.

25        THE COURT:  All right, so Exhibit A is admitted for

1    purposes of today's proceedings under seal.

2            (Exhibit A admitted in evidence.)

3    Q.   And now, Special Agent Carazza, in the course of your

4    duties on the fugitive investigation did you become aware

5    that multiple arrest warrants had issued for Mr. Bulger?

6    A.   Yes.

7    Q.   And did you also learn that an arrest warrant had

8    issued for Ms. Greig?

9    A.   Yes, I did.

10   Q.   Would you turn to Exhibit or Tab 1 in the binder in

11   front of you?  Are you able to identify what that is?

12   A.   That's the January 1995 federal indictment for James

13   Bulger and others.

14   Q.   Was that the first of the federal indictments against

15   Mr. Bulger?

16   A.   It is.

17           MR. HERBERT:  Your Honor, we would offer this as

18   Exhibit 1 for today.

19           MR. REDDINGTON:  No objection.

20           THE COURT:  All right.  Government Exhibit 1 is

21   admitted for purposes of the record.

22            (Exhibit No. 1 admitted in evidence.)

23   Q.   And would you turn to Tab 2, sir?  What is that?

24   A.   That is the arrest warrant that issued for James Bulger

25   for his role in the indictment.

1            MR. HERBERT:  We would offer this as Exhibit 2, your

2    Honor.

3            MR. REDDINGTON:  No objection, your Honor.

4            THE COURT:  All right.  Government Exhibit 2 is

5    admitted for purposes of these proceedings.

6            (Exhibit No. 2 admitted in evidence.)

7    Q.   Would you turn to Tab 3, sir?  What is that?

8    A.   That is a copy of the complaint charging Catherine

9    Greig in 1997 with harboring a fugitive.

10           MR. HERBERT:  We would offer this as Exhibit 3, your

11   Honor.

12           MR. REDDINGTON:  No objection.

13           THE COURT:  All right.  Exhibit No. 3 is admitted

14   for purposes of today's proceedings.

15           (Exhibit No. 3 admitted in evidence.)

16   Q.   Would you turn to Tab 4, sir?

17           THE COURT:  Mr. Herbert, is this the line of

18   questioning that's going to go through Exhibit 7?

19           MR. HERBERT:  Through 6, I believe.

20           THE COURT:  Through 6, all right.  Mr. Reddington,

21   do you have any objection to the admission of these

22   exhibits?

23           MR. REDDINGTON:  No, your Honor.

24           THE COURT:  All right.  So 2 through 6 are now in

25   evidence for purposes of today's proceedings.

```
 1              (Exhibit Nos. 4 - 6 admitted in evidence.)

 2              MR. HERBERT:  Thank you, your Honor.

 3     Q.   And just for the record, sir, is it fair to say

 4     Exhibit 5 is the indictment that issued in Criminal

 5     No. 99-10371-RGS charging Mr. Bulger in a superseding

 6     indictment in September of 2000?

 7     A.   That's correct.

 8     Q.   All right, and is Exhibit 6 the arrest warrant that

 9     issued as a result of that indictment?

10     A.   It is.

11     Q.   Now, sir, what date was Mr. Bulger first charged in any

12     form federally?

13     A.   January 4th of 1995.

14     Q.   Was that pursuant to a complaint?

15     A.   It was.

16     Q.   And I take it agents tried to execute an arrest warrant

17     on or about January 5th, is that correct?

18     A.   That's correct, agents and officers.

19     Q.   And were unable to locate Mr. Bulger, is that correct?

20     A.   Correct.

21     Q.   Did they arrest any of Mr. Bulger's co-defendants on

22     that date, January 5th, 1995?

23     A.   They did.

24     Q.   Who was that?

25     A.   Stephen Flemmi was one.
```

1    Q.   And do you know whether or not the charges were then

2    made public after Mr. Flemmi's arrest?

3    A.   They were.

4    Q.   Did you become aware of certain publicity about those

5    charges and the fact that Mr. Bulger had not been arrested?

6    A.   It appeared in the newspaper; it also appeared on the

7    news the evening of the 5th.

8    Q.   All right.  So do you know specifically with respect to

9    the evening of January 5th which news reports it appeared on

10   first?

11   A.   I don't.

12   Q.   All right.  Have you read accounts that indicate it

13   appeared on the 11 o'clock news that night?

14   A.   Yes.

15   Q.   And that it was, in fact, the lead story on the three

16   major networks in Boston that night?

17   A.   Yes, it was.

18   Q.   All right, and you also indicated it appeared in the

19   newspapers.  Could you turn to Exhibit 7 of your binder,

20   please?  Could you tell us what that consists of?

21   A.   These are printouts from LexisNexis from January of

22   1995, stories in the Boston Herald and the Boston Globe,

23   concerning the charges and the indictments and the attempts

24   to apprehend James Bulger.

25   Q.   So it's fair to say this was a front page story in the

1  Herald and the Globe on January 5th of 1995?

2  A.   I don't recall the front page from that day; but from

3  what I heard, it was, it was well-publicized.

4  Q.   All right, and also on subsequent days in January of

5  '95; is that correct?

6  A.   Yes.

7  Q.   Now, are you aware that the fugitive investigation,

8  not limiting yourself to the time frame of January 1995,

9  but the fugitive investigation and Mr. Bulger's charges

10  received national press attention as well?

11  A.   It sure did.

12  Q.   Can you just describe in general what type of press

13  attention it received?

14  A.   Sure.  It made America's Most Wanted a record number of

15  15 times starting in 1998 but also --

16  Q.   Let me stop you there actually.

17  A.   Sure.

18  Q.   Would you turn to Tab 8 of your binder?

19  A.   Okay.

20  Q.   What does that depict?

21  A.   That is the summary of the dates on which James Bulger

22  and Catherine Greig were featured on America's Most Wanted.

23  Q.   All right.  And it's in reverse chronological order

24  from August 14th of 2010 all the way back to January 21st of

25  '98?

1    A.   It is.

2    Q.   All right, and what other types of national press did it

3    get?

4    A.   Unsolved Mysteries.  We placed an ad in the USA Today

5    in 2001.  The task force requested and was granted placement

6    of James Bulger on the Top Ten Fugitive List in 1999.

7    Additionally, we requested, and it was approved, to increase

8    the reward amount from $250,000 to 1,000,000; both the

9    placement on the Top Ten and the increase of the reward

10   generated publicity.

11   Q.   All right.  Was there also publicity in various trade

12   magazines?

13   A.   There were.

14   Q.   And what brought that about?

15   A.   Interest/hobbies of both James Bulger and Catherine

16   Greig.

17   Q.   So was that publicity generated by the FBI?

18   A.   It was.

19   Q.   And, I take it, is it fair to say there was a recent

20   press initiative focusing on a public service announcement

21   focused on Ms. Greig?

22   A.   There was.

23   Q.   All right.  Now, sir, did you become aware in the

24   course of your duties and what you reviewed that the FBI

25   made certain notifications to professional organizations in

1     an effort to get the word out about Mr. Bulger and Ms. Greig?

2     A.    I have come across that.

3     Q.    What types of organizations were contacted?

4     A.    Numismatist, for coin collectors, a dental association,

5     cosmetic surgery.

6     Q.    Now, why were cosmetic surgeons and plastic surgeons

7     contacted?

8     A.    We developed information that Catherine Greig had had

9     cosmetic surgery.

10    Q.    Once or more than once?

11    A.    More than once.

12    Q.    And how were you able to determine that?

13    A.    Through interviews.

14    Q.    Did you speak to any medical professionals who treated

15    her?

16    A.    I did not but others on the investigation did.

17    Q.    Now, sir, directing your attention to the night of

18    January 5th of 1995, was there any law enforcement

19    surveillance conducted in an effort to arrest Mr. Bulger?

20    A.    There was.

21    Q.    Who was the surveillance of that night?

22    A.    There was a surveillance of Kevin Weeks and also

23    Catherine Greig.

24    Q.    Who's Kevin Weeks?

25    A.    A long-time associate of James Bulger.

1          MR. HERBERT:  Your Honor, if I haven't done so

2     already, I would offer Exhibits 7 and 8 for the record.

3          THE COURT:  Mr. Reddington?

4          MR. REDDINGTON:  No objection.

5          THE COURT:  All right.  Exhibits 7 and 8 are

6     admitted for purposes of today's proceedings.

7          (Exhibit Nos. 7 & 8 admitted in evidence.)

8     Q.   So you said Mr. Weeks is a long-time associate of

9     Mr. Bulger?

10    A.   Yes.

11    Q.   All right.  And where was this surveillance of

12    Mr. Weeks on the night of January 5th, 1995?

13    A.   In the vicinity of the L Street Tavern.

14    Q.   Is that a bar in South Boston?

15    A.   It is.

16    Q.   And what was or what did the agents or investigators in

17    the surveillance observe that night?

18    A.   They observed Kevin Weeks leaving the L Street Tavern

19    between 10:30 and 11:00, go to his vehicle, and drive at a

20    high rate of speed away from --

21    Q.   Just before he left the L Street Tavern, what, if

22    anything, happened?

23    A.   The accounts of the 11 o'clock news that was coming on

24    aired.

25    Q.   So there were teasers for the 11 o'clock news that

1    came on, and right after that Mr. Weeks left?

2    A.   Yes.

3    Q.   What was he seen doing?

4    A.   Driving his car, he drove at a high rate of speed away

5    from the L Street Tavern.

6    Q.   And did surveillance agents and officers see Mr. Weeks

7    meeting with anyone that night?

8    A.   They did.

9    Q.   Who he did meet with?

10   A.   Catherine Greig.

11   Q.   Were they observed in conversation?

12   A.   They were.

13   Q.   Now, at some point, sir, did you learn that Mr. Bulger

14   had, in fact, fled prior to those charges coming down?

15   A.   I did.

16   Q.   And what did you learn about that?

17   A.   I learned that James Bulger and Teresa Stanley had left

18   the Boston area on or about January 23rd of 1994.

19   Q.   What prompted them to leave at that time?

20        MR. REDDINGTON:  Objection.  Again, your Honor, I am

21   deferring to the Court's ruling, and I understand the lax

22   rules, if you will, on a detention hearing, but I would ask

23   your Honor would not allow this type of speculation at this

24   point.

25        THE COURT:  Okay, and if you could elicit from the

 1   agent the basis of his testimony.

 2        MR. HERBERT:  Yes, your Honor.

 3   Q.   Sir, did you and other agents interview Kevin Weeks at

 4   some point after he started to cooperate?

 5   A.   We did.

 6   Q.   All right.  And did Mr. Weeks provide to you any

 7   information about the circumstances of Mr. Bulger's flight

 8   on or about December 23rd, 1994?

 9   A.   At that time, no.  It would have been contact that we

10   had with him in early 1995.

11   Q.   All right, but that contact -- all right.  Let's go to

12   the contact in early 1995.  Did Mr. Weeks report that he

13   had contact with Mr. Bulger about any upcoming indictments?

14   A.   He did.

15   Q.   All right, and did Mr. Weeks say where he had learned

16   about the upcoming indictments?

17   A.   From retired Special Agent John Connolly.

18   Q.   And fair to say Mr. Weeks advised that he passed that

19   information about the upcoming indictments to Mr. Bulger?

20   A.   He did.

21   Q.   All right, and to your understanding is that what

22   prompted Mr. Bulger to flee in -- on or about December 23rd,

23   1994?

24   A.   I believe it is.

25   Q.   Now, sir, going back a little bit earlier in 1994 did

```
 1    you become aware of any trips that Mr. Bulger took?
 2    A.   Yes.
 3    Q.   And how did you learn about these trips?
 4    A.   Through interview and investigation.
 5    Q.   All right.  And, specifically, did you interview anyone
 6    who was traveling with Mr. Bulger in late 1994?
 7    A.   I heard it was Teresa Stanley.
 8    Q.   Who was Teresa Stanley?
 9    A.   A long-time girlfriend of James Bulger.
10    Q.   And what did Ms. Stanley tell you as to where they had
11    traveled?
12    A.   In the fall of 1994 they traveled to Europe; I believe
13    it was Italy, England, and Ireland, were the three countries
14    they visited.
15    Q.   And, yes, you mentioned that Ms. Stanley was a
16    long-time girlfriend of Mr. Bulger's; is it fair to say
17    that Ms. Greig was as well?
18    A.   Yes.
19    Q.   And to your knowledge were they together continuously;
20    in other words, Mr. Bulger and Ms. Greig, were they a couple
21    continuously throughout the time they met until the present
22    time?
23         MR. REDDINGTON:  Objection.  I don't know if that's
24    a confused question.  Do you mean Greig or do you mean
25    Stanley?
```

```
 1              MR. HERBERT:  That's right, yeah, Ms. Stanley.

 2     A.   I know that they lived together for approximately 20

 3     years.  I know that or I'm aware that they did have a

 4     breakup in the fall of 1994 initiated by Catherine Greig.

 5              MR. REDDINGTON:  Again, your Honor, I think we're

 6     confusing Stanley with Greig.  I may be wrong, but he just

 7     said that they had a breakup caused by Catherine Greig,

 8     and his question was pertinent to Catherine Greig, but I

 9     think he meant Teresa Stanley.

10              THE COURT:  I think part of the confusion was we

11     switched from Stanley to Greig, and I think you may have

12     asked the question in the way that you want answers to come

13     up, but it was a little confusing.  Could you rephrase the

14     question?

15              MR. HERBERT:  Yes, your Honor.

16     Q.   All right.  Sir, I was asking about travel by

17     Mr. Bulger and Ms. Stanley.

18     A.   Okay.

19     Q.   Prior to that are you aware that there was a breakup

20     between Ms. Greig and Mr. Bulger?

21     A.   Yes.

22     Q.   And after that Mr. Bulger and Ms. Stanley traveled to

23     Europe, did you say?

24     A.   They did.

25     Q.   And that was in the fall of 1994?
```

1    A.   It was.

2    Q.   Did they return from Europe at some point in the fall of

3    1994?

4    A.   They did.

5    Q.   And did they go anywhere after that?

6    A.   There was -- Teresa Stanley indicated that they did

7    travel across the United States at some point in 1994.

8    Q.   Did she indicate where they went in the United States

9    during that trip?

10    A.   I believe Arizona and California were the two locations.

11    Q.   And did they travel to New York at any time during that

12    trip?

13    A.   She did, Teresa Stanley did, mention that they did spend

14    some time in New York City.

15    Q.   All right.  And are you familiar with the location of

16    Selden, New York?

17    A.   I am.

18    Q.   And did she indicate that they had stopped in Selden,

19    New York, during that trip?

20    A.   In 1994?

21    Q.   Yes.

22    A.   Not that I'm aware of.

23    Q.   All right, and did Ms. Stanley indicate she had taken

24    earlier trips with Mr. Bulger?

25    A.   She did.

1      Q.   Prior to 1994?

2      A.   She did.

3      Q.   Did she say any places that they had gone?

4      A.   Several places in the United States:  Florida, out in

5      the midwest; also, Europe.

6      Q.   Did she indicate they traveled to New York City?

7      A.   She did.

8      Q.   And, sir, did you at any point in your duties read

9      accounts of a trip that Mr. Bulger and Ms. Stanley

10     attempted to take from Boston to Montreal in or about 1987?

11     A.   I have read an investigation from that incident.

12     Q.   Okay, and what was the gist of what you recall from

13     that?

14     A.   To the best my recollection, James Bulger and Teresa

15     Stanley were leaving Logan to go to Canada.  James Bulger

16     was detained at airport security.  A bag was discovered with

17     cash in it.  At the time of the detention Kevin Weeks was

18     also in the airport, and James Bulger was observed to throw

19     the bag of money to Kevin Weeks who then left the airport.

20     Q.   All right.  Do you know whether this was a small amount

21     of cash, a large amount of cash?

22     A.   The accounts are it was a significant amount of cash.

23     Q.   Now, returning then to Mr. Bulger and Ms. Stanley's

24     travel in late 1994, early '95, I believe you indicated that

25     they were in New Orleans; did you say that?

1    A.   They were.

2    Q.   All right, and could you give us the dates they were in

3    New Orleans?

4    A.   They left Boston, James Bulger and Teresa Stanley,

5    around January 23rd of 1994, and it appears as though they

6    proceeded to New Orleans and stayed there at a hotel in the

7    French Quarter, where they checked out on June 2nd, 1994.

8    Q.   And how do you know that?

9    A.   Through review of hotel records from the hotel.

10   Q.   All right.  Do you know where they were on January 3rd

11   of 1995?

12   A.   By review of the bank records, James Bulger accessed a

13   safe deposit box in Clearwater, Florida, on January 3rd of

14   1995.

15   Q.   Did you learn anything about the history of that safe

16   deposit box?

17   A.   It had been established a number of years prior in the

18   names of James Bulger and Teresa Stanley.

19   Q.   And after -- did you learn anything about who paid the

20   rent on that box after Mr. Bulger became fugitive?

21   A.   I did.

22   Q.   Who was that?

23   A.   The statements were sent to James Bulger's brother,

24   John Bulger.

25   Q.   He goes by Jack?

1    A.   Jack Bulger.

2    Q.   All right, and did you learn whether or not he actually

3    paid the rent?

4    A.   He did.

5    Q.   And at that time how was Jack Bulger employed?

6    A.   As a Court Magistrate of the Boston Juvenile Court, I

7    believe.

8    Q.   During your investigation did you learn about any other

9    safe deposit boxes that Mr. Bulger had?

10   A.   I did.

11   Q.   Where were those?

12   A.   Ireland and England.

13   Q.   Do you know where in Ireland?

14   A.   Dublin.

15   Q.   Do you know where in England?

16   A.   London.

17   Q.   With respect to the safe deposit box in London, did you

18   learn that there were any other individuals who were listed

19   with contact information who had contact information with

20   respect to that box?

21   A.   I believe on the England safe deposit box there was a

22   phone number listed for contact that was one of Billy

23   Bulger's contact numbers.

24   Q.   And that's another brother of James Bulger?

25   A.   Yes, it is.

1    Q.   Did anyone interview the bank that had that safe

2    deposit box?

3    A.   The investigation was done in England, yes.

4    Q.   And did anyone learn whether or not anyone from that

5    bank had, in fact, called William Bulger with respect to

6    something concerning that box?

7            MR. REDDINGTON:  I would object, your Honor.

8            THE COURT:  Yes.  Mr. Herbert, are we going to tie

9    this to Ms. Greig?

10           MR. HERBERT:  Yes, your Honor.

11           THE COURT:  All right.

12           MR. HERBERT:  Not directly in terms of factually

13   with the London box, but as part of our argument with

14   respect to detention.

15   Q.   Now, sir, do you know exactly where Mr. Bulger and

16   Ms. Stanley were on or about January 5th of 1995?

17   A.   They were on their way back to Massachusetts.

18   Q.   All right, and how do you know that?

19   A.   Kevin Weeks.

20   Q.   And what did Mr. Weeks tell you that he did after

21   learning about the arrest warrant for Mr. Bulger?

22   A.   He beeped James Bulger.

23   Q.   Did Mr. Bulger call him back?

24   A.   He did.

25   Q.   And what was said in that conversation according to

1    Mr. Weeks?

2    A.   Kevin Weeks made James Bulger aware of the media and

3    the charges outstanding against him.

4    Q.   All right.  Did Mr. Bulger indicate whether or not he

5    had heard about the arrest warrants already?

6    A.   According to Teresa Stanley, she had indicated that he

7    had heard it on the radio or they had heard it on the radio

8    on their way back into Massachusetts.

9    Q.   All right.  Now, do you know where Mr. Bulger went

10   after that?

11   A.   Several places.  The most -- in closest proximity to

12   that time would have been Selden, New York.

13   Q.   And what did Mr. Bulger and Ms. Stanley do in Selden,

14   New York?

15   A.   He purchased a car.  They stayed at a house where

16   people -- James Bulger had a friend named Primitivo Matos.

17   Q.   And who were the Matoses?

18   A.   It's a family that the wife is a cousin to Kevin Weeks.

19   Q.   All right, and Mr. Bulger had made a connection with

20   them previously?

21   A.   Yes, he had.

22   Q.   All right, and did you say what kind of car he bought?

23   A.   A 1994 Mercury Grand Marquis, black.

24   Q.   Do you know what name he bought that car in?

25   A.   Thomas Baxter.

1    Q.   What were you able to learn about the history of that

2    Thomas Baxter identification?

3    A.   James Bulger had established that alias identity going

4    back into the late 1970s and had maintained renewal of

5    licenses and such at the Matoses' address in and around

6    Selden, New York.

7    Q.   And, in fact, sir, is a copy of that Thomas Baxter

8    New York State driver's license with the Selden address, is

9    that attached to the complaint against Ms. Greig?

10   A.   It is.

11   Q.   The complaint affidavit I should say.

12   A.   It is.

13   Q.   All right.  Did you learn about anything that

14   Mr. Bulger had installed in the Matoses' home before

15   becoming a fugitive?

16   A.   He had placed two safes in, I believe, the basement of

17   the Matos' home; one for himself and one for Primitivo Matos.

18   Q.   After that did you learn whether Mr. Bulger stayed in

19   touch with Kevin Weeks?

20   A.   He did.

21   Q.   How did they stay in touch?

22   A.   Met in person on some occasions, spoke on the telephone

23   more regularly than the meets in-person.

24   Q.   And did Mr. Weeks serve as a go-between in order to

25   arrange any phone calls between Mr. Bulger and relatives

1    back in Boston?

2    A.   He did.

3    Q.   Do you know of any relatives that took a call from

4    Mr. Bulger in or about January of 1995?

5         MR. REDDINGTON:  Objection, relevance to Catherine

6    Greig.

7         THE COURT:  Mr. Herbert?

8         MR. HERBERT:  The relevance, your Honor, goes to

9    the whole series of contacts between Mr. Bulger in this

10   case, as we'll explain, and Ms. Greig, phone contacts with

11   individuals back in Boston, arranged to be taken at the

12   homes of third parties.

13        THE COURT:  It does seem, based on what I've heard

14   thus far, rather tangential to the issues before this Court

15   so I would ask you to focus on the issues with respect to

16   Ms. Greig.

17        MR. HERBERT:  Yes, your Honor.

18   Q.   All right.  Now, sir, did you learn that at some point

19   Mr. Bulger had been traveling with Ms. Stanley, decided to

20   come back to this area, and drop off Ms. Stanley and pick up

21   someone else?

22   A.   I did.

23   Q.   All right, and what did you learn about that?

24   A.   Teresa Stanley wanted to come home, and James Bulger

25   had made requests to determine if Catherine Greig would

1    accompany him.

2    Q.   And who did you learn that from?

3    A.   Kevin Weeks and others.

4    Q.   And did you learn that from Ms. Stanley as well?

5    A.   Yes.

6    Q.   Now, can you describe what Ms. Stanley and Mr. Weeks

7    told the FBI about the circumstances of that drop off and

8    pick up?

9    A.   Sure.  Teresa Stanley was dropped off at her

10   daughter's house in Hingham by James Bulger.  He later met

11   Kevin Weeks and Catherine Greig at Malibu Beach in

12   Dorchester and picked up Catherine Greig.

13   Q.   And did Mr. Weeks meet up with Ms. Greig before that?

14   A.   He did.

15   Q.   Where did they meet?

16   A.   Thomas Park in South Boston.

17   Q.   And did Mr. Weeks say who had brought Ms. Greig to that

18   location?

19   A.   Her twin sister.

20   Q.   Who was that?

21   A.   Margaret McCusker.

22   Q.   Did he say they were twins -- to the best of your

23   knowledge and understanding, are they identical twins or --

24   A.   I believe so.

25   Q.   Okay.  Did Ms. Greig have anything with her at that

```
 1    time?
 2    A.   A bag and also a driver's license of her sister, twin
 3    sister, Margaret McCusker.
 4    Q.   Now, at the time did Ms. Greig own a house?
 5    A.   She did.
 6    Q.   Where was that located?
 7    A.   Hillcrest in -- I believe, 16 Hillcrest in Squantum was
 8    the address, in Quincy.
 9    Q.   And did she have any pets at the time?
10    A.   Two poodles:  Nikki and Gigi.
11    Q.   Do you know what arrangements were made with respect to
12    the house and the pets?
13    A.   The house was left unattended for a while.  At some
14    point a friend moved in, and then it was later rented.
15    As to the poodles, they were left with Margaret McCusker
16    who cared for them.
17    Q.   And do you know if Ms. Greig left any money behind?
18    A.   There was some money left for the son of one of her
19    friends sometime right before she left.
20    Q.   Approximately how much money?
21    A.   I think it was almost $100,000.
22    Q.   Which friend are we talking about?
23    A.   Kathleen McDonough, her son Sean.
24    Q.   And did anyone live in Ms. Greig's house after she had
25    left it?
```

1    A.   Kathleen McDonough did for a period of time, and then

2    there were renters at some point.

3    Q.   All right.  Now, based on your investigation were you

4    able to determine where Mr. Bulger and Ms. Greig went after

5    they left Boston?

6    A.   Several places; Louisiana would be one initially.

7    Q.   Where in Louisiana?

8    A.   Grand Isle.

9    Q.   Where is Grand Isle, Louisiana?

10   A.   In the absolute end of Louisiana.  It's in the Gulf.

11   Q.   How long did they stay Louisiana?

12   A.   On and off quite some time.  I believe they were

13   there maybe six or seven times over the course of a

14   year-and-a-half.  Some of the stays were two to three months

15   at a time.

16   Q.   Did they meet some of the residents of Grand Isle?

17   A.   They did.

18   Q.   And based on your investigation how did they identify

19   themselves when they were in Grand Isle?

20   A.   "Tom" was James Bulger, and "Helen" was Catherine Greig.

21   Q.   Did they say where they were from?

22   A.   New York.

23   Q.   So it's fair to say the FBI interviewed subsequently a

24   number of witnesses from Grand Isle?

25   A.   We did.

1    Q.  Did any of the witnesses say whether or not Mr. Bulger

2    and Ms. Greig arrived in a car at that time?

3    A.  They were.

4    Q.  Could you describe the car?

5    A.  It was a black Grand Marquis.

6    Q.  And did that fit the description of the car that

7    Mr. Bulger had purchased in January in Selden, New York?

8    A.  It did, and the vehicle also had a New York license

9    plate.

10    Q.  Now, did you determine that Ms. Greig was in Grand Isle,

11    Louisiana, long enough to have her hair done?

12    A.  She was.

13    Q.  And did you determine -- did you find where she had her

14    hair done in Grand Isle?

15    A.  I can't recall the name of the place.  I just know that

16    it was the chief of Grand Isle's daughter that cut her hair

17    on occasion.

18    Q.  The Chief of Police?

19    A.  The Chief of Police.

20    Q.  And was this person interviewed?

21    A.  She was.

22    Q.  All right.  Did she say anything about Ms. Greig?

23    A.  She came to the salon for a cut and color usually by

24    herself.  I do recall the woman indicating that she brought

25    her own hair coloring at times.

1    Q.   And were other Grand Isle witnesses interviewed

2    including someone named Penny Gautreaux?

3    A.   They were.

4    Q.   And did Ms. Gautreaux say anything about what she was

5    told about Mr. Bulger's background early on in their trip to

6    Grand Isle?

7    A.   He had indicated to her that he had done time in

8    Alcatraz in the past.

9    Q.   Based on your investigation is it fair to say that

10   Mr. Bulger was fairly open about the time he had done in

11   Alcatraz?

12   A.   It is.

13   Q.   And are you aware of anything he wore that had

14   "Alcatraz" on it?

15   A.   I heard that he wore a belt buckle that had Alcatraz

16   and some insignia on it.  I also know he had a weightlifting

17   belt, a leather weightlifting belt, with "Alcatraz" carved in

18   the back of it.

19   Q.   And where was that located?

20   A.   Catherine Greig's house in Quincy.

21   Q.   All right.  Now, going back to Grand Isle to Penny

22   Gautreaux, did she say anything about any interactions she

23   had just with the person she knew as Helen?

24   A.   Yes.

25   Q.   And what did she say about that?

1   A.   On occasion she would come over and visit Penny.  The

2   Gautreauxs had dogs, and Catherine Greig would spend time

3   with the dogs, and they would talk about various things.

4   Q.   All right, and did she indicate whether a person she

5   knew as Helen came alone or with the person you knew as Tom?

6   A.   Both, but at times alone.

7   Q.   Are you familiar with an individual named Glenn

8   Gautreaux?

9   A.   I am.

10   Q.   And was he interviewed as well?

11   A.   He was.

12   Q.   And he did report anything about what he learned about

13   Mr. Bulger and Ms. Greig?

14   A.   That they spent a significant time in Grand Isle, they

15   had become fairly close friends with the Gautreauxs,

16   purchasing appliances and I believe a fence for their dog

17   and other items for the family.

18   Q.   So Mr. Bulger and Ms. Greig purchased appliances for

19   the Gautreauxs?

20   A.   Yes.

21   Q.   Do you know about how many and how much money was spent?

22   A.   The appliances were approximately $2,000, and the fence

23   and some other items.  The best we could come up with is it

24   was probably around $20,000.

25   Q.   Did you find out the method of payment?

1   A.   Cash usually.

2   Q.   And did Mr. Gautreaux report anything that Mr. Bulger

3   or Ms. Greig had said about where they were from or what

4   they had done?

5   A.   They were from New York.

6        MR. REDDINGTON:   Could that be, again, restricted to

7   who's the person making the statement?

8   Q.   Do you remember whether Mr. Gautreaux was specific as

9   to which one they had said they had done previously?

10  A.   I remember him saying that Catherine Greig indicated

11  that they were from New York, and that James Bulger, Tom,

12  was a retired real estate broker.

13  Q.   And did Mr. Gautreaux receive any information as to

14  what Helen did for a living?

15  A.   Oh, a dog groomer, I'm sorry.

16  Q.   Now, was an individual named Ashley Gautreaux

17  interviewed?

18  A.   She was.

19  Q.   And did she provide any information about going on any

20  shopping trips with Helen and Tom?

21  A.   Ashley accompanied James Bulger and Catherine Greig to

22  Walmart in Galliano, Louisiana.  It's the nearest shopping

23  center out of Grand Isle; and on occasion at the Walmart

24  she observed James Bulger making telephone calls from a

25  pay phone and calling cards being issued to him by

1    Catherine Greig out of a pocketbook or a fanny pack.

2    Q.   All right.  Would it be fair to say that Mr. Bulger

3    and Ms. Greig developed some close ties with some people in

4    Grand Isle?

5    A.   They did.

6    Q.   Were any of those individuals interviewed or did any of

7    those individuals who were interviewed express any feelings

8    about Mr. Bulger and Ms. Greig even after learning of their

9    identities?

10   A.   They remained loyal to them.

11   Q.   Now, did the FBI interview any witnesses who, other

12   than the ones you talked about so far, any witnesses who

13   received telephone calls from Mr. Bulger while he was a

14   fugitive?

15   A.   Yes.

16   Q.   Was an individual named Nancy Stanley Adams interviewed?

17   A.   She was.

18   Q.   And what did she report about the phone calls from

19   Mr. Bulger?

20   A.   She indicated she received, I believe, at least three

21   telephone calls.  None of which were received at her

22   residence.

23   Q.   Now, was the 1st of those received in or about January

24   of 1995?

25   A.   I believe it was.

1          THE COURT:  Mr. Herbert, these are from Mr. Bulger?

2     Q.   Did she indicate they were from Mr. Bulger?

3     A.   Yes, they were.

4     Q.   Now, directing your attention to late September or

5     early October of 1995, do you have any information about

6     where Mr. Bulger and Ms. Greig were at that time?

7     A.   In September 1995 in Grand Isle, and, also, at the end

8     of September of 1995 in Selden or Holtsville, New York.

9     Q.   How do you know they were in Selden or Holtsville,

10    New York?

11    A.   Through interview of the Matoses as well as review of

12    hotel records.

13    Q.   Would you turn to Tab 9 in your binder, please?  What

14    is that document?

15    A.   That is a guest received registration for the Best

16    Western Hotel in Holtsville, New York, as well as a New York

17    State driver's license in the name of Thomas Baxter which

18    was presented upon check-in.

19    Q.   And what's the name of the individuals who checked in?

20    A.   According to the registration, Mr. and Mrs. Thomas

21    Baxter.

22    Q.   All right, and what's the address that's given?

23    A.   18 Gerta Court, Selden, New York.

24    Q.   Who lives at 18 Gerta Court?

25    A.   The Matoses.

1    Q.   What was the arrival and check out date on that?

2    A.   The arrival date is September 30th of 1995, and the

3    check-out date is 10/7 of 1995.

4    Q.   Now, is there a separate part of this document that

5    says "credit card approvals"?

6            THE COURT:  Are you seeking to introduce this?

7            MR. HERBERT:  Yes, your Honor.  We would offer

8    Exhibit 9.

9            MR. REDDINGTON:  No objection.

10           THE COURT:  All right.  The document may be

11   admitted.  We don't need to go through it one by one.

12           MR. HERBERT:  Thank you, your Honor.

13           (Exhibit No. 9 admitted in evidence.)

14   Q.   Just for the record, the other documents and the other

15   pages of Exhibit 9 also relate to that stay; is that correct?

16   A.   Yes.

17   Q.   Now, that was, you say, September/October of '95; going

18   on to November '95, did you find out where they went?

19   A.   Back to Grand Isle.

20   Q.   And did they stay there for a period of time?

21   A.   They did.

22   Q.   In a motel, and did they rent a cabin after that?

23   A.   Yes.  The cabin was for about a three-month rental, I

24   believe.

25   Q.   Did you find out how they paid for the motel and the

1    cabin?

2          MR. REDDINGTON:  Again, I would ask it be restricted

3    or at least indicate any source of information, and, also,

4    who was actually making the payments.

5          MR. HERBERT:  Yes, your Honor.

6          THE COURT:  All right.  Overruled with that

7    clarification.

8          MR. HERBERT:  Thank you, your Honor.

9    Q.  First of all, did you find out who made the payments

10   for the accommodations in Grand Isle at that time?

11   A.  James Bulger.

12   Q.  Did you find out how he made the payments?

13   A.  Cash.

14   Q.  And you said the cabin they rented took them for a few

15   months out to about February of 1996?

16   A.  Mid February of 1996.

17   Q.  All right.  And directing your attention to about

18   February 13th of '96, did they leave Grand Isle?

19   A.  They did.

20   Q.  And did they return in about May of 1996?

21   A.  Yes.

22   Q.  At that time where did they stay?

23   A.  They rented another cabin for about a two-month period.

24   Q.  All right.  Who paid for that?

25   A.  James Bulger.

```
1    Q.    How?

2    A.    Cash.

3    Q.    Do you recall about how much cash he paid?

4    A.    1,500 a month approximately.

5    Q.    Now, during that stretch did any witnesses in Grand

6    Isle report seeing Ms. Greig out walking?

7    A.    People indicated that Catherine Greig would at times

8    walk along the beach and the roads in Grand Isle alone.

9    Q.    All right.  Now, directing your attention to June 19th

10   of 1996, do you have some information about where they were

11   specifically, Mr. Bulger and Ms. Greig?

12   A.    In June of 1996?

13   Q.    Yes.

14   A.    In Grand Isle.

15   Q.    Okay, and do you have any information about any

16   shopping that they did on that date?

17   A.    There's a Walmart trip, a Walmart receipt, on or about

18   that date.

19   Q.    All right.  Would you turn to Tab 10 of your binder?

20   A.    Thank you.

21   Q.    I believe you're the only one that has a copy of this

22   document because the print of it is so faint, so I'll ask

23   you if you could describe what that document is for the

24   record?

25   A.    Sure.  These are records obtained by our New Orleans
```

1    FBI office from the Walmart in Galliano.  Unfortunately,

2    they're 14-year-old faxed copies so the print has faded

3    significantly over time; but if you review them closely,

4    you can see that an individual, Tom Marshal, and Helen

5    Marshal, purchased contacts at the Walmart.  Through

6    interview of the Walmart employees, they were able to

7    positively identify that customer as Catherine Greig.

8    Q.   So these are prescription contact lenses, did they say

9    where the prescription had come from?

10   A.   There is a notation of Cohen's Optical.

11   Q.   All right, and was there anything unusual about that

12   prescription that she submitted as reported by the employees?

13   A.   The Walmart employee indicated that there was no

14   address of the optician on the script nor a script -- or a

15   doctor number for the prescription.

16           MR. HERBERT:  Your Honor, we would offer this as

17   Exhibit 10.

18           MR. REDDINGTON:  No objection.

19           THE COURT:  Exhibit 10 is admitted for purposes of

20   today's proceedings.

21           (Exhibit No. 10 admitted in evidence.)

22           MR. HERBERT:  If I could just approach the clerk

23   with the document, your Honor?

24           THE COURT:  Yes.

25   Q.   All right.  Sir, after that did you learn that

1   Mr. Bulger was communicating with various people in the

2   Boston area by phone using telephone calling cards?

3   A.   I did.

4   Q.   And how did you learn about the calling cards?

5   A.   We received information that a certain individual had

6   received a call from James Bulger through investigative --

7   through an investigation into how that call was made, we

8   were able to determine it was made through a prepaid calling

9   card.

10  Q.   And were you then able to trace back where that card

11  was purchased?

12  A.   We were.

13  Q.   Where and when was it purchased?

14  A.   In May of 1996 in Okemah, Oklahoma, at Lowe's Country

15  Store.

16  Q.   Was that the only calling card that was purchased at

17  that time?

18  A.   It was not.

19  Q.   How many were purchased?

20  A.   Five, and they were all $20 cards.

21  Q.   Once you identified those cards, and, I take it, this

22  is after the fact?

23  A.   It's in late '97, maybe early '98, that we determined

24  that.

25  Q.   The cards having been purchased in May of '96?

1    A.   Right.

2    Q.   And were you able to determine what calls had been made

3    using those five calling cards?

4    A.   Several.

5    Q.   Do you know an individual named Doris Shoretel?

6    A.   I do.

7    Q.   Who is she?

8    A.   She is a friend of Teresa Stanley, also, I guess you

9    would say a friend of James Bulger.

10   Q.   And was she interviewed?

11   A.   She was.

12   Q.   And was there a calling card call that was made to her

13   that was learned?

14   A.   Yes.

15   Q.   And do you know what the duration of that call was?

16   A.   Several minutes.

17   Q.   And did Ms. Shoretel say what the call was about, what

18   Mr. Bulger had said?

19   A.   A number of things but I think the main message was

20   that James Bulger wanted Doris Shoretel to tell Teresa

21   Stanley to stop hanging around with someone who was her

22   recent boyfriend.

23   Q.   Any other message that Bulger gave Ms. Shoretel?

24   A.   I can't recall.

25   Q.   All right.  Were there other calls that were -- that

1    you learned about made with these calling cards?

2    A.   Yes.

3    Q.   Can you identify any other individuals that received

4    calls?

5    A.   Sure.  Kathleen McDonough, Margaret McCusker, Kevin

6    Weeks, families that James Bulger was friends with:  the

7    Caputos, friends of Billy Bulger:  Paul Dooley was one name.

8    There were several; there was quite a number of calls so I

9    can't recall all the names offhand.

10   Q.   All right.  Was Mr. Caputo interviewed?

11   A.   He was.

12   Q.   And he did provide any information about the content of

13   the call that he received?

14   A.   It was from James Bulger, and he called to see how

15   things were in Boston and also wanted to get a message to

16   his brother Jackie that he was okay.

17   Q.   Now, did you end up interviewing an individual named

18   Richard Swanson?

19   A.   I believe I did but I have no specific recollection of

20   it.  There were quite of number of interviews done on these

21   calls.

22   Q.   All right.  Now, sir, at some point in the spring

23   or early summer of 1996 did Mr. -- were you advised by

24   Mr. Weeks that at some point during the spring or early

25   summer of 1996 he went to see Ms. Stanley?

1    A.   He did.

2    Q.   And during that conversation with Ms. Stanley, did she

3    advise Weeks of anything that she had told the FBI?

4    A.   Teresa Stanley at that time told Kevin Weeks that she

5    had divulged to the FBI the Thomas Baxter alias identity

6    which James Bulger had set up in the late '70s and had been

7    utilizing as a fugitive.

8    Q.   And what did Mr. Weeks do with that information?

9    A.   He had to wait until he was able to contact -- be

10   contacted by James Bulger.

11   Q.   And once he got in touch with Mr. Bulger, he did tell

12   him about that --

13          MR. REDDINGTON:  Objection.

14   Q.   -- according to Mr. Weeks?

15          MR. REDDINGTON:  I press the objection.

16          THE COURT:  I'm sorry?

17          MR. REDDINGTON:  I press the objection.  I do object.

18          THE COURT:  Grounds?

19          MR. REDDINGTON:  Again, your Honor, it's basically

20   the same argument I've been giving you.  It's very

21   insinuating.  There seems to be a lot of editorial or

22   commentary by the witness as opposed to evidence.  I do

23   understand the low level, if you will, of evidence in a

24   detention hearing but --

25          THE COURT:  I appreciate that, Mr. Reddington, and

1    I would just ask the government again to focus on the

2    defendant that is here in the courtroom.  I understand it's

3    a harboring charge so that allows some latitude, but it

4    does assume that we are treading far afield based on what

5    has been presented.

6         MR. HERBERT:  Yes, your Honor.  If I could just

7    offer this, that a lot of the evidence in this case goes to

8    support the argument about the extent that Mr. Bulger and

9    Ms. Greig went to to develop new IDs, identifications, in

10   order to stay one step ahead of law enforcement and so the

11   fact that --

12        THE COURT:  But we are hearing a lot about

13   conversations that don't seem to have anything to do with

14   this defendant.

15        MR. HERBERT:  Yes, your Honor.

16        THE COURT:  This particular conversation may be

17   relevant, but we just heard a lot of conversations that

18   don't seem to have anything to do with that so I would ask

19   that the government focus on this defendant.

20        MR. HERBERT:  Yes, your Honor.

21   Q.  All right.  What, if anything, did Mr. Bulger say to

22   Mr. Weeks after you gave him this information or did you

23   give him any instructions?

24   A.  They made arrangements to meet in Chicago.

25   Q.  All right.  And did Mr. Weeks, in fact, meet Mr. Bulger

1    in Chicago?

2    A.   He did.

3    Q.   Do you know about when that was?

4    A.   July of 1996.

5    Q.   Now, at that point just before meeting in Chicago where

6    were Mr. Bulger and Ms. Greig?

7    A.   Grand Isle, Louisiana, until, I believe, July 7th of

8    1996.

9    Q.   And when they left Grand Isle, did they tell anyone in

10   Grand Isle where they were going?

11   A.   San Diego.

12   Q.   Where, in fact, did they go?

13   A.   Chicago.

14   Q.   All right, and you indicated Mr. Weeks then met up with

15   them in Chicago?

16   A.   He did.

17   Q.   Did he meet with Mr. Bulger and Ms. Greig in Chicago?

18   A.   He did.

19   Q.   Did he say anything about what Mr. Bulger's appearance

20   was at that time?

21   A.   He had grown a mustache.

22   Q.   And did Mr. Bulger give Mr. Weeks any instructions when

23   they got there?

24   A.   James Bulger requested --

25          MR. REDDINGTON:  Your Honor, I apologize but I'm

1   going to object.  I would like to know, at least at this

2   point I think it would be incumbent on the government to

3   indicate whether or not Mr. Bulger is going to have these

4   types of conversations with Mr. Weeks in the presence of

5   Catherine Greig; and I understand it's still a hearsay

6   objection, if you will, but I think it's important for you

7   to know that, though.

8        MR. HERBERT:  Yes, your Honor.  Let me clarify that

9   with this witness.

10  Q.   Sir, based on what Mr. Weeks told you about that

11  meeting, where was Ms. Greig when he was talking to

12  Mr. Bulger about the identification?

13  A.   Present.

14  Q.   Did Mr. Bulger ask Mr. Weeks to take any photographs of

15  him?

16  A.   He did.

17  Q.   And before that did Mr. Weeks do anything in preparation

18  for that?

19  A.   Kevin Weeks and his girlfriend had drove to Chicago and

20  met James Bulger and Catherine Greig at the Water Tower Mall,

21  went to a department store, and purchased a bedsheet to use

22  as a backdrop for identification photos to be taken.

23  Q.   All right, and they took those photos?

24  A.   They did.

25  Q.   And where was Ms. Greig when those photos were being

1    taken?

2    A.   In the hotel room.

3    Q.   So present when they were being taken?

4    A.   Present when they were being taken.

5    Q.   All right.  Now, to the best of your recollection

6    before that had Mr. Bulger asked Mr. Weeks to obtain any

7    photographs for him to be used for fake identifications?

8    A.   He did.

9    Q.   And what specifically was his instruction to Mr. Weeks?

10   A.   He asked Kevin Weeks to obtain identifications for him

11   utilizing his brother Jackie's picture.

12   Q.   All right, and was Mr. -- was Jack Bulger supposed to

13   change his appearance in any way for these photos?

14   A.   He put on a fake mustache.

15   Q.   And did Mr. Weeks indicate that he, in fact, did that?

16   A.   He did, and Kevin took the pictures; Kevin Weeks took

17   the pictures.

18   Q.   Were those pictures delivered to Mr. Bulger?

19   A.   They were.

20   Q.   And was Mr. Bulger satisfied with the appearance of

21   those pictures?

22   A.   Quite displeased.

23        THE COURT:  Mr. Herbert, what about Ms. Greig's

24   knowledge of it?

25   A.   As to the pictures of -- according to Kevin Weeks and

1    to the best of my recollection, when he displayed the IDs

2    for James Bulger depicting his brother Jackie, she was

3    present.

4    Q.   Now, how did Mr. Bulger and Ms. Greig get from Grand

5    Isle to Chicago?

6    A.   Drove in the Grand Marquis.

7    Q.   That was the one that was purchased in Selden?

8    A.   It was.

9    Q.   And what happened to that car when they got to Chicago?

10   A.   They left it in a parking garage.

11   Q.   And was it just parked in the parking garage or

12   abandoned?

13   A.   He had made arrangements -- James Bulger made

14   arrangements for someone to pick it up, so I don't know if I

15   could characterize it as abandoned.

16   Q.   Okay.  Who did he make those arrangements with?

17   A.   Primitivo Matos.

18   Q.   Now, where did Mr. Bulger and Ms. Greig go after

19   Chicago?

20   A.   New York, New York.

21   Q.   How did they get there?

22   A.   Amtrak.

23   Q.   How do you know that?

24   A.   Through interview of Kevin Weeks, through review of

25   Amtrak records, and through telephone call announcements.

```
1    Q.   Could you turn to Tab 11 in the binder, please.  Do you

2    recognize that document?

3    A.   I do.

4    Q.   What is that?

5    A.   That is an Amtrak ticket purchased in the names of

6    Mark and Carol Shapeton purchased in July of 1996 for a trip

7    from Chicago to Penn Station.

8         MR. HERBERT:  All right.  We would offer Exhibit 11,

9    your Honor.

10        MR. REDDINGTON:  Assuming there will be a

11   foundation for that, I would otherwise have no objection to

12   the document, your Honor.

13        THE COURT:  All right.  The document's admitted

14   subject to you adding a foundation.

15        MR. HERBERT:  Yes, your Honor.

16        (Exhibit No. 11 admitted in evidence.)

17   Q.   Sir, what's the connection to this ticket and Mr. Bulger

18   and Ms. Greig?

19   A.   This is a ticket that Mr. Weeks said they utilized in

20   the summer of 1996, Mark and Carol Shapeton, and Kevin Weeks

21   also indicated that they traveled by Amtrak from Chicago to

22   New York.

23   Q.   All right.  According to your investigation did the

24   train make any stops between Chicago and New York?

25   A.   At least one I knew of in Albany, New York.
```

1    Q.   And were you able to determine through calling card

2    analysis that any calls were made on the calling cards

3    Mr. Bulger had purchased in Albany?

4    A.   There was a telephone call to someone that was a friend

5    or associate of James Bulger in Boston.

6    Q.   And based on the calling card analysis, were you able

7    to determine how long Mr. Bulger and Ms. Greig stayed in

8    New York in the summer of 1996?

9    A.   Through at least August 31st.  I do know that the

10   return ticket purchased was, I believe, for September 13th

11   of 1996.

12   Q.   Now, are you familiar with an individual named Peter

13   Lee?

14   A.   I am.

15   Q.   And did Mr. Lee make any trips to New York during that

16   period?

17   A.   He did.

18   Q.   What was the purpose of that trip?

19   A.   Peter Lee was directed by Kevin Weeks to travel by

20   Amtrak to New York City to deliver a package to James Bulger

21   and Catherine Greig.

22   Q.   What was in the package?

23   A.   According to Kevin Weeks, an identification that Kevin

24   had made for James Bulger.

25   Q.   According to Mr. Lee, he did know what was in the

1  package?

2  A.   He stated he did not.

3  Q.   And did Mr. Lee meet up with Mr. Bulger?

4  A.   He did, and Catherine Greig.

5  Q.   All right, and the two of them were together when that

6  package was delivered?

7  A.   Yes.

8  Q.   And to your knowledge can you say definitively whether

9  or not Mr. Bulger opened that package with the IDs in it in

10  the presence of Ms. Greig?

11      MR. REDDINGTON:  I'm going to object, your Honor.

12  My understanding is this would be a meeting between

13  Mr. Bulger allegedly and Ms. Greig, and this Mr. Lee; I

14  would like to know at least the source of the information.

15      THE COURT:  What is Special Agent Carazza's

16  foundation for his knowledge of that?

17  A.   Through the interview of Peter Lee and through the

18  interview of Kevin Weeks who organized the trip.

19  Q.   And so just to go back to my question, is it fair to

20  say, sir, that you are not able to say definitively that

21  Ms. Greig had personal knowledge of the contents of that

22  package?

23  A.   I cannot say that definitively.

24  Q.   Now, did Mr. Weeks indicate that sometime in about the

25  summer of 1996 he approached Kathleen McDonough to arrange

1    for a phone call to her from Ms. Greig?

2    A.   He did.

3    Q.   What did he say about that?

4    A.   He asked her to find a safe telephone number to take a

5    call at from Catherine Greig.

6    Q.   And did he get such a number?

7    A.   He did.

8    Q.   In about the fall of 1996 -- strike that.  Did you

9    interview an individual named Thomas Sheehan?

10   A.   I did.

11   Q.   All right, and did he provide any information about

12   calls he received beginning in the fall of 1996?

13   A.   He did.  He indicated that he had received, I believe,

14   three telephone calls from James Bulger and Catherine Greig,

15   in which they requested he go next-door and get Margaret

16   McCusker, who was the next-door neighbor for Margaret, for a

17   phone call.

18   Q.   And did he indicate whether he was able to do so in the

19   first of these calls?

20   A.   I believe he did.

21   Q.   And did that call come in under a phone that was listed

22   under Mr. Sheehan's name?

23   A.   I believe it was under his parents' name; it was a

24   phone in the basement.

25   Q.   Was that the principal phone listed to that residence?

```
 1    A.   No, it wasn't.
 2    Q.   And did he indicate whether Ms. McCusker got on the
 3    phone with this caller after he was able to arrange for her
 4    to come over?
 5    A.   He did.
 6    Q.   And did he indicate how Mr. McCusker was able to
 7    address the caller?
 8    A.   I recall him saying that he overheard Margaret say
 9    "Cathy" and inquire as to the weather.
10    Q.   Did he indicate about how long that first phone call
11    lasted?
12    A.   I can't recall if he did.
13    Q.   Now, did he indicate that there was a second attempt at
14    such a call about three months later?
15    A.   Yes.
16    Q.   And was that one unsuccessful because Ms. McCusker
17    wasn't home?
18    A.   Of the three calls, one was unsuccessful; obviously,
19    not the first.  I'm not sure whether it was the second or
20    the third.
21    Q.   Well, was there a third call?
22    A.   Yes.
23    Q.   And when was that?
24    A.   Early '97, I believe, by Mr. Sheehan's account.
25    Q.   All right, and was that call the same pattern as the
```

1    first one?

2    A.   Yes.

3    Q.   So he was able to get Ms. McCusker to come over to his

4    house for a call?

5    A.   Again, I'm confused as to which, whether it was the

6    second or third one that was the actual call that was taken,

7    but he did go and attempt to get her.

8    Q.   So you indicated there were two calls in which

9    Ms. McCusker interacted with Ms. Greig?

10   A.   Yes.

11   Q.   Now, are you familiar with an individual named Ellen

12   DuBane?

13   A.   Yes, I am.

14   Q.   And who is Ms. DuBane?

15   A.   Well, I'm a little vague as to whether it's a friend or

16   family member.  I believe she's the daughter of Ann Marie

17   Donovan, Anne Marie Donovan --

18   Q.   Mary Donovan?

19   A.   Mary Donovan.

20   Q.   And did Ms. Donovan provide any information to the FBI

21   about any calls received at her place from Ms. Greig?

22   A.   She did.

23   Q.   What did she say?

24   A.   There were at least two phone calls received at her

25   house wherein Margaret McCusker and Cathy Greig's friend

1    Kathleen McDonough showed up to receive phone calls.

2    Q.   And do you know whose phone those calls came in on?

3    A.   I'm not positive.

4    Q.   All right.

5    A.   The phone in the house.

6    Q.   All right, and did Ms. Donovan indicate that she asked

7    Ms. McCusker and Ms. McDonough why they were coming to her

8    house to take calls?

9    A.   She did.

10   Q.   And what was the response -- strike that.  Was she able

11   to say specifically who the response came from?

12   A.   She was not.

13   Q.   All right, and what did she state one of them said?

14   A.   Words to the effect that "you never know who's

15   listening."

16   Q.   Now, on or about September 13th of 1996 I think you

17   indicated that there was a return ticket on Amtrak from

18   New York back to Chicago?

19   A.   Yes.

20   Q.   Again, under the names of Mark and Carol Shapeton; is

21   that correct?

22   A.   Yes.

23   Q.   All right.  Now, going to the latter part of 1996, did

24   Mr. Weeks indicate that he had another contact with

25   Mr. Bulger in New York City?

1    A.   He did.

2    Q.   And did he indicate whether or not that was his last

3    contact in person with Mr. Bulger?

4    A.   He claims it is.

5    Q.   And did he indicate what, if anything, he told

6    Mr. Bulger during that meeting?

7    A.   He expressed concern over the fact that he may be "too

8    hot" to be in contact with him.

9    Q.   All right.  And according to Mr. Weeks, did that

10   result in essentially termination of their contacts the way

11   that they had been previously in touch?

12   A.   According to Kevin it was the last contact or the last

13   time he saw him.

14   Q.   All right.

15   A.   And the last time he saw him.

16   Q.   All right.  And is it fair to say, sir, that from that

17   point on until very recently the FBI was unable to say with

18   any certainty where Mr. Bulger and Ms. Greig were living?

19   A.   That's correct.

20   Q.   And I think you talked at the beginning about recent

21   publicity, a press initiative, focused on Ms. Greig,

22   correct?

23   A.   Yes.

24   Q.   All right.  Did that publicity lead to a tip to the FBI

25   that Ms. Greig and Mr. Bulger were, in fact, living in an

1    apartment in Santa Monica, California?

2    A.   It did.

3    Q.   What were the names that they were purportedly living

4    under?

5    A.   Charles and Carol Gasco.

6    Q.   And did that tip lead to the arrest of Mr. Bulger and

7    Ms. Greig on June 22nd --

8    A.   It did.

9    Q.   -- of this year?  All right.  And was that arrest at

10   the apartment at 1012 3rd Street, Santa Monica?

11   A.   James Bulger was arrested outside the apartment

12   building, and Catherine Greig was arrested inside

13   Apartment 303 where they were residing.

14   Q.   So which one was arrested first?

15   A.   James Bulger.

16   Q.   And that was outside the apartment?

17   A.   It was.

18   Q.   And was he lured out of the apartment?

19   A.   He was.

20   Q.   And after Mr. Bulger was in custody downstairs was

21   Ms. Greig arrested in the apartment?

22   A.   She was.

23   Q.   Was any search conducted of the apartment that night?

24   A.   There was.

25   Q.   And can you tell us in general what was found during

1     that search?

2     A.   Sure.  Weapons, a large amount of cash, identifications

3     depicting James Bulger's and Catherine Greig's photos with

4     alias names, false names.

5     Q.   You referred to cash; do you know approximately how

6     much cash was found in the apartment?

7     A.   $822,000.

8     Q.   And approximately how many weapons were found in the

9     apartment?

10    A.   30.

11    Q.   Sir, would you take a look at Tab 12.  Are you able to

12    identify the contents of Tab 12?

13    A.   Sure.  These are pictures taken from the search that

14    was conducted the night of James Bulger's and Catherine

15    Greig's arrest at their apartment in Santa Monica.

16    Q.   In Santa Monica.

17         MR. HERBERT:  We would offer Exhibit 12 at this

18    time, your Honor.

19         MR. REDDINGTON:  No objection, your Honor.

20         THE COURT:  All right.  Exhibit 12 is admitted for

21    purposes of today's proceedings.

22         (Exhibit No. 12 admitted in evidence.)

23    Q.   Special Agent Carazza, could you go through page by

24    page and tell us what is depicted in the photographs in

25    Exhibit 12?

```
1              THE COURT:  Unless there is something special about
2     the pictures, because they're in evidence so I'm not sure
3     we need to go through them picture by picture ... so if you
4     could focus on anything in addition to the pictures or save
5     the other pictures until the end?
6              MR. HERBERT:  Yes, your Honor.  If I could just
7     have a moment ... one thing I do want to elicit, your Honor,
8     would be the location of what is depicted in the first
9     picture.
10             THE COURT:  Okay.
11             MR. HERBERT:  I'm sorry, your Honor.  I would just
12    like to elicit the location of the items depicted in the
13    first picture.
14             THE COURT:  All right.
15    Q.   What does that first page depict?
16    A.   A handgun and some cash.
17    Q.   And what have you learned as to where that handgun was
18    located in the apartment?
19    A.   I believe it was on a shelf near the bed in the bedroom
20    which James Bulger indicated was his.
21             MR. REDDINGTON:  I'm sorry, I didn't hear the last
22    part?
23    A.   In a bedroom which James Bulger indicated was his
24    bedroom.
25             MR. HERBERT:  Your Honor, if I could just clarify a
```

1    couple of locations in here which may not be obvious by

2    looking at the pictures?

3         THE COURT:  Yes.

4    Q.  The second page depicts some cash, is that correct?

5    A.  It does.

6    Q.  All right, and is that how the cash was found or does

7    that depict cash that was pulled out of someplace?

8    A.  I believe that's the cash that was pulled out of a hole

9    that was cut in the wall.

10   Q.  All right.  If you look at the third page, does that

11   depict the hole that was cut in the wall where the cash was

12   found?

13   A.  It does.

14   Q.  And was something covering up that hole?

15   A.  A mirror.

16   Q.  The next page depicts additional holes in the wall, is

17   that correct?

18   A.  It does.

19   Q.  With other items in those holes, is that correct?

20   A.  Yes.

21        MR. REDDINGTON:  I apologize.  Could I ask your

22   Honor if perhaps we know which room?

23        THE COURT:  That would be helpful.

24   Q.  Do you know, Special Agent, where the cash and guns

25   were found?

A.   I do.  They were in a bedroom again which James Bulger
indicated was his bedroom.

Q.   Other than that firearm that you indicated in the first
picture was out on a shelf, were the other guns hidden in
some fashion?

A.   Yes.

Q.   And where were they hidden?

A.   Several in the wall, and I believe three loaded handguns
behind books on the bookshelf.

Q.   So other photographs here that depict weapons that are
laid out, is it fair to say that those are not how they were
found?

A.   Those are after they were retrieved.

Q.   And all of the other items that we see depicted in these
pictures were recovered in the search?

A.   Yes.

Q.   Would you turn to Tab 13 please.  Do you recognize
what's depicted in -- on those pages?

A.   I do.

Q.   All right, and is it fair to say this is a collection
of identification documents that were found in the search?

A.   They were.

          MR. HERBERT:  If I could just have a moment, your
Honor ... we would offer Exhibit 13 under seal, your Honor.

          MR. REDDINGTON:  No objection.

1          THE COURT:  All right.  Exhibit 13 is admitted under

2    seal for purpose of today's proceedings.

3          (Exhibit No. 13 admitted in evidence.)

4    Q.   Now, sir, if you could make reference to that Table of

5    Identification with the letter designations?

6    A.   Yes.

7    Q.   Is it fair to say that these identifications are in the

8    names of Identities A and B that's listed on that table?

9    A.   Yes.

10   Q.   And is it fair to say that those names are similar

11   but not identical to the names used with respect to the

12   apartment building?

13   A.   Correct.

14   Q.   Would you turn to Tab 14 please.  Do you recognize that

15   document?

16   A.   I do.

17   Q.   Was this also found in the search?

18   A.   It was.

19          MR. HERBERT:  And we would offer Exhibit 14 under

20   seal as well, your Honor.

21          MR. REDDINGTON:  No objection.

22          THE COURT:  All right.  Exhibit 14 is admitted under

23   seal for purpose of today's proceedings.

24          (Exhibit No. 14 admitted in evidence.)

25   Q.   And, sir, is it fair to say that Exhibit 14 is a birth

1    certificate under the name of Identity C?

2    A.   It is.

3    Q.   And is Identity C one of the identities that Kevin

4    Weeks said he gave to Mr. Bulger?

5    A.   Yes.

6    Q.   Would you turn to Tab 15.  Are these additional

7    identification documents found in the search?

8    A.   They are.

9         MR. HERBERT:  We would offer these as well, your

10   Honor.

11        MR. REDDINGTON:  No objection.

12        THE COURT:  Under seal as well?

13        MR. HERBERT:  Under seal as well, your Honor.

14   Thank you.

15        THE COURT:  Mr. Reddington just has to respond.

16        MR. REDDINGTON:  I said no objection.

17        THE COURT:  I'm sorry, I didn't hear you.

18   Exhibit 15 is admitted for purposes of today's proceedings.

19        (Exhibit No. 15 admitted in evidence.)

20   Q.   Again, with reference to the identification/alias table,

21   is it fair to say that Exhibit 15 represents a collection of

22   identity documents in the name of Identity D?

23   A.   It is.

24   Q.   Would you turn to Tab 16?  Are these additional

25   documents found in the search?

1    A.   They are.

2         MR. HERBERT:  We would offer these under seal as

3    well, your Honor.

4         MR. REDDINGTON:  No objection.

5         THE COURT:  All right.  Exhibit 16 is admitted under

6    seal for purposes of today's proceedings.

7         (Exhibit No. 16 admitted in evidence.)

8    Q.   Sir, is it fair to say that Exhibit 16 represents a

9    collection of identity documents and medical records under

10   Identity E?

11   A.   Correct.

12   Q.   I'm sorry, if we could just go back to Exhibit 15 for a

13   second, Special Agent Carazza, without identifying the name

14   on these, could you just tell us, identify the types of

15   identification documents they were?

16   A.   Sure.  There's a New York State resident identification,

17   an employee ID card for an employee listed as the individual

18   in Identify E in New York City, a Social Security card --

19   actually, three variations of a Social Security card bearing

20   that same Identity E, some business cards, handwritten

21   information, and another handwritten identification card,

22   and then what looks to be a photocopy of a plastic business

23   card or a membership card for the Sportsmen's Collection

24   with no name on it.

25   Q.   Now, if you would just turn back to the page that has

```
 1    the Social Security cards on it, the top right on that page,
 2    is that a selective service identification card?
 3    A.   You cannot read all of it, but it appears as though
 4    it's -- most of the word is selective.
 5    Q.   Okay.  And at the bottom, is that a card that purports
 6    to entitle the holder of it or the undersigned to medical
 7    care?
 8    A.   Yes.
 9    Q.   And then if you'd turn back to Tab 16, if you would
10    just go through those and do the same thing again; 16,
11    again, is under -- the identity documents and medical
12    records under Identity E?
13    A.   Yes, they are.
14    Q.   Just on the first page, what types of documents are
15    those?
16    A.   Two California licenses and a Social Security card.
17    Q.   On the third page do you have various documents --
18    various cards that seem to relate to health insurance or
19    prescription savings cards?
20    A.   AARP cards as well, yeah.
21    Q.   Three pages in is there a birth certificate?
22    A.   There is.
23    Q.   Is there a certificate of military service?
24    A.   There is.
25    Q.   Is there --
```

1        THE COURT:  Mr. Herbert, I can tell what types of

2    documents these are.  If this doesn't have to do with

3    Mr. Bulger, I suggest you move on.

4        MR. HERBERT:  Certainly.

5    Q.   Turn to Tab 17, sir.  Are these additional documents

6    seized in the search?

7    A.   They are.

8        MR. HERBERT:  We'd offer these as Exhibit 17 under

9    seal.

10       MR. REDDINGTON:  No objection.

11       THE COURT:  Exhibit 17 is admitted for today's

12   proceedings under seal.

13       (Exhibit No. 17 admitted in evidence.)

14   Q.   And, sir, is this a collection of identification

15   documents using the name of Identity F?

16   A.   They are.

17   Q.   And is the photo depicted on the identification

18   document at the top, does that appear to be a photograph of

19   Mr. Bulger or someone else?

20   A.   Someone else.

21   Q.   And then sort of the third page of that is just a

22   photograph; are you aware of when that photograph was taken?

23   A.   Last week.

24   Q.   To the best of your understanding, is that a photograph

25   of the individual who's identified as Identity F?

```
1    A.   It is.

2    Q.   Moving on to Tab 18, another document seized in the

3    search -- is that another document seized in the search?

4    A.   It is.

5         MR. HERBERT:  We'd offer this as Exhibit 18 under

6    seal, your Honor.

7         MR. REDDINGTON:  No objection.

8         THE COURT:  All right.  18 is admitted for purposes

9    of today's proceedings, and do you need this admitted under

10   seal?

11        MR. HERBERT:  I think we do need this under seal.

12        THE COURT:  Under seal.

13        (Exhibit No. 18 admitted in evidence.)

14   Q.   Is that a business card under the name of Identity G?

15   A.   It is.

16   Q.   Turn to Tab 19.

17   A.   Okay.

18   Q.   Were these documents seized in the search as well?

19   A.   They were.

20        MR. HERBERT:  I'd offer these as Exhibit 19 under

21   seal, your Honor.

22        MR. REDDINGTON:  No objection.

23        THE COURT:  Exhibit 19 is admitted for purposes of

24   today's proceedings under seal.

25        (Exhibit No. 19 admitted in evidence.)
```

```
 1    Q.   Are these a collection of business purchase cards under

 2    the name of Identity H?

 3    A.   They are.

 4    Q.   And is this a female identity?

 5    A.   It is.

 6    Q.   If you would turn to Tab 20, was this also seized in

 7    the search?

 8    A.   It was.

 9         MR. HERBERT:  We would offer this as Exhibit 20

10    under seal, your Honor.

11         MR. REDDINGTON:  No objection.

12         THE COURT:  Exhibit 20 is admitted under seal for

13    purposes of today's proceedings.

14         (Exhibit No. 20 admitted in evidence.)

15    Q.   And is that a New York State identification -- state

16    resident identification card, and behind it a medical record

17    using the name Identity I?

18    A.   It is.

19    Q.   Does that first page have a picture of the defendant on

20    it?

21    A.   It does.

22    Q.   Turning to Tab 21, was this also seized in the search?

23    A.   It was.

24         MR. HERBERT:  I'd offer this, your Honor, as

25    Exhibit 21 under seal.
```

1          MR. REDDINGTON:  No objection.

2          THE COURT:  Exhibit 21 is admitted for purposes of

3     today's proceedings under seal.

4          (Exhibit No. 21 admitted in evidence.)

5     Q.   Is this a collection of documents under the name of

6     Identity J?

7     A.   It is.

8     Q.   And as part of this, is there a marked-up copy that

9     purports to be a legal document for a name change?

10    A.   There is.

11    Q.   And that's a different female identity, is that

12    correct?

13    A.   That's correct.

14    Q.   Tab 22 was also seized in the search?

15    A.   Yes, it was.

16         MR. HERBERT:  We would offer this as Exhibit 22

17    under seal, your Honor.

18         MR. REDDINGTON:  No objection.

19         THE COURT:  Exhibit 22 is admitted for purposes of

20    these proceedings under seal.

21         (Exhibit No. 22 admitted in evidence.)

22    Q.   Is this collection of business cards with means of

23    identification notations under various names including

24    Identities I, J, K, and L?

25    A.   Yes.

1    Q.   And those are all female identities, correct?

2    A.   They are.

3    Q.   Was tab 23 also seized in the search?

4    A.   Yes, it was.

5         MR. HERBERT:  We'd offer this as Exhibit 23 under

6    seal, your Honor.

7         MR. REDDINGTON:  No objection.

8         THE COURT:  Exhibit 23 is admitted for today's

9    proceedings under seal.

10        (Exhibit No. 23 admitted in evidence.)

11   Q.   And these handwritten notations with means of

12   identification information for Identities M, N, and O,

13   among others?

14   A.   Yes, they are.

15   Q.   And the last name on the first page of Exhibit 23, is

16   that the same as the last name for Identity E?

17   A.   It is.

18   Q.   And Exhibit 23 reflects a female identity, and

19   Exhibit E is a male identity; is that correct?

20   A.   I'm sorry.  What was that?

21   Q.   Exhibit 23, Page 1, reflects a female identity, and

22   Exhibit E is a male identity; is that correct?

23   A.   Yes.

24   Q.   If you'd turn to Tab 24, was this document also seized

25   in the search for documents?

1    A.   It was.

2         MR. HERBERT:  We would offer this as Exhibit 24

3    under seal, your Honor.

4         MR. REDDINGTON:  No objection, your Honor.

5         THE COURT:  Exhibit 24 is admitted for purposes of

6    today's proceedings.  Did you say under seal?

7         MR. HERBERT:  I did, your Honor.  Thank you.

8         (Exhibit No. 24 admitted in evidence.)

9    Q.   Is it fair to say, sir, this is copies of a weekly

10   planner book for 2011?

11   A.   It is.

12   Q.   And have you had a chance to flip through the pages in

13   this exhibit?

14   A.   I've seen some of them.

15   Q.   Is it fair to say it's a weekly planner that has

16   notations typical of a datebook?

17   A.   Yes.

18   Q.   And various of these pages reflect shopping trips?

19   A.   Television shows, shopping trips, appointments.

20   Q.   Does it reflect monies expended?

21   A.   Yes.

22   Q.   If you would flip to Exhibit 25, please.  Were these

23   documents also seized in the search?

24   A.   No.

25   Q.   I'm sorry, I withdraw that question, sir.  Were these

1    documents obtained from a pharmacy in Santa Monica?

2    A.   Yes, they were.

3         MR. HERBERT:  We would offer these as Exhibit 25

4    under seal, your Honor.

5         MR. REDDINGTON:  No objection.

6         THE COURT:  All right.  Exhibit 25 is admitted under

7    seal for purposes of these proceedings.

8         (Exhibit No. 25 admitted in evidence.)

9    Q.   Now, sir, with respect to the first page of Exhibit 25,

10   can you say what that page depicts, again without saying the

11   ID that's on there?

12   A.   Identity E, that's a transaction list detail from

13   Barnes Pharmacy in Santa Monica, California.

14   Q.   Okay.  Is this a printout essentially of an electronic

15   signature in connection with a transaction there?

16   A.   It is.

17   Q.   Through investigation were you able to determine who

18   had signed that name Identity E?

19   A.   Through interview of pharmacy employees at Barnes, they

20   indicated that Catherine Greig had signed the name on these

21   signature lines, which is actually Identity E in the chart.

22   Q.   And in connection with what type of transaction there?

23   A.   Pick-up of medicine at the pharmacy.

24   Q.   Prescription medication in the name of Identity E?

25   A.   Yes.  I believe there might be some also in -- there's

1   one in Identity I, which was actually a prescription for

2   Catherine Greig which she picked up and signed in the name

3   of Identity I.

4   Q.   All right.  Now, is there -- you indicated there were

5   interviews of store employees; did these take place last

6   week?

7   A.   They did.

8   Q.   And as part of those interviews, were agents able to

9   obtain any security video from the Barnes Pharmacy that

10  corresponded to the transactions reflected in Exhibit 25?

11  A.   They did.

12  Q.   Would you turn to Tab 26, please.

13       THE COURT:  How much longer do you think you have?

14       MR. HERBERT:  20 minutes, 25 minutes, your Honor,

15  best guess, maybe less.  We were actually going to identify

16  this security video CD and play it, your Honor.

17       THE COURT:  All right.  About how long is the video?

18       MR. HERBERT:  It's not very long.

19       THE COURT:  So why don't we go forward, play the

20  video, and then, unfortunately, I didn't know this was going

21  to take this long or we would have started earlier today,

22  but I think we have some time to continue.  When do we have

23  time?

24       THE CLERK:  Wednesday, your Honor, July 13th at

25  10:30.

1        THE COURT:  And is that convenient for you as well,

2   Mr. Reddington?

3        MR. REDDINGTON:  Yes, your Honor.

4        THE COURT:  So we'll see the video and then recess

5   until Wednesday.

6        MR. HERBERT:  Yes, your Honor.

7   Q.   Just, sir, for the record, are you able to identify the

8   CD or DVD in Tab 26 as the security video obtained from

9   Barnes Pharmacy?

10  A.   It's a copy of the video obtained.

11  Q.   And did you review that exact CD?

12  A.   I did.

13  Q.   And did you initial the CD --

14  A.   I did.

15  Q.   -- label?  Okay, and just in general what is depicted

16  on it?

17  A.   It was surveillance footage of an individual who was

18  identified as Catherine Greig coming into the pharmacy and

19  then departing the pharmacy.

20       MR. HERBERT:  We would offer this as Exhibit 26,

21  your Honor.

22       MR. REDDINGTON:  No objection.

23       THE COURT:  Exhibit 26 is admitted for purposes of

24  today's proceedings.

25       (Exhibit No. 26 admitted in evidence.)

1    Q.   If I could ask if the agent could step down, and we'll

2    play the video?

3              THE COURT:  Yes.

4              MR. HERBERT:  Actually, before we do that, your

5    Honor, could I just clarify one thing with the witness so

6    the record's clear?

7              THE COURT:  Yes.  Actually, is it a quick question?

8              MR. HERBERT:  Yes, it is.

9              THE COURT:  All right.

10   Q.   Special Agent Carazza, is it fair to say this is an

11   edited version of the video that was obtained from Barnes

12   Pharmacy to focus specifically on three clips relating to

13   the defendant?

14   A.   It is.

15   Q.   Okay.  If you could play it, and if you could use the

16   remote control; with the Court's permission, if the witness

17   could just pause it briefly when the defendant's image

18   comes up?

19             THE COURT:  Yes.

20   A.   This is the wrong remote.

21   Q.   Actually, if you could step to the side that would --

22   and, actually, if I could ask the witness just to step to

23   the other side so you're not blocking the judge's view?

24   A.   Sorry, your Honor.

25             (Whereupon, the videotape was played for the Court.)

1    Q.   If you could just pause it and tell us what is depicted

2    in the video?

3    A.   Sure.   That's Catherine Greig entering the pharmacy.

4    Q.   Okay.

5    A.   That's Catherine Greig after going to the pharmacy

6    counter, putting something in her bag, and then making her

7    way out of the pharmacy, and then that was Catherine Greig

8    leaving the pharmacy.

9    Q.   All right.   Thank you.   Now, sir, just briefly,

10   after viewing that security video did agents go back to the

11   apartment being searched pursuant to a search warrant and

12   find a jacket that appears to match the jacket that the

13   defendant was wearing in that video?

14   A.   We did.

15        MR. HERBERT:   Would this be a good time to stop?

16        THE COURT:   All right.   So we will stand in recess

17   for today.

18        I understand that there may be some victims that

19   would like to speak, and I'd like the government and

20   Mr. Reddington to see if they could come up with an

21   agreement as to the procedure; and if so, then, I will

22   hear from the victims on Wednesday.

23        MR. REDDINGTON:   Your Honor, I will address the

24   issue, but I'd just like to flag the issue to the Court,

25   I would respectfully suggest that there are no victims on

1    this crime that is alleged by the government.  I certainly

2    understand concerns dealing with the other defendant, but

3    regarding the charge that's before you, I question whether

4    the victim statute or victim rights statute would really

5    apply in this proceeding.

6         THE COURT:  I understand that, Mr. Reddington, and

7    I understand the statute speaks to direct victims and

8    proximate; and, I mean, I may have the terms slightly wrong,

9    but it's a bit more attenuated than a direct connection,

10   and I believe, actually, Judge Feuerstein's opinion out of

11   the Eastern District of New York may be instructive on this

12   issue; wherein, she counseled that actually courts should

13   be inclusive of the definition of "victims" rather than

14   exclusive, but I would be happy to hear from the parties

15   on that on Wednesday.

16      Is there anything further, Mr. Herbert?

17        MR. HERBERT:  No, your Honor.

18        THE COURT:  Anything further, Mr. Reddington?

19        MR. REDDINGTON:  No, your Honor.  Thank you.

20        THE COURT:  We stand in recess.

21        THE CLERK:  Court's adjourned on this matter.

22   Court, all rise.

23        (Whereupon, the proceedings concluded at 4:20 p.m.)

24

25

1                        C E R T I F I C A T E

2

3        I, Helana E. Kline, a Registered Merit Reporter,

4    Certified Realtime Reporter, and Federal Official Court

5    Reporter of the United States District Court, do hereby

6    certify that the foregoing transcript, from Page 1 to

7    Page 86, constitutes, to the best of my skill and ability,

8    a true and accurate transcription of my stenotype notes

9    taken in the matter of the United States of America v.

10   Catherine Greig.

11

12

13

14

15

16

17

18

19

20

21

22

23        /s/ Helana E. Kline                    July 18, 2011

24        Helana E. Kline, RMR, CRR

25        Federal Official Court Reporter