UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> v.  ) <br> ) <br> CATHERINE E. GREIG, ) <br> a/k/a Carol Gasko, ) <br> a/k/a Carol Gasco, ) <br> a/k/a Helen Marshall, ) <br> a/k/a Carol Shapeton, ) <br> a/k/a Mrs. Thomas Baxter, ) <br> a/k/a J.L., ) <br> a/k/a P.M., ) <br> a/k/a N.S., ) <br> a/k/a J.W., ) <br> a/k/a C.L., ) <br> Defendant. ) <br> ) | CRIMINAL NO. 11-Cr-10286 <br><br> Violation: <br><br> 18 U.S.C. § 371 <br> (Conspiracy to Harbor Fugitive) |

## INDICTMENT

The Grand Jury charges that:

### Background

1. At all times material to this indictment, Defendant CATHERINE E. GREIG, a/k/a Carol Gasko, a/k/a Carol Gasco, a/k/a Helen Marshall, a/k/a Carol Shapeton, a/k/a Mrs. Thomas Baxter, a/k/a J.L., a/k/a P.M., a/k/a N.S., a/k/a J.W., a/k/a C.L., ("GREIG") had a close, personal relationship with James J. Bulger ("Bulger"). In or about late 1994, GREIG and Bulger both lived in the Boston, Massachusetts, area.

2. On or about December 23, 1994, Bulger fled Massachusetts in anticipation of being indicted by a federal grand jury sitting in Boston.

3. On or about January 5, 1995, Bulger and a criminal associate, Stephen J. Flemmi ("Flemmi"), were charged by federal criminal complaint with a felony, namely extortion in violation of 18 U.S.C. § 1951, and, that same day, federal arrest warrants issued for Bulger and Flemmi. Flemmi was arrested that day, but law enforcement efforts to locate and arrest Bulger were unsuccessful.

4. On or about January 5, 1995, a criminal associate of Bulger's ("John Doe No. 1"), after learning that Flemmi had been arrested, spoke with GREIG about Flemmi's arrest and told her that he believed that law enforcement was also looking to arrest Bulger.

5. On or about January 5, 1995, after Flemmi was arrested, John Doe No. 1 spoke with Bulger by telephone from the home of another individual. After this call, Bulger continued his flight to avoid apprehension on the federal warrant.

6. On or about January 6, 1995, members of law enforcement searching for Bulger spoke with GREIG at her home in Quincy, Massachusetts. Law enforcement officers informed GREIG that they were looking for Bulger and asked permission to enter GREIG's house to look for him. GREIG denied their request.

7. On January 10, 1995, a federal grand jury sitting in Boston, Massachusetts, returned a multi-count superseding felony indictment (Case No. 94-10287-MLW) against Bulger and several co-defendants charging Bulger with, among other things, extortion and violations of the federal Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1962(c) and (d). On that same day, a warrant issued for Bulger's arrest on that superseding indictment.

8.     On September 27, 2000, a federal grand jury in Boston, Massachusetts returned a multi-count superseding felony indictment (Case No. 99-10371-RGS) against Bulger charging him with, among other things, violations of the RICO statute alleging as predicate acts murders of nineteen (19) individuals. On October 25, 2000, a warrant issued for Bulger's arrest on that superseding indictment.

9.     From January 5, 1995, through June 22, 2011, the charges against Bulger and the fact that law enforcement was seeking to arrest him were heavily publicized in Boston and, eventually, throughout the United States. Among other efforts to publicize the fact that Bulger was wanted on outstanding warrants, the FBI placed Bulger on its list of the Ten Most Wanted Fugitives and offered a reward for information leading to his capture.

## COUNT ONE
### (Conspiracy to Harbor Fugitive - 18 U.S.C. § 371)

10.    The Grand Jury hereby re-alleges paragraphs 1-9 of this Indictment and incorporates them by reference as if fully set forth herein.

11.    Beginning in or around January 1995 and continuing until on or about June 22, 2011, the exact dates being unknown to the Grand Jury, in the District of Massachusetts and elsewhere, the defendant:

CATHERINE E. GREIG,
a/k/a Carol Gasko,
a/k/a Carol Gasco,
a/k/a Helen Marshall,
a/k/a Carol Shapeton,
a/k/a Mrs. Thomas Baxter,
a/k/a J.L.,
a/k/a P.M.,
a/k/a N.S.,
a/k/a J.W.,

3

a/k/a C.L.,

willfully and knowingly conspired and agreed with Bulger and others known and unknown to the Grand Jury to commit an offense against the United States, namely, harboring and concealing Bulger, a person for whose arrest a felony warrant and process had been issued under the provisions of a law of the United States so as to prevent his discovery and arrest, after notice and knowledge of the fact that a warrant and process had been issued for the apprehension of Bulger, in violation of 18 U.S.C. § 1071.

### Purpose and Objective of the Conspiracy

12.  The purpose and objective of the conspiracy was to enable Bulger to avoid apprehension on warrants for his arrest, including at least one warrant, *inter alia*, that had been issued by the United States District Court for the District of Massachusetts in January 1995.

### Manner and Means

13.  It was part of the conspiracy that GREIG, Bulger, and other co-conspirators known and unknown to the Grand Jury pursued the purpose and objective of the conspiracy in the manner and means described below in paragraphs 14 to 21 of this Indictment.

14.  GREIG and Bulger would and did falsely pose as a married couple under different false identities, and claimed to be from states other than Massachusetts.

15.  GREIG and Bulger, with the assistance of others known and unknown to the Grand Jury, would and did obtain multiple means of identification, including social security numbers, driver's licenses, and state identification cards of other persons in order to conceal GREIG's and Bulger's true identities from others.

16. GREIG and Bulger would and did use multiple false identities in order to conceal their true identities from others.

17. GREIG and Bulger, while living together, would and did purchase goods and services, including necessities such as rent and drug prescriptions, using cash and money orders so as to conceal their true identities and the source of the funds.

18. GREIG and Bulger would and did continue to communicate with other persons in Massachusetts using methods of communication that masked their true identities and locations.

19. GREIG would and did obtain prescription medication for Bulger and herself using false identities both for Bulger and herself.

20. GREIG would and did pay bills for Bulger, including rent and utility bills under an assumed name.

21. GREIG would and did shop for groceries, clothing, and other household items for Bulger while they were living together under false identities, thereby enabling Bulger to minimize his time in public.

### Overt Acts

22. In furtherance of the conspiracy, and to effect the purpose and objective of the conspiracy, GREIG, Bulger, and other co-conspirators known and unknown to the Grand Jury committed the following overt acts in the District of Massachusetts and elsewhere:

   a. In or about February 1995, the exact date being unknown to the Grand Jury, GREIG arranged with John Doe No. 1 to meet Bulger at a location in Boston, Massachusetts, so that John Doe No. 1 could take her to another location in

      Boston, Massachusetts, to meet Bulger so GREIG could accompany and assist Bulger with his efforts to avoid apprehension.

b.    In or about February 1995, the exact date being unknown to the Grand Jury, GREIG met John Doe No. 1 at Thomas Park in South Boston, Massachusetts, accompanied John Doe No. 1 on an hour long drive in and around Boston to defeat possible law enforcement surveillance of John Doe No. 1, and then met Bulger with John Doe No. 1 at Malibu Beach in Boston, Massachusetts.

c.    In or about February 1995, the exact date being unknown to the Grand Jury, GREIG, carrying a small bag with her, joined Bulger in Bulger's car and left Massachusetts with Bulger.

d.    On various dates, from in or about February 1995 through in or about November 1996, the exact dates being unknown to the Grand Jury, Bulger communicated by telephone with John Doe No. 1, who, in turn, arranged telephone calls between Bulger and other persons, including other co-conspirators, in Massachusetts, at homes of third parties in an effort to conceal the location of Bulger and GREIG.

e.    On at least one occasion between February 1995 and November 1996, the exact date being unknown to the Grand Jury, John Doe No. 1 and Bulger arranged a phone call between GREIG and an individual in Massachusetts, at the home of a third party in an effort to conceal the location of Bulger and GREIG.

f.    On September 30, 1995, Bulger and GREIG checked into a Best Western Hotel in New York using the names "Mr. and Mrs. Thomas Baxter."

g.  In or about June, 1996, GREIG purchased contact lenses at a Walmart in Louisiana using the false name "Helen Marshall."

h.  In or about the spring of 1996, the exact date being unknown to the Grand Jury, John Doe No. 1 informed Bulger that Bulger's false identity of "Thomas Baxter" had been made known to law enforcement.

i.  In or about July 1996, the exact date being unknown to the Grand Jury, John Doe No. 1, along with persons in Massachusetts known and unknown to the Grand Jury, prepared and caused to be prepared false identification documents for Bulger.

j.  In or about July 1996, John Doe No. 1 took photographs of an individual, John Doe No. 2, who was a relative of Bulger's, in order to prepare false photo identification documents for Bulger. John Doe No. 2 wore a fake moustache for the photographs in order to make him look like Bulger, who had altered his appearance as a fugitive by growing a mustache.

k.  In or about the summer of 1996, Bulger spoke by phone with John Doe No. 1 and John Doe No. 2, who were at the home of a third party in Massachusetts, and discussed with John Doe No. 1 the delivery of false identification documents to Bulger.

l.  In or about July 1996, Bulger and GREIG met with John Doe No. 1 and another person known to the Grand Jury, at a hotel in Chicago, Illinois, where John Doe No. 1 took photographs of Bulger for use on additional false identification documents.

m. In or about July 1996, Bulger and GREIG obtained a train ticket from Chicago, Illinois, to New York, New York, under the names "Mark Shapeton" and "Carol Shapeton."

n. On or about July 23, 1996, Bulger and GREIG traveled by train from Chicago, Illinois, to New York, New York, using the names "Mark Shapeton" and "Carol Shapeton."

o. On or about September 13, 1996, Bulger and GREIG traveled by train from New York, New York, to Chicago, Illinois, using the names "Mark Shapeton" and "Carol Shapeton."

p. In or after 1995, the exact date being unknown to the Grand Jury, Bulger obtained a certified copy of a birth certificate of an individual (E.B.) born in Massachusetts.

q. In or after 1995, the exact date being unknown to the Grand Jury, Bulger obtained a social security card with a social security number of an individual (C.W.G.) with an address in New York, New York.

r. In or after 1995, the exact date being unknown to the Grand Jury, Bulger obtained identification documents displaying the social security number of an individual (C.W.G.) and photographs with Bulger's likeness.

s. In or after 1995, the exact date being unknown to the Grand Jury, Bulger obtained a social security card with a social security number of another individual (D.G.G.) with an address in New York, New York.

t.  In or after 1995, the exact date being unknown to the Grand Jury, Bulger obtained identification documents displaying the social security number of D.G.G. and photographs with Bulger's likeness.

u.  In or before 1998, the exact date being unknown to the Grand Jury, Bulger and GREIG rented an apartment in Santa Monica, California, using the false names "Charles Gasko" and "Carol Gasko."

v.  On various dates from 1996 through June 22, 2011, the exact dates being unknown to the Grand Jury, GREIG falsely told individuals associated with the Santa Monica apartment, including the property managers, that she was "Carol Gasko," that she was married to "Charles Gasko," and that they were from Chicago.

w.  In or after 1998, the exact date being unknown to the Grand Jury, GREIG falsely informed a property manager at the apartment GREIG and Bulger rented in Santa Monica, California, that her husband "Charlie" was ill with emphysema, which was intended as a false explanation for why Bulger stayed in the apartment as much as he did and for why the apartment windows had the shades pulled which had the effect of shielding Bulger from unnecessary exposure.

x.  On various dates from 1996 through June 22, 2011, including on or about May 1, 2011, the exact dates being unknown to the Grand Jury, GREIG delivered the rent for the apartment in Santa Monica, California to the management office, paying in cash.

y.  On various dates in 2010 and 2011, including on or about May 11, 2011, GREIG paid the monthly electricity utility bill for the apartment in Santa Monica, which was under the name "Carol Gasco" with a money order and the name "Carol Gasko."

z.  In or about 2000, the exact date being unknown to the Grand Jury, Bulger obtained identification documents of an individual (J.W.L.) with an address in California. These documents included social security numbers, California driver's licenses, and a birth certificate, among other things.

aa. On various dates from 2007 through 2011, the exact dates being unknown to the Grand Jury, Bulger obtained medical services and prescription medication using a false name (J.W.L.).

bb. On or about June 11, 2010, Bulger had a medical consultation at a medical clinic in Los Angeles, California, a false name (J.W.L.).

cc. In or about 2000, the exact date being unknown to the Grand Jury, GREIG obtained an identification document, which had a photograph appearing to be GREIG, but which displayed a false identity (J.L.) and an unassigned social security number.

dd. On various dates from at least 2003 through 2007, GREIG obtained medical services and prescription medication using a false name (J.L.).

ee. On some date prior to June 22, 2011, the exact date being unknown to the Grand Jury, GREIG and Bulger created business cards for GREIG with a false name (J.L.).

ff.  On some date prior to June 22, 2011, the exact date being unknown to the Grand Jury, GREIG and Bulger obtained the social security card of a female individual (P.M.), along with a Los Angeles County Court document and a birth certificate documenting a name change for this individual (P.M.).

gg.  On some date prior to June 22, 2011, the exact date being unknown to the Grand Jury, GREIG and Bulger created business cards for GREIG with a false name (P.M.).

hh.  On some date prior to June 22, 2011, the exact date being unknown to the Grand Jury, GREIG and Bulger obtained social security information of a female individual (N.S.).

ii.  On some date prior to June 22, 2011, the exact date being unknown to the Grand Jury, GREIG and Bulger created business cards for GREIG with a false name (N.S.).

jj.  On some date prior to June 22, 2011, the exact date being unknown to the Grand Jury, Bulger and GREIG obtained identification documents of an individual (S.J.T.), who had a driver's license from Nevada. The documents included a social security card and a Nevada driver's license, among other things.

kk.  On or about June 3, 2011, GREIG, using a false name (J.L.), obtained from a pharmacy in Santa Monica, California, prescription medication for Bulger that he had obtained using a false name (J.W.L.). On that occasion, GREIG signed Bulger's false name (J.W.L.) when picking up the medication at the pharmacy.

ll.      In or after 1998, Bulger and GREIG secreted approximately $800,000 in cash in holes cut into the walls of an apartment they were renting in Santa Monica, California.

mm.      At least by 2007, and continuing at least until 2010, Bulger and GREIG used a bank account of an individual (J.W.L.), whose identity Bulger had appropriated and who died in 2007, to pay for articles of clothing, health-related products, and other items.

All in violation of 18 U.S.C. § 371.

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY

_____
Jack W. Pirozzolo
First Assistant United States Attorney
James D. Herbert
Assistant United States Attorney

DISTRICT OF MASSACHUSETTS: August 11, 2011

Returned into the District Court by the Grand Jurors and filed.

_____ 8/11/11 - 1:10 pm
DEPUTY CLERK