UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 11-10286-DPW

UNITED STATES OF AMERICA

v.

CATHERINE E. GREIG

**<u>ORDER ON DEFENDANT'S MOTION FOR RELEASE</u>**

Boal, M.J.

The defendant, Catherine E. Greig, is charged in an indictment with harboring and concealing a fugitive in violation of 18 U.S.C. § 1071. An initial appearance was held on June 24, 2011,[1] at which time the government moved for detention pursuant to 18 U.S.C. §§ 3142 (f)(2)(A) (risk of flight) and (f)(2)(B) (obstruction of justice).

The court held a detention hearing on July 11 and 13, 2011. The government called one witness, FBI Special Agent Michael Carazza, and introduced thirty-seven exhibits into evidence. The defense called one witness, Kevin Weeks.

After the detention hearing, the defendant agreed to voluntary detention without prejudice and the court issued such an order on July 15, 2011. (Docket No. 19). On September 22, 2011, Greig filed a motion to reopen the detention hearing and submitted two exhibits.[2] (Docket Nos. 32, 39 and 40). On October 12, 2011, the government opposed the motion to

---

[1] At the time of the initial appearance, Greig had been charged in a criminal complaint. The grand jury returned an indictment on August 11, 2011. (Docket No. 25).

[2] At the initial status conference on September 29, 2011, Greig's counsel clarified that he did not seek a further hearing or argument on detention.

1

reopen the detention hearing and submitted three additional exhibits. (Docket No. 44).

The court considered the evidence submitted at the detention hearing, the parties' arguments and pleadings, and Pretrial Services Reports from the Central District of California and this District. After careful consideration of the evidence and for the following reasons, the court orders that the defendant be detained pending trial.

**I.    FACTS**

The government alleges that Greig harbored and concealed fugitive James J. Bulger (a/k/a Jimmy Bulger, Whitey Bulger) in violation of 18 U.S.C. § 1071. On January 5, 1995, a criminal complaint was filed charging Bulger with extortion in violation of 18 U.S.C. § 1951. (Tr. Day 1 at 17; Ex. 3 at ¶ 3).[3]  Based on the complaint, a warrant for Bulger's arrest was issued on that date. (Id.). The government attempted to execute the warrant for Bulger's arrest on January 5, 1995, but it was unable to find Bulger. (Tr. Day 1 at 17). The government did arrest one of Bulger's co-defendants, Steven Flemmi. (Id.).

News reports regarding the charges against Bulger and Flemmi's arrest appeared in several Boston area newspapers, including the Boston Globe and the Boston Herald. (Tr. Day 1 at 18; Ex. 3 at n. 1). The charges against Bulger and Flemmi's arrest were the lead news story on the 11:00 p.m. news broadcasts on January 5, 1995. (Id.). During January 1995, both local and national newspapers carried stories regarding the charges against Bulger and the fact that he had managed to elude arrest. (Tr. Day 1 at 19; Ex. 3 at n. 1; Ex. 7).

In an effort to locate Bulger, FBI Special Agents and Boston Police detectives conducted

---

[3] "Tr. Day 1 __" refers to the transcript of the July 11, 2011 detention hearing in this matter (Docket No. 23).

surveillance of Kevin Weeks, a known associate of Bulger's, on January 5, 1995.  (Tr. Day 1 at 21; Ex. 3 at ¶ 15).  At 10:00 p.m. that day, Weeks was observed at the L Street Tavern in Boston, Massachusetts.  (Tr. Day 1 at 22; Ex. 3 at ¶ 15).  At 10:30 p.m., advertisements for the 11:00 p.m. news on several major Boston television networks announced that federal authorities were looking for Bulger and that an arrest warrant on federal charges had issued for Bulger.  (Tr. Day 1 at 22-23; Ex. 3 at ¶ 15).  At approximately 10:35 p.m., agents observed Weeks leaving the L Street Tavern and driving away at a high rate of speed.  (Tr. Day 1 at 23; Ex. 3 at ¶ 15).  At approximately the same time, Greig, who was also under surveillance, was observed leaving her home in Quincy and driving to South Boston.  (Tr. Day 1 at 23; Ex. 3 at ¶ 15).  At approximately 11:00 p.m., agents observed Weeks and Greig meeting with one another on the streets of South Boston.  (Tr. Day 1 at 23; Ex. 3 at ¶ 15).

On January 10, 1995, a federal grand jury sitting in Boston returned a multi-count indictment against Bulger and several of his associates, charging Bulger with, among other things, extortion and violations of the federal RICO statute, 18 U.S.C. § 1962(c).  (Ex. 3 at ¶ 4).  A warrant for Bulger's arrest was issued the same day.  (Ex. 3 at ¶ 4).

Prior to charges being brought against Bulger, Bulger had left Massachusetts with a long-time girlfriend, Teresa Stanley.  (Tr. Day 1 at 25-29; Ex. 3 at ¶ 11).  Stanley informed the FBI that in or about the fall of 1994, she learned that throughout most or all of the time she had been Bulger's girlfriend, Bulger had also been romantically involved with Greig.  (Ex. 3 at ¶ 9).  This news caused a strain in Stanley's relationship with Bulger. (Ex. 3 at ¶ 9).

From approximately April 1996 through October 1996, Stanley cooperated with and provided information to the FBI in an effort to locate Bulger.  (Ex. 3 at ¶ 10).  Stanley told the

FBI that, at the time the arrest warrants were issued for Bulger on January 5 and 10, 1995, she was with Bulger in a location outside of Massachusetts. (Ex. 3 at ¶ 11).

In mid-January 1995, Bulger returned Stanley to Massachusetts. (Tr. Day 1 at 35). Later that day, Bulger met Greig and Weeks at Malibu Beach in Dorchester, Massachusetts. (Tr. Day 1 at 35; Tr. Day 2 at 69-70).[4] Margaret McCusker, Greig's identical twin sister, drove Greig to South Boston on that date. (Tr. Day 1 at 35). Weeks then picked up Greig and drove her to Malibu Beach, where they met with Bulger. (Tr. Day 1 at 35; Tr. Day 2 at 69). Greig had in her possession a bag and her sister's drivers license. (Tr. Day 1 at 36; Tr. Day 2 at 70). Greig then left Massachusetts with Bulger. (Tr. Day 1 at 35).

After they left Massachusetts, Greig and Bulger traveled to several places, including Grand Isle, Louisiana, Selden and Holtsville, New York, and Okemah, Oklahoma. (Tr. Day 1 at 37, 43, 48). Greig has also admitted traveling to Mexico to buy prescription medicine in 1995.

On or about May 30, 1997, a warrant was issued for Greig's arrest in this matter. (Ex. 4). On or about September 27, 2000, a federal grand jury sitting in Boston returned a superseding indictment, charging Bulger with violations of the federal RICO statute. (Ex. 5). The indictment alleged, among other things, that Bulger and others associated together for the purpose of earning money through extortion, loansharking, bookmaking, trafficking in narcotics and other controlled substances, and committing crimes of violence, including murder, attempted murder, and assault. (Ex. 5). A warrant was issued for Bulger's arrest in connection with those charges on October 25, 2000. (Ex. 6).

---

[4] "Tr. Day 2 __" refers to the transcript of the July 13, 2011 detention hearing in this matter (Docket No. 21).

Greig and Bulger were featured fifteen times on America's Most Wanted between January 24, 2008 and August 14, 2010. (Tr. Day 1 at 19; Ex. 8). In addition, Greig and Bulger were featured in the show Unsolved Mysteries. (Tr. Day 1 at 20). The FBI also placed an ad in USA Today in 2001 as well as a number of ads in trade magazines. (Tr. Day 1 at 20). News articles regarding the authorities' search for Bulger and Greig appeared in the Los Angeles Times a number of times between 1998 and 2011. (Ex. 30). At the detention hearing, the government introduced evidence that Greig subscribed to the Los Angeles Times and that she was also seen buying copies of the Los Angeles Times from a street box. (Tr. Day 2 at 13; Ex. 29).

Greig and Bulger were fugitives until they were apprehended on June 22, 2011. (Tr. Day 1 at 65). At the time of their arrest, Greig and Bulger were living together in an apartment in Santa Monica, California under assumed names. (Tr. Day 1 at 65). They had lived in that apartment since the late 1990s. (Tr. Day 2 at 10). A search of the apartment uncovered weapons,[5] a large amount of cash, a number of identifications depicting Bulger's and Greig's photos with false names, and books concerning the creation of false identifications. (Tr. Day 1 at 66; Tr. Day 2 at 17-18; Ex. 12-13, 15-20, 32).

## II.   ANALYSIS

### A.   Legal Standard

Under the Bail Reform Act, a defendant may only be detained pending trial if the government establishes either by clear and convincing evidence that the person poses "a danger

---

[5] One firearm was located on a shelf; the rest were hidden in the wall or behind books on a bookshelf. (Tr. Day 1 at 69).

to the safety of any other person or the community if released," or by a preponderance of the evidence that the person poses a serious risk of flight. 18 U.S.C. § 3142(f); United States v. Patriarca, 948 F.2d 789, 791-793 (1st Cir. 1991). A defendant may also be detained if the government establishes by clear and convincing evidence that a serious risk exists that the defendant will, or will attempt to, obstruct justice or threaten or injure prospective witnesses or jurors. 18 U.S.C. § 3142(f)(2)(B). If there is some risk, the Court should consider whether a combination of release conditions "will serve as a reasonable guard." Patriarca, 948 F.2d at 791.

In determining whether suitable release conditions exist, the judicial officer must take into account the following: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the accused, including family ties, employment and other factors; and (4) the nature and seriousness of the danger posed by the person's release. 18 U.S.C. § 3142(g). Each of these factors must be weighed, and the decision on whether to release is an individualized one. Patriarca, 948 F.2d at 794.

The Government bears the burden of persuasion to establish that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. United States v. Dillon, 938 F.2d 1412, 1416 (1st Cir. 1991).

After carefully evaluating the evidence in light of the criteria for detention set forth in 18 U.S.C. § 3142, the court determines that the government has met its burden regarding detention.

### B.     Defendant's History And Characteristics

Greig is sixty years old. She was born and raised in Massachusetts, where she resided

until 1995. Although she no longer resides there, the defendant owns a home in Quincy, Massachusetts. She has a twin sister, Margaret McCusker, who lives in South Boston, Massachusetts.

The defendant has been in a romantic relationship with Bulger for the last 36 years. Since sometime in the 1990s through the date of her arrest, Greig lived with Bulger in Santa Monica, California.[6] She has no children.

Greig was unemployed while living in California. Prior to relocating to California, she worked as a dental hygienist and taught at a dental hygienist school in the Boston area.

Greig has no criminal record.

### C.  Nature of the Offense; Weight Of The Evidence

This is not a typical harboring case where, for example, a relative hides a fugitive for a few days in her house or gives the fugitive some money so that he can leave town. Here, according to the government, for sixteen years, Greig actively assisted Bulger to elude capture. To accomplish this, Greig herself lived a fugitive lifestyle to avoid government detection. In addition, while the crime of harboring a fugitive is not normally considered a crime of violence, the court cannot ignore the fact that Greig is charged with harboring a fugitive who is accused of nineteen murders. Under the circumstances, and based on the government's presentation at the detention hearing, the evidence against Greig appears substantial.

---

[6] There is a dispute as to the exact date when Greig moved to California. She told Pretrial Services that she lived in California since 1995. However, the government introduced evidence at the detention hearing that Greig and Bulger traveled extensively in 1995 and 1996, living for extended periods of time in New York, Louisiana and Illinois.

### D.      Risk Of Flight

Greig presents a serious risk of flight if not detained. A defendant's history of flight must be given careful consideration in determining whether bail should be granted. United States v. Shakur, 817 F.2d 189, 199 (2nd Cir. 1987). Greig's history of flight is particularly important in this case. Greig hid herself from law enforcement for sixteen years while allegedly aiding Bulger in eluding capture. Greig was a fugitive herself for fourteen of those years. During that time, Greig lived under a variety of assumed names and was able to obtain false identification documents, some of which appear to be government-issued identifications which bear her photo and a false name.[7]

In addition, Greig does not appear to have any significant community or family ties to this District or any place in particular. Her parents are deceased. She owns a home in Massachusetts and has a sister in Massachusetts as well, but she walked away from both sixteen years ago when she left Massachusetts with Bulger, demonstrating a willingness to leave everything and everyone behind.

Greig appears to be in good physical and mental health and faces no restrictions that would prohibit her from fleeing. Accordingly, the court finds that Greig poses a serious risk of flight.

### E.      Proposed Conditions Of Release

Even after finding that the defendant poses a serious risk of flight, the court must consider whether there are conditions that will reasonably guard against that risk. See Patriarca,

---

[7] The government provided evidence that Greig used more than five such names. (Ex. 19-22).

948 F.2d at 791.  Greig asks the court to release her on conditions.  She proposes to live with her sister, Margaret McCusker, in South Boston, Massachusetts under home detention with electronic monitoring.  She also proposes to post her home in Quincy, Massachusetts and her sister's home in South Boston, Massachusetts as security.  An appraisal of Greig's home has valued the property at $300,000.  (Docket No. 39).  An appraisal of McCusker's home has valued the property at $605,000.  (Docket No. 40).

After examining Greig's proposal alongside her prior flight with Bulger and her extended period as a fugitive of justice, the Court finds that the proposed conditions will not reasonably assure Greig's appearance as required.

First, Greig proposes to live at the home of her sister, Margaret McCusker.  However, the government presented evidence that Ms. McCusker obstructed the government's investigation and may have aided Greig in fleeing with Bulger in 1995.  Ms. McCusker is Greig's identical twin.  (Tr. Day 1 at 35).  Greig took her sister's license when she left with Bulger.  (Id. at 36).  In addition, Ms. McCusker drove Greig to meet Bulger at the time of their departure together from Massachusetts.  (Id. at 35).  More importantly, Ms. McCusker pled guilty to perjury and obstruction of justice based on her lying to federal authorities about her contact with Greig.  (Ex. 33).

Greig also proposes that she be subject to home detention with electronic monitoring.  However, "home detention with electronic monitoring does not prevent flight; at best, it limits a fleeing defendant's head start."  United States v. Benatar, No. 02-CR-99, 2002 WL 31410262, at *3 (E.D.N.Y. Oct. 10, 2002) (citation omitted).

Greig's proposal to put up her home and her sister's home as security fares no better.

9

Greig already left this property behind in 1995. The court could have no assurance that the defendant would not do so again.

Greig has also offered to post her sister's residence as collateral. However, there is serious doubt that McCusker holds clear, unencumbered title to the property. (See Ex. 3 to Government's Memorandum in Opposition to Greig's Motion for Miscellaneous Relief). In addition, the home is just collateral for a bond. There is no evidence before the Court regarding McCusker's overall financial status or that she would actually face severe financial hardship if Greig flees. See Patriarca, 948 F.2d at 795 (a court may not rely on proposed financial conditions without information regarding the defendant's assets or net worth).

Accordingly, the court finds that the government has met its burden of proof that no condition or combination of conditions will reasonably assure the appearance of the defendant as required[8] and orders that Greig be detained pending trial.

## III.   ORDER

In accordance with the foregoing memorandum, IT IS ORDERED that:

1. Catherine E. Greig be committed to the custody of the Attorney General or his designated representative, for confinement in a corrections facility separate, to the extent

---

[8] The government moved for detention on the grounds that the defendant poses a serious risk that she will obstruct, or attempt to obstruct, justice pursuant to 18 U.S.C. § 3142(f)(2)(B). The government bears the burden of proving, by clear and convincing evidence, that the defendant poses a serious risk of obstructing justice. Id. Here, the government argues that the investigation leading to this indictment was plagued by numerous acts of obstruction of justice by the defendant, aided by her sister and others close to her and Bulger. (Docket No. 44 at 5-6). In any event, having found that the government has proved by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of the defendant as required, the court need not address the government's argument that the defendant poses a serious risk that she will obstruct, or attempt to obstruct, justice.

practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

    2. Catherine E. Greig be afforded a reasonable opportunity for private consultation with counsel; and

    3. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which Catherine E. Greig is detained and confined shall deliver her to an authorized Deputy United States Marshal for the purpose of any appearance in connection with a court proceeding.

## RIGHT OF APPEAL

THE PERSON OR PERSONS DETAINED BY THIS ORDER MAY FILE A MOTION FOR REVOCATION OR AMENDMENT OF THE ORDER PURSUANT TO 18 U.S.C. § 3145(b).

                                       /s/ Jennifer C. Boal
                                       JENNIFER C. BOAL
                                       United States Magistrate Judge

Date: November 4, 2011