UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:11-CR-10286-DPW |
| | ) | |
| CATHERINE E. GREIG, | ) | |
| Defendant. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM
## (REDACTED AND REVISED TO CONFORM TO LOCAL RULES)

Pursuant to the Court's procedural order of March 14, 2012, the United States submits

this sentencing memorandum in advance of the sentencing hearing for the Defendant Catherine

E. Greig ("Defendant" or "Greig") scheduled for June 12, 2012.

### I. Introduction

Greig's role in harboring James J. "Whitey" Bulger ("Bulger") calls for a substantial

sentence, including a substantial period of imprisonment.  As discussed in more detail below, this

is no garden variety harboring case.  It is the most extreme case of harboring this District has

seen.  For over sixteen years, Greig conspired to, and did, protect Bulger – alleged to be one of

the most dangerous and violent criminals in the history of this District – from being discovered

by law enforcement.  Knowing full well that Bulger was wanted for very serious crimes and

having ample opportunity to walk away at any time, Greig not only concealed Bulger from law

enforcement but did, herself, commit multiple additional felonies in order to protect him from

capture.  While these features of Greig's conduct – the nature of Bulger's crimes, the length of

time that Greig harbored Bulger, and Greig's own additional independent felonious conduct – by

themselves warrant a substantial period of incarceration, they are not the only features of Greig's

conduct relevant to her sentence.  Greig did not just co-habit with Bulger in Santa Monica.  She was his partner.  She handled the daily tasks necessary for them to maintain their otherwise low profile in Santa Monica.  And in doing so, she hid not only his identity, but also hid the fact that Bulger had filled their modest two bedroom apartment with weapons, enabling Bulger to avoid capture by violence if necessary.  She also participated in targeting people whose lives had been broken by mental illness, drugs, and alcohol in order to stockpile identities that Greig and Bulger could, and at times did, use to maintain their guise as a nondescript retired couple from Chicago.

Greig's conduct also did far more than protect Bulger from law enforcement.  It also denied victims and family members of victims for many years the opportunity to see Bulger answer for his alleged crimes.  Those victims and the public at large spent sixteen years watching revelation after revelation of violence and corruption unfold while the person allegedly at the center of it, Bulger, was absent.  The sentence ought to take into account the broader effect of Greig's conduct in order truly to reflect the seriousness of the offense and the need to promote respect for the law.

For the reasons that follow, the United States recommends a sentence of imprisonment of 120 months, a fine of $150,000, a period of supervised release of 3 years, a mandatory special assessment of $300 and forfeiture as set forth in the plea agreement.  The United States' recommended sentence is within the applicable sentencing guidelines range as calculated by the United States and is otherwise appropriate and reasonable under the sentencing factors set forth in 18 U.S.C. § 3553(a).  To the extent that the Court disagrees with the United States and calculates a lower guidelines offense level than the United States, the Court should nevertheless impose the sentence recommended by the United States because the circumstances of this case

warrant an upward departure or, alternatively, an upward variance in light of the sentencing factors of 18 U.S.C. § 3553(a).

## II.  Proposed Findings of Fact

In accordance with the Court's procedural order, the United States sets forth the following proposed findings of fact.  The United States incorporates as proposed findings: a) the Pre-sentence Report ("PSR") at ¶¶ 13-32, which recites the statement of offense conduct provided by the United States and to which the Defendant did not object; and b) the Defendant's Statement of Facts attached to her Plea Agreement.  The United States also incorporates herein the information it has submitted in connection with the detention proceedings in this matter and in the Sealed Appendix accompanying this memorandum.[1]

### A.    Background

Greig was the longtime girlfriend of James J. Bulger ("Bulger").  In late 1994, Greig lived in the Boston area.  Also in late 1994, Bulger learned that he was soon to be charged in federal court with various federal crimes and fled the area.   Bulger originally left in the company of another longtime girlfriend ("Jane Doe No. 2").  PSR ¶ 13.

On January 4, 1995, Bulger and a criminal associate, Stephen J. Flemmi ("Flemmi"), were charged by federal criminal complaint with a felony, namely extortion in violation of 18 U.S.C. § 1951, and, that same day, federal arrest warrants issued for Bulger and Flemmi. Flemmi was arrested the next day, but law enforcement efforts to locate and arrest Bulger were

---

[1]  References to the PSR appear as "PSR ¶#." References to the Statement of Facts appears as "SF ¶#."  References to the Detention Hearing materials appear as "DH Ex.**."  References to the Sealed Appendix appear as "SA, Tab #, page #."  References to Docket Entries appear as "Dkt. #."

unsuccessful.  The next day, January 5, 1995, a criminal associate of Bulger's ("John Doe No. 1"), after learning that Flemmi had been arrested, spoke with Greig about Flemmi's arrest and told her, in substance, that he believed that law enforcement was also looking to arrest Bulger. PSR ¶ 14, SF ¶ 2.  Around that same time, John Doe No. 1 also spoke with Bulger and told him about Flemmi's arrest.  Bulger then continued his efforts to avoid apprehension.  PSR ¶ 14.

The next day, January 6, 1995, members of law enforcement continued their search for Bulger in order to arrest him.  In connection with their search for Bulger, law enforcement officers went to Greig's home in Quincy, Massachusetts, where they spoke with Greig and asked for permission to enter the premises.  Greig refused to speak with them about Bulger's location and denied them permission to enter her house.  PSR ¶ 15, SA, Tab 68 at pp. 13-14.

A few days later, on January 10, 1995, a federal grand jury sitting in Boston, Massachusetts, returned a multi-count superseding felony indictment (Criminal No. 94-10287-MLW) against Bulger and several co-defendants charging Bulger with, among other things, extortion and violations of the federal Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1962(c) and (d).  On that same day, a warrant issued for Bulger's arrest on that superseding indictment.  PSR ¶ 16.[2]

---

[2] The extensive media coverage in the immediate aftermath of Flemmi's arrest and the unsealing of these charges identified Bulger as a reputed murderer and violent organized crime boss.  One article quoted a 1981 FBI tape played at the racketeering trial of Boston mob boss Gennaro Angiulo, with Angiulo's top lieutenant Larry Zannino saying of Bulger and Flemmi in 1981: "These are nice people.  These are the kind of (expletive) people who straighten a thing out.  If I called these guys right now, they'd kill anybody we tell 'em to."  Other articles mentioned that in 1986 a presidential commission labeled Bulger "a reputed killer, bank robber and drug trafficker."  Articles also discussed affidavits filed in court stating that Bulger, a convicted bank robber, boasted of his "personal participation in acts of violence" and that he once put a long-bladed knife to the throat of a bar owner and offered to let him "buy his life" for $50,000.  *See* DH Ex. 7.

### B.     Greig's Flight With Bulger

A few weeks later, in or about February 1995, Bulger got word to Greig that he would be returning to Boston and that he wanted her to accompany him in his flight from law enforcement. According to Jane Doe No. 1, Bulger called Jane Doe No. 1 and asked her if she could relay a message to Greig that Bulger wanted to meet with her.   PSR ¶ 17, SA, Tab 77 at p. 33.   Jane Doe No. 1 passed the word to Greig.   SA, Tab 77 at p. 34.   According to Jane Doe No. 1, a few days later, Greig came to Jane Doe No. 1's house with a large pocketbook.   Greig told Jane Doe No. 1 that she was being picked up by somebody in a couple of hours and that she wanted Jane Doe No. 1 to take custody of Greig's vehicle and poodles.   PSR ¶ 17, SA, Tab 77 at p. 35.   Greig told Jane Doe No. 1 that she would be leaving for what Greig estimated to be about three months and asked Jane Doe No. 1 to drive her to a location in the Thomas Park area of South Boston. Separately, Greig had arranged to meet John Doe No. 1 there.   Jane Doe No. 1 agreed to do so and gave Greig one of Jane Doe No. 1's credit cards.   Jane Doe No. 1 then drove Greig to Thomas Park in South Boston and dropped her off.   PSR ¶ 17, SA, Tab 77 at pp. 35-40, SF ¶ 4(a).   Greig then met John Doe No. 1, and the two of them (John Doe No. 1 and Greig) drove around Boston in John Doe No. 1's car for about an hour in order to defeat possible law enforcement surveillance.   John Doe No. 1 eventually drove to Malibu Beach in Dorchester where John Doe No. 1 and Greig met Bulger.   John Doe No. 1 and Bulger spoke for a period of time, and then Greig entered Bulger's car and left Boston.   PSR ¶ 17, SF ¶ 4(b).

A few weeks later, Greig contacted Jane Doe No. 1 and asked her to withdraw funds from a bank account the two of them held jointly.   PSR ¶ 18, SA, Tab 77 at p. 52-53.   Jane Doe No. 1 withdrew a total of $15,500 in two separate transactions two days apart.   On February 22, 1995,

Jane Doe No. 1 withdrew $8,000 from the bank account (number ending in 1163), and on

February 24, 1995, Jane Doe No. 1 withdrew $7,500 from the same bank account.  PSR ¶ 18,

SA, Tab 77 at pp. 54-56.  Jane Doe No. 1 then delivered the money to an associate of John Doe

No. 1's ("John Doe. No. 2") who came to Jane Doe No. 1's house and picked up the money.

Later, Greig contacted Jane Doe No. 1 and "intimated" that she had received the money saying

something like "I got that package, and don't worry."  PSR ¶ 18, SA, Tab 77 at pp. 56-64.

On various dates, from in or about February 1995 through in or about November 1996,

Bulger communicated by telephone with John Doe No. 1, who, in turn, arranged telephone calls

between Bulger and other persons at homes of third parties.  By arranging to have the calls placed

through third parties, Bulger and Greig were able to communicate with associates back in

Massachusetts without revealing their location.  Although most of the known calls were set up so

that Bulger could speak with associates in Massachusetts, on at least some occasions, Bulger

arranged for Greig to speak with Jane Doe No. 1 and a friend of Greig's ("Jane Doe No. 3").

PSR ¶ 19, SF ¶ 4(c).

From February 1995 through November 1996, Bulger and Greig traveled to various

locations in the United States, including, among other places, Selden, New York, Grand Isle,

Louisiana, Chicago, Illinois and New York, New York.  From February 1995 through mid-1996,

Bulger traveled under the alias "Thomas Baxter" ("Baxter").  PSR ¶ 20.  Baxter was a real

individual who had died some years earlier.  PSR ¶ 20, SA, Tabs 11, 14.  Several years before his

flight from Boston, Bulger had obtained Baxter's personal identifying information and a

Massachusetts driver's license under the name Baxter.  PSR ¶ 20, SA, Tab 14.  Bulger later used

that information and license to obtain a New York driver's license under the Baxter alias.  During

his flight from law enforcement, Bulger used the license as an identification document.  For example, on September 30, 1995, Bulger provided the license to a Best Western Hotel when Greig and he checked into the hotel.  Records from the hotel show a copy of the license and a registration of "Mr. and Mrs. Thomas Baxter."  PSR ¶ 20, SA, Tab 14, SF ¶ 4(d).

In 1995 and 1996, Bulger and Greig traveled also to Grand Isle, Louisiana, a seaside community south of New Orleans, Louisiana.  Once there, Bulger and Greig befriended some members of the community.   Bulger and Greig used various alias identities.  At one point, Greig used the alias "Helen Marshall," an identity appearing on a receipt documenting her purchase of contact lenses at a Walmart.  PSR ¶ 21, SA, Tab 15, SF ¶ 4(e).

In approximately the spring of 1996, John Doe No. 1 learned from Bulger's former girlfriend (Jane Doe No. 2) that she had told law enforcement about Bulger's "Baxter" alias.  John Doe No. 1 could not immediately tell Bulger that the identity had been compromised because John Doe No. 1 had no way to get in touch with Bulger.   He had to wait until Bulger got in touch with him.   Eventually, Bulger contacted John Doe No. 1 and John Doe No. 1 informed him that the Baxter identification had been compromised.  Bulger and John Doe No. 1 agreed that John Doe No. 1 would obtain additional false identification documents for Bulger and, in or about July 1996, John Doe No. 1 arranged to have false identification documents prepared.   In connection with preparing the false identification documents, John Doe No. 1 took photographs of John Doe. No. 3, wearing a fake moustache to make him look like Bulger, who had altered his appearance by growing a mustache.  In an arranged telephone call around that time, Bulger spoke with both John Doe No. 1 and John Doe No. 3 about creating the false identification documents.  PSR ¶ 22.

Once the documents were prepared, John Doe No. 1 delivered them to Bulger in Chicago, where Bulger and Greig had traveled after they learned that the Baxter identification had been compromised.  John Doe No. 1 traveled with his girlfriend at the time, and met Bulger and Greig in Chicago.  John Doe No. 1 showed Bulger the identifications with John Doe No. 3's photos on them.  Bulger was unhappy with the quality.  Consequently, John Doe No. 1 and Bulger bought a blue bed sheet and, using it as a backdrop, took several photos of Bulger.  Greig was present and knew why John Doe No. 1 was taking the photos of Bulger.  PSR ¶ 23, SF ¶ 4(f)-(g).

One of the new alias identities Bulger assumed in Chicago was the alias "Mark Shapeton."[3]  Shortly thereafter, on or about July 23, 1996, Bulger and Greig obtained a train ticket from Chicago, Illinois, to New York, New York under the names "Mark Shapeton" and "Carol Shapeton."  After traveling to New York under those assumed names, on or about September 13, 1996, Bulger and Greig took the train back to Chicago, again using the names "Mark Shapeton" and "Carol Shapeton."  PSR ¶ 24, SA, Tab 16, SF ¶ 4(h).

## C.    Bulger and Greig Go To Santa Monica

At some point in time, at least by 1996, Bulger and Greig arrived in Santa Monica.  SA, Tab 102 at ¶ 6(b).  Bulger and Greig left Chicago and traveled by train to Los Angeles, where they stayed briefly before going to Santa Monica to rent an apartment.   SA, Tab 102 at ¶ 6(c).  According to Bulger, who made statements to law enforcement after his arrest, he had been to the Venice Beach area sometime before, when he was traveling with Jane Doe No. 2.  On that trip he had become familiar with Santa Monica.   SA, Tab at 102 at ¶ 6(a).  Bulger liked Santa Monica

---

[3] ███████████████████████████████████.

8

because it was a cosmopolitan location with a number of transient and homeless people and vacationers.  SA, Tab 102 at ¶ 6(a).

Once in Santa Monica, Bulger obtained identification documents of an individual named "C.W.G."  PSR ¶ 25, SA, Tab 102 at ¶ 6(e), SF ¶ 4(I).  C.W.G. was a real individual, and, among other forms of identification, Bulger obtained C.W.G.'s social security card.[4]  PSR ¶ 25, SA, Tabs 11, 17, 102 at ¶ 6(e).  In approximately 1996, using C.W.G.'s social security number, Bulger created, among other things, a "New York National ID" card with Bulger's photo and C.W.G.'s social security number.[5]  PSR ¶ 25, SA, Tab 17.  Bulger had identified and targeted C.W.G. when he and Greig arrived in Santa Monica.  SA, Tab 102 at ¶ 6(e).  In a statement he gave to law enforcement after his arrest, Bulger said that C.W.G. was a street person with a drinking problem, whom Bulger scammed for a piece of identification.  SA, Tab 102 at ¶ 6(e).  Bulger reported that C.W.G. did not have a driver's license but provided Bulger with other pieces of identifying information.[6]   SA, Tab 102 at ¶ 6(e).

By late 1996, Bulger and Greig began renting a two bedroom apartment at 1012 Third Street in Santa Monica, California.  Falsely claiming to be a married couple from Chicago, Bulger and Greig rented the apartment using a slight variant of the "C.W.G." name:  "Charles Gasko" and "Carol Gasko."  PSR ¶ 26, SA, Tabs 3, 18, SF ¶ 4(k).  The "Gasko" aliases, which

---

[4]  C.W.G. died in 2002.  SA, Tab 11.

[5]  The "New York" identification does not appear to be a qualifying "identification document," although the social security number on the identification does qualify as a "means of identification."

[6]  The United States has obtained medical records, some of which are attached, showing that C.W.G. was a resident of Santa Monica, who, as of 2001 was living in a nursing home and suffered from multiple severe health issues.  SA, Tab 73.

were wholly fictitious, were the aliases that Bulger and Greig used with acquaintances they met

in and around the apartment building for the entire time they lived in Santa Monica.  PSR ¶ 26,

SA, Tabs 57-60, 69-72, SF ¶ 4(l).

**D.     Greig's Role in Santa Monica**

While in Santa Monica, Greig was primarily responsible for the day to day tasks needed

to maintain the Santa Monica household.  PSR ¶ 27.  Greig paid the rent.  PSR ¶ 27, SA, Tabs

18, 70 at p. 13, SF ¶ 4(m).  Greig paid the utilities.  SA, Tabs 21, 48.  The electric bill, for

example, was sent to "Carol Gasco."  PSR ¶ 27, SA, Tab 21, SF ¶ 4(m).  Greig usually paid the

rent in cash, often falsely telling the property manager that she had just come from a bank.  PSR

¶ 27, SA, Tabs 18, 70 at p. 13, SF ¶ 4(m).  Sometimes, she used postal money orders to pay the

rent.  PSR ¶ 27, SA, Tab 18, SF ¶ 4(m).  Greig most often paid other bills, such as the electric

and cable bills, with postal money orders.  PSR ¶ 27, SA, Tabs 21, 48.  Greig did most of the

grocery shopping and other shopping needs for Bulger.  Although Bulger was sometimes seen

outside the apartment, usually in the evening, Bulger spent much of his time inside the

apartment.  PSR ¶ 27, SA, Tabs 60 at p. 16, 69 at p. 2.  Greig often made false excuses to the

property manager as to why Bulger spent so much time indoors, telling her that "Charlie" was

sick.  PSR ¶27, SF ¶ 4(l).

Greig also played a significant role in assisting Bulger to obtain much needed medical

and dental care.  Bulger's medical records during his fugitive years show that Greig actively

helped Bulger through various medical procedures.  SA, Tabs 27 - 28, 31-32.  One doctor

reported that Bulger was considered a high fear, or high anxiety, patient.  SA, Tab 32.  The

medical and dental records also show that Bulger had a fear of shots – he described himself in

one written form as a "dental chicken, from Chicago." SA, Tab 31 at p. 4. The medical records show that Greig was present during procedures to calm him down. SA, Tabs 27-28, 31-32. This was not simply an act of compassion on her part. Bulger had a volatile temper, and was often abusive toward medical staff. SA, Tab 28. By remaining at his side during procedures, Greig mitigated the risk that Bulger would lash out in a way that might reveal his or her true identity. Bulger himself told law enforcement that Greig helped Bulger control himself and his temper. SA, Tab 102 at ¶ 6(o).[7]

### E.   Bulger and Greig Used Multiple Aliases and Targeted Vulnerable Individuals For Their Identities

As part of their efforts to avoid apprehension, Bulger and Greig used various alias identities, including those of real people. The aliases of real people they either possessed or used, in addition to those already mentioned (Baxter, ████, C.W.G.) include the following:

### D.G.G.

> Found in the apartment were at least two genuine social security cards for a D.G.G. (deceased, 2009). Also found was a "New York State Resident" card under the name D.G.G. with Bulger's photograph and the real D.G.G.'s social security number. Also found in the Santa Monica apartment was a safe deposit box receipt in D.G.G.'s name for a bank in Bisbee, Arizona, a town close to the Mexican border. Subsequent investigation revealed that D.G.G. was, at one point, a resident of Bisbee who had alcohol problems. SA, Tabs 11, 33, 74-76, SF ¶ 4(I).

---

[7] There is no evidence that Greig was anything other than a full and willing partner to Bulger during their stay in Santa Monica. Greig was with Bulger because she wanted to be with him, and for no other reason. At one point in time, Greig had expressed to an acquaintance in Santa Monica that she knew Bulger (whom she referred to as her husband) was a "bad boy," but that "she liked the bad boys." SA, Tab 72 at p. 14.

**J.W.L.**

Found within the apartment were multiple genuine identification documents for a J.W.L., who was a real person with an address in West Los Angeles, California. These documents included a social security card, California driver's licenses, and a birth certificate, among other things. SA, Tab 22-24, SF ¶ 4(I), (n).

Bulger informed law enforcement that once Greig and he settled in Santa Monica, he began to look for another person besides C.W.G. from whom he could obtain alias identification. He saw J.W.L. on the oceanfront walk in Santa Monica. J.W.L. appeared to be homeless. J.W.L. was also an alcoholic. SA, Tabs 11, 102 at ¶ 6(f), (h).

Bulger reported that he was able to persuade J.W.L. to give him the identification documents by claiming to be a Canadian illegally in the United States and that he needed a driver's license in order to work. Bulger paid J.W.L. for the use of J.W.L.'s identity and identification documents. SA, Tab 102 at ¶ 6(f)-(g).

Bulger used the J.W.L. identity to operate a car registered under J.W.L.'s name. SA, Tab 102 at ¶ 6(I), PSR ¶ 31(b). Bulger opened a bank account in J.W.L.'s name and used the account to, among other things, provide money to pay the insurance on the vehicle Bulger was using in J.W.L.'s name. PSR ¶ 31(b), SA, Tabs 20, 25, and 102 at ¶ 6(I)-(j). Greig was well aware of the J.W.L. bank account – indeed she herself made purchases through it. PSR ¶ 31(b), SA, Tabs 20, 25.

Bulger also used the J.W.L. identity to obtain medical services and prescription medication. Greig often used the J.W.L. name for herself, calling herself C.L. when she met with physicians treating Bulger. PSR ¶ 31(b), SA, Tabs 26-30, SF ¶ 4(I).

The real J.W.L. died in 2007, but Bulger continued to use the J.W.L. name to obtain medical services and prescription medication up until the date of his arrest. PSR ¶ 31(b). A few weeks before the arrest, Greig was observed on a surveillance video at a drug store picking up a prescription for Bulger using the J.W.L. name. SA, Tab 30, SF ¶ 4(v).

**S.J.T.**

Found within the apartment was a Nevada driver's license and a social security card for a "S.J.T.," who, at the time of Bulger's and Greig's arrests was a real person living in North Hollywood, California. PSR ¶ 31(c), SA, Tabs 11, 34, 86-87.

S.J.T. was an individual with a substance abuse problem.   Following the arrests, law enforcement agents located S.J.T. in a transitional housing shelter.  He bore a resemblance to Bulger. SA, Tab 88.

S.J.T. informed the agents that some years ago, he had been walking in Palisades Park in Santa Monica and walked past a man and a woman, whom he later identified to the agents as being Bulger and Greig.  Bulger made small talk with S.J.T. and then asked to purchase S.J.T.'s driver's license for $200.  S.J.T. agreed and offered to throw in his social security card and a "Sam's Club" card for an additional $50.  According to S.J.T., Greig was present during the conversation, but did not say much.  SA, Tab 87.

About ten days after agents interviewed S.J.T., an agent was sent to serve a grand jury subpoena on him and found him on the floor of his apartment, unresponsive. S.J.T. was later pronounced dead.  SA, Tab 89.

Although Greig has denied knowing about the S.J.T. identification documents found in the apartment and denies having any role in obtaining them, S.J.T.'s statement to law enforcement contradicts Greig's position.

### P.M.

Also found in the apartment was a social security card, birth certificate and judicial name change order for P.M., a real person.  SA, Tabs 11, 13, 36, SF ¶ 4(t). P.M., whose original name was R.W., has a history of mental illness and is currently residing in a mental health facility ████████████████, where she is under observation following an arrest for bank robbery.  Among other things, P.M. suffers from delusions that the CIA is following her, although in two separate interviews, P.M. appeared lucid when discussing her interactions with Bulger and Greig. SA, Tabs 78-80.

P.M. lived in transient hotels for a period of time in Venice Beach, California, which is close to Santa Monica.  P.M. reported that an older man and woman (whom she described as having "nice white teeth") approached her on Venice Beach.  P.M. was having trouble with her suitcase and the man offered to buy her another one.  They took her to a suitcase store and bought her a new one.  The couple -- the female in particular -- then told her they were from Canada and they needed identification to legally reside in the United States.  P.M. sold her identification documents to the couple for $200.  P.M. reported that it was clear that the female wanted to use the identification documents for herself.  SA, Tab 78.  Although Greig denies having anything to do with obtaining the P.M. identification documents, P.M.'s version of events is more credible.

### N.S.

Also found in the apartment was identifying information, including social security number information, for N.S., a real person who now lives in California.  SA, Tabs 11, 37, 38.  In addition to N.S.'s social security number, Greig and Bulger had additional detailed information about N.S., including her date of birth, her son's name and age, her California driver's license number, when she received her first driver's license, her parents' names and her birthplace.  SA, Tabs 37-38, SF ¶ 4(u).

N.S. has a substance abuse problem.  When interviewed, she had no recollection of providing her identification information to Bulger or Greig.  She did report, however, that from 1992 through 1999 she was homeless, living on the streets of Santa Monica.  She often slept in Palisades Park or on the beach.  In late 1999 she and her boyfriend were run over by a car.  Her boyfriend was paralyzed and she lost an eye, broke a leg and received other injuries.  SA, Tab 82.

Accompanying this memorandum is a video interview of N.S., along with a newspaper article documenting her background.  SA, Tabs 83, 85.

Of the six real people whose identification documents and means of identification are tied to Bulger and Greig in Santa Monica, all of them – C.W.G., D.G.G., J.W.L., S.J.T., P.M., and N.S. – suffer, or suffered, from mental illness or substance abuse problems.

Bulger and Greig also used alias names of fictitious people.  In addition to those already mentioned (Marshall, Gasko), they used the following fictitious aliases:

### J.L.

Found within the apartment was a "New York State Resident" identification card with Greig's photo and the name "J.L."  On the identification card was an unassigned social security number.  SA, Tab 35, SF ¶ 4(o).  Greig principally used this fictitious alias and social security number when obtaining medical services and prescriptions.  SA, Tabs 29, 35.  Greig used this alias and the false identification information on multiple occasions and with multiple doctors from at least 2002 through the date of her arrest.  She also used this alias when obtaining prescriptions for herself.  SA, Tabs 29, 35, SF ¶ 4(p).

### J.R. and M.R.

Bulger and Greig also falsely posed as a married couple named "J.R." and "M.R." with a dentist who treated Bulger.  For a period of years while in Santa Monica, Bulger went to a dentist using the name "J.R."  Bulger reported to the dentist that he was afraid of needles, calling himself a "dental chicken from Chicago." Medical records show that Greig -- calling herself M.R. -- spoke directly to the dentist following a procedure the dentist performed on Bulger. SA, Tabs 31-32, SF ¶ 4(r).

For a variety of their aliases, Bulger and Greig created multiple business cards bearing the alias identities and containing address information that usually was associated with a hotel or other transient location that did not tie back to the apartment in Santa Monica they were renting under the name "Gasko." SA, Tabs 12, 37.[8]

### F.    Greig Knew About the Cash and Firearms

Neither Bulger nor Greig was employed during the time they were in Santa Monica. Bulger and Greig supported themselves with cash Bulger and Greig had secreted inside the apartment.  SA, Tab 102 at ¶ 6(n).  It is unclear how much money Bulger and Greig had access to during the time they were living in Santa Monica, but at the time of their arrest they had approximately $822,000 in cash inside the apartment, most of it secreted in the wall in a common area of the apartment.[9] PSR ¶ 28, SA, Tabs 51-52.

Similarly, during the time they were living in Santa Monica, Bulger secreted multiple weapons, mostly firearms, in the apartment.  At the time of their arrest, Bulger and Greig had

---

[8]  Some of the business cards had other names on them as well, including "J.W." and "J.W.-2." SA, Tab 37.

[9]  Greig regularly handled cash for Bulger, when paying bills and shopping.  Many of the purchases appear to have been large – records seized from the apartment show, for example, purchases of appliances.

stored within their apartment approximately 30 weapons. Many of these weapons were found hidden in the walls of the apartment. Others were located in a bedroom that appeared to be principally used by Bulger. They were located in that room on bookshelves and under a bed. On one bookshelf in that room was a handgun in plain view.[10] PSR ¶ 29, SA, Tabs 50-51.

Although Greig and Bulger have both claimed at various times that Greig was unaware of the cash and the firearms, their claims are not credible. Greig and Bulger lived together in a small two bedroom apartment for over a decade.[11] SA, Tabs 1-6. The sheer volume of cash and weaponry found within the apartment make it unlikely that Greig would not have seen at least some of the cash and weapons. SA, Tab 50. Although Bulger claimed in a statement to law enforcement that the weapons were in his room and that Greig had not been allowed in his room for several years, the search of the apartment proved that statement to be false. Photos from the scene show that most of the cash and most of the weapons were located in a cut-out section of wall behind a mirror in a common area of the apartment, not in Bulger's bedroom. To get to the cash – which both Bulger and Greig needed and used – the mirror had to be pulled off the wall. As the photos from the scene show, once the mirror was pulled off the wall, both the cash and the weapons were exposed. SA, Tabs 4, 51-52.

---

[10]   Following Bulger's and Greig's arrests, the government performed traces of the weapons and learned that Bulger must have acquired most of the weapons during the time Greig and he lived in Santa Monica. SA, Tab 56.

[11]   Included in the Sealed Appendix is the Evidence Response Team ("ERT") report documenting the search of the apartment on June 22 and 23, 2011. That report includes a diagram of the apartment and documents the location of the cash and firearms found after the arrest. SA, Tab 8. Also included is a panoramic video of the apartment taken during a second search of the apartment in July 2011. SA, Tab 1. That video shows the layout of the apartment, and provides a sense of how difficult it would have been for Bulger to maintain 30 weapons and over $800,000 in cash without Greig knowing.

Greig also must have been aware that Bulger was creating hiding places in the walls. The photos from the search of the apartment show areas in the apartment with plaster repair marks, and the apartment property manager confirmed that the marks were not made by the apartment maintenance employees. SA, Tab 8 at p. 5. Those plaster marks were in plain view in the apartment. It is virtually impossible to credit that Greig somehow failed to notice those marks on the wall. SA, Tab 52.

In addition, Greig appears to have kept a notebook that listed items for purchase at Home Depot: "dust" face masks, safety glasses, and ear plugs, among other things. The notebook also notes: "hacksaw – cuts metal plaster," among other repair-type notations. SA, Tab 53. Even assuming that Bulger performed the actual alterations, this notebook suggests that Greig knew about the hiding places and made a shopping list of items needed to create them.

It is also difficult to imagine that Bulger, who was very careful, would have left a handgun on his bookshelf if he weren't completely confident of Greig's complicity. Greig and Bulger also discussed what Greig's options were should Bulger die. According to Bulger, he told her she could stay in Santa Monica as an option. For that to have been an option, though, Greig must have known about the cash hidden in the walls.

In short, it is evident that Greig knew about the cash and the weapons given: (a) the amount of cash and number of weapons; (b) the location of the cash and weapons, including a hiding place in the common area where most of the weapons were found; (c) the presence of at least one firearm in plain view on Bulger's bookshelf; (d) the presence of plaster repair marks on the walls of the apartment; (e) the shopping list of tools needed to perform the work on the walls; (f) the size of the apartment; (g) the length of time Greig lived in the apartment; and

(h) as to the cash, the absence of any outside legitimate source of income. If, somehow, she did not have actual knowledge of the cash and weapons hidden in the apartment, it could only have been through conscious efforts to make herself willfully blind to the obvious.

### G.      Greig's Knowledge of the Allegations Against Bulger

As Greig has admitted, during the time they were living in Santa Monica, Bulger and Greig were aware of legal developments in Boston and that law enforcement was seeking to arrest him. SF ¶ 2. As is also set forth in the PSR's discussion of offense conduct, to which Greig has not objected, Bulger and Greig knew about the 2000 indictment charging Bulger with RICO offenses, including 19 predicate acts of murder. Bulger and Greig were aware that law enforcement was seeking to arrest Bulger on the indictment charging the murders.[12] PSR ¶ 30.

Greig and Bulger also had within the apartment multiple books discussing Bulger's criminal conduct. On one bookshelf in Bulger's room were a variety of books discussing Bulger's criminal activities, including, among others, Kevin Weeks' memoir *Brutal* and Patrick Nee's book *A Criminal and an Irishman*. SA, Tab 41. In addition, Bulger had drafted a manuscript of his own life, in which he specifically mentions John Martorano's appearance on

---

[12] Over the past several years, multiple civil actions in different district and appellate courts in Boston have found that Bulger committed various of the crimes underlying the 2000 indictment, including findings that Bulger was responsible for murders charged as predicate acts in the 2000 indictment. *See, for example, Davis v. United States*, 670 F.3d 48, 52 (1st Cir. 2012) (affirming findings that Bulger and Flemmi murdered Debra Davis and Deborah Hussey; also noting findings of Bulger's involvement in other murders underlying the 2000 indictment); *McIntyre v. United States*, 545 F.3d 27 (1st Cir. 2008) (affirming finding, among other things, that "Bulger, Flemmi and their associates in the notorious Winter Hill Gang" committed the "brutal murder" of John McIntyre). SA, Tabs 97-98.

television.[13]  The books about Bulger were prominently displayed on the bookshelf in Bulger's

room.  Moreover, Greig knew about, and had seen, the manuscript.  SA, Tab 102 at ¶ 8.  Shortly

after their arrest, when Bulger was told that agents had found the manuscript, Bulger asked Greig

if he had "named names" – and she replied that she didn't think so.  SA, Tab 102 at ¶ 8.

Finally, Bulger reported to law enforcement that both he and Greig had been aware of the

public service announcement that the FBI had released in June 2011, which had focused on

Greig.  Bulger had seen the announcement and told Greig "this is it."  SA, Tab 102 at ¶ 6(q).

### H.    Financial Disclosures Since Arrest and Ability to Pay Fine

Contrary to her statement to Pretrial Services in California at the time of her arrest that

she did not have any assets or liabilities in her name, the Government is aware of at least three

significant assets owned by Greig:

1.    **Eastern/Mt. Washington Bank Account.**  At the time of her
      arrest, Greig owned a bank account ending in 3225  held in the
      name of "Catherine E. Greig Trustee for Kathleen McDonough."
      On December 1, 2012, the Defendant's sister Margaret McCusker,
      pursuant to a Durable General Power of Attorney for Greig,
      withdrew the balance of the funds in that account ($134,545.49)
      and deposited the funds in a new bank account ending in 8733 held
      in the name of "Catherine E. Greig, Margaret McCusker POA,"
      with Mt. Washington Bank.  The current balance of the Mt.
      Washington account is approximately $105,145.93.  SA, Tab 101.

2.    **16 Hillcrest Road, Quincy, Massachusetts.**  Greig is the owner of
      record of real property located at 16 Hillcrest Road, Quincy,
      Massachusetts.  The property was purchased for $160,000, and no

---

[13] Martorano was featured on a 60 Minutes segment that aired on January 8, 2008.  Martorano
admitted to being Bulger's partner and to killing 20 people, including businessmen Roger
Wheeler and John Callahan at Bulger's request.  The broadcast states that Bulger is still on the
FBI's Most Wanted list and is facing 19 murder charges as a result largely of Martorano's
testimony.  The report also states that Martorano's information helped uncover secret mob
graves, and it showed video of bodies being removed from these graves.  SA, Tab 47.

mortgage was, or has been, recorded on the property since Greig's purchase in 1986.  In 2011 the assessed value of the property for the City of Quincy tax assessment was $343,700.  SA, Tab 99.

3.    **889 East Fourth Street, South Boston, Massachusetts.**  By deed dated July 23, 2011, Greig purported to convey her fractional interest (2/9) in the real property located at 889 East Fourth Street, South Boston, Massachusetts to McCusker for consideration of $1.00.  In 2011 the assessed value of this property for the City of Boston tax assessment was $617,500.  SA, Tab 100.

### III.  Sentencing Guidelines

**A.    Conspiracy to Harbor a Fugitive (18 U.S.C. § 371) (Group 1)**

**1.    The Base Offense Level is 30.**

United States Sentencing Guideline ("U.S.S.G.") § 2X1.1 applies to violations of 18 U.S.C. § 371 (Count 1).  Section 2X1.1(c)(1) states that when a conspiracy is expressly covered by another offense guideline section, the court is to apply that guideline section.  In this case, the Defendant's conviction for Conspiracy to Harbor a Fugitive, which is a conspiracy to violate 18 U.S.C. § 1071, is expressly covered by U.S.S.G. § 2X3.1.  Under § 2X3.1(a)(1) & (3) the base offense level (BOL) is either 6 levels lower than the offense level for the underlying offense or 30, whichever is lower, unless "the conduct is limited to harboring a fugitive," in which case the offense level is capped at 20.  *See* U.S.S.G. § 2X3.1(a)(3)(A) & (B).  In this case, because the guidelines for Bulger's most serious underlying offense – first degree murder – is 43, Greig's BOL, which would otherwise be 37 (i.e., 6 levels below 43), is 30.

The Probation Department's conclusion that the BOL cap of 20 applies here is incorrect.  The cap of 20 does not apply to Greig because her conduct was not limited to harboring a fugitive.  Under the plain language of the guideline, the level 20 cap only applies if the

Defendant's "conduct is limited to harboring a fugitive." Cases construing that language have held that additional criminal conduct, that goes beyond "mere harboring" disqualifies a defendant for the level 20 cap. *See, e.g.*, *United States v. Vega-Coreano*, 229 F.3d 288 (1st Cir. 2000) (the cap of 20 does not apply where the defendant's offense conduct goes beyond "mere harboring"); *United States v. Jackson*, 105 F.3d 655, 1996 WL 762917 (5th Cir. 1996) (unpublished) (same); *United States v. Boyd*, 2008 WL 4963198 (E.D. Tenn. Nov. 18, 2008) (the commission of a felony in addition to harboring goes beyond "mere harboring" and the level 20 cap does not apply).[14]

A defendant's offense conduct goes beyond "mere harboring" when it includes the commission of other crimes. *See Boyd*, 2008 WL 4963198 at *10 ("Committing a separate felony in addition to the offense of accessory after the fact to further assist [the defendant] in avoiding apprehension certainly goes beyond mere harboring."). A defendant's conduct also goes beyond "mere harboring" if the conduct consists of something more than simply giving shelter to a fugitive. *See Vega-Coreano*, 229 F3d at 290 (applying cap of 30, not 20, where the defendant's conduct went beyond mere harboring because the defendant "had done more than simply giving shelter to fugitives."); *Jackson*, 105 F.3d at 655 (applying level 30, not 20, where, "[defendant] did more than merely house the fugitive, he also lied to [law enforcement] about the fugitive's

---

[14] The Sentencing Commission could have, but did not, assign the lower BOL to cases in which "the offense of conviction" is limited to harboring a fugitive. Instead, the Commission assigned the lower BOL to cases in which "the conduct" was limited to harboring a fugitive. The proper inquiry, then, is the full scope of the relevant conduct attributable to the Defendant under § 1B1.3(a)(1) and (3). In this case, that conduct went well beyond mere harboring.

whereabouts and the last time he saw the fugitive, and he received a box of stolen money from [a] robbery.").[15]

Here, Greig committed multiple felonies in addition to the conspiracy to harbor.  She has pled guilty to two of them:  identity fraud in violation of 18 U.S.C. §§ 1028(f) and (a)(7).  While her guilty pleas on those charges, by themselves, make the 20-level cap inapplicable, the record in this case also shows that her conduct included multiple additional, albeit uncharged, felonies while on the run with Bulger.  These felonies include multiple acts of social security number fraud in violation of 42 U.S.C. § 408(a)(7).  They also include aiding and abetting a fugitive (and felon) in possession of firearms (and Bulger's own possession of firearms), in violation of 18 U.S.C. §§ 2 and 924(g)(1) & (2).  See U.S.S.G. § 1B1.3(a)(1)(B).[16]

Moreover, even if Greig had not engaged in additional felonies while on the run with Bulger, her conduct during the scope of the conspiracy went well beyond "simply giving shelter to" a fugitive.   Greig's offense conduct lasted over 16 years and included travel with Bulger through multiple states, using multiple separate identifications, and playing multiple different roles in order to help Bulger avoid capture.  Greig handled money for Bulger, dealt with his medical providers, lied on multiple occasions about her own identity when she herself was

---

[15]  Courts that have examined this guideline have noted that the definition of "harboring" in § 1071 is not the same definition that should be applied to the guidelines phrase "conduct is limited to harboring a fugitive." Boyd, 2008 WL 4963198 at *10 ("[T]he Court does not find that the definition of harboring as it applies to the harboring statute also defines the phrase 'conduct [] limited to harboring a fugitive' as it is used in the sentencing guidelines.").

[16]  Separate and apart from her own role as an aider and abetter of Bulger's unlawful possession of firearms, the Defendant is liable under the guidelines for Bulger's own illegal possession of the firearms during the harboring conspiracy given that the conspiracy to harbor was a jointly undertaken criminal activity and Bulger's possession was itself an overt act in furtherance of the conspiracy.  See U.S.S.G. § 1B1.3(a)(1)(B).

seeking medical care, and was the key actor in the conspiracy to protect Bulger from being discovered. Accordingly, under the analysis of this guideline provision set forth in, among other cases, the First Circuit's *Vega-Coreano* decision, Greig's offense level is not capped at 20. Her appropriate BOL is 30.[17]

### 2.    The Vulnerable Victim Enhancement Applies.

Section 3A1.1 of the Sentencing Guidelines provides that the base level offense should be raised two levels "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1.  A vulnerable victim is a "person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, Commentary, Application Note 2; *see also United States v. Bailey*, 405 F.3d 102, 113 (1st Cir. 2005) (upholding finding that a prisoner in a psychiatric unit was a vulnerable victim).  The vulnerable victim enhancement applies here because, as alleged in the Superseding Information, the conspiracy included as overt acts multiple instances in which Bulger and Greig unlawfully obtained identification documents and means of identification from individuals who suffered from substance abuse problems or mental illness.

To apply the vulnerable victim enhancement, "[f]irst, the sentencing court must find that the victim of the crime was vulnerable, that is, that the victim had an 'impaired capacity ... to detect or prevent the crime.';[sic] and second, the sentencing court must find that the defendant

---

[17] The Probation Department's use of the "rule of lenity" to find that the level 20 cap applies here is inappropriate.  Because the language of the guideline is clear, this is not a circumstance in which the rule of lenity should apply.

knew or should have known of the victim's unusual vulnerability." *United States v. Donnelly*, 370 F.3d 87, 92-95 (1st Cir. 2004) (internal citation omitted).[18]  Both prongs are met here. Several of the individuals whose identification documents and means of identification Bulger and Greig acquired, including D.G.G., C.W.G., J.W.L., S.J.T., P.M. and N.S., were financially destitute, homeless, mentally ill, alcohol or drug dependent, or, in certain cases a combination of these factors.[19]  Bulger certainly knew of their impairments; among other things, he admitted to knowing about C.W.G.'s and J.W.L.'s substance abuse problems and liking Santa Monica because of the transient and homeless population there.  Under well settled principles of relevant conduct, these features of Bulger's conduct provide a sufficient basis to apply the enhancement to Greig who, as a member of the conspiracy, is responsible for Bulger's reasonably foreseeable conduct in furtherance of their joint criminal venture.  See U.S.S.G. § 1B1.3(a)(1)(B).

The facts here also permit the Court to find that Greig knew, or should have known, that she and he were taking advantage of individuals suffering from significant impairments.  It is no

---

[18]  In applying this definition, the First Circuit has held that the focus should be placed on the "impaired capacity of the victim to detect or prevent the crime, rather than the quantity of the harm suffered by the victim." *Bailey*, 405 F.3d at 113 (citing *United States v. Donnelly*, 370 F.3d 87, 92-95 (1st Cir. 2004) and *United States v. Fosher*, 124 F.3d 52, 55-56 (1st Cir. 1997)).

[19]  This class of victims is not limited to those individuals whose identity documents and information were used and possessed by Bulger and Greig without *their* authority.  Pursuant to 18 U.S.C. § 1028(a)(7) (Count III), an individual violates this provision if she "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law."  (Emphasis added).  The First Circuit has held that even when a person willingly sells his means of identification to a defendant, that possession by the defendant is "without lawful authority."  *See United States v. Ozuna-Cabrera*, 663 F.3d 496, 500-01 (1st Cir. 2011).  The First Circuit has further indicated in dicta, in *Ozuna-Cabrera*, that those who willingly sold means of identification may be victims.  *Id.* at 500 (*citing United States v. Mobley*, 618 F.3d 539, 547-48 (6th Cir. 2010) as finding "a § 1028A violation for credit card conspiracy where victims willingly provided their social security numbers") (emphasis added).

24

accident that of the two female identities of real people found in the apartment – P.M. and N.S. –

both are seriously impaired by, in the case of P.M., mental illness and, in the case of N.S.,

substance abuse and physical limitations.  The P.M. and N.S. identifications were clearly meant

for Greig.  Greig, in fact, directly participated in securing the identification documents from

P.M., who, at the time Greig and Bulger approached her, was pulling a broken suitcase down

Venice Beach and agreed to sell her name change documents and social security card for $200.

### 3.      The Obstruction of Justice Enhancement Applies.

The Defendant's offense level should be increased by 2 levels pursuant to U.S.S.G.

§ 3C1.1, the obstruction of justice enhancement.  That enhancement applies if the Defendant, or

someone whose conduct is attributable to the Defendant under § 1B1.3:

> (1) ... willfully obstructed or impeded, or attempted to obstruct or impede, the
> administration of justice with respect to the investigation, prosecution, or
> sentencing of the instant offense of conviction, and (2) the obstructive conduct
> related to (A) the defendant's offense of conviction and any relevant conduct; or
> (B) a closely related offense ....

U.S.S.G. § 3C1.1. The enhancement applies to the Defendant because she gave false statements

to Pretrial Services in connection with its assessment of her suitability for bail.[20]

---

[20]  As the United States set forth in its objections to the draft PSR, the harboring conspiracy
resulted in the conviction of several of the Defendant's co-conspirators for obstruction of justice.
Although the United States recognizes that the Defendant's liability for the obstructive conduct
of her co-conspirators under 1B1.3(a)(1)(B) is arguably foreclosed by application note 9 to 3C1.1
and that case law construing the note has so held, the United States does not agree that the
application note does in fact foreclose its application.  In any event, United States asserts that the
conduct of her co-conspirators is relevant nonetheless under 3553(a) when assessing the
seriousness of the offense as a whole.

The Defendant's false statements to Pretrial Services during her interviews in California and Massachusetts warrant application of the enhancement. *See United States v. Restrepo*, 53 F.3d 396, 397 (1st Cir. 1995) ("Although materially false statements made to law enforcement officials do not warrant an enhancement unless they 'significantly obstructed or impeded the official investigation or prosecution of the instant offense,' see U.S.S.G. § 3C1.1 n. 3(g), the same is not true of materially false statements made to probation officers and, by analogy, pretrial services officers, in respect to an investigation for the court, see U.S.S.G. § 3C1.1, comment. n. 3(h).") (citing *United States v. St. Cyr*, 977 F.2d 698, 705 & n. 6 (1st Cir.1992)).

As pointed out in the Government's Opposition to Greig's Motion for Miscellaneous Relief (i.e., her bail motion), Greig made numerous false and misleading statements and omissions of material facts to Pretrial Services both in California and Massachusetts after her arrest. *See* Dkt. 44 at 4-5. Those false and misleading statements and omissions included the following. The Defendant told Pretrial Services in California that she had not spoken to any of her family members or friends in over seventeen years. This was untrue, as the indictment to which McCusker and McDonough pleaded guilty alleged that the Defendant had spoken to both on multiple occasions since becoming a fugitive. *See* DH Exs. 33 and 34. The Defendant also told Pretrial Services in California that she had resided at the Santa Monica apartment since relocating to California in 1995. This was false or at least misleading because, as the evidence from the detention hearing established, the Defendant and Bulger traveled extensively in 1995 and 1996, living for extended periods of time in New York, Louisiana, and Illinois. The Defendant also told Pretrial Services in California that she had not traveled outside the country

since 1984.  This was false because, as she later admitted to Pretrial Services in Massachusetts, she and Bulger had traveled to Mexico to obtain prescription medication.

The Defendant also told Pretrial Services in California that she did not have any assets or liabilities in her name at the time of her arrest, despite the fact that her house at 16 Hillcrest Road in Quincy, Massachusetts was in her name.  She did mention that she once owned a home in the Boston area but claimed to be unaware of what had happened to the property after she relocated to California.  This was likely a false statement, because the Defendant was in contact with her sister Margaret McCusker and her friend Kathleen McDonough after McDonough had moved into the Defendant's house and after McCusker had begun helping to take care of the house.  *See* DH  Exs. 33 and 34.  The Defendant also did not disclose her interest in the house at 889 E. 4th Street, South Boston, Massachusetts, an interest which the Defendant appears to have attempted to convey fraudulently to her sister Margaret McCusker.  *See also*, *generally*, Dkt. 44, at 4-5 & n.1.[21]

### B.    Identity Fraud and Conspiracy (18 U.S.C. §§ 1028(a)(7) and 1028(f)) (Group 2)

#### 1.    Calculation of Offense Level For Fraud Offenses.

Under U.S.S.G. § 2B1.1(a)(2), the BOL for the identity fraud offenses is 6, because neither of the offenses of conviction has a statutory maximum term of imprisonment of 20 years or more.  The offense level is increased to 12 because the enhancements in U.S.S.G. §§

---

[21] The United States also notes here that the Defendant's continued denials of her knowledge of the weapons and cash raise a question as to her true level of acceptance of responsibility, and the United States has reserved the right in the plea agreement to argue that she has not accepted responsibility.

2B1.1(b)(10)(A) and (C) each apply (relocation and sophisticated means enhancements). As to subsection (A), the offense conduct for Counts 2 and 3 involved the use of multiple different means of identification and identification documents. Relocation to avoid law enforcement was, in many respects, the essence of the identity fraud, most particularly in Count 3. As to subsection (C), Greig's and Bulger's use of the different identities in Santa Monica was both widespread and complex. They each used different identities, some of real people and some of fictitious people. They used them at different times and in different contexts. Greig's conduct in maintaining the multiple identities was at least as complex as conduct the First Circuit has held to be sufficient to trigger the sophisticated means enhancement in *United States v. Evano*, 553 F.3d 109, 112-13 (1st Cir. 2009).

Pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i), the offense level is increased by 2 more levels, because the offense involved the unauthorized transfer or use of a means of identification unlawfully to produce or obtain other means of identification. The instant offense involved the use of Thomas Baxter's personal identifying information, including a Massachusetts driver's license, to obtain a New York driver's license with Baxter's information. In addition, the instant offense involved the use of C.W.G.'s identifying information, including C.W.G.'s social security number, to produce a "New York National ID" card with Bulger's photo and C.W.G.'s social security number.

The firearms enhancement in U.S.S.G. § 2B1.1(b)(14)(B) also applies to the offense conduct underlying Counts 2 and 3. Section 2B1.1(b)(14) provides, in pertinent part: "[i]f the offense involved . . . possession of a dangerous weapon (including a firearm) in connection with the offense, increase by 2 levels. If the resulting offense level is less than level 14, increase to

level 14." Greig's offense conduct underlying Count 3 – identity fraud in connection with harboring a fugitive – included the possession of firearms. At the time of her arrest, approximately 30 firearms were found in Greig's apartment. Although Greig denies knowing the firearms were there, her denials are not credible. At least one firearm was on a shelf in plain view at the time of her arrest. Nineteen others were found stored in a cut-out portion of the wall (behind a mirror) along with hundreds of thousands of dollars in cash. Those weapons could have been used to elude law enforcement, by threat or force if necessary. The possession of those weapons was, at a minium, related to the harboring offense that serves as the predicate of Count 3, and, therefore, was "in connection with" the offense conduct of Count 3.

**2. Vulnerable Victim and Obstruction Enhancements Also Apply.**

The vulnerable victim and obstruction of justice enhancements discussed above apply equally to Group 2, adding another 4 levels.

**C. Total Adjusted Offense Level**

The total adjusted offense levels, then, are 34 for Group 1 and as high as 20 for Group 2.[22] Since Group 2 is more than 8 levels lower than Group 1, no levels are added pursuant to U.S.S.G. § 3D1.4. Based on the Defendant's acceptance of responsibility, three levels should be subtracted from the highest group, resulting in a total adjusted offense level of 31. The Defendant is in Criminal History Category I. The Guideline Sentencing Range for Level 31 in

---

[22] Although not material for purposes of the overall offense level calculation presented here, Group 2 arguably is at level 20 instead of the level 18 the United States submitted in its objections to the draft PSR if the specific offense characteristics adjustments are stacked rather than counted separately. In addition, the total offense level calculated by the United States would not change if the Court determines that the offenses should be counted as a single Group.

29

Criminal History Category I is 108-135 months. The fine range under the guidelines at level 31 is $15,000 to $150,000.

## IV. Application of the Factors Under 18 U.S.C. 3553(a)

The United States disagrees with the sentencing guidelines calculations prepared by the Probation Department. As discussed at length above, it is the United States' position that the PSR has incorrectly applied the guidelines to the circumstances of this case. Properly applied, the guidelines advisory range is 108 to 135 months imprisonment and a significantly higher fine. Whether or not the facts of this case result in certain specific adjustments under the guidelines, however, many of the facts of this case justify a sentence substantially in excess of the 27 to 33 months set forth in the PSR's guidelines calculation and within the range the United States proposes. As discussed in more detail below, separate and apart from the guidelines calculation, the United States' recommended sentence is an appropriate sentence under the sentencing factors of 18 U.S.C. § 3553(a) and is one that should be imposed under the circumstances of this case.

### A.    The Nature and Circumstances of the Offense

This is as extreme a case of harboring – at least in terms of its length and the seriousness of the fugitive's alleged crimes – as may exist in any domestic case. The United States has been unable to locate any comparable cases. Indeed, although the harboring statute may be violated by one isolated act of providing assistance to a fugitive from any federal offense, in this case, the Defendant committed such acts every day for over 16 years. And she did so in order to prevent the arrest of one of the country's most notorious fugitives, one who was wanted for nineteen murders, among other crimes.

The circumstances of this case, in both duration and in the seriousness of the fugitive's offenses, stand in sharp contrast to other, more typical, harboring cases. Consider the harboring cases collected in the table below:

| Case Name | Outstanding Warrant | Acts of Harboring | Duration |
|---|---|---|---|
| *United States v. Silva*, 745 F.2d 840 (4th Cir. 1984) | Escape from prison | Defendant had rented a motel room under an assumed name and was in possession of firearms and disguises. | 11 days |
| *United States v. Faul*, 748 F.2d 1204 (8th Cir. 1985) | Misdemeanor failure to file tax returns | Defendant helped to conceal a fugitive by testing surveillance of fugitive's location and disguising fugitive; violent confrontation. | Hours |
| *United States v. Hayes*, 518 F.3d 989 (8th Cir. 2008) | Drug offenses | Defendant hid stepson in basement while agents were outside home seeking to arrest stepson. | Hour and a half |
| *United States v. Stacey*, 896 F.2d 75 (5th Cir. 1990) | Drug charges | Defendant closed and locked the door to a house where a fugitive was hidden. | Minutes |
| *United States v. Erdman*, 953 F.2d 387 (8th Cir. 1992) | Bankruptcy fraud | Defendant painted fugitive's van; helped him get a job; had keys to a trailer; helped the defendant haul grain; and attempted to cash checks on fugitive's bank account. | 10 months |
| *United States v. Lockhart*, 956 F.2d 1418 (7th Cir. 1992) | Possession of stolen vehicle and unlawful flight to avoid prosecution | Defendant helped the fugitive obtain a car; helped him transport stolen parts; arranged to get the fugitive a drivers license under an alias; and decoyed the FBI from a house in which the defendant believed the fugitive was hiding. | Two and a half years |

31

| | | | |
|---|---|---|---|
| *United States v. Andruska*, 964 F.2d 640 (7th Cir. 1992) | Drug charges | Defendant drove fugitive across state lines; used her credit card; and later, when driving with the fugitive, fled a short distance in the car after being stopped by police. | Three months |
| *United States v. Gros*, 824 F.2d 1487 (6th Cir. 1987) | Bank robbery | Defendant went "underground" with Top Ten fugitive under an assumed name and possessed multiple false identification documents, along with blank social security cards. | Nine years |

None of these cases, which are a representative sample of harboring cases, involved the type of fugitive or length of time involved in this case. Yet some involved the imposition of a sentence greater than or equal to the guidelines range set forth in the PSR. Take, for example, *Hayes*, in which the defendant received a 33 month guidelines sentence for hiding her stepson in her basement for an hour and a half. *See* 518 F.3d at 991-92, 995-96. In *Gros*, which was a pre-guidelines case, but involved facts similar to – but still not as extreme – as this case, the defendant was sentenced to a total of five years on a combination of harboring and identity fraud charges. 824 F2d at 1489. When compared to *Hayes* or *Gros*, the circumstances of this case warrant a far more significant period of incarceration.

And while the Defendant's harboring conduct here was far more extensive than a typical harboring case, her conduct, as discussed at length above, was not limited to harboring. She committed additional felonies, both charged and uncharged; Bulger and she took advantage of transient, homeless people to obtain needed identification information; and Bulger and she secreted cash and weapons in the apartment. In addition, the conspiracy to which she pled guilty involved numerous acts of obstruction by her co-conspirators; she, herself, provided false and

misleading information after her arrest; and she appears to have participated in a fraudulent

conveyance.  The nature and circumstances of this case call for a substantially longer period of

incarceration and fine than the guidelines range set forth in the PSR.  The United States'

recommended sentence, under the circumstances, is more reasonable.

**B.      The Characteristics of the Defendant**

While Greig has no criminal history, was reportedly a good neighbor and friend, and was

kind to animals, at least one characteristic of her background is less positive.  In the years before

she fled with Bulger, Greig did not work.  Instead, she enjoyed Bulger's cash.  Her sister,

Margaret McCusker, reported that Bulger bought Greig:

> Trips, furs, coats.  I mean, he bought quite, quite a lot of things.  She didn't really
> want for anything.  I remember they, they had a globe, in the middle of the dining
> room, that opened up, and that's where you put liquor, but instead of liquor, there
> was (sic) bills in it.  You know, 50s and 20s.  $100.00 bills in it, and when she
> wanted, needed something, she'd just go in there and take bills.  I used to be like,
> 'Oh my god.  Do you know how much you're spending?  Do you even know?'  I
> mean, but that was her lifestyle.  I guess.

SA, Tab 77 at pp. 23-24.  Apparently, Greig liked Bulger's money and the life it brought her.

**C.      The Need for the Sentence to Reflect the Seriousness of the
Offense, to Promote Respect for the Law, and to Provide Just
Punishment for the Offense**

While the nature and circumstances of this case call for a sentence that reflects the

seriousness of the conduct, there is another feature of this case that justifies the sentence the

United States seeks.  There is a particularly acute need in this case to impose a serious sentence

in order to promote respect for the law.  Although the Defendant has pled guilty here, she still has

shown no remorse for her actions.  While she had been forced, as a result of her arrest, to

confront the consequences of her crimes, she has shown no respect for the laws she has violated. Her loyalty to Bulger appears paramount, and overrides any respect she has for the law.

While her disregard of the law would, in and of itself, warrant the substantial sentence that the United States seeks, imposing such a sentence will promote respect for the law in another, more general, sense. What the Defendant has failed to accept, and what the sentence here needs to take into account, is that the Defendant's role in denying the judicial system, and the public it serves, the ability to have Bulger called to court to face the charges against him had implications beyond simply her own substantial disregard of the law. Her conduct helped deprive the families of Bulger's victims of their right to see Bulger tried on the charges without undue delay. Bulger's sixteen year disappearance – a disappearance the Defendant played a central role in prolonging – compounded the anguish of the victims' families. For sixteen years, many people – the victims of Bulger's crimes, the hard working and dedicated members of law enforcement who investigated his crimes, and the members of the public who put faith in the justice system – watched as revelation after revelation of horrifying violence and cancerous corruption worked their way through the courts, while, absent from it all was the person allegedly at the center of it. The sentence here must, in some measure, take into account that harm, both to promote respect for the law, and to impose a just punishment. This calls for the period of imprisonment and fine the United States recommends.

34

### D.      The Need for General and Specific Deterrence

In light of the notoriety of this case, which stems from the notoriety of Bulger's alleged crimes, the potential general deterrent effect of the sentence the United States recommends is high.  High profile defendants such as Bulger require substantial assistance if they are to remain fugitives.  That assistance is likely to be sought in the first instance from close friends and relatives.  Individuals in a position such as Greig must know that there is a high price to be paid for choosing personal affection and loyalty over their legal obligations.  As with the other factors, the need for deterrence weighs heavily in favor of the United States' recommended sentence.

## V.  Upward Departure

For all of the reasons discussed above, to the extent that the Court does not accept the United States' guidelines calculations, this case lies sufficiently outside the heartland of cases that an upward departure is warranted under the policy statements set forth in U.S.S.G. § 5K2.6 (possession of weapons and dangerous instrumentalities) and U.S.S.G. § 5K2.21 (court may depart to reflect the actual seriousness of offense based on uncharged conduct).  The United States intends to move for such a departure should the Court calculate the guidelines materially differently than the United States.

## VI.  Conclusion

For all the foregoing reasons, the Court should impose the United States' recommended

sentence.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney


By:  /s/ Jack W. Pirozzolo
JACK W. PIROZZOLO
First Assistant U.S. Attorney
MARY B. MURRANE
JAMES D. HERBERT
Assistant U.S. Attorneys
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3189

Dated: June 8, 2012


## CERTIFICATE OF SERVICE

I, Jack W. Pirozzolo, hereby certify that this document, filed through the Electronic Court
Filing system, will be sent electronically to the registered participants as identified on the Notice
of Electronic Filing and paper copies will be sent to those indicated as non-registered
participants..

/s/ Jack W. Pirozzolo
Jack W. Pirozzolo
First Assistant U.S. Attorney