1                     UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA            )
                                         )
5                                        )
                                         )
6    vs.                                 )  No. 1:11-cr-10286-DPW
                                         )
7                                        )
     CATHERINE E. GREIG,                 )
8                                        )
                        Defendant.       )
9

10
     BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK
11

12
                         RULE 11/PLEA HEARING
13

14

15
              John Joseph Moakley United States Courthouse
16                          Courtroom No. 1
                            One Courthouse Way
17                          Boston, MA 02210
                        Wednesday, March 14, 2012
18                             2:30 p.m.

19

20

21                 Brenda K. Hancock, RMR, CRR
                       Official Court Reporter
22        John Joseph Moakley United States Courthouse
                        One Courthouse Way
23                        Boston, MA 02210
                           (617)439-3214
24

25

1    APPEARANCES:

2         UNITED STATES ATTORNEY'S OFFICE
          By:  AUSA Jack Pirozzolo
3              AUSA James D. Herbert
               AUSA Mary B. Murrane
4         1 Courthouse Way, Suite 9200
          Boston, MA 02210
5         On behalf of the United States of America.

6         LAW OFFICES OF KEVIN J. REDDINGTON
          By:  Kevin J. Reddington, Esq.
7         1342 Belmont Street, Suite 203
          Brockton, MA 02301
8         On behalf of the Defendant.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (The following proceedings were held in open court

2   before the Honorable Douglas P. Woodlock, United States

3   District Judge, United States District Court, District of

4   Massachusetts, at the John J. Moakley United States Courthouse,

5   One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6   Wednesday, March 14, 2012):

7           THE CLERK:  All rise.

8       (The Honorable Court entered the courtroom at 2:30 p.m.)

9           THE CLERK:  This Honorable Court is now in session.

10  You may be seated.

11          This is Criminal Action 11-10286, United States versus

12  Catherine Greig.

13          THE COURT:  Well, there are couple of preliminary

14  procedural things I do want to touch on.

15          One is the question of how the Los Angeles cases get

16  here.  This does not appear to be a traditional Rule 20.

17          So, maybe, Mr. Pirozzolo, you can explain it.

18          MR. PIROZZOLO:  They get here by way of a waiver of

19  venue.  So, the defendant has agreed, pursuant to the plea

20  agreement -- venue, as you know, can be waived.

21          THE COURT:  It can.  The reason I raise it -- I am not

22  sure that it is disqualifying -- but Rule 18 seems to say that

23  you can only do this pursuant to a rule or a statute; that is,

24  the defendant is supposed to be tried in the district, the

25  vicinage district.  Then Rule 20 has a mechanism for dealing

1    with it, but the Rule 20 mechanism, while it has been

2    broadened, seems to indicate that there should be a complaint

3    in the other District at a minimum.  Is there a complaint in

4    the Central District of California?

5         MR. PIROZZOLO:  No, there is not.  Pursuant to the

6    Plea Agreement there was an agreement signed off on by the

7    United States Attorney in the Central District of California

8    agreeing that that was an appropriate disposition of the

9    charges that would otherwise lie in California.

10        THE COURT:  So, I think I end up where you do, but I

11   wanted to be sure I understood fully and Ms. Greig understands

12   fully --

13        MR. PIROZZOLO:  Yes.

14        THE COURT:  -- that this is departure from the Rules

15   of Criminal Procedure, both Rule 18 and Rule 20, and it is done

16   simply as a waiver of a Constitutional right.

17        MR. PIROZZOLO:  Venue is not a Constitutional right, I

18   don't believe.

19        THE COURT:  The Sixth Amendment says that you have a

20   right to be tried in the state and the district in which the

21   crime was committed.

22        MR. PIROZZOLO:  Thank you.

23        THE COURT:  That *is* a Constitutional right.  I think

24   that is where it is located.

25        MR. PIROZZOLO:  I stand corrected.

1    THE COURT:  Well, Mr. Reddington, I take it your

2  client is prepared to waive the venue?

3    MR. REDDINGTON:  Yes, your Honor.  I explained in

4  detail, and we did have a written waiver that will be

5  submitted, if it has not already to you, and she is well aware

6  of the right that she has to be tried in California, does wish,

7  pursuant to the Plea Agreement, to waive that and have the

8  matter disposed of in this District before your Honor.

9    THE COURT:  Well, I am obviously going to ask her some

10  questions about it.

11    The second issue really has to do with the Crime

12  Victims' Rights Act of 2004.  I realize that Magistrate Judge

13  Boal has extended the right of allocution to certain of the

14  persons who have been identified as victims.  The question for

15  me is whether or not the statute reaches that far, and I guess

16  I need to understand the Government's view.  For present

17  purposes today I will treat it as the law of the case, but I

18  think it is a closer question as a matter of law.

19    MR. PIROZZOLO:  I'll address that, your Honor.

20    THE COURT:  Sure.

21    MR. PIROZZOLO:  Starting with the statute, and this

22  goes under the definition of "victim," 3771(e), which provides

23  you the definition of "victim," defines "victim" as anyone who

24  is directly and proximately harmed by the offense of

25  conviction.

1          I am going to address two components, two things that

2     I think are relevant to the analysis.  The first is, and I know

3     it is not binding on the District Court at all, but under the

4     Attorney General's guidelines, which were recently promulgated

5     in 2011, emotional harm can be a type of harm that would be

6     under the guidelines that the Department of Justice operates

7     that would permit a victim to be heard.

8          THE COURT:  Let me just pause there.

9          MR. PIROZZOLO:  Yes.

10          THE COURT:  Is that defined as a civil tort of

11     emotional distress?  It strikes me that when you have language

12     like "directly and proximately harmed," that it is invoking

13     civil tort law.

14          MR. PIROZZOLO:  That's precisely correct.  I think, in

15     fact, if you look at the case law construing the statute and

16     you look at the language of the statute itself, it's framed in

17     terms of traditional common law torts.

18          THE COURT:  Does the Government contend that Ms. Greig

19     would be exposed to common law tort liability to any of the

20     persons who have been identified as victims?

21          MR. PIROZZOLO:  Potentially, actually.  Well, can I

22     unpack this a little bit?  There are different victims who are

23     involved in this case and there are three different sets of

24     charges.  Two are identity fraud, identity theft charges, and

25     with respect to those there are individuals who we consider to

1    be victims in connection with those offenses, because it was

2    their identities that were unlawfully obtained in the course of

3    the harboring conspiracy and in the course of the conspiracy to

4    commit identity fraud.

5            THE COURT:  Are they asking for right of allocution?

6            MR. PIROZZOLO:  Well, we have notified them, we have

7    provided them the opportunity, and they haven't today asked to

8    speak.

9            THE COURT:  Okay.

10            MR. PIROZZOLO:  So, those victims, there's no -- I

11    mean, I don't think -- I doubt the Court would contend that the

12    statute doesn't reach at least those victims.

13            There are two other categories of victims that fall

14    within the scope of the statute.  There are family members of

15    people who are standing in the shoes, if you will, of people

16    who suffered, allegedly, at the hands of Mr. Bulger in

17    connection with the cases pending in front of Judge Stearns.

18    So, there are families of murder victims who are victims in the

19    case.

20            There are also, and we have notified them, although

21    they have not requested to allocute today, there are certain

22    categories of people who are extortion victims as well, and

23    that becomes a little bit hard to parse, because the guidelines

24    that we have under the AG's guidelines provides for shades of

25    culpability.  So, where there's a culpability issue with

1    respect to a victim, there's a great deal of discretion that

2    the Attorney General vests in the U.S. Attorney community to

3    decide who should be notified.  So, we did our best to cut

4    that.  It turns out none of them have asked to speak here

5    today, so really the question is the victims who are in the

6    category of family members of murder victims allegedly at the

7    hands of Mr. Bulger and his cohorts.

8            Now, with respect to them, I am going to go back to

9    the tort concept.

10           THE COURT:  Right.

11           MR. PIROZZOLO:  It is true that in the civil context

12   of emotional distress ordinarily there would be a requirement

13   of some form of bodily harm.  That is sort of the traditional

14   construct of the emotional distress.  However, I took a look at

15   the *Restatement*, which is sort of a general principles, and

16   Section 46 of the *Restatement* provides for in the case of

17   outrageous conduct that there doesn't need to be any attendant

18   bodily harm.  Recall also that what is really at issue here

19   isn't an action in money damages, which I think can affect the

20   analysis somewhat, but simply the right to be heard.

21           THE COURT:  Well, for analytical purposes it is, from

22   my perspective, money damages, or at least that is a place I

23   start.

24           MR. PIROZZOLO:  And so, the question is it's really a

25   question of fact, and if you look at the restatement of the

1    law, and I use the second version, *Restatement Second of Torts*,

2    if you look at that, Section 46, you will see that someone who

3    engages in extreme and outrageous conduct intentionally or

4    recklessly causing severe emotional distress to another is

5    subject to liability for such emotional distress and if bodily

6    harm results -- but that doesn't apply here, that provision --

7    would be, in fact, liable.

8         Now, it's the Government's position that harboring a

9    fugitive like Mr. Bulger for 16 years, as is alleged in this

10   case, is, in fact, such outrageous conduct that this would

11   permit people who suffered emotional distress as a consequence

12   of that conduct to say that they were directly and proximately

13   harmed by the offense of conviction, and here it would be the

14   harboring conspiracy principally.

15        With respect to the question of whether, in fact, they

16   were harmed and suffered emotional distress, it is, in fact,

17   the case that the delay in bringing Mr. Bulger here to face the

18   charges caused severe emotional distress in that there are

19   many, many people who are seeking justice in this case who had

20   to wait for 16 years and, in fact, they faced the prospect of

21   never seeing Mr. Bulger face the charges that he was facing in

22   the Stearns case or even in the earlier case involving -- that

23   was in front of Judge Wolf.

24        THE COURT:  Well, I guess I do not mean to cut you

25   off, but I think you have covered the waterfront of your basic

1    concept.

2         I think I would like to have this briefed fully.  I

3    realize the statute has not been developed a great deal in

4    terms of case law, but the application of the statute to

5    accessories after the fact seems to me to be a difficult one.

6    I see the several different categories of potential victims

7    here, but it seems to me important to see if there are lines

8    that need to be drawn in this connection.

9         As I have said, for present purposes I view it as law

10   of the case that these individuals are victims here with a

11   right to allocute.

12        Do they intend to allocute here?

13        MR. PIROZZOLO:  One victim has requested to allocute.

14        THE COURT:  All right.  So, we will proceed in that

15   fashion.  But if you can get me something, say, 30 days from

16   today --

17        MR. PIROZZOLO:  Thank you, your Honor.

18        THE COURT:  -- that attaches the Attorney General's

19   guidelines and anything else that you want to include in that.

20   I am not sure of any Massachusetts case that has ever taken

21   that position.  I understand the emotive quality of it.  I am

22   not sure about its legal validity.

23        MR. PIROZZOLO:  Thank you, your Honor.

24        THE COURT:  So, I have this Plea Agreement that has

25   been provided to me indicating Ms. Greig is prepared to plead

1    guilty to a superseding information including charges that

2    would otherwise be brought in the Central District of

3    California.

4         So, I will ask Mr. Lovett to swear Ms. Greig, and I

5    will ask her some questions.

6              DEFENDANT CATHERINE GREIG DULY SWORN BY THE CLERK

7              THE COURT:  You may be seated, Ms. Greig.

8         Ms. Greig, the purpose of this hearing is to satisfy

9    me that what appears to be your intention to plead guilty to

10   three very serious federal felonies is a knowing and voluntary

11   act on your part.  In order for me to make that kind of

12   determination, I have to ask you some questions, and some of

13   those questions are personal in nature.  You will understand I

14   am not trying to delve into your personal life except as it

15   makes it possible for me to decide whether or not you know what

16   you are doing and what you are doing is voluntary.

17        Do you understand?

18             THE DEFENDANT:  Yes, your Honor.

19             THE COURT:  I started by referencing the Plea

20   Agreement.  It is a letter that is dated March 5th directed to

21   your attorney, Mr. Reddington, and signed on behalf of the U.S.

22   Attorney's Office for the District of Massachusetts by

23   Mr. Pirozzolo and on behalf of the Central District of

24   California by Mr. Dugdale, the Chief of the Criminal Division

25   there, and it is signed by you acknowledging it and signed by

1    Mr. Reddington.

2            Is this the Plea Agreement between you and the

3    Government?

4            THE DEFENDANT:  Yes, your Honor.

5            THE COURT:  Did anybody promise you something that is

6    not in this Plea Agreement to get you to plead guilty?

7            THE DEFENDANT:  No, your Honor.

8            THE COURT:  Did anybody threaten you in any way to get

9    you to plead guilty?

10           THE DEFENDANT:  No, your Honor.

11           THE COURT:  Can you tell me how old a woman you are?

12           THE DEFENDANT:  I will be 61 in a couple --

13           THE COURT:  Mr. Reddington, maybe if you could put the

14   microphone a little bit closer to Ms. Greig.

15           THE DEFENDANT:  I will be 61 in a couple of weeks.

16           THE COURT:  How far did you get in school?

17           THE DEFENDANT:  Finished my bachelor's degree.

18           THE COURT:  Where was that?

19           THE DEFENDANT:  Northeastern University.

20           THE COURT:  In what subject?

21           THE DEFENDANT:  Allied Health.

22           THE COURT:  I understand from the attachment here

23   there appears to be a statement of yours that you have not been

24   employed since 1995; is that right?

25           THE DEFENDANT:  That's correct.

1    THE COURT:  But before 1995, what did you do for a

2  living?

3    THE DEFENDANT:  I taught in a dental hygiene school.

4    THE COURT:  Now, have you had any difficulty

5  understanding what this case is about, what it is that the

6  Government is accusing you of?

7    THE DEFENDANT:  I've had questions, but my attorney

8  has helped me resolve those questions.

9    THE COURT:  Do you think you know enough about this

10  case, what the Government is accusing you of, to make a serious

11  judgment about pleading guilty?

12    THE DEFENDANT:  I do, your Honor.

13    THE COURT:  Have you ever had any problems with

14  substance abuse, either drugs or alcohol?

15    THE DEFENDANT:  Never, your Honor.  Never.

16    THE COURT:  Are you taking any prescription drugs now?

17    THE DEFENDANT:  I am taking a prescription drug for a

18  thyroid condition.

19    THE COURT:  Is that affecting your ability to make

20  important decisions?

21    THE DEFENDANT:  No, your Honor.

22    THE COURT:  Are you seeing a physician for any kind of

23  physical problem?

24    THE DEFENDANT:  No, your Honor.

25    THE COURT:  Have you ever had occasion to consult with

1    a mental health professional --

2              THE DEFENDANT:  Pardon?

3              THE COURT:  A mental health professional, a

4    psychiatrist, a psychologist, a psychiatric social worker or

5    anyone like that?

6              THE DEFENDANT:  At one time.

7              THE COURT:  If you could just generally tell me when

8    and what the problem was that you were addressing.

9              THE DEFENDANT:  It was after a suicide in my family.

10             THE COURT:  And how long ago was that?

11                        (Pause)

12             THE COURT:  Decades?

13             THE DEFENDANT:  It was decades.

14             THE COURT:  Can you tell me the decade that it took

15   place?

16             THE DEFENDANT:  '84.

17             THE COURT:  Now, you understand that in this

18   proceeding when I am asking you questions and you are giving

19   the answers, the answers that you give me can be used against

20   you in a prosecution for perjury or for false statement.  Do

21   you understand that?

22             THE DEFENDANT:  Yes, I do, your Honor.

23             THE COURT:  Now, let us turn to the Plea Agreement.

24   Maybe Mr. Reddington can put it in front of you.

25             But it indicates that you are pleading guilty to three

1    counts.  One has to do with a conspiracy to engage in harboring

2    a felon; the second has to do with a conspiracy to engage in

3    identity fraud; and the third is a particular charge of

4    identity fraud.  Each one of those counts has a period of

5    incarceration of five years, maximum period of incarceration of

6    five years, there is a supervised release term of three years,

7    and for each of the counts there is a $250,000 fine potential,

8    a mandatory Special Assessment of $100, and in connection with

9    Counts Two and Three, which are the identity fraud, there is

10   potential for restitution and forfeiture.

11        Do you understand that that is what you are facing --

12        THE DEFENDANT:  I do, your Honor.

13        THE COURT:  -- in this circumstance?

14        Now, part of the Plea Agreement indicates that the

15   Government is not going to charge you with certain offenses.

16   Whether they have the evidence or not is not clear, but, in any

17   event, they are not going to charge you with Aggravated

18   Identity Fraud, which is a very specific provision which

19   provides for enhanced sentences --

20        THE DEFENDANT:  Yes.

21        THE COURT:  -- and also anything having to do with

22   guns.  Do you understand that?

23        THE DEFENDANT:  Yes, I do, your Honor.

24        THE COURT:  And that is part of the bargain that you

25   entered into with the Government; is that right?

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  Now, here the parties have indicated that

3   they are reserving the right to make arguments about sentencing

4   in this case, and I want you to understand and be sure you

5   understand certain things about sentencing under these

6   circumstances.

7          Number one, I am going to listen carefully to what the

8   parties have to say, but I am not bound by what they have to

9   say.

10         Do you understand that?

11         THE DEFENDANT:  Yes.

12         THE COURT:  You have to answer.

13         THE DEFENDANT:  Yes, I do, your Honor.

14         THE COURT:  So, first, the parties are going to make

15   arguments to me after they have seen the Probation Presentence

16   Report about what the *Sentencing Guidelines* would be here, and

17   the *Sentencing Guidelines* are a series of directives to me that

18   tell me what the range of sentences might be for someone with

19   your background who has committed these crimes, and I will make

20   the calculations with the assistance of the parties, and I

21   suspect that the parties have thought about this a good deal

22   and have some provisional idea about it.

23         But I want to emphasize this again:  I am not bound by

24   that.  Do you understand that?

25         THE DEFENDANT:  I do, your Honor.

1          THE COURT:  And I am not bound by the *Sentencing*

2     *Guidelines* per se.  I have got to consider them, and I will,

3     but I have to move on and consider the larger purposes of

4     sentencing.  Do you understand that?

5          THE DEFENDANT:  I do, your Honor.

6          THE COURT:  Now, what this means is you are pleading

7     guilty in the face of uncertainty about what I am going to do.

8     You do not know what I am going to do.

9          THE DEFENDANT:  That's right, your Honor.

10          THE COURT:  And are you prepared to do that?  Have you

11     had a full opportunity to discuss this with Mr. Reddington,

12     your attorney?

13          THE DEFENDANT:  I have, your Honor.

14          THE COURT:  One thing that I want to get to is the

15     bottom line.  If I accept your plea and then I impose a

16     sentence you do not like, you do not get to withdraw your plea;

17     you are stuck with it.

18          Do you understand that?

19          THE DEFENDANT:  I understand, your Honor.

20          THE COURT:  Now, turning to the larger issues that the

21     parties have talked about, to some degree I want to ask some

22     questions having to do with press reports too of additional

23     matters that are suggested to be in this Plea Agreement or

24     additional agreements that the parties are said to have, and I

25     want to be sure that there is not some side agreement here and

1   that you are not relying on something that is not included in

2   this Plea Agreement.

3           But I want to turn, first, to the question of

4   cooperation.  There is no cooperation agreement here?

5           THE DEFENDANT:  There is not, your Honor.

6           THE COURT:  And I take it that you have not agreed

7   with the Government about anything having to do with

8   cooperation; is that right?

9           THE DEFENDANT:  No, I have not, your Honor.

10          THE COURT:  But you understand that the Government is

11  in a position to compel you to testify --

12          THE DEFENDANT:  I do, your Honor.

13          THE COURT:  -- and that they can do that by means of

14  making an application to the Court?

15          THE DEFENDANT:  Mm-hmm.

16          THE COURT:  -- in connection with grand jury

17  proceedings or in connection with a trial, and if you choose

18  not to testify the result can be that you can suffer civil

19  contempt and perhaps criminal contempt --

20          THE DEFENDANT:  Mm-hmm.

21          THE COURT:  -- and that that can lead to an extension

22  of any sentence I impose.  I will impose whatever sentence I

23  think is appropriate here, but if the Government chooses, and

24  it is their choice, it is not the Court's choice, if the

25  Government chooses to proceed against you and compel you to

1    testify, and if a judge agrees that they have grounds for doing

2    that, you could be spending more time in jail if you do not

3    cooperate.

4           Do you understand that?

5           THE DEFENDANT:  I understand, your Honor.

6           THE COURT:  Now, the second issue that comes up in

7    connection with the Plea Agreement -- I do want to deal with

8    this question of testimony or lack of testimony, but on page 3

9    of the Plea Agreement the Government says it reserves the right

10   not to recommend a certain reduction under the *Sentencing*

11   *Guidelines* if you fail to provide truthful information about

12   your financial status.

13          Do you understand that you have an obligation to

14   provide truthful information about your financial status?

15          THE DEFENDANT:  I do, your Honor.

16          THE COURT:  And that it is going to have to be given

17   to the Probation Office as well.  But it also can be given to

18   the Government, if they ask for it.

19          THE DEFENDANT:  Fine, your Honor.

20          THE COURT:  Similarly, if you give any false or

21   misleading information in any proceeding, that is Section (e)

22   on page 4 of, I believe, part 3, in connection with any of the

23   conduct here or relevant conduct related to that, that, again,

24   they can withdraw support for changes in the *Guidelines*.  Do

25   you understand that?

1          THE DEFENDANT:  I do, your Honor.

2          THE COURT:  Now, the Plea Agreement also has certain

3    provisions having to do with financial terms, particularly

4    having to do with forfeiture, and I want to explore that a

5    little bit with you.

6          But you understand forfeiture is not the only

7    financial obligation that you face; as we talked about, there

8    are substantial fines that could be imposed here?

9          THE DEFENDANT:  Yes, your Honor.

10         THE COURT:  And any asset that has been restrained by

11   order of the Court can be subject to satisfaction through the

12   fine, if a fine is imposed.

13         Do you understand you are exposing yourself to that?

14         THE DEFENDANT:  I do, your Honor.

15         THE COURT:  Now, turning to the question of

16   forfeiture, there is a lengthy provision here about forfeiting

17   and assigning any proceed from any publicity or intellectual

18   property rights, and that is direct and indirect.  It is not

19   just if you make an arrangement, say, with a book publisher or

20   something like that, but if someone else on your behalf or in

21   connection with you does, that has to be forfeited to the

22   United States.

23         Do you understand that under this agreement?

24         THE DEFENDANT:  I do, your Honor.

25         THE COURT:  Now, in addition, you are giving up

1    certain of the property rights that are particularly identified

2    in the forfeiture.  Do you understand that?

3              THE DEFENDANT:  Property rights?

4              THE COURT:  Anything that has to do with, for

5    instance, materials that were found in the apartment --

6              THE DEFENDANT:  Oh, yes, yes.

7              THE COURT:  -- in Santa Monica, that sort of thing.

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  But during the course of the proceedings

10   having to do with bail the Government made certain accusations

11   concerning your not being forthright about financial

12   circumstances --

13             THE DEFENDANT:  They did.

14             THE COURT:  -- and also that there were some

15   additional financial materials that were available.

16             In particular, the Government, in a rather peculiar

17   submission, said that they would offer evidence, if I asked for

18   them to offer evidence.  That is not the way it is done, and I

19   think the Government probably understands that.  They provide

20   whatever evidence they want and then I rule on it.  I do not

21   play a game with them of I will take some and then bring some

22   back.

23             But, in any event, they made a suggestion about

24   something like that having to do with some bank account that

25   you have here.  You understand that that can be exposed to

1    restraining and, perhaps, application in connection with any

2    fine that is imposed here?

3            Do you understand that?

4            THE DEFENDANT:  I understand.

5            THE COURT:  Now, in addition, the Government made

6    reference in the course of the bail proceedings here to a piece

7    of real property that you have at 16 Hillcrest in Quincy.  It

8    is not specifically identified here, although in the bail

9    materials the Government suggested that it may have been

10   purchased as a result of the proceedings of some criminal

11   activity, and I guess I want to be sure that the Government

12   does not believe that it is subject to the forfeiture

13   proceeding here.

14           MR. PIROZZOLO:  It is not.  Because of the offenses

15   that are implicated in this proceeding that property legally

16   would not be subject to forfeiture.  The law of forfeiture only

17   reaches so far, and so as a legal matter we can't in this

18   proceeding.  But we've been clear, and I want to make it clear,

19   the same cannot be said for the other matter pending against

20   Mr. Bulger.

21           To the extent -- and that is really for a future

22   proceeding -- to the extent that house is shown to be proceeds

23   of illegal conduct on the part of Mr. Bulger, under those

24   circumstances it could well be forfeited to the extent it

25   applies in that proceeding.

1          THE COURT:  Well, let me tell you what I am going to

2     direct the Government to do.  I want you to understand this

3     before you enter your plea.  That is, I want the Government to

4     provide me with an order restraining you from engaging in any

5     transactions involving any assets that you have that the

6     Government is aware, and, of course, the Government is entitled

7     to know everything about your financial assets --

8          THE DEFENDANT:  Mm-hmm.

9          THE COURT:  -- and that includes your house.  I have

10    not made a decision about sentencing, we are at the earliest

11    stages of this, but I want to be sure that if it comes to

12    sentencing and if there is money involved that there are

13    available assets that could be used to satisfy that, and that

14    includes the house at Hillcrest.

15         I am going to ask the Government seven days from today

16    to provide me with a list of all that they know of financial

17    assets or interest that Ms. Greig has, and I am going to make

18    them subject to what is identified in the Plea Agreement as the

19    potential for restraint of such financial interests here.  But

20    I want you to understand it is not that I have made a decision

21    about --

22         THE DEFENDANT:  I understand, your Honor.

23         THE COURT:  -- the question of money, but I want to be

24    sure that there is no misunderstanding or that other purchasers

25    receive notice that there is a question.  So, for example, I

1    expect the Government to provide me with a *lis pendens* for the

2    Hillcrest Street property.

3         Now, one of the things that is included here is the

4    waiver of certain Constitutional rights that you have, and, in

5    particular, I am a little concerned about the provision on

6    page 8, which says that you waive your right to all

7    Constitutional, legal and equitable challenges by direct appeal

8    or *habeas corpus* or any other means to any forfeiture carried

9    out in accordance with this Agreement.

10        Ordinarily, I have found that most defendants do not

11   understand what it means to be giving up the right to appeal in

12   criminal cases, and so I ordinarily do not accept waivers of

13   appeal.  This is a property issue, and I am prepared to do

14   that, but you understand that you are giving up all your rights

15   to contest the forfeiture?  You may say, Well, that was not

16   part of the property, that that property was not part of the

17   criminal transaction.  You could say that, "I want to challenge

18   all of that."

19        You are giving up the right to do that under this Plea

20   Agreement.  Do you understand that?  If you want to consult

21   with Mr. Reddington, you can.

22       (Defendant consulted with Atty. Reddington off the record)

23            THE DEFENDANT:  Yes, your Honor.

24            THE COURT:  So, you are prepared to do that?

25            THE DEFENDANT:  I am, your Honor.

1          THE COURT:  And what that means is that the forfeiture

2    process can go forward even without a judge, and you do not

3    have a basis for seeking some sort of review with respect to

4    that.  Do you understand that?

5          THE DEFENDANT:  I do, your Honor.

6          THE COURT:  Now, I have gone through some of the more

7    significant dimensions, I think, of the Plea Agreement so that

8    I can understand this, but do you have any questions of me

9    regarding the Plea Agreement and how it applies?

10          THE DEFENDANT:  No, your Honor.

11          THE COURT:  You understand you do not have a

12    responsibility to plead guilty here?

13          THE DEFENDANT:  I do, your Honor.

14          THE COURT:  Under our *Constitution,* a person is

15    provided with various kinds of rights.  We started with a

16    discussion about what is, in fact, a Constitutional right, to

17    be tried in the district where a criminal transaction, alleged

18    criminal transaction, takes place.  That is what we generally

19    call "venue," and Mr. Reddington has indicated that you have

20    signed a waiver of venue for this.

21          But there is a reason for that, and the reason is that

22    people who are in a particular district are assumed to have the

23    right to contest the case *there*, not somewhere else, and so the

24    founders of the *Constitution* put that in the *Constitution*, and

25    you have a right to insist on that.

1          I understand that you are prepared to give up that

2     right to have this part of the case litigated, that is, Counts

3     Two and Three, litigated in the Central District of California,

4     which is the Los Angeles County area.

5          THE DEFENDANT:  I am, your Honor.

6          THE COURT:  Not only that; apparently you are going to

7     plead guilty to what is called an "information."  An

8     "information" is a direct charge by the United States Attorney

9     here, two United States Attorneys, the United States Attorney

10    from the District of Massachusetts and the one from the Central

11    District of California, and they are charging you directly.

12    Under our *Constitution*, a person who is accused of serious

13    crimes like this is entitled to have a grand jury make that

14    determination.

15          THE DEFENDANT:  Mm-hmm.

16          THE COURT:  A grand jury consists of 23 individuals, a

17    majority of whom have to vote in favor of an indictment, and if

18    they do not the Government cannot move on that indictment.  It

19    sometimes happens that grand juries decide that they are not

20    going to let the Government go forward.  The grand jury

21    functions as a filtering or screening device for criminal

22    transactions, and under our *Constitution* a person who is

23    potentially accused of a crime is entitled to have that group

24    of citizens make that preliminary determination about whether

25    or not the case goes forward on those charges.

1          Now, as I understand it, you are prepared to give up

2     that Constitutional right and let the Government proceed

3     directly against you here in the District of Massachusetts with

4     respect to particularly Counts Two and Three, because Count One

5     has already been indicted here in Massachusetts.

6          Are you ready to do that?

7          THE DEFENDANT:  I am, your Honor.

8          THE COURT:  And you have discussed giving up these

9     rights with Mr. Reddington fully, and you understand what the

10    pros and cons are of doing that; is that right?

11         THE DEFENDANT:  I do, your Honor.

12         THE COURT:  And you are satisfied with the legal

13    advice that you have received from him --

14         THE DEFENDANT:  Very much so.

15         THE COURT:  -- regarding this?

16         THE DEFENDANT:  Yes, your Honor.

17         THE COURT:  Now, more fundamentally, the Government

18    cannot make you guilty just by accusing you.  Under our system

19    of justice, a person who is accused of a crime is presumed

20    innocent unless and until the Government can prove beyond a

21    reasonable doubt each essential element of the offenses charged

22    against that individual.  You do not have to do anything at

23    all.  You can sit back, look the Government straight in the eye

24    and say, "Prove it," and unless and until they do you cannot be

25    found guilty, unless, of course, you plead guilty.

1          So, what you are doing is giving up those valuable

2     Constitutional rights.  Do you understand that?

3          THE DEFENDANT:  I do, your Honor.

4          THE COURT:  And you have the right to challenge the

5     case.  You do not have to just sit back.  You can have

6     Mr. Reddington cross-examine the Government's witnesses.  He

7     could bring in witnesses on your behalf.  If they would not

8     come in here voluntarily, I would give him court process to

9     force them to come in here.

10         You could take the witness stand yourself and tell

11    your side of the story, or you could choose not to, and if you

12    chose not to, I would tell the jury, if the case were tried to

13    a jury, and I would make this determination myself, that we

14    cannot hold that against you.  That is another valuable

15    Constitutional right that you have, the right to remain silent

16    in the face of criminal accusation.

17         Now, by pleading guilty you are giving up all of those

18    rights.  Do you understand that?

19         THE DEFENDANT:  I do.

20         THE COURT:  Now, I want to turn to the provisions that

21    the Government has accused you of, and there are basically two

22    categories.  One is Harboring, the other is Identity Fraud.  I

23    want to outline, if I can for you, briefly, the elements,

24    although I want to be sure that you have discussed the elements

25    with Mr. Reddington, and if you have any questions of me

1     regarding the elements, what it is that the Government has to

2     prove beyond a reasonable doubt, then stop me and ask me.  All

3     right?

4            THE DEFENDANT:  Yes, your Honor.

5            THE COURT:  Count One deals with Conspiracy to Harbor,

6     so what it is is an agreement to engage in harboring a

7     fugitive.  Now I want to talk about what harboring a fugitive

8     requires the Government to prove.  First, they have to prove

9     that some federal warrant or process for a felony charge has

10     been issued for the arrest of the fugitive, and here that is

11     said to be Mr. Bulger.

12            THE DEFENDANT:  Yes.

13            THE COURT:  Second, that you knew that the warrant or

14     process, that particular warrant or process had been issued.

15            Third, that you harbored or concealed the fugitive.

16     "Harboring and concealing" is a pretty broad term.  It means

17     some sort of physical acts or providing assistance in avoiding

18     detection and apprehension.  For example, physical acts like

19     providing food and shelter and medical assistance and other

20     necessities would qualify under these circumstances.

21            Finally, the Government has to prove that you did this

22     intentionally to prevent Mr. Bulger's discovery or arrest.

23            It has got to show all of those things.  Do you

24     understand that?

25            THE DEFENDANT:  I do, your Honor.

1          THE COURT:  Now, the question of Identity Fraud is a

2     little bit different, a little bit more complex, but let me go

3     through it briefly with you, because in Count Three it is

4     charged as a particular act of Identity Fraud, and then it is

5     charged as Conspiracy in another area.

6          But the Government has to prove with respect to the

7     Identity Fraud in the third count, the individual substantive

8     act, that you knowingly transferred or possessed or used a

9     means of identification of some other person, that you did so

10    without lawful authority, that you did so with the intent to

11    commit or aid in the commission of some sort of unlawful

12    activity, and here the unlawful activity is harboring or

13    concealing, and that the document was used or appeared to be

14    used under the authority of the United States, something like a

15    Social Security card, that sort of thing, or that the transfer,

16    possession or use affected interstate commerce.

17         The Government has to prove those things for the

18    Identity Fraud in Count Three.  Do you understand that?  You

19    seem to be puzzled.

20         THE DEFENDANT:  I'm puzzled.  I'm puzzled about that.

21         THE COURT:  If you want to discuss it a little bit

22    with Mr. Reddington before.

23         THE DEFENDANT:  Please.

24       (Defendant conferred with Atty. Reddington off the record)

25         THE DEFENDANT:  Yes, okay.  I understand.

1          THE COURT:  Do you have any questions of me concerning

2     that?

3          THE DEFENDANT:  No, I don't.

4          THE COURT:  Now, have you explored with Mr. Reddington

5     fully the kinds of defenses that you might have, the

6     initiatives that you might have, the ways in which you might

7     confront and deflect charges like that?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  Now, I said that there are two basic kinds

10    of issues here, one Harboring and the other Identity Fraud, but

11    the Government has charged them a little bit differently.  With

12    respect to the harboring or concealing, they have charged this

13    as a conspiracy, and part of the reason, perhaps, is that not

14    all of the acts that the Government contends are involved took

15    place in Massachusetts, but at least one did, and that is why

16    they say this case can be brought in Massachusetts.

17         But what the Government has to prove is that you

18    entered into an agreement with one or more other persons to

19    engage in the violation of the harboring or concealing statute,

20    No. 1071, and that some overt act was taken in connection with

21    that.  An "overt act" is simply something to assist or make

22    move forward.  It does not have to be an illegal act itself but

23    something that assists and makes it possible for the agreement

24    to be carried out.

25         So, the Government has to prove two basic things:

1    First, that you agreed with other persons; and, number two,

2    that the agreement was to conceal or harbor Mr. Bulger.

3         Do you understand that that is what the Government has

4    to prove?

5         THE DEFENDANT:  I do, your Honor.

6         THE COURT:  And, similarly, they charged a conspiracy

7    under the special conspiracy statute of Identity Fraud, and

8    here the Government has to prove that there is an agreement

9    that is listed, as described in the indictment, involving at

10   least two people to knowingly possess with the intent to use

11   unlawfully or transfer unlawfully five or more identification

12   documents other than those that are lawfully in your possession

13   that have authentication features or falsity in the

14   identification features, that you voluntarily and intelligently

15   and with the specific intent -- that is, you knew what you were

16   doing; this was not some mistake or you were just acting

17   without understanding what was going on here -- that there be

18   this underlying violation of the Identity Fraud statute, and

19   that, although it is not clear, really, I think from the

20   statute itself, there was an overt act.

21        I am going to tell you that there was an overt act.  I

22   am not sure that the statute requires an overt act here.  But,

23   again, an "overt act" is an act in furtherance of that

24   conspiracy; somebody among the conspirators did something to

25   make that conspiracy succeed, the conspiracy to engage in

1  Identity Fraud.

2         The Government has to prove all of those things beyond

3  a reasonable doubt.  Do you understand that?

4         THE DEFENDANT:  I do, your Honor.

5         THE COURT:  Now, one of the reasons that I went

6  through this in some detail is that I am going to ask the

7  Government briefly to tell me what the evidence would be.  I

8  have, of course, had provided to me a statement by you

9  concerning this and signed by you, but it is important for that

10 statement, for my purposes, the Government's understanding of

11 the statement to be presented in open court so I can observe

12 you and decide whether or not you really know what it is that

13 you have agreed to.  All right?

14        THE DEFENDANT:  Yes.  Thank you.

15        THE COURT:  Mr. Pirozzolo.

16        MR. PIROZZOLO:  Thank you, your Honor.

17        If this case were to have proceeded to trial, the

18 Government would have been prepared to prove the following:

19        That sometime prior to December 1994 Ms. Greig, the

20 defendant, had a personal relationship with James Bulger, and

21 that that personal relationship continued through the time of

22 their arrest in Santa Monica, California on June 22nd, 2011;

23 that the defendant, Ms. Greig, became aware in late 1994 or

24 early 1995 that Mr. Bulger had, in fact, fled Massachusetts,

25 and in early January 1995 had become aware that a criminal

1    associate of Mr. Bulger's, Stephen J. Flemmi, and Mr. Bulger

2    had been charged with criminal offenses.

3        The Government would also be prepared to prove that

4    she became aware of that event from a third party, John Doe

5    No. 1, who is identified in the Statement of Facts as John Doe

6    No. 1, and who was known to Ms. Greig, and that she believed

7    and was informed that -- he informed her that he believed that

8    law enforcement was looking for Mr. Bulger and that Mr. Flemmi

9    had been arrested.  She also later became aware of those events

10   when law enforcement questioned her at her home in Quincy

11   sometime later.

12       In addition, through the period of time from 1995

13   through 2011 she was also aware of various federal criminal

14   offenses that law enforcement was seeking to arrest Mr. Bulger

15   on.

16       The Government will also be prepared to prove that in

17   early 1995 Ms. Greig agreed to join Mr. Bulger and travel with

18   him during his flight from law enforcement, and that she agreed

19   to harbor and conceal him from law enforcement with others.

20   The Government would be able to prove that Mr. Bulger and

21   Ms. Greig, in connection with that Conspiracy to Harbor and in

22   connection with that effort to harbor and conceal Mr. Bulger

23   from law enforcement, that they would use alias identities.

24       During the period of time set forth in the superseding

25   information, the Government would be able to prove that from

1    January 1995 through June 22, 2011 that they possessed unlawful

2    identification documents, including drivers' licenses and

3    Social Security cards of real people, that they posed falsely

4    as a married couple, that Ms. Greig often used alias names,

5    false names of individuals using the last name of individuals

6    whose identifications Mr. Bulger himself had unlawfully

7    obtained, and that she also provided false cover stories to

8    people who they met in Santa Monica during the period of time

9    of the conspiracy.

10           The Government would also be able to prove that as

11   part of her role in the harboring conspiracy and the Identity

12   Fraud offenses that are charged in the superseding information

13   the following:

14           That in or about February 1995 Ms. Greig drove with a

15   woman identified as Jane Doe No. 1, whose identity she is aware

16   of, and a John Doe No. 1, whose identity she is aware of, to a

17   Thomas Park in South Boston, Massachusetts and that John Doe

18   No. 1 would take her to meet Mr. Bulger, and that she would

19   then leave the area of Boston, Massachusetts with Mr. Bulger.

20           The Government would be able to prove, in addition,

21   that the meeting did occur, it is set forth in more detail in

22   the Statement of Facts, and that, in fact, they met at Malibu

23   Beach in Boston, Massachusetts and then left the Boston area.

24           The Government would also be able to prove that at

25   various times from 1959 through 1996, and, again, this is set

1     forth in more detail in the Statement of Facts signed by

2     Ms. Greig, that Mr. Bulger arranged for Ms. Greig to speak to

3     others, including Jane Doe Number One via telephone, and they

4     would set up a mechanism by which they would place those calls

5     so the parties could not be detected by law enforcement.

6          The Government would also be able to prove that

7     Ms. Greig used the alias of "Ms. Thomas Baxter" at various

8     times, that, in fact, that Mr. Bulger -- and she was aware that

9     Mr. Bulger checked the two of them into a hotel in New York

10    using the name "Mr. and Mrs. Thomas Baxter" in or about 1995,

11    September 30, 1995.

12         The Government would also be able to prove that

13    Ms. Greig used the alias "Helen Marshall" in Louisiana,

14    including an instance where she purchased contact lenses at a

15    Walmart in Louisiana in 1996.

16         THE COURT:  Do you contend in connection with either

17    one of those that they involved Identity Fraud in the sense of

18    identity documents?

19         MR. PIROZZOLO:  As you know, the identity statute is

20    very particular as to what does and does not count with respect

21    to Identity Fraud, and as to the "Helen Marshall," that appears

22    to be a completely fabricated alias, and it does not appear to

23    be something that would qualify under the statute as --

24         THE COURT:  So, it is not one of the five?

25         MR. PIROZZOLO:  No, it is not.  We are able to

1    identify the five, if you would like.  The Thomas Baxter

2    identification and the ID -- the identification fraud

3    conspiracy is a conspiracy that includes acts not just by

4    Ms. Greig but also Mr. Bulger.

5            THE COURT:  Right.

6            MR. PIROZZOLO:  The Thomas Baxter identity involved a

7    driver's license and, in fact, does count as one, although, as

8    you will hear, there are many, many more that come much later

9    in time.

10           THE COURT:  I do want you to identify those that you

11   contend are among the five as you go along.

12           MR. PIROZZOLO:  The charge is not limited to five,

13   your Honor.

14           THE COURT:  I understand.

15           MR. PIROZZOLO:  If you could just bear with me one

16   moment.  I think we may have a chart or a table.

17           THE COURT:  Sure.

18           MR. PIROZZOLO:  I think we do have a table that we may

19   be able to provide in some redacted form to the Court at some

20   point, although we could file it under seal.

21           THE COURT:  Right.  But just as you go along, if you

22   can identify those that you say are identifications of real

23   people that fall within the scope of the Identity Fraud

24   statute.  I take it that you say that Thomas Baxter was.

25           MR. PIROZZOLO:  That was a real individual, deceased,

1    and there is a driver's license that was obtained.

2         Moving on, at some point in time in 1996 the

3    Government would be able to prove that Ms. Greig learned as to

4    Mr. Bulger that the Thomas Baxter alias had been compromised,

5    had been made known to law enforcement, and they stopped using

6    the Baxter aliases.

7         And then in 1996, mid-1996, there was an event in

8    Chicago set forth in more detail in paragraph (g) of the

9    Statement of Facts, where false identification documents were

10   delivered to Mr. Bulger and that Mr. Bulger was very unhappy

11   with the quality.  This is an event that occurred in a hotel

12   room in Chicago.  At the hotel room John Doe No. 1, the John

13   Doe No. 1 identified in the Statement of Facts, took additional

14   photographs of Mr. Bulger and then created additional

15   identifications at a later date.

16        With respect to the event in the hotel room, Ms. Greig

17   was present in the hotel room, was aware that the photos were

18   being taken and why they were being taken, and in the Statement

19   of Facts she states that John Doe No. 1, in fact, offered to

20   take photos of her, but she declined.

21        Item (h), there is an alias that was used by the name

22   of Mark Shapeton, and Ms. Greig began using the alias of Carol

23   Shapeton, and they traveled, as set forth in the Statement of

24   the Facts, between Chicago and New York.

25        With respect to the Shapeton ID, we do not allege with

1    respect to this charge that that is a means of identification,

2    although there is an individual who was affected by this.  So,

3    even though we do not allege that, it did affect a real person

4    who had real consequences because of the use of that name.

5              THE COURT:  That individual is a victim in the first

6    category of victims that you identified?

7              MR. PIROZZOLO:  Correct, your Honor.

8              So, after the departure from Boston and through the

9    time they were living in Santa Monica the Government would be

10   able to prove that Mr. Bulger obtained multiple additional

11   identification documents of other individuals, including -- and

12   they are identified by initial in the Statement of Facts and in

13   the charging document -- CWG, DGG and JWL.  With respect to

14   each of those, those were real individuals and they involved

15   real identification documents.  With respect to JWL -- as you

16   requested, I am telling you which identification documents.

17             THE COURT:  Right.  So, right now they are two, three

18   and four.

19             MR. PIROZZOLO:  Understand the charge is not simply

20   limited to individuals; it is the number of identification

21   documents.  That is the conspiracy.

22             So, with respect to certain of these individuals,

23   there are multiple identification documents.  For example, JWL,

24   there are at least two drivers' licenses and one Social

25   Security card and birth certificates, more than one birth

1    certificate, that were obtained in connection with the use of

2    that identity.

3          With respect to CWG and DGG, those involved Social

4    Security information and a card.

5          The Government would also be able to prove that

6    Ms. Greig was aware of the possession of those identification

7    documents for those individuals, and that at various times she,

8    in fact, used the last name of JWL, often referring to herself

9    as "Carol L," and she did that on multiple occasions, meeting

10   with doctors who were often treating Mr. Bulger.  The evidence

11   would show that Ms. Greig would, in fact, accompany Mr. Bulger

12   to doctors' offices to help him as various procedures were

13   being performed.

14         The Government would also be able to prove that as

15   part of the Conspiracy to Harbor that Mr. Bulger and Ms. Greig

16   rented an apartment in Santa Monica California using false

17   names "Charles Gasko" and "Carol Gasko."  Those names do not

18   count in the conspiracy, the identity fraud conspiracy, because

19   so far as we could determine they are entirely fictitious, so

20   far as the evidence would show they were fictitious.  Although,

21   the Court may note that there were a slight variant of the --

22         THE COURT:  JWL?

23         MR. PIROZZOLO:  The CWG.

24         The Government would also be able to prove that at

25   various times Ms. Greig would introduce herself to others in

1    Santa Monica, including property managers with whom she had

2    regular contact and paid the rent, by the name of "Carol Gasko"

3    and that she was married to a "Charles Gasko" and they were

4    from Chicago.  She also falsely told the property manager of

5    the apartment that Charlie was ill with bronchitis.

6           The Government would also be able to show that she was

7    responsible for delivering the rent payments to the property

8    manager and that she often paid in cash, although sometimes by

9    postal money order.  She also paid the electric utility bill

10   which was under her name under a slight variant of "Carol

11   Gasko."  It was under the name "Carol Gasco" with a c,

12   G-a-s-c-o.

13          I have already addressed what is set forth in

14   paragraph (n), which is with respect to the identification

15   documents of JWL.  They included a Social Security card,

16   California drivers' licenses, birth certificate, among other

17   items, each of which counts as an identification document.

18          The Government would also be able to prove that during

19   the course of the conspiracy Ms. Greig obtained an

20   identification document which had her photograph on it but

21   which displayed false identity under the name "JL" and had an

22   unassigned Social Security number.

23          That does not count.  That identification was not a

24   state-issued identification, nor did it purport to be.  There

25   was a disclaimer on the top of it.  So, it does not count as

1    one of the ID's that would be covered --

2              THE COURT:  Was it a real person?

3              MR. PIROZZOLO:  No, so far as we could tell.  We could

4    not identify a real person, so far as the evidence would show.

5              THE COURT:  Right.

6              MR. PIROZZOLO:  Although, using that document with the

7    unassigned Social Security number, Ms. Greig obtained medical

8    services and prescription medication using the false name and

9    would show and provide the identification document when

10   receiving services.  She knew at the time she was providing

11   that information and that document to the doctors that it was

12   not her Social Security number and that it, in fact, was not

13   assigned to her as a Social Security number.  She knew it was

14   false.

15             The Government would also be able to prove that

16   Ms. Greig and Mr. Bulger used other alias identities while in

17   Santa Monica, including the name "John R" and "Mary R," in

18   connection with obtaining services from a dentist who treated

19   Mr. Bulger at various times.  As with the doctors, Ms. Greig

20   would often accompany, always listed as an emergency contact or

21   would speak with the dentist over the telephone regarding

22   Mr. Bulger's treatments or convalescence from a treatment.

23             Now, with respect to those, those do not count.  There

24   is no evidence that those qualify as either means of

25   identification or identification documents for purposes of a

1    conspiracy.

2           Mr. Bulger also created and provided to Ms. Greig

3    business cards with the false name "JL," which is the name that

4    she often used in Santa Monica.

5           The Government would also be able to prove that

6    Mr. Bulger and Ms. Greig possessed a Social Security card of a

7    female individual, "PM."  This is a real individual, and this

8    is one of the items that does count in connection with the

9    conspiracy, and of course it's charged in Count Three as well.

10          THE COURT:  Right.

11          MR. PIROZZOLO:  Along with that, this involved a birth

12   certificate, which also counts.  The birth certificate is

13   actually under a different name, but accompanying the birth

14   certificate is a court document documenting a name change from

15   the original name, which was on a birth certificate from Ohio,

16   to the name "PM," and that was also something that they

17   possessed in connection with the conspiracy and relevant to

18   Count Two, the conspiracy to commit Identity Fraud in Count

19   Two.

20          In addition, Mr. Bulger created and provided business

21   cards under the name PM, and Ms. Greig, in fact, kept one of

22   those business cards, at least one of those business cards, in

23   her bedroom with the Social Security number associated with

24   "PM" written on the back of it, which also contained other

25   personal identifying information of PM.

1          The Government would also be able to prove that

2    Mr. Bulger and Ms. Greig possessed Social Security information

3    of another female individual "NS," and that's a real

4    individual.  It does not count for purposes of Count Two,

5    because it was the Social Security information that was

6    obtained, not the identification document.  So, the distinction

7    is with respect to the conspiracy.

8          THE COURT:  Right.  It is evidentiary.

9          MR. PIROZZOLO:  It certainly is.  It's evidence of the

10   conspiracy, but if you are asking for what are the five --

11         THE COURT:  I am trying to identify within the

12   contemplation of the conspirators five pieces of

13   identification.

14         MR. PIROZZOLO:  Correct.

15         And then the Government would also be able to prove

16   that on more than one occasion Ms. Greig would obtain for

17   Mr. Bulger prescription medication from a pharmacy claiming to

18   be Mr. Bulger's wife.  She would, in fact, sign the false alias

19   for Mr. Bulger "JWL" to pick up medication at the pharmacy in

20   Santa Monica.  In fact, the Government would be able to prove,

21   and Ms. Greig agrees, that there is video surveillance of her

22   going into a Santa Monica pharmacy and signing Mr. Bulger's --

23   where she signed Mr. Bulger's alias identity while picking up

24   prescription medication.

25         The Government would also be able to prove that

1    Ms. Greig obtained cash to pay for groceries, medication,

2    medical services, rent, utilities and other personal and

3    household expenses for Mr. Bulger, and at the time they left

4    Boston they were not employed from 1995 through June 22nd,

5    2011.

6              In the document, in the Statement of Facts, although

7    this is not necessary for the purposes of the -- the Government

8    would submit it's not necessary for purposes of accepting the

9    plea -- Ms. Greig admits that the only source of funds during

10   that time was the cash Mr. Bulger provided to her, and she also

11   states that she didn't use the names "PM" or "NS" or any of the

12   other named identities to defraud anyone.  That is also further

13   stated in the Statement of Facts although not, in the

14   Government's view, material to the acceptance of the plea.

15             That's in the Statement of Facts with respect to

16   Counts One, Two and Three of the superseding information, and

17   the Government submits is a sufficient factual basis to accept.

18             THE COURT:  So, Ms. Greig, two things.  One, there is

19   attached to the Plea Agreement this statement that you signed.

20             THE DEFENDANT:  Yes.

21             THE COURT:  Is that true?

22             THE DEFENDANT:  Yes, your Honor.

23             THE COURT:  And did you hear anything that

24   Mr. Pirozzolo said that you disagree with?

25             THE DEFENDANT:  No, your Honor.

1          THE COURT:  That is what happened?

2          THE DEFENDANT:  That's what happened.

3          THE COURT:  I am prepared to accept the plea to the

4  information, including an information waiving venue in this

5  jurisdiction.

6          I gather, Mr. Reddington, do you have the document?

7  Have you passed up the documents?

8          MR. REDDINGTON:  Your Honor, we have actually two of

9  them, one for the Government, one for you, and I believe

10  Mr. Pirozzolo has both the waiver of the indictment and the

11  waiver of venue.

12          THE COURT:  All right.

13          (Documents provided to the Court Atty. Reddington)

14          THE COURT:  Based on the discussion we have had this

15  afternoon, I am satisfied that the decision to waive the

16  indictment and waive venue in the Central District of

17  California for Counts Two and Three is a knowing and voluntary

18  act on behalf of Ms. Greig, and I am going to allow those

19  waivers by signing them at this point.

20          Now, I started before we went through the discussion

21  by indicating some concerns about the application of the Crime

22  Victims' Rights Act under these circumstances, but I also

23  indicated that I would hear any person identified as a victim

24  who wishes to be heard before I act on the question of the plea

25  or acceptance of the plea.

1        Mr. Pirozzolo, you said there was an individual who

2   wanted to speak.

3        MR. PIROZZOLO:  Yes, your Honor.  Mr. Steven Davis.

4        THE COURT:  If you could use the podium there.

5        MR. DAVIS:  I can't come up to you?

6        THE COURT:  Right.

7        MR. DAVIS:  I am speaking on behalf of my family.

8        THE COURT:  Sir, if you could identify yourself for

9   the record.

10        MR. DAVIS:  My name is Steve Davis.  My sister was

11   Debra Davis.

12        I'm just speaking on behalf of my family and some of

13   the others, the Donahues, that you have to consider this woman,

14   she is not what she appears to be.  She's a monster under all

15   that skin of hers.  That she kept the Government and all these

16   families 16 years out of the 30 years they've been looking for

17   this guy, we could have resolved this 16 years ago, and she

18   kept him in hiding for all that time.  And I just wish, looking

19   at her, that she could have some kind of feeling on her

20   family's suicide, her crying after all these years, to figure

21   what we went through after 31 years.  And my mother isn't alive

22   today to see this.

23        I just want everyone to know that and look at this

24   when it comes time for sentencing this woman.  She doesn't

25   deserve a break in my heart or any one of the victims'

1    families'.  Thank you.

2          THE COURT:  Thank you, Mr. Davis.

3          As I indicated, there are two separate questions here.

4    First, the question of concerns by individuals arising out of

5    all of the transactions, and they are, of course,

6    understandable.

7          There is a second issue, and that is the legal issue,

8    the application of the Crime Victims' Rights Act, and I have

9    indicated that I wanted the Government, anyway, to submit

10   something 30 days from today concerning this application.

11         Of course, Mr. Reddington, you are free to do so.

12         Mr. Davis or any of the victims are free to do so as

13   well.

14         I will make a determination about the application of

15   the Act, but my view is I am going to, as I indicated earlier,

16   even if it is not authorized by the Act itself, in light of the

17   established record in the case and also my own view of the

18   exercise of discretion, hear statements of victims at the time

19   of sentencing as well.  But I am going to rule on the question

20   of whether I am doing it as a matter of discretion or as a

21   matter of a legal obligation, because the statute I think has

22   not fully been construed, and I think it is important to have

23   some constructions that perhaps will indicate the actual

24   boundaries of the statute.

25         So, based on the discussion we have had here, I am

1    prepared to accept the change in plea on behalf of Ms. Greig to

2    Count One and a plea as to Counts Two and Three.

3            I take it, Mr. Reddington, because this is an initial

4    appearance for purposes of the information, that there is no

5    need to read the --

6            MR. REDDINGTON:  No.  We waive that, your Honor, yes.

7            THE COURT:  So, Mr. Lovett will inquire of Ms. Greig.

8            THE CLERK:  Catherine Greig, on Criminal No. 11-10286,

9    Count One of the Superseding Information charges you with

10   Conspiracy to Harbor a Fugitive in violation of Title 18 United

11   States Code 371; Count Two of the Superseding Information

12   charges you with Conspiracy to Commit Identity Fraud in

13   violation of Title 18 United States Code 1028(f); Count Three

14   of the Superseding Information charges you with Identity Fraud

15   in violation of Title 18 United States Code 1028(a)(7).

16           What say you as to Counts One through Three, guilty or

17   not guilty?

18           THE DEFENDANT:  Guilty.

19           THE COURT:  You may be seated.

20           Mr. Pirozzolo, do you know of any reason I should not

21   accept the plea?

22           MR. PIROZZOLO:  No, your Honor.

23           THE COURT:  Mr. Reddington?

24           MR. REDDINGTON:  No, your Honor.

25           THE COURT:  All right.  Based on the discussion we

1   have had, I am satisfied that the decision of Ms. Greig to

2   plead guilty to the Superseding Information is a knowing and a

3   voluntary act and is supported by substantial evidence from

4   which a finder of fact could find you guilty of the three

5   charges alleged there.  You are now adjudged guilty of those

6   offenses.

7          The next formal event in this court will be

8   sentencing, and sentencing will take place on June 7th.

9          (The Court conferring with the Clerk off the record)

10         THE COURT:  On the 7th I am going to have to be at a

11  Judicial Conference meeting, so I am going to put it over to

12  June 12th at 2:30.

13         Now, what is going to happen, Ms. Greig, is that the

14  Probation Office of the Court will prepare a Presentence

15  Report.  Both you and Mr. Reddington will have a chance to work

16  with them.  It is very much in your best interest but also an

17  obligation that you have.  You should answer all the questions

18  that they have that they think I would like to know the answers

19  to, and you can bring to their attention information you think

20  that I should know.

21         You will get a chance to see the Presentence Report in

22  its draft form.  If you are not satisfied with the draft, you

23  can ask the Probation Office to make changes or corrections.

24  If they do not make the changes or corrections to your

25  satisfaction, you can bring the matter up to me at the time of

1    sentencing, and at the time of sentencing both you and

2    Mr. Reddington will have an opportunity to address me in open

3    court about the factors that I should have in mind before I

4    actually pronounce sentence.

5         Now, there are two outstanding matters here that were

6    unaddressed.  One is the question of bail.  I assume that that

7    is not being pressed any further here.

8         MR. REDDINGTON:  No.  That's correct, your Honor.

9         THE COURT:  The second was the question of exclusion

10   for purposes of the Speedy Trial Act, and I will exclude

11   through today, and, of course, as a consequence of the

12   sentencing the Speedy Trial Act clock has ended here.

13        Is there anything else that we need to take up this

14   afternoon?

15        MR. REDDINGTON:  No.

16        MR. PIROZZOLO:  No, your Honor.

17        THE COURT:  All right.  We will be in recess, then.

18   Thank you.

19        THE CLERK:  All rise.

20      (The Honorable Court exited the courtroom at 3:40 p.m.)

21       (WHEREUPON, the proceedings adjourned at 3:40 p.m.)

22

23

24

25

1                        C E R T I F I C A T E

2

3

4           I, Brenda K. Hancock, RMR, CRR and Official Reporter

5     of the United States District Court, do hereby certify that the

6     foregoing transcript constitutes, to the best of my skill and

7     ability, a true and accurate transcription of my stenotype

8     notes taken in the matter of *United States v. Catherine Greig*,

9     No. 1:11-cr-10286-DPW.

10

11

12

13

14

15     Date: September 4, 2012          /s/ *Brenda K. Hancock*

16                                      Brenda K. Hancock, RMR, CRR

17                                      Official Court Reporter

18

19

20

21

22

23

24

25