1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4     UNITED STATES OF AMERICA          )
                                        )
5                                       )
                                        )
6     vs.                               )  No. 1:11-cr-10286-DPW
                                        )
7                                       )
      CATHERINE E. GREIG,               )
8                                       )
                      Defendant.        )
9


10

      BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK
11

12

                            SENTENCING HEARING
13

14

15

          John Joseph Moakley United States Courthouse
16                      Courtroom No. 1
                        One Courthouse Way
17                      Boston, MA 02210
                     Tuesday, June 12, 2012
18                        9:30 a.m.

19

20

21            Brenda K. Hancock, RMR, CRR
                   Official Court Reporter
22       John Joseph Moakley United States Courthouse
                      One Courthouse Way
23                    Boston, MA 02210
                        (617)439-3214
24

25

1    APPEARANCES:

2        UNITED STATES ATTORNEY'S OFFICE
         By:  AUSA Jack Pirozzolo
3             AUSA James D. Herbert
              AUSA Mary B. Murrane
4        1 Courthouse Way, Suite 9200
         Boston, MA 02210
5        On behalf of the United States of America.

6        LAW OFFICES OF KEVIN J. REDDINGTON
         By:  Kevin J. Reddington, Esq.
7        1342 Belmont Street, Suite 203
         Brockton, MA 02301
8
                  - and -
9
         THE LAW OFFICE OF JEFFREY K. CLIFFORD
10       By:  Jeffrey K. Clifford, Esq.
         21 Mayer Thomas J. McGrath Highway
11       Suite 501
         Quincy, MA 02169
12       On behalf of the Defendant.

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2    before the Honorable Douglas P. Woodlock, United States

3    District Judge, United States District Court, District of

4    Massachusetts, at the John J. Moakley United States Courthouse,

5    One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6    Tuesday, June 12, 2012):

7          THE CLERK:  All rise.

8      (The Honorable Court entered the courtroom at 9:30 a.m.)

9          THE CLERK:  This is Criminal Action 11-10286, United

10   States versus Catherine Greig.

11         THE COURT:  Well, I think we have to do some

12   housekeeping at the outset to clarify exactly what is before me

13   and how.

14         Let me start, first, with the Preliminary Order of

15   Forfeiture here, which, pursuant to the Plea Agreement, has

16   Ms. Greig giving up her property rights including her rights to

17   intellectual property or publication rights.  Those are

18   assigned to the United States.  She is giving up everything

19   that was seized during the course of the investigation, and she

20   is giving up any property that might have been hers at the

21   apartment in Santa Monica.

22         Unless there is an objection, Mr. Reddington, I am

23   going to sign that.

24         MR. REDDINGTON:  No problem, your Honor.  Thank you.

25         THE COURT:  So, I will allow the motion, which is

1    No. 105, for the forfeiture of the property.

2         Now, there are a series of submissions that have been

3    made under seal here, and I think it is important to establish

4    a protocol; in fact, a protocol has been established by the

5    Government.

6         But I have, for example, the Government's Motion

7    No. 108, which requests sealing of the Government's unredacted

8    Sentencing Memorandum and the three volumes of supporting

9    materials here.  The Government did submit a redacted version

10   of the Sentencing Memorandum, which seems to me to be the

11   appropriate way of dealing with that, but I want to have a

12   redacted version of all three of the volumes as well, using the

13   same basic understanding, that is, not identifying addresses

14   and identities of persons who would not otherwise be

15   identified, and if there are issues that arise as a result of

16   investigations, of course that could be done.  But I would like

17   to have that done by noon on Friday.

18        MR. PIROZZOLO:  We can do that, your Honor.

19        THE COURT:  So, I am allowing the Government's Motion

20   No. 108 to seal in accordance with this instruction, that is,

21   that there has to be filed redacted versions of the materials

22   that are sought to be sealed.

23        The Government has filed a Motion for Protective Order

24   to permit nondisclosure regarding an informant whose activities

25   may bear upon the conduct that is subject to consideration in

1    sentencing.  That is No. 103.  I cannot rule on that until I

2    have had an opportunity to hear exactly what the Government's

3    arguments are; it depends on the Government's arguments.  So, I

4    am reserving that.

5            And then there is 114, which seeks the sealing of a

6    letter from an individual who I will identify as "PM."  It is

7    the letter of May 16th, 2012.  I will allow that, but it has to

8    be redacted.  A redacted version of it has to be filed, again,

9    by noon on Friday.

10           Now, in addition, there are a number of submissions

11   through the Probation Office, and these sometimes do not make

12   it onto the record, so I want to be clear that they are on the

13   record.

14           There is attached to the Presentence Report the

15   statement of Paul C. McGonagle and his family, a letter from

16   Thomas Angeli.  I do not see a reason for them to be sealed

17   and, as a consequence, I am going to direct the Clerk to file

18   them and docket them.  That is the way in which I ordinarily

19   deal with anything that is submitted directly to me in

20   Chambers, and that is what I did with the letter from Maureen

21   England, that is, it gets docketed and provided to Probation so

22   that the parties can see it.

23           But, in any event, with respect to those statements of

24   Mr. McGonagle and Mr. Angeli, those will be filed, and I do not

25   see anything there that requires redaction.

1          There is a letter from Margaret McCusker that

2    Mr. Reddington submitted under seal.  Again, I do not see a

3    reason for it to be under seal, Mr. Reddington.  Is there

4    anything else?

5          MR. REDDINGTON:  No, your Honor.

6          THE COURT:  So, that will be filed by the Clerk as

7    well and docketed in its regular form.

8          Now, I have some materials from Ms. Griffin, the

9    Victim Witness Specialist in the U.S. Attorney's Office, that

10   have been submitted to me.  They have not seemed to make their

11   way onto the docket.  I think they should.

12         One is the Victim Impact Statement that Steven Davis

13   made, and the second is an e-mail of yesterday to Mr. Pirozzolo

14   from Ms. Griffin regarding the individuals who are identified

15   as NS and PM.  Again, I think that e-mail can be redacted and

16   filed on the docket, and I will ask the Government to do that.

17         I have the submissions under the Crime Victims' Rights

18   Act, and in connection with that I have a notice from

19   Ms. Griffin that four persons, who I will identify

20   alphabetically, have requested to speak during the course of

21   the sentencing.  Those are Timothy Connors, Steven Davis,

22   Patricia Donahue and Paul McGonagle, and I will give notice

23   that I am going to permit them to speak.  I will explain at a

24   later point that I do not believe that that permission is

25   required by the Crime Victims' Rights Act, but there are very

1    specific reasons in this case that it seems to me that they

2    should be afforded that opportunity in this proceeding.

3         Now, in addition, I have the Government's submission

4    indicating that it is seeking an evidentiary hearing, and I

5    guess I want to understand what the dimensions of that are,

6    Mr. Pirozzolo.

7         MR. PIROZZOLO:  Thank you, your Honor.  Well, this is

8    going to be largely driven by any questions that the Court

9    thinks need to be answered by live testimony from agents.

10        THE COURT:  Well, we have had this in connection with

11   the bail hearing.  This is not a "Mother, may I?" kind of

12   circumstance.  The Government adduces whatever evidence it

13   thinks is important, and I will rule on the evidence.  My

14   intention is to identify those areas of dispute under the

15   *Guidelines* and rule on what legal issues I can, and then if the

16   parties have something more they want to offer or the rulings

17   indicate that there is a factual dispute that the parties want

18   to develop, I will do that.

19        Under present circumstances what do you anticipate?

20        MR. PIROZZOLO:  There are three principal areas of

21   dispute, your Honor.  The first and most significant is the

22   defendant's persistent claim that she did not know about either

23   the cash or the firearms that were in the apartment.

24        THE COURT:  For purposes of sentencing, what

25   difference does the cash part make?

1          MR. PIROZZOLO:  Well, it is relevant to the 3553(a)

2     factors.

3          THE COURT:  In a general sort of way, but it is not

4     relevant to any Guidelines issue.

5          MR. PIROZZOLO:  The existence of the cash in and of

6     itself does not bear on a specific guidelines issue, that's

7     correct.  It does -- in a general sense, as you have

8     identified, it is relevant potentially to considering the

9     degree to which the defendant is accepting responsibility for

10    the conduct.

11         THE COURT:  Is the Government on the basis of anything

12    it has seen so far withdrawing its view that the defendant is

13    entitled to three points?

14         MR. PIROZZOLO:  Not yet, your Honor, but I think a lot

15    is going to depend on what happens at the evidentiary hearing.

16         THE COURT:  Well, what does "yet" mean?  Does it mean

17    that the defendant testifies and then you decide whether or not

18    she has been forthcoming?

19         MR. PIROZZOLO:  Yes, your Honor.

20         And then the second area of dispute is the evidence of

21    the defendant's knowledge of Mr. Bulger's underlying offenses.

22    We believe that the PSR made that clear, but in yesterday's

23    Sentencing Memorandum there is a statement that's claiming she

24    did not know the degree of the underlying offenses, the type of

25    underlying offenses that he was faced with.  We think the PSR

1   answers that, your Honor.

2          However, to the extent that there is still contest

3   over that, we intend to put in evidence, mostly evidence found

4   in the search that shows that she knew what was --

5          THE COURT:  Is it anything beyond what I have in the

6   three binders, though?

7          MR. PIROZZOLO:  No, no.  It's in the documents that we

8   submitted.

9          And then the third area of dispute is a factual

10  dispute, is the degree to which the defendant was involved in

11  procuring identification documents from various individuals in

12  Santa Monica.  In connection with the PSR and elsewhere the

13  defendant has taken a position that she had no role in

14  obtaining those documents.  Through an agent, through

15  interviews of various individuals, the evidence contradicts

16  that assertion at least in a couple of respects.

17         The submissions that we have provided in the binders

18  are, we believe, sufficient for that purpose.  However, to the

19  extent that Mr. Reddington wants to cross-examine an agent who

20  actually interviewed some of these people, we have an agent who

21  is available to testify.

22         THE COURT:  All right.

23         MR. PIROZZOLO:  We also separately submitted an

24  affidavit that is relevant to a variety of these issues that

25  details --

1          THE COURT:  Again, in Volume I, I guess.

2          MR. PIROZZOLO:  Correct.  And also to the extent that

3     Mr. Reddington were to inquire of that agent, he is available

4     to testify on cross-examination as to the contents of that

5     affidavit.

6          THE COURT:  Well, I think the most expeditious way,

7     then, to deal with this is for me to at least give an

8     indication of the legal issues that will generate my view with

9     respect to the objections of the Government and let the parties

10    respond as they see fit as to whether or not additional

11    information is necessary.

12          Of course, the *Advisory Guidelines* are advisory, they

13    are not mandatory, but you have to start there.  So, the

14    parties, I guess, have laid out their respective positions.

15    The Probation Office says that the guideline here for purposes

16    of the Total Offense Level is 18, which generates a range of 27

17    to 33 months in prison, and the defendant indicates that she is

18    seeking a sentence at 27, which is within the *Guidelines* at the

19    low end.

20          The Government has filed some very extensive

21    objections, and it provides an alternative Total Offense Level

22    of 31, as a consequence of which the guideline would be 108 to

23    135 months in prison.  The Government recommends 120 months,

24    which is roughly in the midrange of that.

25          At least as far as I can see, in looking through the

1    materials that have been submitted by the parties, there are

2    five guideline issues, and I want to pause to ensure that in

3    the course of the housekeeping that I did I have identified

4    every piece of written material that the parties have submitted

5    here, I have not missed anything in this.

6            Are there any other materials, written materials, that

7    any of the parties have?

8            MR. REDDINGTON:  No, your Honor, not for the defense.

9            MR. PIROZZOLO:  There is one that is referenced in the

10   Sentencing Memorandum that is a docketed entry that's relevant

11   to the obstruction of justice.

12           THE COURT:  This is the Statement of Facts by the

13   defendant?

14           MR. PIROZZOLO:  Well, there is the Statement of Facts

15   which is attached to the PSR, of course, but also in connection

16   with the bail hearing there was a submission that the

17   Government made in connection with detention.  It's referenced

18   in the Sentencing Memorandum, but to the extent the statements

19   in that document are relevant --

20           THE COURT:  Right.  They are on the docket.  But is

21   there anything else that I have not identified that may not be

22   on the docket?

23           MR. PIROZZOLO:  The only other thing is within the

24   materials there is a disc, a variety of discs that include

25   various photos.  Not all the photos that are particularly

1   relevant to the argument were separately blown up and copied,

2   and we have those as well.  They are in the file --

3          THE COURT:  Right.

4          MR. PIROZZOLO:  -- but not necessarily highlighted.

5          THE COURT:  So, let me turn to what I think are the

6   objections.  I have gone through the objections in the

7   Presentence Report and I have tried to cull them by topic.

8   Some of the objections had to do with where things were located

9   in the Presentence Report and that sort of thing.  I do not

10  think that is particularly relevant.

11         The five issues, as far as I see it, are the Base

12  Offense Level, that is, are we dealing here with more than mere

13  harboring, as the case law uses it; second, whether or not we

14  have vulnerable victims in the persons whose identities were

15  taken in an exchange of some sort; the third is whether or not

16  there was obstruction of justice that is attributable to the

17  defendant; the fourth is whether or not what was involved here

18  was what we will call "sophisticated means" and involved,

19  perhaps, relocation; and the fifth is the firearms, what, if

20  any, significance, for purposes of the guideline evaluation, is

21  to be attached to the large number of firearms found in the

22  apartment after the defendant and Mr. Bulger were taken into

23  custody.

24         Are there any other broad topics that seem to be at

25  issue here?

1           MR. PIROZZOLO:  As to the *Guidelines*, no.

2           THE COURT:  Well, let me deal, then, one by one.  With

3    respect to the Base Offense Level, I am going to sustain the

4    Government's objection.  This is more than mere harboring.  It

5    is sufficient, I think, for the Government to rely on the fact

6    that there was in connection with harboring here or the

7    conspiracy to harbor aggravated identity theft or fraud,

8    whatever shorthand you use for this statute, that the defendant

9    has indicated by her plea to Count Three she engaged in.

10          The guideline has the effect of starting with what we

11   call "mere harboring," which is providing shelter, I suppose,

12   to a defendant, and that it sets at Level 20, but it takes that

13   cap off and goes to Level 30 if there is something more, and

14   the "something more" here -- although at the margins it would

15   be a litigable issue I think -- is clearly evident; that is,

16   the defendant was involved in more than simply providing a

17   shelter for Mr. Bulger.  She provided a variety of things but,

18   more specifically, engaged in criminal activity, and so for

19   that reason the Base Offense Level is going to go up to 30.

20          I turn to the question of vulnerable victims, and this

21   is a little bit more difficult, I think.  It may involve some

22   factual dispute.  The Government takes the position, as I

23   understand it, that people whose identity papers are purchased

24   with some sort of consideration can, nevertheless, be victims.

25          The Probation Office took the position that "victim"

1    probably should be defined for purposes of the *Guidelines* under

2    the Crime Victims' Act.  I do not believe that is the case.

3          But we are dealing here with a question of whether or

4    not we have an unusually impaired victim or person in the

5    language of the *Guidelines*, and that means an impaired capacity

6    to detect or prevent crime.

7          The factual issue, as I see it, is this:  It appears

8    from the evidence that a number of the people, and it really

9    only requires one, but a number of the people whose identities

10   were possessed by Ms. Greig had problems with alcoholism, or

11   drugs, or they were homeless or they had mental disturbances.

12         But I think that is not enough.  It seems to me the

13   Government has to demonstrate that these were not people who

14   were capable of making the exchange, that is to say, "It is

15   worth it to me to take $200 for my identity."  I have in mind

16   that at least one of the individuals in a document that will be

17   redacted but put on the record indicates nothing bad happened

18   to her as a result of the identity being taken from her or

19   giving the identity to Mr. Bulger and Ms. Greig.

20         So, as a matter of law it seems to me that, in order

21   to establish that there were vulnerable victims, I have to have

22   evidence of an impaired capacity to detect and prevent crime,

23   which I will define as lacking the capacity to make the

24   exchange because they simply did not know what they were doing

25   here.  In looking at the materials, I do not see that.

1          Mr. Pirozzolo, do you want to address that?

2          MR. PIROZZOLO:  Yes, your Honor.

3          Within the materials -- well, let me start more

4     broadly.

5          The premise, as I understand from the Court's point of

6     view, is whether they had an ability to engage in the exchange.

7          THE COURT:  I think the way it goes for me is, putting

8     to one side mental or emotional or substance abuse problems,

9     people are free actors, they make their own choices, and so

10    someone who sells an identity to someone else is not easily

11    described as a victim, although I see loose language in some of

12    the cases that suggests otherwise.  They are accomplices.

13         Now, in order to be a vulnerable victim, from my

14    perspective here -- you can argue to the contrary if you

15    want -- is that you have to show these are people who did not

16    know what they were doing or were the subject of duress or such

17    overbearing as would result in a court, for instance, creating

18    recision of the transaction.

19         MR. PIROZZOLO:  Well, I think the evidence shows that,

20    whether it is duress or overbearing, what Mr. Bulger and

21    Ms. Greig did was to target people whose ability to understand

22    and perceive and resist the temptation of $200, $250, to turn

23    over their IDs was so compromised by their dependence on

24    alcohol or substance abuse, or in the case of PM mental

25    illness, that they were exploiting that weakness that they had

1    such that they weren't really, truly free agents.

2           THE COURT:  Well, I will focus it more specifically,

3    because I understand the general argument.  Apart from it being

4    against public policy, if I represented by this as an argument

5    about rescinding a contract this person received $200 to

6    provide certain documents, would I be required on this record

7    to rescind that, and, again, putting to one side the question

8    of public policy, which is a different issue?

9           MR. PIROZZOLO:  Well, as to the public policy issue, I

10   think that is the issue.

11          THE COURT:  It may be, but it does not directly

12   address the question of how the guideline applies.  It may,

13   again, as many things are, be applicable for purposes of 3553.

14   The question here is how I do the arithmetic that the

15   *Guidelines* generate.  So, I have got a *Guideline* provision, it

16   talks of "vulnerable victims," and it means unusually

17   vulnerable victims who have such an impaired capacity that they

18   could not detect or prevent a crime, and do I not find that, at

19   least now, in any of the materials with respect to these

20   people.  At the risk of using too glib a statement, these are

21   just poor souls who are prepared to sell things that other

22   people would probably hold dear for relatively modest amounts,

23   but that does not necessarily mean that they are unusually

24   vulnerable in the language of the guideline.

25          MR. PIROZZOLO:  Well, in the context of the vulnerable

1    victim guideline, I think there are a couple of concepts that,

2    by analogy, I think would apply here.  The first is -- I start

3    with the proposition that if Mr. Bulger and Ms. Greig had

4    approached someone who had, for instance, a Down Syndrome or

5    some form of physical or mental impairment, I do not think that

6    there would be much argument that even though under those

7    circumstances somebody with that kind of impairment was turning

8    over -- was tricked into turning over an ID in order to get

9    money.  There would be no question that that would be someone

10   who would be considered vulnerable.

11         THE COURT:  I agree with that.  Basically, it is

12   *petitio principii.*  You have stated the principle; that is,

13   someone lacking capacity does not have the capacity to engage

14   in the exchange.  The question is whether or not *these* people

15   fall in that category.

16         MR. PIROZZOLO:  Well, in the case of NS, for example,

17   I think if you looked at the video it's evident that she is --

18   it's an issue of degree.  It's clearly an issue of degree.

19         THE COURT:  I interrupt you, and you will clarify for

20   me, but that is a video at a later date, right?  When did the

21   exchange take place?

22         MR. PIROZZOLO:  On the record it's not clear, it's

23   unknown, in part because, as the evidence shows, she was in a

24   very serious accident.

25         THE COURT:  Right.  After the transaction, right?

1          MR. PIROZZOLO:  I don't know that the record is clear

2     whether it's before or after.

3          THE COURT:  Well, what I guess I am getting to is,

4     yes, I have looked at the video, and yes I would have some

5     questions about the capacity of that person, the person I see

6     on the video making that exchange.  But I am not sure that the

7     person I saw on the video is the person who made the exchange

8     because of the passage of time.

9          MR. PIROZZOLO:  Well, if that is not enough, I will

10    turn to PM.  You can see the letter that was submitted by her

11    that was submitted under seal yesterday.

12         THE COURT:  The letter of May 16th, 2012, after she

13    came back to Massachusetts and was subject to control by state

14    authorities.

15         Again, we have homeless people, people with mental

16    issues, all of that.  The question is whether or not at the

17    time one would say they did not have the capacity to make an

18    exchange and what the evidence is of that.  Now, maybe

19    California is more willing to let people be deinstitutionalized

20    than elsewhere, although I think that is a problem throughout

21    the country, but I am focusing specifically on the question of

22    at the time that the exchange took place could I say that the

23    Government has satisfied me it is more likely than not that

24    these people could not -- any contracts that they made could

25    not be upheld.

1          MR. PIROZZOLO:  Well, again, I guess I am really not

2     getting very far with the Court, I do not think.

3          THE COURT:  Well, there is a famous line from Justice

4     Holmes during a conference saying to one of his colleagues,

5     "This will not wash," and the colleague saying, "Well, let me

6     keep scrubbing."

7          So, if you want to keep scrubbing you can, if there is

8     more laundry that you can use.

9                         (Laughter)

10         MR. PIROZZOLO:  Well, I will point out some additional

11    pieces of laundry.

12         It is evident that with JWL that Mr. Bulger knew of

13    his alcohol abuse, and I think actually it is more probable

14    than not, and of course I am not the one making the findings

15    here, but on this record when you see the pattern of conduct,

16    you start with DG and then the various IDs of the various

17    individuals, you see a pattern here.

18         THE COURT:  Again, I do not disagree with that.

19    Again, though, I interrupt because I want to focus on

20    Ms. Greig, not on Mr. Bulger and *his* transactions with

21    particular individuals.

22         I understand your argument with respect to conspiracy

23    I think here, but at least for specific purposes of this

24    guideline and a couple of other guidelines, I would like to see

25    things that deal specifically with Ms. Greig.

1          MR. PIROZZOLO:  So, circling back to NS.  With respect

2     to the ones we have evidence of her present, NS, PM and ST, as

3     to NS, if you look at her video and the 302 that was supplied,

4     she actually has no recollection at all of any exchange, and

5     that in and of itself suggests an impairment that made it such

6     that she did not understand or does not recall how it was that

7     her identification information came into Ms. Greig's

8     possession.  So, that is as to NS, which is an additional fact

9     that is relevant to her own mental impairment that would

10     support the inference that she is a vulnerable victim.

11          As to PM, understand that the image that we see by the

12     302 is that there is this woman who is walking down Venice

13     Beach tugging a suitcase with a wheel off, and she is

14     approached by Ms. Greig and Mr. Bulger.  They specifically

15     targeted her and spoke to her for 45 minutes, were able to buy

16     her a piece of luggage.  Under those circumstances Ms. Greig

17     must have known that this person was impaired in some way.

18     Now, if the issue is whether or not as a matter of contract law

19     that contract would be rescinded, setting aside public policy,

20     which I think is a major issue here with respect to even the

21     application of this guideline --

22          THE COURT:  Well, then, everybody is a vulnerable

23     victim.  Anytime someone sells their identity they become a

24     vulnerable victim under this statute if your theory is that

25     public policy bars it, so, consequently, we have to rescind all

1   of those contracts, and that is why I take it off the table,

2   because I do not think that is the law.

3         MR. PIROZZOLO:  I don't think the Government's

4   position goes that far.  Somebody who is in full control of

5   their faculties, who decides, yes, I am going to sell my

6   driver's license, that would not be a vulnerable victim, and

7   that is not the Government's position.  But where you have

8   people who --

9         THE COURT:  But that would be against public policy.

10  That is why I take public policy off the table for these

11  purposes.  Of course, we are talking about the literal language

12  of the *Guidelines*, which captures some things and do not

13  capture other things.

14        MR. PIROZZOLO:  And then as to ST -- although it is in

15  the record, your Honor, I am not sure that I am going to be

16  able to articulate anything that is not in the various 302s.

17        THE COURT:  This is the opportunity to focus me on

18  things that you think are going to be compelling on this.

19        MR. PIROZZOLO:  Again, with respect to ST, it is

20  evident that what he described was he was again targeted by

21  both Mr. Bulger and Ms. Greig at the time.  They were sitting

22  on a park bench.  He was walking past them while they sat on a

23  park bench in Santa Monica, and they asked him about turning

24  over the ID, and at the time you will see from the 302 that it

25  was clear to them that he was doing that because they asked him

1   specifically about drunk-driving convictions.  He told them

2   after he sold the ID that he was going to go get a drink.  I

3   start with the proposition that someone compromised by alcohol,

4   someone compromised by drug abuse is somehow compromised or

5   impaired in some way.

6           Now, it's the Government's position that with respect

7   to that, ST, which she clearly knew, she clearly knew based on

8   that 302 that he had been impaired by alcohol.

9           PM, I don't know that the record is quite clear as to

10  precisely the degree of the mental illness she was aware of,

11  but it was evidently quite a sight sufficient that they

12  approached her and for the purchase of a suitcase were able to

13  persuade her to turn over her ID.

14          And then NS, I think based on the submissions

15  obviously she is impaired and she had been, by the way -- the

16  record shows that she had been an alcoholic for years and years

17  and years and years before any time, before any conceivable

18  time that they had approached her or somehow had obtained that

19  identifying information.

20          So, with respect to the alcohol and mental illness

21  they were compromised in some way, and they knew that they were

22  compromised in order to approach them to obtain those IDs.  I

23  can say it no more clearly than that.

24          THE COURT:  I do not disagree with the

25  characterization, but I am dealing with a specific guideline

1    that has specific language to it, and we are talking about

2    unusually vulnerable, meaning people who have an impaired

3    capacity to detect and prevent crime.  While it is close for

4    purposes of the guideline calculation, I am going to overrule

5    the Government's objection as to this one, because I do not

6    think that it has been made out in the context of the

7    *Guidelines* themselves.

8         Now, that having been said, that does not make it

9    irrelevant to calculation of the proper sentence, but it does

10   make it not material for the guideline calculation.

11        So, then I turn to Obstruction of Justice, and you

12   alluded to it, and I think it is important to deal with the

13   issue of vicarious responsibility in sentencing.

14        The law of sentencing is not quite the same as the

15   substantive law in the sense that there are several different

16   levels of vicarious responsibility:  conspiracy, aider and

17   abettor and Pinkerton liability.  But for sentencing the

18   touchstone is reasonable foreseeability, and that, it seems to

19   me, changes the calculation a bit.  If you disagree with it, of

20   course I would like to hear that.

21        I am sad to relate that I dealt with this now 20 years

22   ago in a case before the First Circuit when I was sitting by

23   designation called United States versus O'Campo and had to

24   tease out those kinds of distinctions.  But the distinction is

25   basically this:  Is it reasonably foreseeable?  Because the

1    sentencing issue is one of personal responsibility.  There can

2    be vicarious relations, but it is not the same as conspiracy

3    where a conspirator who enters into a conspiracy is chargeable,

4    for purposes of the conspiracy is chargeable with all the acts

5    of the conspirators even before they enter into the conspiracy.

6    In the Pinkerton setting, even if it was not reasonably

7    foreseeable that somebody was going to do something who was a

8    co-conspirator, you are nevertheless chargeable with it.

9         But that is different in sentencing, and so, as I see

10   the obstruction of justice issue, it is twofold.  One is that

11   co-conspirators engaged in and were convicted of perjury and

12   Obstruction of Justice, Ms. McCusker, for example, and I guess

13   I have to find that that perjury and obstruction of justice, as

14   they were charged and convicted, was something that was

15   reasonably foreseeable to Ms. Greig.

16        The second is a series of acts that are said to be

17   false statements, I guess, although I think the measure that I

18   would take of it is could they fairly be prosecuted as perjury

19   to ensure that there is a certain rigor to evaluation of

20   whether or not this was truly false in a culpable sort of way.

21        So, with that outline, I guess, Mr. Pirozzolo, you can

22   address the issues.  If you want to expand on the legal

23   framework that I provided, obviously you can do that too.

24        MR. PIROZZOLO:  I am going to defer to Mr. Herbert,

25   who will address the obstruction.

1          MR. HERBERT:  Yes, your Honor.

2          Taking them in order, then, first of all, with the

3    vicarious responsibility, the Court's correct, that under 1B1.3

4    there are two things we would need to show.  One is was the

5    conduct of these other individuals, such as the defendant's

6    sister and her close friend, part of a jointly undertaken

7    criminal activity?  In our argument it is the harboring

8    conspiracy.  And, secondly, was it reasonably foreseeable to

9    the defendant?

10         THE COURT:  In its precise form, I think, that is to

11   say, was there an agreement that they would engage in perjury?

12         MR. HERBERT:  Well, that's framing it more narrowly

13   for sure.

14         THE COURT:  It is.

15         MR. HERBERT:  I don't believe that the Government

16   would need to show that there was a specific agreement that

17   they would commit perjury.  I think it would be enough for the

18   Government to show that it was part of the conspiratorial

19   agreement that individuals trying to hide or conceal the

20   location of Bulger and the defendant would lie to authorities.

21         THE COURT:  Well, let us take it a step further, then.

22   I guess we will get to this in a moment, but is it part of the

23   agreement that those who attempt to take Mr. Bulger into

24   custody would use firearms?

25         MR. HERBERT:  That those who would attempt to arrest

1    him would use firearms?

2         THE COURT:  That Mr. Bulger would use firearms or

3    someone else in the conspiracy, if he were taken into custody

4    or attempted to be taken into custody.

5         Here is the issue, and it is a foreseeability issue in

6    a larger sense, that is, the zone that is foreseeable for

7    particular individuals who are caught up in a conspiracy.

8    Would they, can they be said to say, "I know if my sister ever

9    gets herself into the grand jury she is going to lie," and that

10   is part of the deal, or "I know if something untoward happens"

11   -- we'll get to it with firearms -- "if something untoward

12   happens Mr. Bulger is going to use that firearm on some law

13   enforcement personnel or someone who could otherwise threaten

14   his continued fugitive status"?  And that applies specifically

15   to Ms. Greig, not to Mr. Weeks or others of the

16   co-conspirators, potential co-conspirators in this case.

17        MR. HERBERT:  Yes, your Honor, and I think it has to

18   be obviously viewed in the context of all of the evidence in

19   this very unusual harboring case.  At the time the defendant

20   made the decision to leave Boston and go become a fugitive with

21   Mr. Bulger, she knew already that he was one of the most sought

22   after, one of the most wanted individuals certainly in this

23   area.  She knew that this was an extremely high-profile case.

24   She knew that there would be extraordinary law enforcement

25   efforts made to try to capture him.  She also knew that there

1    would have to be certain steps that would be taken to keep them

2    as fugitives.

3          Magistrate Judge Boal in her detention order found as

4    fact that when the defendant left she took her sister's license

5    with her.  She left to travel the country with Mr. Bulger in an

6    automobile.  You can easily imagine that one purpose of taking

7    her sister's license would be to show that -- this is her twin

8    sister -- would be to show it to any trooper that stops them on

9    the highway.  And that would be a lie to law enforcement in

10   order to conceal her identity.  I think it would also be

11   certainly foreseeable if they were going to --

12         THE COURT:  That is a little bit different from

13   perjury, and that is what Ms. McCusker was charged with here.

14   I am using her as the example, just because the close

15   relationship probably makes it the best case for vicarious

16   responsibility.  Unless the Government argues otherwise, but

17   even if the Government does argue otherwise, I think it is

18   probably not obstruction of justice to use somebody else's

19   license.

20         MR. HERBERT:  I would dispute that, your Honor.  That

21   would be certainly a false statement to a law enforcement

22   officer.  It may not rise to the level of obstruction of

23   justice if there were not an underlying investigation that you

24   were aware of.  So, if you or I were stopped for speeding and

25   we gave someone else's license, that may not be obstruction of

1    justice.  It would be a false statement to law enforcement.

2    And I would note in I believe it's the Restrepo case that we

3    cited this was in the context of the defendant's own lies to

4    Pretrial Services.

5              THE COURT:  Right.

6              MR. HERBERT:  The First Circuit has held that lying to

7    Pretrial Services about your identity after being arrested is

8    enough to qualify for the obstruction of justice enhancement.

9              THE COURT:  That is the second level of this

10   discussion.  I am dealing now just with --

11             MR. HERBERT:  Correct.  But I'm applying that to the

12   Court's question as to whether merely lying to or giving up

13   your sister's license to a state trooper who stops you would be

14   enough to qualify as obstruction of justice; would that be

15   within the conspiratorial agreement that if we are going to

16   remain on the lam we are going to have to lie and be prepared

17   to lie to authorities who would otherwise lead to our

18   apprehension?  We would say in the context of this --

19             THE COURT:  Let me pause on that, just because it was

20   not clear from the papers that you were saying that the

21   obstruction of justice consisted of using her sister's license.

22             MR. HERBERT:  We did not cite that as a particular

23   example.  I am raising that now simply as a way of saying I

24   think that we do not have to show actual perjury, a false

25   statement under oath, in order to qualify for the obstruction

1    enhancement.

2         THE COURT:  I think that is right.  The issue -- and

3    maybe we are going back and forth between the two branches of

4    the argument, but I want to break those branches apart, at

5    least for analytical purposes -- is how does she get charged

6    with the obstruction or perjury of others?  And it has to be

7    fairly closely tied to what she is aware people will do under

8    those circumstances.

9         MR. HERBERT:  Sure.  And I think it is simply drawn

10   from the context of her flight, knowing who Bulger was, how

11   sought after he was, knowing that someone that high profile who

12   intended to disappear for good, which was obviously his

13   intention, would need the help of others, and that network of

14   others back in Boston would have to be prepared to lie to the

15   authorities.  She knew people were going to come looking for

16   them.  The State Police went to visit her the night of Flemmi's

17   arrest.  So, she knew there would be immediate and intensive

18   efforts to find people.

19        THE COURT:  But I look at that, and it is identified

20   in the materials, and she declined -- maybe that is a gentle

21   way of describing her response to those who showed up -- and

22   asked for consent to search.  On the other hand, they did not

23   have a search warrant.

24        MR. HERBERT:  No.

25        THE COURT:  So, people are entitled to make their own

1    judgments about whether or not they are going to cooperate.

2    Non-cooperation is not obstruction.

3          MR. HERBERT:  And I am not arguing that it is, your

4    Honor.  I am not saying *that* was an act of obstruction.  I am

5    saying that was direct personal knowledge by the defendant that

6    there would be immediate aggressive efforts to try to locate

7    Bulger, so that if they were in contact with people back in

8    Boston once they were on the road, such as her sister, such as

9    Kathleen McDonough, such as one or more of Mr. Bulger's

10   brothers, these were people how were going to be asked, "Have

11   you been in contact with Bulger or your sister?"  And they

12   would have to lie in order for Bulger and Greig to remain --

13          THE COURT:  Would they have to?

14          MR. HERBERT:  I am looking at that time from --

15          THE COURT:  We are dealing with real legal issues.  A

16   properly defendant potential witness under these circumstances

17   could decline to testify, requiring the Government to immunize

18   them.  Now, that is a rather sophisticated chain to establish

19   foreseeability by someone whose training is not in the legal

20   field.

21          MR. HERBERT:  That's true, and if she were on the lam

22   on her own, it would be a different story.  She was,

23   nevertheless, a fugitive with Mr. Bulger who had extensive

24   experience with the legal system and would certainly --

25          THE COURT:  See, that is the attribution issue that I

1    guess I am getting to, whether or not he was providing seminars

2    on the effect of the immunization process and other aspects of

3    investigation to Ms. Greig.

4        MR. HERBERT:  Seminars, no, but enough background to

5    say the Government's not going to take "Five" for an answer?

6    Yes, I would say they are going to be asking relatives, they

7    are going to be giving them grand jury subpoenas.  Sure, they

8    can invoke their Fifth Amendment privileges.  The Government's

9    not going to stop with that.

10       But Bulger had sat through a lengthy investigation of

11   his own criminal enterprise that it led to the indictments in

12   that case.

13       THE COURT:  The question is whether he communicated

14   that to Ms. Greig.

15       MR. HERBERT:  It is an inference, but I would submit

16   that it's a very strong inference that he did it.

17       THE COURT:  Now, let us turn to the question of her

18   own direct obstruction as the Government sees it.

19       MR. HERBERT:  Yes, your Honor.

20       THE COURT:  I guess here it is, "When did you get to

21   California?", one of them.  That seems to me to be kind of

22   thin.  "Did you leave the country?"  "No, we went to Mexico

23   from Southern California."  If it had been Ireland that is

24   another matter.  I am not sure that they rise to the level of

25   significance.  Is there something that is truly significant

1    that one could say under the pressures of being interviewed, as

2    I understand the circumstances, immediately after arrest this

3    was an effort, however foolish, to try to mislead?

4         MR. HERBERT:  Yes, your Honor, and I would like to

5    come back to those, but let's start with what I think is the

6    most significant, which is telling Pretrial Services that she

7    doesn't have any assets in her name.  Sure, you can say that

8    was a statement that was made in California under the pressure

9    of the immediate arrest, but it's --

10        THE COURT:  Let me interrupt you by asking a factual

11   question about the assets that the Government says she has.

12   She has the checking account.

13        MR. HERBERT:  Yes.

14        THE COURT:  That is being administered by Ms. McCusker

15   during this entire period?

16        MR. HERBERT:  As of July 9th of 2011, two days before

17   the detention hearing began, when the defendant gave

18   Ms. McCusker a power of attorney.

19        THE COURT:  But the misstatement is to Pretrial

20   Services; is that right?

21        MR. HERBERT:  Originally in California, correct.

22        THE COURT:  Right.  But that is the one you are

23   relying on?

24        MR. HERBERT:  Yes.

25        THE COURT:  What I guess I am trying to get at is what

1    access, if any, did she have, directly or indirectly, to that

2    bank account during the time period that she was absconding

3    with Mr. Bulger?

4            MR. HERBERT:  It was still under her name during the

5    time that she was absconding with Mr. Bulger.

6            THE COURT:  Was there any activity in it?

7            MR. HERBERT:  Not that we are aware of while she was a

8    fugitive.

9            THE COURT:  Now, let me turn to the question of the

10   house, her house or her condominium, the Quincy property.  Who

11   was administering it and how was it being administered?  Were

12   they paying for the taxes, were they paying for other upkeep

13   kinds of things?

14           MR. HERBERT:  Yes.

15           THE COURT:  And who decided whether or not there was a

16   tenant?

17           MR. HERBERT:  The defendant's sister, Ms. McCusker,

18   was in charge of administering that house.  The defendant's

19   close friend, Ms. McDonough, and later Kathleen Arloskus (ph)

20   lived in that house for a period of time and was essentially

21   the person on site that would be responsible for that.

22           THE COURT:  But after she left what was --

23           MR. HERBERT:  It then went to other tenants, other

24   individuals.

25           THE COURT:  Third parties, not affiliates, as far as

1    you know?

2           MR. HERBERT:  Affiliates at least in one case.  I

3    believe there was a relative who was living there for a period

4    of time, and then I believe two third parties.

5           THE COURT:  Now, turning to the South Boston property.

6           MR. HERBERT:  Yes.

7           THE COURT:  During this time period there were certain

8    changes in beneficial ownership, I guess is the best way to

9    describe it.

10          MR. HERBERT:  Yes.

11          THE COURT:  Was there any action on Ms. Greig's part

12   to focus on that, that she was participating in it, agreeing to

13   it, signing a disclaimer, that kind of thing?

14          MR. HERBERT:  Not until after her arrest, at which

15   point, as the Court's aware, she signed over her proportionate

16   interest in it to Ms. McCusker for a dollar.

17          THE COURT:  So, insofar as the assets are concerned,

18   these were assets that were left in Massachusetts, as they had

19   to be, to which she had no access during that time period, as

20   far as you know?

21          MR. HERBERT:  No, I would not agree with that, your

22   Honor.  I would say she had as much access while she was a

23   fugitive to a house that's in her name, a bank account that's

24   in her name.  She could pick up the phone.  She would be taking

25   a risk by doing that, but she could pick up the phone and

1    withdraw the funds from that account.

2            THE COURT:  The question, because this is inference as

3    well, is whether or not she was exercising some kind of control

4    over that or knew that she could continue to exercise control

5    over it.

6            MR. HERBERT:  There is absolutely no reason to

7    conclude that she did not know that she could exercise control

8    over assets in her name that she left behind in Boston in the

9    care of her sister.  She remained in contact with her sister

10   for a period of time.  We don't have evidence that she

11   continued to remain in contact with her after her sister was

12   convicted, but I think, again, it is a reasonable inference

13   that she did.  Her sister has denied that and I think she has

14   denied it.  Nevertheless, if the defendant needed that money

15   she certainly would have had access to it from where she was.

16           THE COURT:  So, in her interview with Pretrial

17   Services she denied that she had any assets?

18           MR. HERBERT:  Correct.

19           THE COURT:  That is what you consider to be the

20   strongest one?  I know you want to move back to the others.

21           MR. HERBERT:  Well, yes, your Honor.  And I guess I

22   would not limit it to the mere statement initially to Pretrial

23   Services in California, because I think you have to take into

24   account when you talk about whether she tried to obstruct

25   justice in connection with this case the fact that that lie,

1    which might have been given under the pressures of an immediate

2    arrest, persisted throughout the detention proceedings to the

3    point where let's say two days before the detention hearing she

4    is giving a power of attorney to her sister on an undisclosed

5    bank account that has $135,000 in it.

6             THE COURT:  Let me pause with that, because this is a

7    highly technical issue, I think.  She makes a statement to

8    Pretrial Services in California immediately upon arrest.  Was

9    there any other point at which she had a duty to disclose in

10   the form of responding to the Magistrate Judge's statements in

11   some fashion in which she continued to contend that she did not

12   have any assets?

13            MR. HERBERT:  If the Court is defining a "duty to

14   disclose" merely as a duty to respond to a direct question

15   about that, then I don't know.

16            THE COURT:  But isn't that the measure, that is, once

17   somebody makes a statement, call it improvident for present

18   purposes, when they find that it was improvident and

19   inappropriate do they have a duty to disclose that except on

20   the next occasion on which they are asked the specific

21   question?

22            MR. HERBERT:  Oh, I would say absolutely, your Honor.

23   If I, essentially, tell something to Pretrial Services on a

24   material issue such as my assets and I wake up the next day and

25   say, What was I thinking of? and I am persisting in trying to

1    get bail based in part on financial conditions, I would say

2    absolutely you have an obligation to come forward and correct

3    the misstatement.  Otherwise, it is persisting in the false

4    statement.

5              THE COURT:  That is why I ask it as a question of duty

6    to disclose.  Assume that they make the false statement, the

7    decision is made, whatever the decision is made, and they do

8    not seek to correct it.  Then there comes another decision

9    point at which point they do correct it, or perhaps they do

10   not.  But, in any event, I am saying they do.  Have they

11   engaged in more than the first initial failure properly to

12   apprise Pretrial Services of the full scope of their assets?

13             MR. HERBERT:  I view it as a continuing false

14   statement to Pretrial Services as long as that issue is

15   material.  I do not have a case that says that, but I would say

16   it would be akin to a perjury situation in which the defendant

17   gives a false statement under oath and then does not recant.

18             THE COURT:  Well, but then you focus on the false

19   statement at the time that the false statement was made, and

20   that is why I am focusing on this.  Isn't this the concern

21   being the false statement at the time it was actually made,

22   which is a circumstance in which I think it would be unlikely

23   that a perjury prosecution would be brought because of the

24   distress that someone is under and lack of recollection that

25   might be understood under those circumstances?

1      MR. HERBERT:  Well, I'm not sure I would accept the

2  Court's characterization that the defendant would have a duress

3  or impaired-capacity defense to a charge of a false statement

4  to the Court under those circumstances or perjury.

5  Nevertheless, I do think obstruction of justice broader, and I

6  do think when the defendant for whatever reason initially

7  claims not to have anything and then is engaging in a course of

8  conduct to place assets that she certainly is aware of at the

9  time she is giving a power of attorney to her sister and

10  transferring her interest in the South Boston home to her

11  sister and having her sister go and clean out the bank account,

12  at the time all that is going on, I think the obstruction of

13  justice enhancement under the *Guidelines* would certainly

14  contemplate that ongoing course of conduct that flows from the

15  initial uncorrected false statement to Probation.  It certainly

16  was material to the detention proceedings.

17      THE COURT:  Let me turn back, because I want to be

18  sure I have understood the full extent of what you are arguing.

19  Are you arguing that because someone is engaged in harboring

20  that they are necessarily engaged in obstruction of justice

21  and, consequently, this should be included?

22      MR. HERBERT:  Absolutely not, no.  That would be

23  double counting.

24      So, just to briefly touch on the other false

25  statements -- and I take the Court's point.  Certain things

1   like, Did we get to California in 2005 or 2006, at first glance

2   it looks likes it's not a big deal.  When you take into

3   consideration, however, what they were doing during 2005 and

4   much of 2006, it becomes more of a big deal in terms of the

5   detention decision, because during that time --

6              THE COURT:  Do you mean 2005 and 2006 or 1995 and

7   1996?

8              MR. HERBERT:  I am the one with impaired capacity.

9              THE COURT:  I do not mean to turn it on you, but that

10  may tell the point, doesn't it?  Do people remember with that

11  kind of precision when they are confronted with numbers of

12  where was I in 1995 and 1996?  That is why I say it is a kind

13  of *de minimis* problem, that even the prosecutor who is speaking

14  directly to a court would make a mistake like that.

15             MR. HERBERT:  If that were the standard, I wouldn't be

16  able to get up in any proceeding in this courthouse.

17             THE COURT:  None of us would, but the point is we are

18  charging someone with that responsibility.

19             MR. HERBERT:  And I'm not making light of it.  The

20  fact of the matter is, yes, your Honor, can she be expected to

21  remember the fact that she traveled the country with James

22  Bulger in 1995 and 1996 living in different locations, making

23  contacts in those locations, living under different names?

24             THE COURT:  But it is the specific date.

25             MR. HERBERT:  And that is why I'm saying the specific

1    date by itself, if you pluck that out in a vacuum, maybe that

2    doesn't make that much of a difference, but if what you are

3    suggesting to Pretrial Services is, "We went straight from

4    Boston to California and set up residence there," as

5    Mr. Reddington said, "hiding in plain sight," that paints a

6    very different picture than somebody who has had two years of

7    practicing living in other locations.  So, if you give me a

8    couple of steps toward the door, I'm somebody who actually has

9    some practice at living in different locations.

10          THE COURT:  But was she asked?  Did she misrepresent

11   about the kind of stopping in New Orleans or Louisiana,

12   Chicago?  Did she misrepresent about that?

13          MR. HERBERT:  The only direct misrepresentation along

14   those lines is, "I've never been out of the country."  I think

15   if you are arrested in Southern California and you are saying,

16   "I've never been out of the country," which includes, "I've

17   never been to Mexico to get medication under these

18   circumstances," which means, "I've got to be able to get over

19   there," I would say that's a material misrepresentation, not

20   *de minimis*.

21          But, yeah, I think saying to Pretrial Services, "We

22   have been living in California since we moved here in 1995," is

23   a material misstatement under those circumstances.  I don't

24   think it's as strong as the financial misstatements, but I

25   think it's material.

1          I think her statement that she hadn't spoken to any of

2    her family members or friends in over 17 years may come closer

3    to what the Court is saying in terms of can you really be

4    expected to keep track of how many years?  More than 17 years

5    would have put her back in the middle of 1994.  That is

6    probably not what she was literally suggesting, but I do think

7    that that time period, I think if you can come up with 17

8    years, you could probably come up with when you actually did

9    flee with him.  And to suggest you hadn't been in touch with

10   family members when you have been under circumstances that were

11   specifically designed to evade law enforcement surveillance is

12   again a material misstatement.

13          The other ones we mentioned were her saying that her

14   form of ID in Santa Monica was an AARP card.  Obviously, it

15   went substantially beyond that.

16          THE COURT:  I do not mean to be trying to create

17   strained hypotheticals, but I am trying to understand how an

18   ordinary person might respond under these circumstances.  You

19   are asked, "Do you have a credit card?", and you pick the

20   salient one, even if you have eight of them.  It is that kind

21   of thing that I think should not be assimilated into

22   obstruction of justice too easily.

23          MR. HERBERT:  And I think if that were all we had I

24   think that I might have to agree with the Court on that one,

25   but I do think you can take into account the fact that it was

1    not just one false or seriously misleading statement or

2    omission, it was a series of them.

3           Finally, denying knowledge of the firearms in the

4    apartment.  That will be addressed separately, but I think

5    that, again, we have strong argument that she had to have known

6    about the firearms in the apartment, and to deny knowledge of

7    them in the context of a bail proceeding is a material

8    misstatement.

9           THE COURT:  All right.

10          I am going to put off resolving this one until I get

11   to the firearm one as well, because the Government presses

12   that, and I want to take it up in its full context.

13          So, putting to one side the firearm issue,

14   Mr. Reddington, is there anything you want to say about this?

15          MR. REDDINGTON:  Yes, your Honor.  I think it would be

16   important for me to note that since Catherine has been involved

17   in the system in Massachusetts I have certainly been at her

18   side and involved myself.

19          What I think is important to understand is that, as

20   your Honor pointed out, she was pretty much in shock dealing

21   with the law enforcement authorities.  There had been such a

22   significant period of time, and as I think your Honor knows, or

23   maybe doesn't know, that while she was out in California her

24   mother passed away.  She didn't even know about it, didn't go

25   to the funeral.

1          THE COURT:  I do not mean to minimize that, but is

2     that material to the -- is that something that happened that

3     she was aware of and, consequently, threw her off pace?

4          MR. REDDINGTON:  Oh, no, no, no.  The point that I'm

5     getting at is in reference to the Government's suggestion that

6     she lies and lies and lies to Probation and Pretrial Services.

7     What's important for your Honor to realize is when she was in

8     California she did not know or believe or understand that she

9     even owned property or had money in an account.  It was gone.

10    When she got to Massachusetts they talk about in a sinister

11    sense that she signed over for a dollar her interest in the

12    real estate.  That was because we needed to have a clear title

13    at the time of the bail hearing, and Attorney Lane, the family

14    attorney, prepared the documents based on the recommendation --

15         THE COURT:  But the argument, as I understand

16    Mr. Herbert is making, is how could she not know that she had a

17    house in Quincy?  Put to one side how the family was claiming

18    or disclaiming interests in the South Boston house.  How could

19    she not know that she had a bank account of over $100,000 when

20    she left?  The assumption is it disappeared into thin air.

21         MR. REDDINGTON:  If I can respond, for example, on the

22    bank account, your Honor?

23         THE COURT:  Sure.

24         MR. REDDINGTON:  That was another issue that was not

25    even known by any of us until Attorney Lane was given a letter

1    or a document from a bank because his client was advised of a

2    bank that there was an old account.  They assumed that it had

3    been closed up.

4          THE COURT:  We are not talking about a five-dollar

5    escheat.  We are talking about $100,000.  The issue is how

6    someone could not know that they had when they left more than

7    $100,000 in the bank and then tell Pretrial Services, "I have

8    no assets," or know that they had free title, clear title to

9    property in Quincy when they left and not identify that in

10   talking to Pretrial?

11         MR. REDDINGTON:  As I say, your Honor, the point is

12   that it had been such a significant passage of time with no

13   contact, she in her mind was not of an opinion that she owned

14   the real estate or had the bank account when she's dealing with

15   Pretrial Services.  This is not a situation where it would even

16   impact.  In other words, you tell Pretrial Services, "Yeah, I

17   have a house in Quincy."  It's there, it's a house, it's pretty

18   apparent.  There's no benefit or nothing for her to be gained

19   by saying, "I don't own anything."  In her mind she owned

20   nothing when she was talking to Pretrial Services.

21         THE COURT:  There are a variety of ways that that has

22   an impact.  It gets developed more fully at bail, but it

23   affects questions of whether or not you have counsel appointed

24   for you.  It also affects the likelihood to flee, that is, you

25   have got a house and, nevertheless, you leave.  Those are all

1    things that are material I think for a judge making a

2    determination with respect to an initial appearance that one

3    would expect someone to recall.  That 17 years passed and she

4    forgot she had $100,000 and she forgot she had a house, that is

5    a little bit difficult to accept.

6              MR. REDDINGTON:  Can I just suggest to the Court that,

7    hypothetically, if she knew that she had $100,000, I would

8    suggest the inference might be that maybe that account would

9    have been drawn on or there would have been some activity on it

10   rather than --

11             THE COURT:  By whom?  It is her account.  The point is

12   that she had to give a power of attorney to Ms. McCusker when

13   she got back here.  Not to get into the specifics of how people

14   access accounts, but there is no reason to believe, unless

15   there were communications between her and Ms. McCusker or

16   others who were close enough to be able to access an account,

17   which implicates a separate issue of misrepresentation, that

18   she thought the account was exhausted.  The answer has to be --

19   I am not giving you the answer that you have got to give me to

20   make me satisfied, but the answer has to be, "I just clean

21   forgot it."

22             MR. REDDINGTON:  That's the truth, your Honor.  That's

23   the answer.  It's not a situation where there is

24   misrepresentation that would even be -- I understand what you

25   are saying about in initial appearance and the issue of bail.

1   These are things that would have helped her.  In other words,

2   "Yeah, I have property."  The converse argument would be,

3   "Yeah, well, you took off even though you had property."

4           My position, your Honor, and what I am suggesting to

5   you is the fact that that account had literally no activity for

6   all of those years until Attorney Lane was advised by the bank

7   that there was an account with a lien on it.  Nobody even knew

8   that that account existed.  Attorney Lane wrote the letters to

9   the bank.  Attorney Lane was the one that dealt with the bank

10  and was able to uncover this account, and your Honor knows the

11  rest of the history from there in our dealings with the

12  U.S. Attorney's Office and coming before the Court.

13          THE COURT:  Well, I think I understand those

14  arguments.

15          MR. REDDINGTON:  And I did want you to know that the

16  issue of the signing off of the real estate for a dollar was

17  based upon the title search that was done to present good

18  title.  Should Magistrate Boal have decided that release was

19  appropriate I had to make sure that I had the title

20  certification, and Attorney Reed, who did the title search,

21  recommended that she sign -- I don't even know what it is.

22  It's real estate.  I don't do real estate.

23          THE COURT:  I am less likely to be influenced by that

24  for this purpose, the question of whether, if it comes to that,

25  there is an interest in that property that she maintains.

1    Expectancies and that sort of thing, which is what she had when

2    she left anyway, are not going to influence me, I think, on

3    this one.  What is going to influence me or is important to me

4    is misrepresentation with respect to the house, with respect to

5    the account.  You have given me your answer, and I understand

6    it.

7            Then the question of communications with friends and

8    family while she was at large outside of Massachusetts.  It is

9    pretty clear she had those communications, isn't it?

10           MR. REDDINGTON:  Based on the sister's conviction and

11   her friend's conviction sometime prior I think the inference is

12   obviously there.  But as far as the years, the significant

13   passage of time, as I say, they didn't know when her mother

14   died.  There was no contact between the sister or anybody for

15   that significant period of time.

16           THE COURT:  At that point.

17           MR. REDDINGTON:  Yes.

18           THE COURT:  Now, I want to go back to the first branch

19   of this discussion, which is the question of attribution of

20   obstruction and perjury to Ms. Greig by other persons, her

21   sister, using her sister as the example.

22           She is in a conspiracy.  The conspiracy is to cover up

23   where Mr. Bulger is.  The question is, is it reasonably

24   foreseeable that others in this conspiracy are going to engage

25   in specific acts of obstruction of justice and perjury, and why

1    shouldn't I say that they would, as Mr. Herbert argues?

2           MR. REDDINGTON:  I think that counsel's argument is

3    obviously speculative.  That, I don't think, rises to the level

4    of evidence that the Court would need to apply an enhancement

5    for obstruction of justice.

6           In other words, Attorney Herbert suggests that, well,

7    it's her sister.  Based on the fact that it's her sister, she

8    loves her sister, the inference is her sister is not going to

9    say anything that's going to get her in trouble, so, therefore,

10   it's reasonably foreseeable that the sister would take the

11   Fifth, then get immunity and then perjure herself before the

12   grand jury.  It's just as likely that perhaps her sister would

13   not have answered a question and maybe taken a contempt order.

14   It's just as likely that the sister may not have cooperated or

15   perhaps the sister would have cooperated.  It's very

16   speculative, your Honor.

17          THE COURT:  All right.  I understand the argument.

18          MR. REDDINGTON:  Thank you.

19          THE COURT:  As I said, I want to not resolve this one

20   until I deal with the full range of the issues raised by

21   obstruction, which is one specific one, firearms.

22          Maybe I ought to just turn to firearms right now.  I

23   do not know who is going to be speaking to this, but I guess,

24   Mr. Pirozzolo, the guideline talks in terms of possession, and

25   here the question is did she possess either directly or

1    constructively?  That there were a large number of firearms

2    suggests to me rather clearly that she knew that there were

3    firearms there -- I will let Mr. Reddington try to talk me out

4    of that, but I think that is unlikely -- that Mr. Bulger had

5    quite a collection, and she knew it.

6         The question is whether or not she possessed; at

7    least, that is the first order of question.  There are

8    questions of vicarious responsibility I understand.  Here I

9    have some difficulty.  Mr. Bulger does not strike me, based on

10   the evidence that I have received, as someone who welcomed the

11   opportunity to share his weapons with anyone.  So, the question

12   then becomes why do I attribute them to Ms. Greig?  Simply

13   because she is in the household with him?

14        MR. PIROZZOLO:  So, then, focusing on the 2B1.1(b)(14)

15   enhancement, the Government would agree that it comes down to

16   an issue of constructive possession, focusing on just the

17   possession prong, and I take it from the Court's comments that

18   the Court is satisfied that she knew of the existence of the

19   firearms.

20        THE COURT:  You do not have to argue with me about

21   that.  Mr. Reddington may.  But for your purposes, assume that

22   I am prepared to find that she knew that there were firearms,

23   and large numbers of them, in the apartment.

24        MR. PIROZZOLO:  So, it comes down to her ability to

25   exercise dominion and control over the space.

1          THE COURT:  Right.

2          MR. PIROZZOLO:  And I think what I would like to point

3     out is a couple of things that are relevant to this.  There is

4     sort of the general control over the space that she had by

5     virtue of being the one who paid the rent, which is relevant to

6     constructive possession.

7          THE COURT:  Well, it is, and, again, I test the

8     proposition against less dramatic circumstances.  Does every

9     spouse possess the firearms that are in her or his spouse's gun

10    closet?  I do not think I would reach that conclusion, even if

11    they paid rent together.  And so, I am testing this on the idea

12    of is there some evidence that Ms. Greig used firearms in the

13    past or trained in firearms or knew what various firearms were,

14    apart from the fact that they're dangerous?

15         MR. PIROZZOLO:  No.  The Government can't show you any

16    evidence that we have today that she held the firearms.  As you

17    know, as we submitted, the fingerprints examination came back

18    with no fingerprints of use, including Mr. Bulger's,

19    incidentally, and there is no other evidence that she actually

20    handled the firearms.

21         THE COURT:  Let me pause.  It is not determinative,

22    but I would want your response to this.  I asked the question,

23    I believe, at the time of taking the plea, noting that the Plea

24    Agreement specifically indicated that the Government would not

25    pursue firearms charges against Ms. Greig, and I recall the

1    response being that there simply was not sufficient evidence to

2    do that.  Now, am I faced here with an argument that the

3    standard of proof is different, that is, if you pursue firearms

4    against Ms. Greig you are going to have to do it against a

5    standard of beyond a reasonable doubt as a criminal offense,

6    but here in sentencing you get to do it by fair preponderance?

7             MR. PIROZZOLO:  Well, the standard is different.

8             THE COURT:  It is, but I want to be sure that I

9    understand that the Government is asking me to do in sentencing

10   something that it was not prepared to do for purposes of the

11   charging decision because there was inadequate evidence against

12   the higher standard.

13            MR. PIROZZOLO:  Well, in making the judgment with

14   respect to the plea, there is always a range of judgment as to

15   the probability of success, obviously, and in the context of

16   sentencing where the preponderance standard does apply here, it

17   is an entirely different matter.

18            THE COURT:  It is, but I raise this, and I think I

19   understand the law on this.  There is a different dimension to

20   it.  And that is, and it is one that I have struggled with in

21   other cases in other circumstances, in which the count of

22   conviction is simply a ticket to create criminal liability

23   against a lower standard.  The law permits it, I think.  The

24   question for me is evaluating that fully and what its

25   implications are for purposes of sentencing.

1      I have taken the position in the past that if the

2   Government charges something and then drops it, then I will not

3   consider that for purposes of sentencing; that is, the

4   Government had a chance, they chose not to.

5      This is a different issue.  The Government chose not

6   to charge in the first place for a variety of reasons, the

7   obvious one being that you would never make a gun case, I

8   think, on this evidence, and so now the question is whether or

9   not I fill in the blanks in imposing additional criminal

10  liability on someone for whom it would be impossible to do a

11  gun case, at least on this record.

12      MR. PIROZZOLO:  Well, understand that we are talking

13  about the Court evaluating the appropriate sentence.  We are

14  talking about a guideline that's evaluating the appropriate

15  sentence under the circumstances.

16      THE COURT:  Should I take into consideration the

17  choices that the Government makes with respect to the charging

18  decision in doing that?  Because it seems to me that it is an

19  incentive, not always acted on, but an incentive to the

20  Government to choose the most provable case perhaps against the

21  least demanding set of evidentiary requirements and then, once

22  before the judge, to drive that sentence up higher for things

23  that were not charged at all.  I am concerned with that larger

24  issue.  I am not suggesting that has happened here, but I am

25  testing it against that proposition.

1          MR. PIROZZOLO:  I will answer it this way.  I will try

2     to answer it.  I can understand the concern about having the

3     defendant plead to one thing, the clear charge beyond a

4     reasonable doubt, and then have the Government start shoveling

5     all kinds of stuff in that it could never have proved beyond a

6     reasonable doubt in front of a jury.  That's a concern.

7          My first answer to that is an institutional one, which

8     is, frankly, the Sentencing Commission and Congress ultimately

9     have made the decision that in the context of sentencing as a

10    policy matter that is an entirely appropriate way for the Court

11    to proceed.  In fact, it's not just a *Sentencing Guidelines*

12    issue.  3661 does not limit the information that the Court can

13    consider in the context of sentencing.  It's a different thing.

14    It's not a guilt or innocence, necessarily, standard.

15          THE COURT:  I understand the larger protocols for

16    sentencing, but the difference here is constructing a

17    guideline, essentially stacking various elements of culpability

18    in a fashion that -- this sounds, and I do not mean it to, as

19    inflammatory, but an end run around the standard mechanisms by

20    which we establish culpability.  Here what I have is a

21    circumstance in which she is in the house and there are lots of

22    guns.  That is really what it comes down to, I think, as the

23    direct evidence, and you are inviting me to make inferences

24    which I think would never make it by clear and convincing

25    evidence.  The question is whether they make it by a fair

1    preponderance.

2        MR. PIROZZOLO:  Well, let me unpack that, your Honor.

3    Because with respect to constructive possession of the weapons,

4    we do make that by clear and convincing evidence, and we can

5    establish by way of her knowledge and the location of the

6    weapons, which I can address in a moment, because they weren't

7    all in one place, but the weapons were in different spots --

8        THE COURT:  You just introduced, or maybe I did,

9    "clear and convincing."  I don't think I did.  Did I say "clear

10   and convincing"?

11       MR. PIROZZOLO:  I think you said "clear and

12   convincing."

13       THE COURT:  So, we have got a range of things.  You

14   say, We can do more than fair preponderance, we can do clear

15   and convincing, but not beyond a reasonable doubt.

16       MR. PIROZZOLO:  But let me address I think the more

17   institutional thing that you posit.  What we are talking about

18   here is a guideline that provides for an incremental penalty.

19   It does not provide for the full and complete range of penalty

20   she would face if she were, for example, sentenced under the

21   firearms guideline.  So, in the context of 2B1.1, which is the

22   precise legal question here, she does not face and would not

23   face the same penalty as she would face if she were tried and

24   convicted of the gun charges.

25       So, it really is not the case that it is dropping a

1    charge and then shoveling it in in the context of this

2    guideline.  Rather, it is simply a marginal incremental penalty

3    in the context whereby a preponderance of the evidence if you

4    can show she had constructive possession of those weapons,

5    which I think the Government can show, that there is a marginal

6    increase in her penalty under the fraud guideline.

7         THE COURT:  So, let us talk about the proof on that,

8    and at the risk of having too glibly characterized the

9    Government's proof, what else is there, apart from the fact

10   that she was in an apartment for an extended period of time

11   with someone who collected guns?

12        MR. PIROZZOLO:  Well, the Government submitted a

13   notebook that was found at the scene that appears to be in her

14   handwriting.  If you bear with me, I can put it up on the

15   screen or I can just refer to it, your Honor.  We actually have

16   the notebook here, your Honor, if you would like to look at the

17   entire thing.

18        THE COURT:  But it is included in the collection?

19        MR. PIROZZOLO:  Selections are included in the binder.

20   The actual entire notebook is here, present, if the Court --

21        THE COURT:  Well, I will see if I want to see it.  But

22   remind me of what --

23        MR. PIROZZOLO:  So, if you bear with me, your Honor, I

24   just want to put it up.

25        THE COURT:  And maybe it would be a good idea to

1    simply, so that other people are able to observe it, if you

2    could put it up on the screen too.

3              MR. PIROZZOLO:  I will do that, your Honor.  It's

4    Exhibit 53, your Honor.

5              THE COURT:  53?

6              MR. PIROZZOLO:  Yes.

7              THE COURT:  And that is Volume II?

8              MR. PIROZZOLO:  That I think is Binder II, your Honor.

9    Just bear with me, your Honor.

10             THE COURT:  Yes.

11             MR. PIROZZOLO:  So, I just put up the first page of

12   the exhibit.  Actually, it's the second page of the exhibit.

13   There is Exhibit 53.  The first page is a tag, like an

14   inventory tag from the FBI.

15             THE COURT:  Right.

16             MR. PIROZZOLO:  That is the cover of it, your Honor.

17   Do you have that in front of you?

18             THE COURT:  I do.

19             MR. PIROZZOLO:  I am going to first put up a page.

20   Among other things, the handwriting appears to correspond to

21   handwriting of other things, including a weekly planner that

22   Ms. Greig kept.  But also, just before I get into the substance

23   of what's in that notebook that's relevant to this issue, there

24   is a page that I think makes clear that this is, in fact,

25   Ms. Greig's notebook.

1                You can see there is a page here, and I will blow it

2        up on the screen.  It's a reference to cat lovers.

3                THE COURT:  Right.  I have been through that part of

4        it.  What I am looking for is what ties her to guns.

5                MR. PIROZZOLO:  Yes, your Honor.  Well, as you know,

6        the evidence showed that there were weapons found in a common

7        area of the apartment behind a mirror where there had been

8        hides that were created.  They'd cut through the wall --

9        somebody had cut through the wall to place the weapons in that

10       location.

11               There was another location in the apartment as well

12       where there was a hide cut through the wall.  That was in a

13       bathroom that appeared to be used by Mr. Bulger.  However, most

14       of the guns, 19, and the ERT report documents where they came

15       from, the guns and the weapons, most of them came from that

16       common area behind the mirror.

17               THE COURT:  All of that I assume is conceded, that

18       there were large numbers of guns concealed or secreted at

19       various points in the apartment.  The issue, as I said, is how

20       I attribute them in the possession, constructive possession

21       sense, to Ms. Greig.

22               MR. PIROZZOLO:  So, the inference is, if you look at

23       the notebook, I put up on the screen page -- let's see.  It's

24       six pages in.  There is a name on the original.

25               THE COURT:  Right.

1          MR. PIROZZOLO:  On the sealed one there is an

2     original.  I've redacted out the name that was on the top of

3     that.

4          THE COURT:  Maybe I can move this along a little

5     faster.  I see the reference to tools and the kinds of tools

6     that would be used to create hides or access hides, and I

7     understand that, I think.  The question is does that create

8     constructive possession?

9          I will put it in a different way.  In an ordinary gun

10    case, put to one side the standard, if someone was asked by

11    another to go get equipment that would be useful to hiding guns

12    would we say that they are in constructive possession of them?

13         MR. PIROZZOLO:  If somebody built the hide or built

14    the gun closet or helped get the tools to build the gun closet,

15    which is what this appears to have been, if someone got the

16    tools to build the gun closet or the hide, as is the case here,

17    and that person lived in the apartment and that person paid the

18    rent on the apartment and that person paid the utilities on the

19    apartment and that person paid the cable bill on that apartment

20    and that person used the room in which at least one of the

21    hides was created, then the answer is yes.

22         THE COURT:  Has there ever been a case like that?

23         MR. PIROZZOLO:  I cannot cite you a case.

24         THE COURT:  No, there hasn't been, because we have

25    these gun cases all the time in which we have paramours -- I

1    use women because most of the time it's men who are the

2    possessors -- who live with someone and maybe do the grocery

3    shopping and even go to Home Depot for them and they do not get

4    charged.  Now, maybe that is a charging decision.  I think it

5    is a charging decision based on a larger proposition, which is

6    that does not in and of itself establish constructive

7    possession.

8         The kinds of things that lead to constructive

9    possession are the ability to use the weapon in some fashion.

10   That is, I think, what I am looking for here, or asking you to

11   provide for me, because it is a little bit more strained under

12   these circumstances.  That is why there are no cases on it.

13   Now, maybe there are not cases because, as I said, there are

14   charging decisions that are made that it is not the best

15   possible case to do to do the paramour because she got a

16   hacksaw for metal/plaster cutting.

17        MR. PIROZZOLO:  There are other pages, your Honor,

18   that show -- there's a lock the next page over.  You can see

19   lock, graphite lock, silicone, level, masking tape on walls,

20   duct tape removes paint.  You can see that.  Buy a caulking

21   gun, vice grip.

22        THE COURT:  Right, I see all of those.

23        MR. PIROZZOLO:  This is all evidence of her

24   participation in exercising dominion and control over the

25   space.

1          THE COURT:  I do not mean to be too technical, but the

2     *Guidelines* themselves are technical.  The person who builds the

3     cabinet is in constructive possession of what is later put in

4     the cabinet by the person who has direct possession of it?

5     That is the theory?

6          MR. PIROZZOLO:  With the other indicia of control over

7     the space.

8          THE COURT:  Who lives in the house?  I do not mean to

9     create too many hypotheticals.  But the teenage boy whose

10    father asks him as a shop project to create a cabinet -- he

11    lives in the house, knows there are lots of guns, and creates

12    the cabinet for his father -- is in constructive possession of

13    the guns that are in the cabinet?

14         MR. PIROZZOLO:  To the extent -- well, I am repeating

15    myself, but to the extent that that person is exercising

16    dominion and control over the space, the answer is yes.

17         THE COURT:  Yes, but that is the bottom-line

18    conclusion.  The question is how do I get to that conclusion?

19         So, your position is the 15-year-old, under the

20    hypothetical I have just given to you, is someone who is in

21    constructive possession of what the father puts in the cabinet?

22         MR. PIROZZOLO:  Let me add another fact, which is that

23    Mr. Bulger made a statement which is in the affidavit submitted

24    by Agent Torisney (ph).  It's tab 102.

25         THE COURT:  102 is it?

1        MR. PIROZZOLO:  102, your Honor.

2        THE COURT:  Go ahead.

3        MR. PIROZZOLO:  Add to that in the affidavit there is

4   a paragraph --

5        THE COURT:  What is the number?

6        MR. PIROZZOLO:  6P.

7        THE COURT:  "P" as in "Paul"?

8        MR. PIROZZOLO:  "P" as in "Paul."  It says in that,

9   and I think I can read this because there's nothing in there

10  that ought to be redacted, "Bulger advised that he did discuss

11  with Catherine Greig what would happen if he, Bulger, should

12  die.  Bulger told Greig that she had two options, either to

13  remain in Santa Monica and lead the same life without him or to

14  go home.  The only way that she could stay in Santa Monica and

15  live the same life without him is if she knew and had the

16  ability and controlled the cash and the weapons that were with

17  the cash."

18       THE COURT:  Put to one side, because I think it has to

19  be split up, we are talking about a time other than the time

20  that is relevant here, that is, after Bulger passes away.

21  Second, cash is different from guns.  That is why I asked the

22  question about cash early on in this discussion.  Cash is the

23  means of living.  Guns or weapons are something that Mr. Bulger

24  had that apparently he could pass on if he died.  That does not

25  mean that someone has constructive possession or direct

1  possession of them until he dies.

2         That is the issue here.  It is during this time that

3  she was there did she have constructive possession of this, and

4  you have told me a variety of things from which inferences

5  might be drawn about this, but there is nothing more, and I am

6  asking this as a question because I have obviously gone through

7  these materials.  Is there nothing more than her filling his

8  shopping list for what is necessary to a build a hide of her

9  direct involvement at that time?

10         MR. PIROZZOLO:  Aside from her presence -- I feel like

11  I am repeating myself.  Aside from her presence --

12         THE COURT:  I am looking for something beyond what you

13  have told me so far.

14         MR. PIROZZOLO:  All right.  Aside from the list of

15  things that gave her control over that apartment, the fact that

16  she apparently had direct involvement in creating the hides

17  where the weapons were, in addition to the fact that the

18  weapons and the guns, most of the weapons and most of the cash

19  were all together where she clearly had license at least to the

20  cash.

21         THE COURT:  Let me ask that, because that is a little

22  bit new, that is, that they were all together in the hide or

23  hides.  The response that Mr. Reddington has given is that she,

24  I infer, received an allowance, it was put in a cash drawer and

25  that she used it for purposes of household necessities.  Is

1   there some indication that she had broader access to the hides

2   themselves, apart from the inferences that could be drawn,

3   where the cash was?

4        Imagine this:  Imagine a hypothetical of, let us say,

5   a controlling personality who has with him someone who over a

6   period of years has developed accommodations with him, and he

7   is prepared to give her some money but not all of the money,

8   and the way in which he does it is he gives her an allowance.

9   Now, I want to understand whether or not, apart from his

10  bequest in paragraph 6P, there is anything more that suggests

11  her ability to access those hides for purposes of the money

12  without his restrictions.

13       MR. PIROZZOLO:  Aside from the fact that she lived in

14  the apartment, I think that she knew where the cash was, the

15  evidence shows she knew where the cash and the weapons -- I

16  will focus on the cash, where the cash was.  She clearly had

17  the ability -- she must have had the ability, because

18  Mr. Bulger could have gone out, and setting aside whether he

19  had died or not, she must have had the ability, there must have

20  been, it's a reasonable inference that she must have had

21  license to take that cash if Bulger was compromised in some

22  way.

23       THE COURT:  That is a contingent responsibility.  I do

24  not mean to get into -- well, I suppose I do because it is

25  technical in that sense -- the law of property, which is to say

1    if a contingency occurs you have possession, rightful

2    possession.

3          But we are not dealing with that.  We are dealing with

4    a circumstance in which the contingency has not occurred,

5    either his death or in some fashion being compromised.  We are

6    dealing with how they lived in that place during the time that

7    she was there with him and whether or not she had possession,

8    direct or constructive, of the weapons.

9          I am analyzing access to cash as a way of

10   understanding collateral things that she might have, and I am

11   having some difficulty saying that she would have had or that

12   the Government has established that she had possession of those

13   weapons.  And I go back to, because both parties have asked me

14   to infer things about Mr. Bulger and his personality that, as I

15   said, he does not seem to be someone who shared those kinds of

16   things easily with anybody.

17         MR. PIROZZOLO:  Can I come at this from a different

18   angle, your Honor?  If you look at item 14.

19         THE COURT:  Item 14?

20         MR. PIROZZOLO:  Excuse me.  2B1.1(b)(14), the

21   guideline, I just want to go back to the text of the guideline,

22   because that is what we are construing here.  It says, "The

23   Offense."  If the offense involved possession of a dangerous

24   weapon, including a firearm, in connection with the offense,

25   then you get the increase.  The offense here is identity fraud

1   in connection with harboring and possession of IDs in excess of

2   the statutorily defined amount.  So, the offense that we are

3   talking about here under the application of this guideline

4   includes -- there is no question that Mr. Bulger, no question

5   that Mr. Bulger --

6           THE COURT:  Well, that is a different issue.  If you

7   want to go to the question of vicarious responsibility, we

8   will.  I just want to be sure that I have exhausted everything

9   that I need to know that you would like to bring to my

10  attention about the responsibility of Ms. Greig here.

11          MR. PIROZZOLO:  Aside from the record of inferences

12  that I have already laid out about dominion and control over

13  the apartment, etc., it is a fact that we cannot point you to

14  any particular evidence that shows her fingerprints --

15          THE COURT:  I am just asking for what it is.  I will

16  make my own conclusions about whether it is successful.  Now

17  the question that I think you are leading into is but she was a

18  conspirator with someone who she knew, it was reasonably

19  foreseeable that she knew that he had weapons and those weapons

20  were there for purposes of forestalling being apprehended.  Is

21  that the argument, that is, reasonable foreseeability as

22  created by the conspiracy that they had?

23          MR. PIROZZOLO:  Well, it's more than just reasonable

24  foreseeability.  She had actual knowledge that the weapons were

25  in the apartment in connection with --

1          THE COURT:  Well, the actual knowledge, subject to

2     hearing from Mr. Reddington, I have conceded that that is

3     established.  So, she has actual knowledge of it.  She is not

4     prepared to do it herself, use it herself, I do not think that

5     there is any evidence that she is, and so then the Government

6     is saying, okay, so we are going do it on a vicarious

7     responsibility basis, that she is part of a conspiracy that is

8     designed to protect Mr. Bulger, and I think it has to be the

9     harboring one, not the identity fraud.

10          MR. PIROZZOLO:  Well, your Honor, one of the identity

11    frauds is premised on the harboring.  So, the (a)(7) is, in

12    fact -- the liability flows from harboring.

13          THE COURT:  In any event, I think it has to be based

14    on harboring.  That is, the conspiracy, however the charging

15    works, it has to be based on the assumption of responsibility

16    vicariously through harboring rather than a pure identity

17    fraud.

18          MR. PIROZZOLO:  I am not sure I understand the "rather

19    than pure identity fraud."

20          THE COURT:  Yes.  If it were pure identity fraud, that

21    is, she got a card, as charged in Count Three, got a card,

22    possessed it, maybe even used it, guns would not be part of

23    that, or at least it would take quite a leap to get to that.

24    That would be part of harboring.

25          MR. PIROZZOLO:  Yes, your Honor.

1          THE COURT:  One could say that it is conceivable that

2     a conspiracy involving harboring is going to involve taking

3     steps to avoid apprehension.

4          MR. PIROZZOLO:  Yes, your Honor.

5          THE COURT:  So, now we are talking about she knows

6     there exists these guns.  It would be different if she didn't

7     know that there exists these guns, but I am saying that she

8     does.  Is that an alternative line that you are pursuing?

9          MR. PIROZZOLO:  Yes, your Honor, it is, and the

10    *Guidelines* permit it.  When the offense conduct covers -- in

11    this case the existence or presence of those weapons had a role

12    in the conduct of harboring and the harboring conspiracy and,

13    therefore, it's chargeable to her on that basis for purposes of

14    application of this guideline.

15         THE COURT:  I think I understand that one a little bit

16    more clearly.  But I wanted to move, then, to the question of

17    her individual responsibility, which I find is more tenuous.

18         MR. PIROZZOLO:  Just so the record is clear, it's the

19    Government's position that with respect to her individual

20    responsibility it is not as tenuous as the Court is --

21         THE COURT:  I am not asking you to agree with me,

22    people, not infrequently, do not, and for purposes of

23    preserving the record, but I think those have different

24    strengths, those arguments.

25         So, Mr. Reddington.

1          MR. REDDINGTON:  Yes, your Honor.  Thank you.

2          First of all, I know when not to argue.  I hear loud

3    and clear that your Honor has made that determination on the

4    knowledge aspect.

5          THE COURT:  I am not soliciting you to engage in a

6    futile act, but it just seems to me to be incomprehensible that

7    she did not know about the guns there.

8          MR. REDDINGTON:  Understood, your Honor, and I suggest

9    that this is clearly concisely the issue of the significance of

10   the evidence and whether or not the issue of possession has

11   been met for purposes of 2B1.3.  This book, the notebook, has

12   been central in the Government's argument, and it's

13   interesting, if I may have the liberty, your Honor --

14         THE COURT:  Yes.

15         MR. REDDINGTON:  -- of using the actual exhibit?

16   Thank you.

17         THE COURT:  Mr. Lovett is going to switch it over.

18         MR. REDDINGTON:  If I put this under here?

19         THE COURT:  Yes, that does it.

20         MR. REDDINGTON:  Thank you.

21         Your Honor, first of all, if you look at the actual

22   exhibit, and --

23         THE COURT:  I think maybe you want to pull it up a

24   little bit higher, just because it may compromise someone's

25   name, that is all.

1          MR. REDDINGTON:  Is that all right?  If you look at

2     the actual exhibit, your Honor, first of all, I have taken the

3     liberty --

4          THE COURT:  Let me just stop.  If you could pull it

5     off there for just a second.  It is just a question of

6     redaction.  This is just somebody who lived in the

7     neighborhood; is that right?

8          MR. PIROZZOLO:  Yes.

9          THE COURT:  So, I do not think this is a problem.  The

10    question is there is an individual whose name is identified who

11    apparently was living in the neighborhood.

12         MR. REDDINGTON:  I can read from it, and your Honor

13    can certainly look at it.  This book is a notebook that she had

14    in a class, and if you look at the notebook -- and this is what

15    is so scary about the Government arguing inferences based upon

16    what is really innocent documentation.  I am looking at the

17    notebook and I see, as we go along, she had, the first class

18    was computers, and there are dates in it and it's consecutive,

19    October 12th --

20         THE COURT:  Let me cut through that a bit.  Was she

21    taking a class in cutting plaster and metal?

22         MR. REDDINGTON:  I am going to address that, your

23    Honor.  The point I want to make is the dates continue on in a

24    consecutive fashion, so you can tell that this was not

25    something that was certainly compiled as a fraud.  The next

1      class that she took was Home Repair, and it clearly sets forth

2      the name of the teacher, the fact that the home repair and

3      toilet replacement was the specific focus.  And you look at it,

4      the tools that you need.  It goes on and on about the tools,

5      the drill.  They talk about the snips, they talk about graphite

6      and the lock as it goes on consecutively.  Vice grips, wire

7      cutters, screwdriver, voltage tester, and it continues on with

8      different projects in the course that she was taking.

9              Your Honor can go on and see June 23rd:  Particulate

10     masks, toothpaste-size tube of caulking material.

11             THE COURT:  When you say "June 23rd," I am not seeing

12     the date.

13             MR. REDDINGTON:  Okay.  Do you see right there, your

14     Honor?  And that's throughout that entire notebook, it goes on

15     October such and so, November, December, and then it goes up to

16     June 23rd.

17             THE COURT:  I see.

18             MR. REDDINGTON:  You see?  And this is where it's

19     talking about the toothpaste-size tube of caulking material,

20     masking tape.  And then it talks about gas, electric and turn

21     off the water valve.  That's what this is about.  It's lectures

22     and notes that she took on how to fix a toilet.  And to have

23     the Government come in here and start to argue that this is

24     indicative of her knowledge because she is involved with the

25     hide I suggest, your Honor, would not be appropriate argument

1    or inference for this Court.

2         THE COURT:  So, let us, then, turn to the question of

3    she is in the apartment, she knows there are lots of guns, she

4    knows that Mr. Bulger keeps them in various locations, and

5    while she may not her herself have constructive possession of

6    those guns, she is nevertheless part of a conspiracy in which

7    it is obvious that it has both a defense policy and a war

8    policy.

9         MR. REDDINGTON:  Well, I understand the Court's point.

10   Pursuant to the guideline the offense must involve possession

11   of the weapon in connection with the particular offense.

12        THE COURT:  Possession by Bulger is clear, right?

13        MR. REDDINGTON:  Yes.

14        THE COURT:  So, is it reasonably foreseeable to her

15   that his possession could be used in connection with that

16   conspiracy?

17        MR. REDDINGTON:  I understand what your Honor is

18   suggesting.  I just don't see that the evidence is there for

19   purposes of the possession in connection with furtherance of

20   the offense by her, not Mr. Bulger.  So, I would object to it

21   and request that the Court not add that enhancement.

22        It seems pretty clear the Government suggests that

23   they are not looking to throw everything or "shovel it in," I

24   think was the expression that was used.  Well, it's pretty

25   apparent that they are.  I think that clearly there is no

1    charge of the weapons, but now they seek to, under the lesser

2    standard of proof, enhance her sentence, and I just don't see

3    that the evidence is there, and it's certainly something within

4    the Court's discretion and your sound judgment as to what you

5    determine the facts to be based on the evidence.  So, I would

6    ask that you not give that weapon enhancement.

7         THE COURT:  Well, let me go back to the ones that deal

8    with these two, that is, the question of firearms and the

9    question of obstruction.

10        I am going to apply the firearm enhancement, not

11   because there is, from my perspective, adequate evidence by any

12   of the cognizable standards, including fair preponderance, that

13   there was constructive possession by Ms. Greig of those

14   weapons.  There is nothing here that I can see that suggests

15   that she was in a position, except with the approval of

16   Mr. Bulger, and that approval does not appear anywhere in the

17   record, to make use of those weapons.

18        So, I put off the table the question of her direct

19   responsibility, but I get to the question of conspiracy and how

20   conspiracy works in the context, as I said, of sentencing and

21   within the protocol that at least I tried to articulate in

22   O'Campo 20 years ago.  It is apparent to me that she knew that

23   there were lots of weapons there.  It is apparent to me that

24   she would be fully knowledgeable what those weapons were for in

25   this setting, and they were for perhaps other things, but

1    certainly for preventing apprehension, that is, to continue the

2    harboring in this case.  So, under those circumstances it seems

3    to me appropriate to attach the enhancement for firearms.

4         Now, I turn back to the question of obstruction of

5    justice.  There is a danger with obstruction of justice that

6    everything that makes it a little bit more difficult for the

7    Government to prove a case or for courts to develop evidence

8    constitutes obstruction.  I will not take that position.  The

9    parties are entitled to exercise their rights, and it is

10   appropriate for parties in exercising their rights to claim to

11   provide various kinds of evidence and pursue various kinds of

12   initiatives that are authorized.

13        But that is not the issue.  The issue, it seems to me,

14   is whether or not there were affirmative acts of

15   misrepresentation and at a critical time.  Again, I look at the

16   critical time as one that was highly charged in which the

17   defendant would, any person would, be quite upset.  That having

18   been said, however, I find critically important the

19   protestation that she did not have any property when it was

20   clear that she did and we, of course, found that out.

21        I do not mean to denigrate the argument, but it would

22   require the view that the property just disappeared into thin

23   air, and it is not just $10 kept in a bank and forgot about, it

24   is a very substantial, six-figure bank account, and it is a

25   house with no mortgage on it.  That is a misrepresentation at

1   the outset of the case to Pretrial Services.  A more

2   sophisticated development with respect to how property might be

3   used unfolded in the context of the bail hearing, but that was

4   misrepresentation at the outset, and I find it to be material.

5          I am less concerned with and, frankly, would not

6   otherwise attach obstruction of justice to the year that she

7   got to California -- we all make mistakes about years -- or

8   going to Mexico from Southern California.  It does not strike

9   me as so clear.

10         The question of denial of knowledge of cash and denial

11  of knowledge of firearms is material, and it seems to me that

12  that has to be included.  So, on that ground I will find that

13  the obstruction enhancement is also appropriate under the

14  *Guidelines*.

15         There is a second branch, as we discussed earlier on,

16  of the obstruction enhancement.  That is the branch that has to

17  do with conspiracy, and I find this to be very close.  On the

18  one hand it is reasonably foreseeable that all the conspirators

19  are going to take whatever steps are necessary to further the

20  conspiracy; but some of those steps are rather specific, and

21  here attributing to Ms. Greig the acts of her sister on this

22  record seems to me to be a stretch and one I am not prepared to

23  make.  I say it is close because I think it is a close

24  question, but the issue is the record itself.

25         So, for those reasons I am adding those two

1    enhancements.

2         Before taking a break, I want to take I think the last

3    issue here, which is relocation and sophisticated means.  It is

4    Objection No. 10 that the Government has made to the

5    calculation made by the Probation Office.

6         While I will permit, obviously, and carefully

7    consider, Mr. Reddington, what you have to say, I have to say

8    that this is, it seems to me, one that falls pretty squarely

9    within the *Guidelines* here.  It is possible to say, well, this

10   is not that sophisticated; how sophisticated is it to go to

11   people with alcohol problems and drug problems, even serially,

12   and obtain for relatively modest exchange amounts their

13   identities?  But it seems to me that this is sophisticated

14   enough to justify the inclusion of that enhancement in this

15   setting.

16        I also think the relocation is appropriate here.  It

17   is of the essence of this conspiracy that Ms. Greig was a part

18   of that there would be relocation until they found someplace

19   that was comfortable and protected enough to continue the

20   conspiracy to harbor and the actual harboring that she was

21   involved in.

22        So, unless there is some further argument,

23   Mr. Reddington, that you would like to make about that, I am

24   inclined to include that enhancement as well.

25        MR. REDDINGTON:  Just note my objection, your Honor.

1          THE COURT:  I do.  And it goes without saying that the

2     parties have argued other sides of this, and their objections

3     are, of course, preserved.

4          So, let us go back, then.  I think I have dealt with

5     all of the outstanding *Guidelines* issues.

6          MR. PIROZZOLO:  That's correct, your Honor.

7          THE COURT:  So, let us, then, recalculate these

8     *Guidelines* so that they reflect what I have actually resolved.

9          Just using paragraph 42 of the Presentence Report, I

10    am increasing that from 20 to 30.  With respect to the

11    additional enhancements for the special offense

12    characteristics, I am increasing it by two.  That would be I

13    think in paragraph 43 or relate to paragraph 43, although the

14    Government has asked with respect to the victims that

15    enhancement is not included.

16         Then I turn to the so-called "Group Two" calculations,

17    and here, because I found firearms, it moves to -- the specific

18    offense characteristics in paragraph 49 go up to 14.  The

19    question of obstruction adds an additional two points, and so,

20    as a consequence, if I have this correctly, in Group One we

21    have an adjusted Offense Level of 32; on Group Two we have an

22    adjusted Offense Level of 22.

23         THE PROBATION OFFICER:  Your Honor, I believe the

24    Court would have to impose the enhancement at the 10 first,

25    which gives you a plus two.

1          THE COURT:  (b)(10), okay.

2          THE PROBATION OFFICER:  And then (b)(11), which is

3   another plus two, so I get an adjusted Offense Level of 16 for

4   Group Two.

5          THE COURT:  Oh, under paragraph 49?

6          THE PROBATION OFFICER:  Correct.  49 would now only be

7   a plus four to bring it to 12.

8          THE COURT:  Right.

9          THE PROBATION OFFICER:  And (b)(10) is another plus

10  two, so then with obstruction I get 16 as an adjusted Offense

11  Level.

12         THE COURT:  And then when you go through the grouping

13  calculations, we are really looking only at the 32, aren't we?

14         THE PROBATION OFFICER:  Correct, your Honor.  So,

15  there is one unit, which brings it to a 33.

16         THE COURT:  So, turning to the way in which the

17  *Guideline*s work, the guideline range for this would turn out to

18  be 121 months to 151 months; is that right?

19         MR. PIROZZOLO:  Your Honor, I misheard, I think.  Did

20  Probation say it's to 33?

21         THE PROBATION OFFICER:  It would be a 33 prior to

22  acceptance of responsibility, which I guess your Honor would

23  have to determine that.

24         THE COURT:  Right.  I am sorry.  So, I do have to take

25  the acceptance.  I assume, unless there is something else going

```
 1    on, the Government is not arguing that there is an acceptance

 2    of responsibility here?

 3              MR. PIROZZOLO:  No, your Honor.

 4              THE COURT:  So, we go down to 29.

 5              MR. PIROZZOLO:  For purposes of clarification, the

 6    Government is not clear how we got from 32 to 33.

 7              THE COURT:  Let us go back to it.

 8              MR. PIROZZOLO:  If I might, I think there is only one

 9    group, your Honor.  There is no additional --

10              THE PROBATION OFFICER:  Correct, your Honor.  I

11    apologize.  It's actually no additional points, so you stay at

12    the 32.

13              THE COURT:  So, we are going from -- let me see if I

14    am capturing it correctly.  We are going from 32 to 29, right?

15              THE PROBATION OFFICER:  Correct, with acceptance.

16              THE COURT:  And the parties agree that is the

17    arithmetic?  Now, put to one side where we go with it.

18              MR. REDDINGTON:  That's the arithmetic.

19              MR. PIROZZOLO:  Yes.

20              THE COURT:  So, that arithmetic, so it is clear, leads

21    to a guideline range of 87 to 108 months in prison, it leads to

22    a fine range of $12,500 to $125,000.

23              THE PROBATION OFFICER:  I believe it's $15,000, your

24    Honor, to $150,000.

25              THE COURT:  You are right, $15,000 to $150,000.  Do we
```

1   have a shared set of numbers after going through this fairly

2   elaborate calculation?

3          MR. REDDINGTON:  Yes.

4          THE COURT:  Those are the *Guidelines*.  Now, it goes

5   without saying, but I will say it again, that the *Guidelines*

6   are advisory.  The Government, I believe, has asked for a

7   sentence that now would involve an upward departure or a

8   variance from the *Guidelines* in this case.  So, the next step,

9   after we take a, say, 15-minute break, is to hear the

10  Government's arguments.  I will hear from the persons who wish

11  to express their views here, the four that I have identified,

12  which I think are the only four here.

13         MR. PIROZZOLO:  For clarification, your Honor, there

14  is an additional victim who this morning asked to speak, so

15  there would be five.

16         THE COURT:  And that person is?

17         MR. PIROZZOLO:  Steven Rakes.

18         THE COURT:  Steven Rakes.  Okay.  And without testing

19  my own recollections, he would fall in that category of persons

20  I think who I would say is not entitled under the Crime

21  Victims' Act but to whom I give permission.  He is no different

22  from anyone else for whom you made the argument with respect to

23  emotional distress; is that correct?

24         MR. PIROZZOLO:  That's correct.

25         THE COURT:  So, then we will hear from those five

1    victims, and then we will hear from defense counsel, and I will

2    hear from Ms. Greig, if she wishes to be heard, before I impose

3    sentence.

4            So, we will take a 15-minute, brief recess.

5            THE CLERK:  All rise.

6        (The Honorable Court exited the courtroom at 11:35 a.m.)

7                        (Recess taken)

8            THE CLERK:  All rise.

9        (The Honorable Court entered the courtroom at 11:55 a.m.)

10           THE CLERK:  This Honorable Court is back in session.

11   You may be seated.

12           THE COURT:  So, I will hear the Government and its

13   recommendation.

14           MR. PIROZZOLO:  Thank you, your Honor.  The

15   recommendation as set forth in our Sentencing Memorandum is a

16   10 years' period of incarceration, $150,000 fine, a $300

17   mandatory Special Assessment, supervised release of 3 years,

18   and forfeiture as set forth in the Plea Agreement.  And I

19   believe that the Court has already imposed the Forfeiture Order

20   this morning, has already entered the Forfeiture Order this

21   morning.

22           Why is it a reasonable sentence?  Under the relevant

23   statute, 3553(a), the Court shall impose a sentence that is

24   sufficient but no greater than necessary to accomplish the

25   purposes of sentencing.  I am going to address certain of the

1    factors that are set forth in 3553(a).  The first --

2         THE COURT:  In the course of it, I assume that you

3    will address the question of why a departure or variance from

4    the *Guidelines* is appropriate.

5         MR. PIROZZOLO:  I will as well.  In fact, with respect

6    to -- the arguments are essentially the same, and we are

7    moving, we conditionally moved in the notice, we are moving

8    under 5K2.21 and 5K2.6 for a departure, a one-level departure

9    from where the Court currently is, which would accommodate the

10   sentence that is proposed.  5K2.21 permits the Court to

11   consider a wide range of conduct, not simply the conduct of

12   conviction, including uncharged conduct, to reflect the

13   seriousness of the offense, and 5K2.6 is a firearms departure

14   as well.  The arguments with respect to the firearms departure

15   are similar to those that are --

16        THE COURT:  But why is that not redundant in the sense

17   that it is specifically identified in the calculation of the

18   *Guidelines* already?

19        MR. PIROZZOLO:  Because those were not taken into

20   account in the *Guidelines* calculation that --

21        THE COURT:  How so?

22        MR. PIROZZOLO:  The Group One, there was the Base

23   Offense Level of 30, there's the obstruction of justice of two.

24        THE COURT:  So, it's through the grouping issues that

25   you want to have that brought back in?

1          MR. PIROZZOLO:  Correct, correct.  And while it was

2     applied in connection with Group Two but not Group One, because

3     Group One is the one that drives the sentence here, it is, in

4     fact, not included or it's not -- yes, it's not included in the

5     calculation that's driving the sentence here.  So, that is the

6     basis on those.

7          So, the arguments under the 3553(a) factors for

8     purposes of the record also justify the one level of departure

9     that the Government is moving for.  Where the *Guidelines*, as

10    calculated by the Court, currently sit don't reflect the

11    seriousness and the nature of the circumstances of the offense

12    in the following sense, and this is why the Government submits

13    an additional period above the *Guidelines* range or a variance

14    is appropriate.

15         First off, this is the most extreme harboring case in

16    terms of the length of time, 16 years, and the nature of the

17    offenses of which the fugitive has been accused of committing.

18    The fugitive, Mr. Bulger, in addition to the original extortion

19    indictment, was also indicted on a RICO for RICO conspiracy and

20    other various crimes that included 19 predicate acts of murder.

21    The duration of this, 16 years, this wasn't just a single

22    incident of harboring, it wasn't even months of harboring.

23    Essentially, the defendant here was committing a crime that

24    persisted day after day after day.

25         In its Sentencing Memorandum the Government set forth

1    some representative cases of harboring, and not one of them is

2    even remotely close in terms of the extremity of the conduct,

3    not remotely.  They are not as close as the extremity of the

4    conduct.

5          THE COURT:  Let me pause on this.  It is clear, to me

6    anyway, that the duration is not included in the calculus of

7    the *Guidelines* and that is a grounds for departure.  I do want

8    to go back, however, as to the serious of the offense.  Isn't

9    that captured by the relation of the guideline to the

10   fugitive's offense, and it brings it very high because the

11   fugitive's offense is very high, but it is not something that

12   has been left unconsidered, I guess, is the way I would ask?

13         MR. PIROZZOLO:  It is considered, but the degree to

14   which it's considered -- so, Mr. Bulger's crimes, the crimes of

15   which he is accused of are so serious, his guideline ranges are

16   43, Level 43.  You're talking about, even if you subtract the

17   six, which is what the *Guidelines* provide for, that still

18   leaves you seven levels above where the *Guidelines* ultimately

19   ended up in this case, seven levels above.

20         THE COURT:  Is it seven or eight?

21         MR. PIROZZOLO:  43 minus six would be 37.  37 minus 7

22   is 30, right?  We end up at 29, that's right.  So, eight, eight

23   levels.  Because of that gap the *Guidelines* don't fully reflect

24   the seriousness of the underlying offense that Mr. Bulger has

25   been accused of.  So, at least in those two respects.

1          I want to draw the attention of the Court to one case

2     that was in the table that I think is instructive.  There are

3     other cases as well, but it was not necessarily -- it was in

4     the table but not highlighted in the memorandum.  The United

5     States versus Andruska.

6          THE COURT:  This is the Seventh Circuit case?

7          MR. PIROZZOLO:  This is a Seventh Circuit case, that's

8     correct.  It's an older case, it's a 1992 case.  If you look at

9     the *Guidelines* calculation for the defendant in that case --

10    and in that case the facts were nowhere near as extreme as they

11    are here.  This is a woman who spent a couple of months helping

12    a motorcycle gang member avoid capture.  She drove to Florida,

13    crossed state lines.  She at one point was stopped with the

14    fugitive in her car, she fled, got into a crash and was

15    arrested.  The *Guidelines* that were calculated for her offense

16    were 97 to 121 months.  She ended up getting five years.  Just

17    for clarity, five years because the statutory max kicked in.

18    In that case it was five years.  But by comparison --

19         THE COURT:  Just so I am clear as to your

20    understanding of it, it was a charging decision on the part of

21    the Government?

22         MR. PIROZZOLO:  In connection with that case, yeah.

23    Well, there may have been -- see, what is not in this case, in

24    the Andruska case, is the additional crimes.  So, whether that

25    was a charging decision or not, there is no evidence of the

1    additional criminal conduct.

2           THE COURT:  I see.

3           MR. PIROZZOLO:  There is no evidence, I don't believe

4    in this case, certainly not of the number of firearms that were

5    housed by the fugitive with the defendant in that case.  So, I

6    think if you compare it to the Andruska case, this is certainly

7    as serious and probably much more serious than in that case,

8    where the Guidelines turned out to be 97 to 121 months.

9           We can discuss that further, there are some wrinkles

10   to that that are different, if you have questions.  But in

11   terms of the facts this is worse.

12          We discussed earlier today my unsuccessful attempt to

13   get the Court to apply the vulnerable victim enhancement.

14          THE COURT:  Valiant, however.

15          MR. PIROZZOLO:  Valiant.  But that does not mean that

16   it's irrelevant to sentencing here.  It is a fair inference

17   from this record that there was a conscious decision to target

18   people who would be, if not vulnerable victims in the legal

19   sense of the Guideline, who would be compromised in some way

20   such that they would be susceptible to these inducements, and

21   there is a clear pattern that Mr. Bulger engaged in.  And here,

22   frankly, the evidence shows that Ms. Greig was part and parcel

23   of that as well.  It didn't happen just one time for her

24   directly.  There's at least three instances where she was

25   personally involved in obtaining -- well, at least two

1    instances, actually.  I want to correct that.  At least two

2    instances where she was directly involved in obtaining the IDs

3    from people who were compromised.  The guidelines calculation,

4    given that the vulnerable victim enhancement didn't apply,

5    don't take account of that conduct, which increases her

6    culpability here.  This is just simply not somebody who was

7    along for the ride and things would just show up.  She was an

8    active participant in this effort to keep Mr. Bulger and

9    herself free from capture.

10           In addition, one of the additional elements that the

11   Court needs to consider is the need to reflect the seriousness

12   of the offense, to promote respect for the law and to provide

13   just punishment.  We outlined our arguments in the Memorandum,

14   and I am not going to repeat them at length here, but I am

15   going to say that there is absolutely no evidence here that

16   Ms. Greig, and this is, frankly, reflected in the Sentencing

17   Memorandum, that Ms. Greig has taken any, she has not -- does

18   not understand or accept that what she did was truly wrongful.

19   She has accepted responsibility in a legal sense of the term

20   because she has to because she has been caught, but there is no

21   sense that she understands that what she did was wrong.

22           You can see in the Sentencing Memorandum there is this

23   discussion about Shakespearean sonnets.  This isn't poetry.

24   This is a woman who, by choice, whether love or not, by choice

25   decided to help a man that has been accused of vicious crimes,

1  vicious and persistent crimes.  There are family members here

2  of people who suffered from some of those crimes that

3  Mr. Bulger allegedly committed, grotesque violence.  We have

4  all seen the corruption for which he was at the center.

5  Whether it's love or not, what she did willfully, knowingly,

6  intentionally was to keep these people from doing nothing other

7  than seeing Mr. Bulger come to face justice, to be called to

8  account to answer for the very, very serious crimes of which he

9  has been accused.

10       That removes this from any conceivable similar case.

11 The closest case that we found on the facts was the Gros case,

12 but what doesn't exist here in terms of the seriousness of the

13 offense was the degree of both corruption and violence that

14 Mr. Bulger is alleged to have engaged in, nor, frankly, was it

15 even the length of time.  In that case, by my count, it was

16 nine years.  I think other cases have said it was six years.  I

17 think they get it wrong.  I think it was nine years.  Here we

18 are talking almost double, almost twice as long.

19       So, the comparison to other cases, the need to reflect

20 the seriousness of the offenses, and then ultimately in terms

21 of the 3553(a) factors, the issue of deterrence -- now, I don't

22 know the specific deterrence in terms of her specific

23 deterrence of committing identity fraud and harboring are

24 particularly relevant here.  It's unlikely she is going to be

25 harboring some other fugitive.

1      But the issue of deterrence is substantial here.

2  People like Mr. Bulger, who is alleged to have been an

3  organized crime figure for many years, needs help; he cannot do

4  it alone.  You can see from the record of this case that

5  Mr. Bulger spent a lot of time planning.  There were people who

6  helped him.  It was necessary for them to help him, and nobody

7  helped him more, nobody, than the defendant, Ms. Greig.  To

8  send the deterrent message it is essential to take that into

9  account.  This is just not any other kind of harboring case, it

10  just isn't, and to do that it has to reflect a very, very

11  serious penalty under these circumstances.  It is hard to

12  imagine, frankly, a more serious harboring case than this one,

13  and to do anything other than what the Government submits is a

14  reasonable sentence here would potentially send the wrong

15  message in terms of deterrence.

16      Now, we are already talking about a very serious

17  sentence under the *Guidelines*, but what the Government is

18  requesting is one additional level up that would permit the

19  10-year sentence here, and under those circumstances the

20  proposed sentence would be reasonable.

21      Unless the Court has any other questions of the

22  Government, we would otherwise rest on our papers.

23      THE COURT:  No.  I think I understand the Government's

24  position.

25      I indicated that I would hear the now five individuals

1   who want to speak, and I indicated briefly my view that this is

2   a matter of discretion rather than a matter of legal

3   obligation, and I think I owe it to all concerned to explain

4   that.

5           Congress created the Crime Victims' Act to provide an

6   opportunity for people outside the system to provide input at

7   critical stages in the system, but they also created a set of

8   constraints.  It was not meant to be an obligation of the

9   Courts to let anyone who wants to speak on any occasion speak.

10  They set up a set of standards, and those standards really go

11  to the question of what we call "direct and proximate cause" in

12  the civil law, which takes us back to foreseeability; that is,

13  whether or not a person who wishes to speak is someone who is

14  within the scope of the understanding of the person who

15  committed the crime.

16          Here, we have not a derivative crime but a crime that

17  depends upon somebody else's bad acts.  The individuals who

18  have identified themselves as wishing to speak are people who

19  have been harmed by Mr. Bulger's activities, as they allege.

20  The relation to Ms. Greig is much more attenuated.  There is no

21  question that she assisted Mr. Bulger in delaying the point of

22  judgment for which the victims of Mr. Bulger's crimes properly

23  wish to see, and some of them, because of the 16 years, have

24  not been able to.

25          But the legal standard for the Crime Victims' Act is

1    one that essentially tracks what we call "tort law," civil law

2    of harms, and the Government makes a valiant effort to say that

3    the law of infliction of emotional distress would be applicable

4    here.  I have to disagree.  If this case were presented to me

5    in the context of a civil action against Ms. Greig for

6    intentional infliction of distress, based on the record that I

7    now have I would probably grant summary judgment for Ms. Greig.

8    The reason is that her activities are simply too attenuated

9    from the harm that the law provides a remedy for to the persons

10   who have identified themselves as victims here.

11          So, I decline, as I said, to do this as a matter of

12   right.  I do it as a matter of discretion because, it seems to

13   me, that, irrespective of what I am obligated to do, this is

14   the right thing.

15          On that point, it seems to me that this is one of

16   those occasions in which a little bit of history is worth a

17   volume of logic.  I will start with the volume.

18          There is a book that has just been published by

19   Professor Bibas of the University of Pennsylvania Law School

20   called *The Machinery of Criminal Justice*.  What he does is, he

21   says there is a division now between insiders and outsiders in

22   the criminal justice system.  There was a time around the

23   Revolution in which everything was transparent; things happened

24   in a community and they were observed in the community.  But,

25   as a result of professionalism, the increase of cases and a

whole variety of factors that I will not go into here, we now

have insiders:  law enforcement people, prosecutors, defense

counsel, although that is less relevant in this context, and

judges.  The law enforcement people gather evidence, make

recommendations, the prosecutors make the charging decision and

the judges dispose of it.

But there is something more fundamental going on, and

it is illustrated as dramatically as it can be by this case,

and that is that the public is no longer directly involved,

except as jurors, in the criminal justice process.

So, let us go back to the question of law enforcement.

This case, or at least Mr. Bulger's case, arises out of a

laser-like focus on obtaining convictions of the Angiulo

Family.  Other considerations were put to one side, and the FBI

made a Faustian bargain with certain individuals, Mr. Bulger

included, to obtain the evidence that was necessary; first, to

get a Title III application and then to get a conviction.  That

was at a time when the view in the Department of Justice was

that the FBI made its own choices about top-level informants,

and prosecutors did not ask any questions.

It was illustrated in this case, it comes to mind, by

current events in the prosecution of Howard Winter for the

race-fix case back in 1979.  The evidence in various cases is

that the FBI prevailed upon the prosecutors not to include

Mr. Bulger in the charges.  Why did they do that?  Well, they

1    did not want to compromise Mr. Bulger because he was providing

2    evidence for purposes of the main chance, which was

3    Mr. Angiulo.

4          Now, there was corruption in the relationship that

5    Mr. Bulger developed with the FBI, that is clear, and the role

6    of the Department of Justice, as I said, was not to inquire too

7    deeply into exactly what was going on.  But as these cases

8    unfolded, it became clear what was going on, and it took Judge

9    Wolf 600 pages to lift the rock off of what was happening to

10   disclose what was going on.  It is important, for historical

11   purposes, to emphasize that the Department of Justice fought

12   him tooth and nail to get the information out in various ways,

13   declining to provide various kinds of information that was

14   relevant to the Faustian bargain that was made by the FBI.

15         This was a difficult time for law enforcement in this

16   City, where other law enforcement agencies declined to

17   cooperate with the FBI, conducted independent investigations.

18         But all of this was insiders, undisclosed to the

19   public, until, frankly, Judge Wolf made that disclosure.

20         Things have changed, obviously.  The FBI has

21   acknowledged its responsibilities with respect to certain

22   agents.  The Department of Justice has been much more vigorous

23   and forthcoming on the criminal side with respect to the

24   prosecution of matters like this and the transparency with

25   respect to informants.  The treatment of high-level informants

1    I perceive, based on my vantage point, is no longer as

2    deferential as it once was, although it is still inflected by a

3    desire to maintain informant confidentiality.  But we have in

4    those two stages of the insider process, the choice of

5    prosecution and investigation by the FBI or law enforcement and

6    the choice of charging by the Government, the essence of the

7    insider-outsider dichotomy that Professor Bibas has identified.

8            For what they considered to be good and sufficient

9    reasons, persons in the FBI were prepared to condone violence,

10   and a number of persons who are speaking here today are victims

11   of that violence, put to one side the role of Ms. Greig at this

12   point.

13           But there is a third dimension.  The Department of

14   Justice chose vigorously and technically to oppose civil cases

15   brought by victims, relying upon, ultimately, although there

16   were a variety of initiatives in defense, the statute of

17   limitations as an affirmative defense, which someone who

18   accepted responsibility might not necessarily invoke.

19           So, the case law of this Court and the Court of

20   Appeals is littered with choices by the Department of Justice,

21   in its incarnations I think principally in Washington in its

22   Civil Division, to continue to exclude the victims of

23   Mr. Bulger's activities; in short, to, at least in certain

24   cases, assure that they have no voice.

25           So, a role for allocution, which is the fancy word for

1    this sort of thing, for these kinds of victims is to give them

2    the opportunity to express themselves about their hurt and

3    their pain in a matter that, as I have said, is not such as to

4    provide them with a cause of action against Ms. Greig but,

5    nevertheless, arises in a context that is exceptionally

6    important for them and for the community.

7           Now, why did Congress put limitations on the Crime

8    Victims' Act?  Well, it is because the criminal justice system

9    and the role of insiders is supposed to be to refine vengeance.

10   The development of the criminal law has been largely a movement

11   away from vengeance or some kind of personal and private

12   retribution to a public role for professionals.

13          The outsiders lack the understanding of these very

14   complex *Guidelines* that read like the *Internal Revenue Code* and

15   reduce judges to the role of Certified Public Accountants.  But

16   they have a sense of justice themselves, and it is a moral

17   sense that is entitled to the opportunity to be heard.  Will it

18   be accepted in precisely those terms?  Not necessarily.  There

19   are a variety of factors that play on sentencing.  But,

20   nevertheless, they have a right to be heard.

21          Now, there are dangers involved in the kind of extreme

22   statements that sometimes get made that do not show the

23   proportionate justice that is necessary in dealing with a case

24   like this or simple-minded resolutions.

25          The opportunity to speak is not a rehearsal for a book

tour.  It is the opportunity to bring to the attention of the

public the larger issues which are subordinated when the

insiders play an insider game, as they did until a full range

of misconduct was developed -- and I, again, give Chief Judge

Wolf the credit for the diligence of pursuing this -- by the

Court.

Now, the Courts tend to resolve cases in light of what

the parties put before them, as they should.  So, one could

say, well, you look on the *Guidelines* and one is on one side

and one is on the other and the Court, showing a fine balance

of the type that we have recognized in Solomon, finds something

in between.

But the Court has an independent responsibility, and

it is an independent responsibility to ensure that the

community feels that justice has been done as best the Court

can within the constraints of the law.  In order to understand

that more fully, it is necessary I think in cases like this,

and particularly this case, to permit persons who are victims

of Mr. Bulger's activity to speak at the sentencing of

Ms. Greig, although under our statute I do not think that they

are entitled to that, they have a legal entitlement to that.

It seems to me important to develop what Professor

Bibas has identified more generally, because it is a constant

invitation to untethering the moral sentiments of the community

from the process-oriented approach of the insiders, including

1    judges.  I call that out because this case, as I have said,

2    raises these issues as dramatically as any case could do so.

3          So, for those reasons, as I have tried to explain them

4    here, we are going to be hearing from first -- I am doing this

5    in alphabetical order -- Mr. Connors, then Mr. Davis, then

6    Ms. Donahue, then Mr. McGonagle and Mr. Rakes.

7          So, Mr. Connors, I am not sure where you are, but if

8    you would go to the microphone here, please.

9          MR. CONNORS:  Good morning.  I am Timmy Connors.

10         THE COURT:  Mr. Connors, you have the same problem I

11   have, which is a soft voice.  If you could move the microphone

12   down.  Mr. Pirozzolo maybe can turn it on for you.

13         MR. CONNORS:  Good morning.  I'm Timmy Connors, and 37

14   years ago today, on June 12th, 1975, my father, Eddie, was

15   killed by "Whitey" Bulger, a man you did everything in your

16   power to hide and protect.

17         You're not here by choice; you're here only because

18   you were caught.  You're as much a criminal as "Whitey" and

19   should be handled as such.  You may not have killed anyone like

20   he did, but in the 16 years you hid him you killed a lot of

21   hopes and dreams of my family members that have passed on in

22   that 16-year span never seeing their loved one's killer brought

23   to justice.

24         Your attorney is trying to portray you as a kind and

25   gentle woman.  You're not.  You're a cold-hearted criminal.

1    You never showed any sympathy towards any of us.  The only time

2    you showed any emotion is when your brother was mentioned.

3    Truth be told, if I had a sister like you, I would have killed

4    myself, too.

5            Judge, I ask you if you give her anything less than

6    what the U.S. Attorney is asking for, you may as well walk over

7    here and stick this pen in my eye, because you would be causing

8    me a lot less pain that way.

9            Thank you.

10           THE COURT:  Thank you, Mr. Connors.

11           I think I should underscore what I have said before,

12   which is the risk in the course of the allocutions that a sense

13   of hurt leads to rhetorical overstatement that does not assist

14   in fashioning a sentence as much as it could.

15           But this is the occasion for persons to speak from

16   their heart in the way that they wish to.  It is also an

17   illustration of why it is that we have a criminal justice

18   system in which professionals make a number of these decisions.

19           So, we turn next to Mr. Davis.

20           Mr. Davis.  I am doing it by alphabetical order.

21           MR. DAVIS:  Oh, they wanted me to go last, your Honor.

22           THE COURT:  Well, I will make the decisions on who

23   goes when.

24           MR. DAVIS:  My name's Steve Davis.  I am speaking on

25   behalf of my mother and my sister, Debra Davis.  The corruption

1   for over 30 years in Boston has been held hostage by James

2   "Whitey" Bulger, the Bulger family, Stephen Flemmi and the FBI.

3   But I do wish to thank the U.S. Attorney Fred Wyshak, Colonel

4   Tom Foley, Sergeant Steve Johnson, and the Massachusetts State

5   Police, and DEA Agent Dan Doherty and Brian Kelly for bringing

6   all this to where we are today for the justice we're looking

7   for.

8          Since my sister's disappearance in '81 until the day

9   my mother died in 2007, she never stopped grieving for her

10   daughter over the 20 years because of the criminal activities

11   of the FBI, Steve Flemmi, Whitey Bulger and his family and

12   Catherine Greig.  My mother was unable to live long enough to

13   witness the capture, the prosecution for my sister, my sister's

14   murderer, "Whitey" Bulger.  This is due to the tremendous

15   amount of support "Whitey" Bulger received from the defendant

16   Catherine Greig.

17                      (Pause)

18          THE COURT:  Take your time, Mr. Davis.

19          MR. DAVIS:  Catherine Greig's acts were not those of a

20   person who didn't understand the consequences and actions.  She

21   was not held against her will.  Her loyalties lied with Bulger,

22   not the murdered victims.  She was a willing partner and

23   co-conspirator of "Whitey" Bulger.  She was determined, as

24   Bulger, to elude the authorities and avoid prosecution for his

25   murders.

1          This woman does not deserve any leniency at all.  She

2     should get the maximum punishment.

3          She doesn't even have the heart to look any of us in

4     the eye.

5          Catherine, you're a dirty bitch.

6          Thank you, your Honor.

7          THE COURT:  Thank you, Mr. Davis.

8          As you know, and as I have said, this is an

9     illustration of the limitations of allocution and the tendency

10    to lead to an unmeasured and vengeful set of considerations,

11    but it also, as I have said earlier, reflects the view of

12    genuine victims.

13         So, I guess Ms. Donahue is next.

14         MS. DONAHUE:  Good afternoon, your Honor.  My name is

15    Patricia Donahue.  I'm the wife of Michael Donahue.

16         I would like to start off by saying that I feel

17    Catherine Greig bears a lot of responsibility for "Whitey"

18    Bulger being a fugitive for 16 years.  She knew exactly what he

19    was capable of and still made the decision to be with him.  I

20    believe he never would have survived all of those years without

21    her help.

22         Her decision has a severe impact on not only my life

23    but my children's lives and the other victims' lives.  She was

24    his enabler.  No matter where they were, she was his constant

25    companion and took charge of his overall well-being.

1          I feel that she should be given the maximum sentence.

2     As my family has been given the maximum sentence, so should

3     she.  Otherwise, the message being sent is that it's okay to

4     harbor a fugitive, in this case the most wanted fugitive in

5     America.  I would like the Court to take all these things into

6     consideration.

7          Thank you.

8          THE COURT:  Thank you, Ms. Donahue.

9          Mr. McGonagle.

10         MR. McGONAGLE:  Good afternoon, your Honor.

11         Catherine Greig was my aunt by marriage.  She was

12     married to my uncle, my youngest uncle, in 1971, Robert

13     McGonagle.  She was welcomed into our family, and I spent many

14     hours with her at her mother Janette's house as a boy.  I

15     traveled with her for family vacations and other activities in

16     and around the Boston area.  I always regarded Catherine not

17     just as a relative but as a real friend.

18         James "Whitey" Bulger is charged with the murder of my

19     father, Paul McGonagle, in an indictment pending in this Court.

20         My family, including my mother, my brother, my uncles,

21     my aunts, feel that Catherine Greig betrayed our family in

22     aiding and abetting Bulger to remain a fugitive for 16 years

23     before being apprehended.

24         This woman, once married to my Uncle Bob, provided

25     invaluable assistance to Bulger to remain free and avoid

1   punishment for his many crimes.  She well knew who and what

2   Jimmy Bulger was and made a willing and conscious decision to

3   help him remain free.

4         The last time I saw my father, he was on his way to

5   pick up my brother, Sean, at a local ice rink.  He never

6   returned.  My mother, Mary, was 36 years old, my brother, Sean,

7   was 10, I was 14.  My father simply disappeared as far as we

8   were concerned.  Twenty-seven years would go by before we knew

9   his fate.

10        During these years, I carried his picture with me

11  always.  Everywhere I went, for business or pleasure, I looked

12  for him.

13        My father was a great father, brother, friend and

14  husband.  No matter his faults, he did not deserve to die the

15  way he did.

16        When my father disappeared my mother, Mary, became the

17  sole bread winner.  She worked to support us as a court officer

18  in Boston for 33 years.  She did an outstanding job raising my

19  brother and me under the circumstances, and my brother and I

20  have gone on to lead productive lives, have families and given

21  our mother three beautiful grandchildren.

22        It my family's firm belief that Catherine Greig was

23  aware of Bulger's involvement in the murder of my father.

24  Catherine Greig has shown herself to have a knowing and willful

25  disregard for the law and a callous disregard to me and my

1    family.

2           The pain and loss that I and my family have felt for

3    the many years my father was missing is only exacerbated by the

4    fact that Catherine Greig, once a member of our family, aided

5    the murderer of my father to remain free for 16 years.

6           For these facts, we urge the Court to give Catherine

7    Greig a sentence fitting the seriousness of her crimes.  Due to

8    the personal relationship which she had with me and my family,

9    she should be sentenced to the maximum possible under the law.

10          Thank you.

11          THE COURT:  Thank you, Mr. McGonagle.

12          Mr. Rakes.

13          MR. RAKES:  Hi.  Good morning.

14          My name is Steve Rakes.  In 1993 my family and I built

15   a liquor store in South Boston.  That was the start of a

16   nightmare, and it continued until 1995.  I was told in 1995

17   they would have captured this man Bulger, but that never

18   happened.  Now comes 16 years later, the person that helped

19   Bulger to evade the law is looking for fair and equitable time

20   to be released.  I would ask the Judge to give her nothing less

21   than the maximum.  If not, you go outside your scope, sir, and

22   give her additional time.

23          Thank you very much.

24          THE COURT:  Thank you, Mr. Rakes.

25          So, Mr. Reddington, I will hear from you.

1          MR. REDDINGTON:  Thank you, your Honor.  You know,

2    when you just went through the analysis of the book and the

3    insiders and dealing with the criminal justice system and how

4    we try to step away from revenge, this is a classic example of

5    that.  You sit up there with restraint, you speak from

6    obviously your experience, your knowledge, your wisdom, you are

7    dealing with the books, the *Sentencing Guidelines*, but yet

8    humanity in trying to be a judge in trying to be fair and

9    trying to be just and trying to do justice.

10         When you consider who I am standing next to, who I

11   have come to know, your Honor, as I have described in my

12   Sentencing Memorandum, it is pretty apparent that I think a lot

13   of Catherine Greig.  I know that she has been called some names

14   here today, and I know that there's an awful significant

15   overflow of emotion, which is understandable with the families

16   of these individuals.

17         But when you analyze what Catherine Greig actually

18   did, Judge, and I put my argument, if you will, in the

19   Sentencing Memorandum, is look at this woman at the age of 60,

20   with no criminal record, who had been living with a man that

21   she was truly in love with, but you consider what she did.  I

22   mean, even with the identification cards, your Honor has looked

23   at the photographs, you have seen the types of cards that they

24   were and not once were they utilized.  Did she ever derive a

25   benefit?  Did she ever use it to obtain insurance, to defraud

1    the Government, to get any type of monetary compensation?  They

2    sat in that apartment.

3         And in the course of her living with Mr. Bulger, yes,

4    she took him to the dentist and she took him to the doctor.

5    They had, as I argued, a very sedentary, modest lifestyle, no

6    criminal activity.  Mr. Bulger, who has been described, and I

7    think we all agree, is a gentleman who is known to have a

8    temper, who is certainly a dominating, obviously a dominating

9    individual, that he lived with Catherine.  She cooked for him,

10   she was basically his house maid.  I know that the Government

11   has argued that she in some sense was, you know, an evil

12   mastermind and orchestrating things.  Basically her life

13   consisted of living in that apartment with him, shopping,

14   rescuing animals and walking on the streets, once in a while

15   having dinner.  A very, very sedentary lifestyle.

16        I think it's important to note, your Honor, the

17   Government has made a large issue out of the purported

18   targeting of vulnerable individuals, portraying an image that

19   Mr. Bulger and Catherine would troll the areas of the beach

20   looking for vulnerable people that were either drunk or

21   homeless or having mental issues, and it couldn't be farther

22   from the truth.  If they were targeting anyone it would be

23   someone that would look like him or that he could use the

24   identification.

25        What's really telling is when you look at one of the

1    302s, your Honor -- I know you have read every piece of paper

2    in the submissions in this case -- but one of the things that's

3    noted is dealing with Mr. JL, one of the alleged victims that

4    were targeted and they were suffering from vulnerability, it's

5    important to note that Mr. Bulger, according to the

6    investigation and the statement, indicates that Mr. Bulger had

7    great respect for this individual.  He had been in the

8    military.  He attempted to get him to quit drinking because the

9    guy had a significant alcohol problem.  He supported him for 10

10   years, that he made sure that Mr. L was able to be taken care

11   of, and he stated that he tried very hard to get him to get off

12   the liquor.  And the trooper or the interviewing individual,

13   the FBI gentleman, indicates that Mr. Bulger described in their

14   investigation, revealed how close he was with Mr. L, and, as I

15   say, indicates that he did indeed support him for 10 years, and

16   that Bulger became visibly emotional when talking about Mr. L's

17   death.

18        I think that speaks volumes, your Honor.  This is not

19   a situation where there is a cold, calculating, sinister woman

20   that is violating the laws.  I understand that there is a need

21   for punishment, and the 3553 factors, your Honor, obviously you

22   have in front of you her age, her health, lack of a criminal

23   record.  What she did in comparison to what the Government is

24   requesting is Draconian.

25        I think I pretty much said it all in my sentencing

1    recommendation, your Honor.  I know that you, as a judge, are

2    going to consider the interests of justice and try to mete out

3    a fair sentence but under the law one that is not excessive or

4    not more, if you will, than what justice calls for.

5            We have talked about the 3553 factors in the sense of

6    need for deterrence, punishment.  I think the comment that she

7    is not going to be harboring any fugitives I think clearly is

8    one that, maybe he was being somewhat jocular, but the point is

9    that Catherine Greig fell in love with Mr. Bulger, and that's

10   why she was in the situation that she was in.

11           I don't think there's much more that I can say.  I

12   know that your Honor has read every document.

13           I would suggest to the Court that Ms. Greig did not

14   believe that Mr. Bulger was capable of these homicides of which

15   he is yet to be proven guilty.  I think that's important to

16   note.

17           And I think what else is important to note, your

18   Honor, is that she has accepted her responsibility.  She has

19   changed her plea to three Class D felonies, 5-year caps on

20   each, not 20-year felonies, and I think, your Honor, knowing,

21   as I do, the study that you put into the *Guidelines* and knowing

22   that the *Guidelines* are advisory, it's really important that a

23   judge not sit, as you said, and kind of become a CPA and

24   calculate numbers.  What is really important is that you sit up

25   there and that you are the epitome of justice.  What you say is

1   what justice requires, regardless of criticism, regardless of

2   anyone's hostilities.  Just as my situation, as this woman's

3   advocate in this courtroom, that whatever your Honor's decision

4   is, I certainly would not set about and criticize it, because

5   you are the epitome of justice.  You are to impose a fair

6   sentence, not a vengeful one.  Thank you.

7            THE COURT:  Thank you, Mr. Reddington.

8            Ms. Greig, I will hear from you, if there is something

9   that you would like to say at this point.

10           MR. REDDINGTON:  Your Honor, Ms. Greig would

11  appreciate the opportunity but would decline.  Thank you.

12           THE COURT:  All right.  What I am going do is take a

13  the luncheon break at this time.  I want to review my notes

14  here.  We will come back at 1:30.

15           THE CLERK:  All rise.

16       (The Honorable Court exited the courtroom at 12:45 p.m.)

17                        (Lunch Recess taken)

18           THE CLERK:  All rise.

19       (The Honorable Court entered the courtroom at 1:30 p.m.)

20           THE CLERK:  This Honorable Court is back in session.

21  You may be seated.

22           THE COURT:  First, I am going to allow Motion No. 103,

23  which is the Protective Order concerning an informant based on

24  the arguments that were presented here.  It is clear that the

25  information concerning the informant is not material to the

1    decision in this case, nor, frankly, relevant to the larger

2    issues of sentencing that are presented.

3         I spent a little bit of time thinking about the

4    presentation of the victims of Mr. Bulger's conduct, and it

5    seems to me important to comment on it again.  It illustrates

6    the tensions in the criminal justice system.  The statements of

7    certain of the victims were cruel, crude, heartfelt, but

8    reflecting vengeance, a desire to get back.  That is where our

9    civilization started; it is not where it is supposed to end.

10   It illustrates the importance of having a professional criminal

11   justice system that tries to refine that vengeance into a fair,

12   proportionate and dispassionate resolution of matters.

13        That tension is particularly evident here, because

14   this is a case that illustrates how the criminal justice system

15   simply broke down because the insiders took control.  But that

16   does not mean that a professional criminal justice system is

17   not the proper way to resolve this.  The question of how much

18   influence outsiders have will be one that I am sure will be

19   debated for a substantial amount of time, and I happen to think

20   that they should have more of a role and that there is a role

21   for restorative justice.  There is not, however, a role for

22   cruelty, crudity and vengeance.

23        What the criminal justice system properly does is

24   attempts to channel understandable emotions into a formal set

25   of accommodation of competing interests.  They are done through

1    the *Sentencing Guidelines*, which give us crude and illusory

2    mathematics of what a sentence should be, but they provide a

3    context in which to consider the question of proportionality in

4    sentencing; and, of course, judges are obligated to calculate

5    them as best they can, and I have, as best I could,

6    understanding that there are objections to various calculations

7    that are made by both parties.

8         I acknowledge that the *Guidelines* do not quite capture

9    everything that is involved in this case.  They do not capture

10   the question of duration.  It is possible to say that the

11   firearms adjustment should have been put in Group One, not

12   Group Two.  That would make a difference.  It is possible to

13   say that the seriousness of the underlying offense for which

14   harboring was involved is so serious that it should be bumped

15   up.

16        Those are all questions on which reasonable people

17   could disagree, and it is up to the Sentencing Commission to

18   make those determinations, and then it is left to the judge.

19   It is left to the judge to consider factors that Congress has

20   identified in Section 3553, and so I will work my way through

21   those factors before reaching the bottom line.

22        The first is the nature and seriousness of the offense

23   and the character of the defendant.  This is a serious

24   collection of offenses, no question about that.  I think,

25   however, we would be ignoring matters if we did not step back a

1    little bit to recognize that there are differences of opinion

2    with respect to harboring in the law of the several

3    jurisdictions.

4           Of course, this is a federal case that is decided by

5    federal law, but if you turn to the law of the Commonwealth of

6    Massachusetts, having a particular relationship with a

7    defendant fugitive is a defense.  It is a defense for brothers,

8    sisters and wives.

9           Why is that?  Well, because the law of Massachusetts,

10   anyway, recognizes that there are competing demands on people

11   when they get themselves involved with relatives who cause

12   problems, and Massachusetts, while it does not have common-law

13   marriage, recognizes common-law marriage as creating a basis

14   for a defense.

15          So, if, for example, Rhode Island has a couple with a

16   common-law marriage and a crime of harboring is committed in

17   Massachusetts, there is a defense.

18          Now, why do I go into this discussion of alternative

19   jurisdictions?  Because it is not applicable here.  First, it

20   is not federal law.  Number two, neither Massachusetts nor

21   California recognizes common-law marriage.  I do it to

22   emphasize that what is involved in all of these matters is a

23   kind of accommodation of competing impulses to protect a family

24   relationship and recognize that sometimes it is too difficult

25   to give up your relative.  That, at least, is the Massachusetts

1    State law resolution.

2            But the federal law recognizes a higher obligation,

3    and the higher obligation is not to be an accessory after the

4    fact, not to help somebody out.  But if this were simply

5    harboring, as I indicated and Probation indicated in its

6    calculations, the guidelines would be relatively low.

7            And that is the point.  It is not merely harboring.

8    It involves the use of identity, a matter of real concern

9    generally in our society.  It was for a very long duration,

10   longer than any of the recorded case law indicates.  It

11   involved harboring someone who is accused of the most serious

12   crimes imaginable, and for those reasons the guideline pushed

13   up.  But even if the guideline had not pushed up, this is a

14   serious offense and there is no ignoring that, and it would be

15   promoting disrespect for the law not to impose a serious

16   sentence for that.

17           The flip side of that first issue is the nature and

18   characteristics of the defendant, and I will step back from the

19   acts involved here for a moment.

20           The defendant is an individual who is educated,

21   composed, capable; in short, a person who can make her own

22   choices, and the recurrence to a kind of "chick lit" or sexist

23   narrative that says this is a story about a woman who liked bad

24   men and that was a bad choice does not capture it.  The

25   defendant is a person capable of making her own choices and had

1    a long time to make those choices.  That is what "duration"

2    means to me in this context.

3         Nevertheless, I do not, of course, countenance the

4    crudity that was used in the statements of victims, but more

5    than that, it is apparent that the defendant has strong

6    qualities in her associations with others and in her conduct

7    apart from her relationship to Mr. Bulger.  But, having stepped

8    back from it, it is her relationship with Mr. Bulger and her

9    choice to make that relationship with Mr. Bulger and to

10   continue that relationship with Mr. Bulger that is the critical

11   factor here.

12        So, then I turn to the question of what we call

13   "deterrence."  Well, deterrence breaks into two parts.  The

14   first part is specific deterrence:  how do we keep Ms. Greig

15   from doing this again?  It is not ironic to say that I do not

16   think that this is going to happen again, that she would be led

17   to this.  But there is general deterrence.  That is, what do we

18   say to other people who might consider a relationship like this

19   and continue in a relationship like this in which what is

20   involved is enabling someone accused of the most serious crimes

21   to stay at large for an extended period of time and involves

22   other violations of federal law:  identity theft or fraud,

23   whatever label you put on the nature of offense?

24        This is really critical to a society that has all

25   sorts of opportunities for losing privacy to have identity

1    taken away.  Now, the identity was taken away by paying for it,

2    somebody who was willing to do it.  In fact, as I mentioned,

3    the individual who was at the source, I believe, of Count

4    Three, said nothing bad happened as a result of that.  They

5    were vulnerable people in a colloquial way, colloquial sense,

6    although, as I have indicated, I did not find them to be so in

7    the precise terms of the *Guidelines*.  But it is critically

8    important, I think, to impose a sentence that is exemplary to

9    tell others who might be in Ms. Greig's position, considering a

10   relationship and continued relationship with a fugitive felon

11   that you will pay for it.

12          Now, one could say it has already been paid for in a

13   life of 16 years of what appears to be extended banality and

14   concern in looking over your shoulder.  That, perhaps, is the

15   banality of *this* evil, but there has to be a price imposed, I

16   believe, to serve general deterrence.

17          I then turn to the question of role in the prison,

18   which is generally put in terms of will prison interfere with

19   somebody's development, either educationally or vocationally;

20   is there something the prison can do?  It is not that the

21   prison is there to provide assistance to people, and no one

22   would ever send or should ever send anybody to prison to give

23   them job training or to help them out, but I look at the

24   question of what does prison mean here?

25          Well, in an odd sort of way, for a person like

1  Ms. Greig it means the opportunity in a constrained setting to

2  demonstrate the personal qualities that Mr. Reddington made

3  reference to, association with other people who may be

4  vulnerable.  But ultimately the question is one for her, like

5  all of these questions are, what she is going to make of it.

6        I look at the question of disparity in sentences.

7  Well, the Government quite properly points out that there has

8  not been a harboring case like this; at least, I have not been

9  able to find one, and the Government has not either.  So,

10  disparity, that is, how do I compare someone else who has done

11  something like this to the sentence to be imposed on Ms. Greig?

12  There are not comparators to be applied.

13        What it ultimately comes down to is imposing a

14  sentence for deliberate choices that someone made that are

15  harmful to the community, and these were choices Ms. Greig did

16  not have to make and choices that she could choose to abandon,

17  and she did not do it.

18        Now, laced through this is a kind of sense of loyalty

19  and stand-up quality.  It is benighted.  Someone is responsible

20  for their own acts, and if they involve themselves with someone

21  who has a small arsenal of weapons and does not leave him, at a

22  minimum leave him, is responsible for a great deal.

23        I make the sentence solely on the basis of the conduct

24  of Ms. Greig, but I recognize that other defendants have

25  received benefit from cooperation.  That is not on the table

1    now, but it is a way for Ms. Greig to demonstrate that she has

2    abandoned bad choices, and there is a mechanism for that to be

3    effectuated.  But the sentence is not for failure to cooperate;

4    it simply recognizes that she has not.

5           I have given this a great deal of thought, as all of

6    us have.  I did not know what the *Sentencing Guidelines* would

7    be finally until we had argument and I had an opportunity to

8    listen to counsel.  I had some rough sense, having been

9    involved in the criminal justice system for some years, of what

10   I would think a proper sentence would be, and I find on this

11   occasion that they coincide for me.

12          I am going to impose a sentence of 96 months'

13   incarceration.  That is 8 years.

14          I am going to impose a fine of $150,000.  It is

15   apparent that there are available assets to Ms. Greig from

16   which that fine can be paid.  I am going to require that fine

17   be paid in a lump sum no later than 60 days from today.  To the

18   degree it is not, the interest will start to run on that.

19   There will be an obligation under the prison financial

20   responsibility program to pay it, and when we get to supervised

21   release there will be an obligation to pay it as a condition of

22   supervised release.

23          There is a period of supervised release of 3 years

24   that I will impose.  I will get back to that in just a moment.

25   And there is an obligation that she pay a Special Assessment

1   for each of the three counts of $100 for each of the counts, a

2   total of $300.

3       Turning to the question of supervised release, in

4   addition to the standard conditions of supervised release, she

5   is obligated not to commit another federal, state or local

6   crime or illegally possess a controlled substance.  There does

7   not appear to be substance abuse in the record and, as a

8   consequence, I am not going to impose drug testing; I will

9   waive that.  I will, however, require Ms. Greig to submit to

10  the collection of a DNA sample as directed by the Probation

11  Office.

12      She is obligated not to possess a firearm or other

13  dangerous weapon.

14      She is obligated to use her true name, and she is

15  prohibited from the use of any false identifying information,

16  and that includes but it is not limited to, aliases, false

17  dates of birth, false Social Security numbers or incorrect

18  places of birth.

19      I have indicated that she is obligated to pay the fine

20  in a lump sum no later than 60 days from today.  To the degree

21  that she does not, interest begins to run on that, and,

22  ultimately, if it is not paid, it will be paid according to a

23  schedule that is created by the Probation Office and approved

24  by me.

25      But, as I have indicated, even with some disputes over

1   assets and what she actually has an interest in, it is clear to

2   me that there is sufficient assets to pay this fine.  Until

3   that fine is paid, she is prohibited from incurring any new

4   credit charges or opening additional lines of credit without

5   the approval of the Probation Office, and she is obligated to

6   provide the Probation Office with any requested financial

7   information, and that, of course, can be shared with and will

8   be shared, I am sure, with the United States Attorney's Office,

9   the Financial Litigation Unit of the United States Attorney's

10  Office.

11          I have given some thought to aspects of community

12  service.  I think, given the defendant's age and particularly

13  the age at which she would be released from prison, that is

14  simply inappropriate under these circumstances.

15          I think I have made clear that I do not countenance

16  the way in which people spoke to you today, Ms. Greig.  The

17  purpose of the criminal justice system is fairness, dispassion

18  and balance, and much of the commentary was none of that.  But

19  there is a harder lesson involved, apart from acts of cruelty

20  towards you, and that is we are all responsible for what we do.

21  We all make choices, and when those choices undermine the

22  fabric of our society in the way in which harboring the way you

23  did Mr. Bulger works out, then there is a price to be paid, and

24  the price is the one that I have indicated here.

25          You should understand that you have a right of appeal,

1   and you will discuss with your counsel whether that makes sense

2   under these circumstances.  Are there other conditions that the

3   parties would have me impose?

4          MR. PIROZZOLO:  Yes, your Honor, just a housekeeping

5   matter.  With respect to the forfeiture, the Government would

6   ask that the forfeiture order be included in the oral

7   pronouncement and in the written judgment --

8          THE COURT:  It will, and to the degree that the events

9   today have not included it as a matter of the oral

10  pronouncement, I am imposing what is imposed by the Preliminary

11  Order of Forfeiture as part of the judgment in this case.

12         MR. PIROZZOLO:  And, again, I think you said this at

13  the beginning, but with respect to the objections, the

14  Government still preserves --

15         THE COURT:  I understand that the parties adhere to

16  their objections, that they have not waived anything that has

17  been argued to me either in their submissions or orally today.

18         MR. PIROZZOLO:  And to the extent the sentence is

19  different from the Government's position, the Government

20  reserves its right to object as well.

21         THE COURT:  My understanding is that, even when

22  waivers of appeal are permitted in courts by some judges, the

23  Government always has a right of appeal, even if the defendant

24  does not.  Certainly here both sides have the right of appeal.

25         MR. PIROZZOLO:  Thank you, your Honor.

1          THE COURT:  Mr. Reddington, anything additional?

2          MR. REDDINGTON:  No, your Honor.  Thank you.

3          THE COURT:  Ms. Victoria, anything?

4          THE PROBATION OFFICER:  No, your Honor.

5          THE COURT:  We will be in recess.

6          THE CLERK:  All rise.

7     (The Honorable Court exited the courtroom at 1:55 p.m.)

8          (WHEREUPON, the proceedings adjourned at 1:55 p.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

        I, Brenda K. Hancock, RMR, CRR and Official Reporter of the United States District Court, do hereby certify that the foregoing transcript constitutes, to the best of my skill and ability, a true and accurate transcription of my stenotype notes taken in the matter of *United States v. Catherine Greig*, No. 1:11-cr-10286-DPW.

Date: September 4, 2012      */s/ Brenda K. Hancock*

                                  Brenda K. Hancock, RMR, CRR

                                  Official Court Reporter