# United States Court of Appeals
## For the First Circuit

───────────────

No. 12-1752

UNITED STATES,

Appellee,

v.

CATHERINE E. GREIG,

Defendant, Appellant.

───────────────

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

───────────────

Before

Thompson, Circuit Judge,
Souter, Associate Justice,*
and Stahl, Circuit Judge.

───────────────

Dana A. Curhan for appellant.
Jack W. Pirozzolo, First Assistant United States Attorney,
with whom Carmen M. Ortiz, United States Attorney, and James D.
Herbert and Mary B. Murrane, Assistant United States Attorneys,
were on brief, for appellee.

───────────────

May 17, 2013

───────────────

───────────

* The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

THOMPSON, <u>Circuit Judge</u>.  Catherine Greig was sentenced
to eight years behind bars after she pled guilty to various crimes
committed during her sixteen years on the run with her long-time
love and wanted fugitive, James "Whitey" Bulger.  Greig takes issue
with the sentence handed down, claiming a variety of errors on the
district court's part.  After carefully considering the matter, we
see no basis for disturbing the court's decision and affirm her
sentence.

## BACKGROUND

### A. How Things Started

In 1994, Bulger, a reputed organized crime leader in
Boston, Massachusetts, learned that he was soon going to be charged
with an assortment of federal crimes.  Faced with this prospect, he
fled the Boston area with another longtime girlfriend (not Greig).
On January 4, 1995, Bulger and one of his criminal affiliates,
Stephen Flemmi, were charged with felony extortion.  Flemmi was
arrested but Bulger was long gone.  Another criminal associate of
Bulger's went to Greig and told her about Flemmi's arrest and also
let her know that law enforcement was hunting for Bulger.  The next
day, officers went to Greig's home in Quincy, Massachusetts looking
for Bulger, but Greig refused to talk or to let the officers in.
A multi-count superseding federal indictment was handed down a few
days later, charging Bulger with extortion and violations of the

-2-

Racketeer Influenced and Corrupt Organizations Act ("RICO"), among other things.  Another warrant for Bulger issued.

### B. Greig Goes on the Run

A few weeks later, Bulger got word to Greig that he was coming back to Boston and he wanted her to accompany him on his flight from law enforcement.  Greig was on board.  After dropping her dogs and car with a family member, Greig, with the help of one of Bulger's criminal associates, went to a prearranged location to meet Bulger.  Greig got in Bulger's car and the pair left town.

For a year or so, the duo traveled to various locations in the United States, including cities in New York, Louisiana, and Illinois.  Initially Bulger traveled under the alias Thomas Baxter, a real individual who had died some years earlier and whose identifying information Bulger had somehow secured before he fled.  Greig posed as "Mrs. Baxter."  But when Bulger learned that the Baxter alias had been compromised, he had to make some changes.  A criminal associate of Bulger's headed out to Chicago, where he and Greig were holed up at the time, and took pictures of Bulger to create false identification documents.  Greig, who was there for the photo shoot, understood why the pictures were being taken.  After that, Bulger and Greig became Mark and Carol Shapeton and they continued their travel about the country.

## C. Settling in California

Sometime in 1995 or 1996, Bulger and Greig headed to Santa Monica, California, a location Bulger settled on in part because of its large homeless and transient population. They began renting a two-bedroom apartment, which they lived in until their 2011 capture. They rented the apartment under the names Charles and Carol Gasko, claiming to be a married couple from Chicago. Charles Gasko was a slight variation on the name of a real-life individual (a homeless man from the Santa Monica area whom Bulger targeted) whose identifying documents, including social security card, Bulger had obtained. Bulger paid another Santa Monica homeless man - this one bore a resemblance to him - for his license, and he used this as well. Greig, at times, used this second homeless man's last name, portraying herself as the wife.

While in Santa Monica, Bulger and Greig used these aliases, as well as other alias identities of both real and fictitious people. Greig was present when Bulger purchased identifications from at least two individuals. The first was a man whom Bulger and Greig struck up a conversation with in a Santa Monica park. Bulger bought the man's driver's license, social security card, and Sam's Club card. The second was a transient woman whom Bulger and Greig approached on Venice Beach. Greig convinced the woman that she was Canadian and that she needed the woman's documents to remain in the United States. Greig ended up

with this woman's social security card, birth certificate, and judicial name change order. Greig also possessed the identifying information, including social security number, of a Santa Monica homeless woman, though it is unknown how Greig ended up with this information.

As far as day-to-day life for Bulger and Greig, things were relatively quiet. Neither worked and they lived off a significant amount of cash they had hidden in the apartment. Bulger tried to stay indoors as much as possible and the day-to-day household tasks fell to Greig. She used the squirreled away cash to pay the rent and utilities, and she did the grocery and other necessary shopping. To conceal her and Bulger's true identities, Greig told false stories to the people she met in Santa Monica.

While in Santa Monica, Greig also helped Bulger get the medical and dental care he needed. She obtained prescription medications for Bulger by pretending to be his wife and signing the name of one of his real-person aliases. She also attended appointments with Bulger, where he used the identity he had acquired from the homeless man he resembled. At these appointments, Greig helped Bulger to keep his temper, which he sometimes lost with the medical staff. Greig herself required some medical care and she used her aliases to obtain it, giving medical providers false identification documents and fake social security

numbers.  She used multiple false identities to fill out forms to obtain medical services.

During their time in Santa Monica, Bulger acquired a variety of weapons, including firearms that were secreted away in the apartment, many hidden in the walls.  He also kept up with the goings-on back in Boston.  He and Greig learned that a grand jury had indicted Bulger on another multi-count superseding indictment in September 2000, this one alleging nineteen murders as predicate acts for more RICO violations.  They knew law enforcement was looking for Bulger to arrest him on this and the earlier indictment.  The duo was also aware of a publicity initiative by the FBI (the push was made sometime around 2011) focusing on Greig. After seeing this campaign, Bulger confided in Greig that he thought their time on the run was up.

### D. The Arrests

Sure enough, Bulger was right.  Law enforcement finally caught up with the pair, sixteen years after they had gone on the run.  Bulger and Greig were arrested in Santa Monica on June 22, 2011.  Based on a criminal complaint for harboring a fugitive, an arrest warrant for Greig had issued back in 1997.  As we said, Bulger, for his part, had a couple of significant indictments pending against him.  The pair was brought back to Massachusetts.

Meanwhile, law enforcement agents descended on the Santa Monica apartment.  There they found $822,000 in cash, most of it

-6-

hidden in the walls. Agents also found approximately thirty weapons, most of them firearms. Many of these were hidden in the walls, on which plaster repair marks (not made by building maintenance) were plainly visible. Other weapons were on a bookshelf or under the bed in a bedroom that appeared to be principally used by Bulger. This included a handgun in plain view on the bookshelf. Agents also discovered in Bulger's bedroom multiple books, that others had penned about Bulger's life of crime, as well a manuscript Bulger had written about his own life.

### E. Greig's Plea and Sentencing

In August 2011, a federal grand jury handed down an indictment charging Greig with one count of conspiring to harbor a fugitive. Pursuant to a plea agreement, the government filed a three count superseding information on March 12, 2012 charging Greig with: conspiracy to harbor a fugitive, 18 U.S.C. §§ 371, 1071; conspiracy to commit identity fraud, id. § 1028(f); and identity fraud, id. § 1028(a)(7). Greig pled guilty to the superseding information.

Greig's sentencing took place on June 12, 2012. Her three counts of conviction fell into two groups - group 1 was the conspiracy to harbor count and group 2 was comprised of the two identity fraud counts. Utilizing the United States Sentencing Guidelines ("Guidelines"), the judge calculated the adjusted offense level for group 1 to be 32. This level was based on the

crimes alleged in Bulger's two indictments (the most serious being RICO murder) as the underlying offenses, which resulted in a base offense level of 30 pursuant to the accessory after the fact guideline applicable to the harboring conspiracy count.  U.S.S.G. § 2X3.1.  The court then applied a two-level increase for obstruction of justice.  Id. § 3C1.1.

The judge put Greig's adjusted offense level for group 2 at 16.  This number was reached by applying the offenses involving fraud guideline, id. § 2B1.1(a)(2), which assigned a base offense level of 6, and then enhancing that to 12 for unlawfully producing means of identification from another means of identification, id. § 2B1.1(b)(11)(C)(ii), and for relocating a scheme to avoid detection or otherwise engaging in a scheme using sophisticated means, id. § 2B1.1(b)(10)(A), (b)(10)(C).  The court then upped Greig's offense level to 14 for possession of a dangerous weapon in connection with the offense.  Id. § 2B1.1(b)(14)(B).  A two-level enhancement for obstruction of justice, id. § 3C1.1, took Greig to the final offense level of 16.

Applying the rules of U.S.S.G. § 3D1.4 for determining the combined offense level, the judge took the higher group offense level of 32 (from group 1), which the court did not enhance by any levels because group 2 was more than 8 offense levels below group 1.  The court then applied a three-level decrease for Greig's acceptance of responsibility.  Id. § 3E1.1.  This brought the final

-8-

combined offense level to 29, which resulted in a Guidelines range
of 87 to 108 months.

After the judge made his calculation, the parties made
their sentencing recommendations.  The court also heard from five
individuals who were family members of Bulger's alleged victims,[1]
one of whom was also a former family member of Greig's.  The judge
then handed down the sentence.  He sentenced Greig to 96 months
(eight years) in prison, three years of supervised release, and
imposed a fine of $150,000.

## DISCUSSION

Greig appeals her sentence.  In sum, she claims that the
court erroneously calculated her base offense level on the
conspiracy to harbor a fugitive count, incorrectly applied the
firearm enhancement, wrongly utilized an obstruction of justice
enhancement, and erred in allowing the family members to speak.

Her first three arguments, all challenges to the court's
Guidelines calculation, call for de novo review.  See United States
v. Murdock, 699 F.3d 665, 671 (1st Cir. 2012); United States v.
Thomas, 635 F.3d 13, 16 (1st Cir. 2011).  The factual findings
underlying the court's determination, however, are reviewed only

---

[1] Four of the individuals who spoke had family members who
were allegedly murdered by Bulger.  The fifth was a man who owned
a South Boston liquor store that Bulger is accused of taking by
coercion.  The parties collectively refer to these individuals as
family members of Bulger's alleged victims, and although the fifth
individual does not technically fall under that umbrella, we too
will use that collective designation for ease of reference.

for clear error. <u>Murdock</u>, 699 F.3d at 671; <u>Thomas</u>, 635 F.3d at 16. We give due deference to the court's application of the guidelines to the facts. <u>United States</u> v. <u>Carrero-Hernández</u>, 643 F.3d 344, 349 (1st Cir. 2011).

Greig's final argument, regarding the family members' elocutions, amounts to a claim that the sentencing court improperly considered certain information. We review such a challenge for abuse of discretion.[2] <u>United States</u> v. <u>Vargas-Dávila</u>, 649 F.3d 129, 130 (1st Cir. 2011).

## A. Conspiracy to Harbor Base Offense Level

As we said, the sentencing judge calculated Greig's base offense level for the conspiracy to harbor a fugitive count (before he applied the obstruction of justice enhancement) to be 30. Greig argues that this number should have been 20; her theory goes like so. The accessory after the fact guideline has a couple of built-in exceptions. U.S.S.G. § 2X3.1. One provides, in relevant part, that "[i]n any case in which the conduct is limited to harboring a

---

[2] Greig advocates for the abuse of discretion standard. However, the government, even though Greig objected below to the individuals speaking, urges us to apply the more stringent plain error standard of review applicable to unpreserved claims. It contends that Greig's argument to the district court - that the family members did not have a right to speak under the Crime Victims Rights Act - is not quite the same as her argument here - that the district court abused the discretion it had outside the Act to allow the family members to speak. Because these arguments are similar, because Greig did object to the family members speaking, and because in the end Greig's challenge would fail under either standard, we apply the abuse of discretion standard.

fugitive . . . the base offense level under this guideline shall not be more than 20." Id. § 2X3.1(a)(3)(B). Greig, as she did below, argues that she did nothing more than harbor Bulger, warranting the cap's application.[3]

The district judge did not buy her argument; he agreed with the government that Greig's conduct was not so limited. The judge primarily focused on the fact that Greig committed other crimes besides harboring, namely identity fraud. He also noted that Greig provided Bulger with "a variety of things," over and above mere shelter. The judge referenced the length of the pair's time on the run, the heinous nature of the crimes Bulger is accused of committing, Greig's capacity to make her own choices, and the fact that a less serious sentence would promote disrespect for the law. The record provides a good deal of support for this refusal to cap Greig's base level at 20.

First, Greig committed, and pled guilty to, other crimes in addition to harboring - conspiracy to commit identity fraud and identity fraud. Her argument that these offenses were committed in

---

[3] Greig also makes a passing argument that sounds like a challenge to the substantive reasonableness of her sentence. She contends her eight year sentence is "unconscionable" and "cannot be reconciled with justice and due process" given that Bulger's criminal associate Kevin Weeks, who helped orchestrate his flight, received a four and a half year sentence and another associate who was involved in multiple murders, John Martorano, was sentenced to ten and a half to eleven years. This is the extent of Greig's argument. No legal authority or reasoning is offered. Greig's perfunctory treatment waives her argument. See Aponte v. Holder, 683 F.3d 6, 10 n.2 (1st Cir. 2012).

furtherance of the harboring charge and therefore should not count against her for purposes of this inquiry has no legal support and is undercut by our case law.  In United States v. Vega-Coreano, this court affirmed the district court's refusal to cap a defendant's sentence pursuant to § 2X3.1(a)(3)(B).  229 F.3d 288, 289-90 (1st Cir. 2000).  The defendant in that case pled guilty to being an accessory after the fact to a robbery; her conduct included escorting one of the robbers out of the house, helping him hide his spoils after the robbery by retrieving a key for him, advising a third party that the money had been counted successfully, and using a false name to obtain hotel rooms for the robbers to use as a hideout.  Id.  Discerning no clear error, the court found that this conduct "amply support[ed]" the district court's view that the defendant did more than "giv[e] shelter to fugitives."  Id. at 290.

Thus, the inquiry here is not, as Greig frames it, whether her additional crimes were solely done in furtherance of the harboring, but rather it is whether, as this court described it in Vega-Coreano, Greig did more than give Bulger shelter.  See id. at 290; see also United States v. Jackson, No. 96-10003, 1996 WL 762917, at *1 (5th Cir. Dec. 19, 1996) (framing the inquiry as whether the defendant "did more than merely house the fugitive").  Here, not only do we have the identity fraud crimes (which facilitated the pair avoiding capture for many years) that Greig

-12-

pled guilty to, but she also did the following.  Greig traveled with Bulger across the country for an extended period of time, using false identities and helping Bulger perpetuate his aliases. She then settled with him in California, where the two remained for a whopping fifteen years or so.  During this time, Greig did not just provide Bulger with shelter, rather she saw to his day-to-day needs, ran errands, maintained the house, paid the bills, and helped him procure medical treatment and needed medications.  Her handling of these tasks undoubtedly helped Bulger keep his public outings to a minimum, thus reducing his risk of detection.  When Bulger did have to go out and about, Greig kept the ruse going, assuming a false identity herself and helping Bulger carry on with his.

In light of this conduct, which extended well over a decade, the district court did not err in finding that Greig's conduct was not limited to harboring Bulger and refusing to cap her offense level accordingly.  See, e.g., Vega-Coreano 229 F.3d at 290 (finding the defendant's conduct, which we detailed above, sufficient to constitute more than harboring); Jackson, 1996 WL 762917, at *1 (affirming the district court's finding that the defendant, who lied to law enforcement about the fugitive's whereabouts and received a box of stolen money from the fugitive, did more than simply harbor).  There is no merit to Greig's first argument.  We move on to her next.

### B. Firearm Enhancement

The sentencing judge, at the government's urging, applied to the group 2 counts a two-level firearm enhancement, which is warranted if the offense involved "possession of a dangerous weapon (including a firearm) in connection with the offense." U.S.S.G. § 2B1.1(b)(14)(B). The judge found that Greig "knew that there were lots of weapons" in the apartment and that she was "fully knowledgeable" that those weapons were there, at least in part, "for preventing apprehension." The question for us to answer is whether this finding is clearly erroneous. The government thinks the answer is no but Greig claims otherwise. She says that there was not enough evidence to establish that she knew about the guns or that it was reasonably foreseeable to her that Bulger would possess weapons in furtherance of his flight from the law.

To warrant the enhancement, the defendant does not need to have possessed the weapon herself or even to have known about it, it just must be reasonably foreseeable that a co-conspirator would possess a weapon in furtherance of the criminal activity. See United States v. Flores-De-Jesús, 569 F.3d 8, 36 (1st Cir. 2009) (considering the application of U.S.S.G. § 2D1.1(b)(1), the dangerous weapons enhancement for narcotics violations); United States v. Casas, 356 F.3d 104, 129 (1st Cir. 2004) (same). Here there was plenty of evidence on the record to support the district judge's findings.

-14-

There were thirty weapons, mostly firearms, in Greig and Bulger's two-bedroom apartment - a modest sized apartment that Greig lived in for about fifteen years. Many of the weapons were hidden in the walls, as was the pair's money that Greig used for day-to-day needs. The walls had visible plaster repair marks on them, which the building manager informed law enforcement were not the result of work done by building maintenance. The largest stash of weapons and cash was found in the wall behind a mirror in a common area of the apartment. Other weapons were out in the open or under the bed in Bulger's bedroom. Traces performed by law enforcement revealed that most of the weapons were obtained while Greig and Bulger were in Santa Monica. Finally, Greig kept a notebook that listed items next to the notation "Home Depot," which included dust face masks, ear plugs, and safety glasses. She also made home repair type notations such as "hacksaw - cuts metal plaster." Greig, generally, was the one who went out and purchased the supplies needed for the home.

All of the above evidence was more than sufficient to support the district court's finding that Greig knew about the weapons in the home. There was no clear error. By this same token, the court did not err in finding that Greig would have known that the weapons were for avoiding apprehension. Greig was fully aware that Bulger was wanted for very serious and violent crimes, some involving murder with guns. And she spent sixteen years

working to keep Bulger and herself hidden, using false aliases and committing identity fraud. The pair went to extraordinary lengths to avoid detection and it was not obviously wrong for the judge to find it foreseeable to Greig that Bulger would possess a weapon in furtherance of the underlying conspiracy. We find no error in the application of the § 2B1.1(b)(14)(B) enhancement.

### C. Obstruction of Justice Enhancement

The two-level obstruction of justice enhancement applied by the district court was based on statements Greig made shortly after her arrest during an interview with a pretrial services officer in California who was conducting a bail investigation. The first was Greig's denial that there were any weapons or cash in the Santa Monica apartment, and of course it was later determined that there was a good deal of both. The second was Greig's claim that she did not have any assets in her name at the time of her arrest. However, Greig in actuality had a six-figure Eastern Bank account and owned a home in Quincy, Massachusetts, with no mortgage on it, worth $300,000 (this figure came from a July 2011 appraisal). She did not tell pretrial services about either of these assets. But a few weeks after talking to them, and four days before her July 13, 2011 detention hearing, Greig executed a durable power of attorney in favor of her sister. The following December, the sister withdrew the entire Eastern Bank account balance, which was

-16-

$134,545.49 at the time.[4] Also, in her opposition to the government's motion for pretrial detention, filed with the court just a couple weeks after her arrest, Greig mentioned the Quincy house.

Eventually, the government figured out that both of the assets existed, and Greig did not try to deny it. Rather, at sentencing, Greig claimed to have believed that, given the passage of time and her inactivity, the bank account and house were somehow gone. Greig also continued to protest her knowledge of the weapons and cash in the apartment. The judge did not buy it. He applied the obstruction of justice enhancement, finding that although the bail hearing ultimately revealed a "more sophisticated" understanding of Greig's financial condition, it was "critically important" that Greig lied about having any assets at the outset. The judge could not conceive that someone would forget about owning such valuable property or think that it disappeared into thin air. He concluded that this was a "material" misrepresentation made at the outset of the case. Coupling this lie with Greig's denial of the weapons and cash, the court ratcheted up her base offense level by 2.

---

[4] It does not appear that Greig ever alerted the court to the existence of the bank account. Rather, it was the government that informed the court that Greig had a bank account that she failed to disclose. This revelation was made in the government's opposition to Greig's request for pretrial release, submitted on November 22, 2011.

On appeal, Greig focuses on her misrepresentation regarding her assets. She argues that there is no evidence that her statement was intentionally false. Greig continues to claim it was all an honest mistake; after sixteen years of not paying taxes or expenses on the home, she assumed it had been taken, and after sixteen years of inactivity on the bank account, she assumed it had been lost to escheat. She adds that even if she had known about the bank account, it had a freeze on it, so she could not have accessed the money anyway. The second part of Greig's theory is that her misrepresentation was not material.

The Guidelines provide for a two-level enhancement if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and that obstructive conduct related to the "offense of conviction and any relevant conduct" or "a closely related offense." U.S.S.G. § 3C1.1. This obstruction of justice enhancement is "warranted when a defendant provides materially false information to a pretrial services officer who is conducting a bail investigation." United States v. Restrepo, 53 F.3d 396, 397 (1st Cir. 1995).

We start with the falsity of Greig's statements. Greig is certainly right that not all false or inaccurate statements constitute a willful attempt to obstruct justice; rather, courts

-18-

have to account for statements that might just stem from
"confusion, mistake, or faulty memory." U.S.S.G. § 3C1.1, cmt. 2.
However, there is no evidence in the record (just her attorney's
assertions) to support Greig's honest mistake theory.    In
particular, there is no evidence that taxes and expenses were not
paid on the Quincy house, that a freeze on the bank account would
result in Greig not being able to access it, or that inactivity on
her bank account would cause the money to disappear.  Further, with
respect to the bank account, Greig, after her statements to
pretrial services, executed a power of attorney in favor of her
sister and her sister emptied out the account.    There is no
evidence in the record explaining how Greig came to the sudden
epiphany that she had, and could access, this bank account.  Along
these same lines, there is no evidence to shed any light on how
Greig figured out that she still owned the Quincy house such that
she was able to reference it in her later quest for pretrial
release.

Based on these facts, the sentencing judge was well
within his right to find the statements to pretrial services
intentionally false.  Plus, even assuming it is plausible that
Greig did not intentionally lie, the factfinder's choice between
two permissible inferences cannot be clearly erroneous.  See United
States v. Villarman-Oviedo, 325 F.3d 1, 16 (1st Cir. 2003); United
States v. Balsam, 203 F.3d 72, 89 (1st Cir. 2000).  And here the

-19-

record contained ample support for a finding that Greig intentionally withheld from pretrial services the fact that she had these assets.

Greig's gripe that the judge erred in finding the statements material is also without merit. In particular, her view that her representations were not material to her investigation, prosecution, or sentencing is too narrow. The term "material," in this context, refers to a fact, statement, or information that "if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, cmt. 6; see United States v. Pineda, 981 F.2d 569, 574 (1st Cir. 1992). Sentencing judges enjoy "broad discretion in deciding whether a falsehood is material." United States v. Biyaga, 9 F.3d 204, 205 (1st Cir. 1993). The test for materiality under the obstruction of justice enhancement is not a stringent one, and a sentencing judge's materiality finding is reviewed only for clear error. United States v. Feldman, 83 F.3d 9, 13 (1st Cir. 1996).

Greig has not met her heavy burden of challenging the district court's materiality finding. The court focused on the effect of Greig's misrepresentations on bail. This was not clearly erroneous. Greig's financial condition is certainly material to the issue of bail, and the advisability of her pretrial release in general, especially given that Greig ultimately sought release

based on financial conditions.[5]    See, e.g., United States v. Patriarca, 948 F.2d 789, 794-95 (1st Cir. 1991) (holding that "some exploration of a defendant's assets or net worth" is necessary when a court imposes a forfeiture condition on a defendant's pretrial release).  Greig's omitting the fact that she had a home and large bank account would tend to affect the issues being determined by pretrial services.  The judge did not abuse his considerable discretion.

We reject Greig's assignment of error.  The obstruction of justice enhancement was properly applied.

### D. Allowing the Family Members to Speak

This takes us to Greig's final claim of error, which is a little different from her first three.  It is not a challenge to the court's sentence calculation; rather, she takes umbrage with the judge's decision to allow family members of Bulger's alleged victims to speak at her sentencing hearing.  The parties went back and forth on this issue prior to sentencing, briefing (at the court's request) the issue of whether the family members had the

_____

[5] Greig opposed the government's motion for pretrial detention and then sought to be released on secured bond.  The court considered the value of Greig's assets (at that time she had only revealed the existence of the Quincy home) when it denied her request.

-21-

right to speak under the Crime Victims Rights Act (CVRA), 18 U.S.C.
§ 3771.[6]

The judge sided with Greig, finding that the family
members had no right to speak under the CVRA[7] and he explained his
conclusion at Greig's sentencing.  In essence, the judge found that
the family members suffered at the hands of Bulger rather than
Greig, and that their relationship to Greig was too attenuated to
fit within the parameters of the CVRA.  Greig, naturally, is on
board with this conclusion but she and the judge part ways on the
next point.  The judge went on to say that even though the family
members did not have a right to speak under the CVRA, he was going
to allow them to do so as a matter of discretion.  The judge
theorized that it was the "right thing" to do and that it was
important, both for the family members and the community, that the
former be allowed to express themselves.  The judge also cited the
court's "independent responsibility to ensure that the community
feels that justice has been done."  After the judge explained all

_____

[6] The CVRA affords a crime victim, defined as "a person
directly and proximately harmed as a result of the commission of a
Federal offense or an offense in the District of Columbia," a
variety of rights including the "right to be reasonably heard" at
public court proceedings involving release, plea, sentencing or
parole.  18 U.S.C. § 3771(a)(4), (e).

[7] The government is still of the same position it took below,
that the family members had the right to speak under the CVRA.
However, it is not pursuing this issue on appeal.  It focuses
instead on the idea that the court acted within its discretion in
allowing the individuals to speak.

of this, the five impacted individuals each made a brief statement (more on what they said later).

To this court, Greig argues that the judge abused his discretion by allowing the family members to speak. She does not dispute that sentencing judges have discretion to consider a variety of information in fashioning a sentence, rather Greig says that the family members' statements strayed beyond her own conduct and character and therefore should not have been considered.

We start with some guiding principles. 18 U.S.C. § 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence." It has long been recognized that "sentencing judges 'exercise a wide discretion' in the types of evidence they may consider" and "'[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information concerning the defendant's life and characteristics.'" Pepper v. United States, 131 S. Ct. 1229, 1235 (2011) (alterations in original) (quoting Williams v. New York, 337 U.S. 241, 246-47 (1949)); see United States v. Rivera-Rodríguez, 489 F.3d 48, 53 (1st Cir. 2007).

We turn to what was said. One of the family members, Timothy Connors, whose father Bulger is accused of murdering,

explained how Greig's conduct of hiding and protecting Bulger negatively impacted his family who hoped to see his father's killer brought to justice.  He also spoke of Greig's lack of sympathy for his family.  Steven Davis, whose sister was allegedly killed by Bulger, spoke about how Greig's assistance to Bulger resulted in his mother not living long enough to see his sister's killer caught.  Another family member, Patricia Donahue, whose husband was killed, spoke about Greig's role as Bulger's companion and caretaker and how this impacted Donahue's and her children's lives.  Paul McGonagle, whose uncle Greig was once married to and whose father Bulger is charged with murdering, also spoke.  He spoke about the personal relationship he had with Greig and how his family felt betrayed by their one-time relation's decision to hide Bulger.

The above information from the family members' statements was relevant to Greig's "background, character, and conduct."  18 U.S.C. § 3661.  The individuals spoke about what she had done, its effect on them and others, and her character.  These statements were particularly relevant given that Greig submitted a letter penned by her sister, which spoke of Greig's upbringing and background and her caring and kind nature.  And when two of the family members made particularly harsh statements,[8] the district

---

[8] One called Greig a "dirty bitch" and another, referring to Greig's brother who committed suicide, said "if I had a sister like you, I would have killed myself, too."

-24-

judge disclaimed reliance on those comments, making clear that he did not countenance such language and that it had no part in the criminal justice system. It is evident that the judge considered only information that was relevant to Greig and that he ignored any extraneous or inappropriate comments. Furthermore, Greig had plenty of notice that the family members might speak. The court specifically asked the parties to address whether the family members should be allowed to speak a few months before her sentencing, and the parties did so. Two of the family members also spoke at Greig's detention hearing, and one of those at her plea hearing as well, expressing similar sentiments to those expressed at sentencing. Greig's advance knowledge that these individuals would speak at sentencing, and of what they would say, obviates any notice concerns that often crop up in challenges to evidence relied on at sentencing. See, e.g., United States v. Berzon, 941 F.2d 8, 21 (1st Cir. 1991) (emphasizing that the sentencing court needed to timely advise the defendant of information it was taking into account at sentencing).

Against this backdrop, the judge's decision to let the family members speak was not an abuse of his wide discretion. A sentencing judge gets to conduct a broad inquiry when deciding what the appropriate sentence is for the crime the defendant committed. We find no merit to Greig's challenge.

## CONCLUSION

On June 22, 2011, Greig's many years of harboring Bulger came to an end. Our consideration of her claimed errors has similarly reached its conclusion. For the foregoing reasons, Greig's sentence stands. We affirm the judgment of the district court.